**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| NETCHOICE, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| DAVE YOST, in his official capacity as Ohio Attorney General, | ) | |
| | ) | |
| *Defendant.* | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     Like other States before it, Ohio has unconstitutionally tried to limit certain minors' access to protected and valuable speech on the Internet. In so doing, moreover, Ohio seeks to restrict those minors' access to a set of websites that extends "much more broadly than traditional social media companies." Dave Yost, FAQ: What is the Parental Notification by Social Media Operators Act, https://perma.cc/EYU3-9GU8 ("Yost, FAQ"). Specifically, the Parental Notification by Social Media Operators Act ("Act") would require an arbitrary subset of websites to secure "verifiable" parental consent through a state-approved means before allowing minors under 16 to create accounts or otherwise access those services. Ohio Rev. Code § 1349.09(B)(1). The websites that the State seeks to regulate here thus join a long line of media that have faced calls for regulation based on fears that they expose minors to harmful speech —such as "dime novels," "[r]adio dramas," "movies," "comic books," "television," "music lyrics," and "video games." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-98 (2011). Just as with those other forms of protected speech, minors' "significant measure of First Amendment protection" includes the right to access the

covered websites here free from governmental restraint. *Id.* at 794 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)); *see Packingham v. North Carolina*, 582 U.S. 98, 104-05 (2017). As the Supreme Court has repeatedly made clear, the government does not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. That is precisely why courts across the country have blocked laws restricting or otherwise regulating minors' access to protected speech online. *E.g.*, *NetChoice, LLC v. Bonta*, 2023 WL 6135551 (N.D. Cal. Sept. 18, 2023); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023). This Court should likewise declare the Act here unconstitutional and enjoin Defendant from enforcing it.

2.      Plaintiff NetChoice, LLC is a leading Internet trade association. Some of its members operate some of the most popular websites, applications, and digital services[1] regulated by the Act. These websites include Dreamwidth, Facebook, Instagram, Nextdoor, Pinterest, Threads, X (formerly Twitter), and YouTube. These websites "allow users to gain access to information and communicate with one another about it on any subject that might come to mind." *Griffin*, 2023 WL 5660155, at *5 (cleaned up; quoting *Packingham*, 582 U.S. at 107). They enable the kinds of interactions across language, culture, and geography that would have been impossible just a generation ago. On these websites, users can discuss the pressing issues of the day, the timeless questions of the past, and everything in between. The websites disseminate everything from high art to pop culture, in forms that span micro-blogging to long-form documentary filmmaking. In short, on the websites covered by this Act, both minors and adults alike create and engage with a wealth of protected speech.

---

[1] This Complaint refers to websites, applications, and other digital services as "websites."

3.     Yet the Act would place a significant hurdle on some minors' ability to access and engage in speech on those websites. Under the Act, covered websites must "[o]btain verifiable consent . . . from the child's parent or legal guardian" before any minor younger than 16 agrees to "terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site." Ohio Rev. Code § 1349.09(B)(1). Covered websites must "deny . . . access" to these minors without such "verifiable consent." *Id.* § 1349.09(E).

4.     The Act violates the Constitution in at least three ways.

5.     *First*, the Act imposes blanket parental-consent requirements for minors to access and engage in all manner of protected speech across a wide swath of websites. Courts have not hesitated to invalidate similar efforts to limit the speech by and to minors. *E.g.*, *Brown*, 564 U.S. at 799 (rejecting parental-consent requirements for violent video games). Indeed, the Supreme Court has rejected the idea that the government has "the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3. Another district court therefore recently enjoined an Arkansas law imposing a similar parental-consent requirement for minors to create accounts on "social media" and similar websites. *Griffin*, 2023 WL 5660155, at *21. While the Act here, unlike the law in Arkansas, does not impose age-verification requirements on covered websites, the Act is sparse and vaguely drafted. If Defendant Ohio Attorney General relies on the Act's drafting to atextually assert that the Act requires websites to verify the ages of all users, that would exacerbate the Act's First Amendment flaws. The Supreme Court has rejected laws that require people to provide identification or personal information to access protected speech. *Ashcroft v. ACLU*, 542 U.S. 656, 673 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997). Thus, if Defendant interprets the Act to require age verification, "it is likely that many" users "who otherwise would be interested in becoming account holders on regulated [websites] will be

deterred—and their speech chilled—as a result of the age-verification requirements." *Griffin*, 2023 WL 5660155, at *17.

6.     *Second*, the First Amendment problems are heightened here because the Act is unconstitutionally both content-based and speaker-based and baldly discriminates among online operators based on the type of speech they publish. For example, the Act exempts "established and widely recognized media outlet[s], the primary purpose of which is to report news and current events." Ohio Rev. Code § 1349.09(O)(2). Yet it regulates media outlets that are not "established" or "widely recognized" and mixed-purpose outlets that cover news and current events in addition to other types of media. The Act similarly exempts websites that are limited to "[r]eviewing products offered for sale by electronic commerce." *Id.* § 1349.09(O)(1). Yet the Act would apparently apply to review functionalities not strictly limited to e-commerce (such as movie or restaurant reviews). Such content-based exceptions render the entire statute content based. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)). Similarly, the Supreme Court's precedents are "deeply skeptical of laws that distinguish among different speakers." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) ("*NIFLA*") (cleaned up). In all events, the Act's arbitrary distinctions blatantly pick and choose among burdened and favored speech, and the arbitrary judgments they reflect do not satisfy any type of constitutional scrutiny.

7.     *Third*, the Act is unconstitutionally vague. Its central coverage provision applies to websites that "target[] children, or [are] reasonably anticipated to be accessed by children." Ohio Rev. Code § 1349.09(B)(1). Websites have no way to know what this means. The Act goes on to

4

provide an eleven-factor list that Defendant and a court "may" use to determine whether a website is covered under the Act, but that list is inherently indeterminate and does nothing to solve the coverage provision's underlying vagueness. *Id.* § 1349.09(C). The First Amendment demands that lawmakers "eschew the open-ended rough-and-tumble of factors" when regulating speech. *Citizens United v. FEC*, 558 U.S. 310, 336 (2010) (cleaned up). And the Act's many content- and speaker-based exceptions rest on other vague terms—such as "established" and "widely recognized"—that will invite subjective, content-driven enforcement. The Act's substantive provisions also contain multiple undefined terms and unexplained obligations, leaving covered websites uncertain about how to comply with the Act. In all, Internet websites will be left guessing whether they must shoulder the Act's significant burdens and what those burdens entail.

8.      For these reasons and more, this Court should enjoin Defendant from enforcing the Act against Plaintiff's members and declare the Act unconstitutional.

## PARTIES & STANDING

9.      Plaintiff NetChoice, LLC is a District of Columbia nonprofit trade association for Internet companies.[2] NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while also minimizing the burdens that would prevent businesses from making the Internet more accessible and useful.

10.     NetChoice has standing for three independent reasons.

11.     NetChoice has associational standing to challenge the Act because: (1) some of NetChoice's members have individual standing to sue in their own right, as those members are subject to the Act; (2) challenging the Act is germane to NetChoice's purpose; and (3) members'

---

[2] NetChoice's members are listed at NetChoice, About Us, https://perma.cc/4CVS-BTL9.

individual participation is unnecessary in this purely legal, facial challenge to the Act. *See Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977).

12.     Although the Act's precise coverage is unclear and rests on vague and subjective terms, based on the Act's definition of regulated entities, Ohio Rev. Code § 1349.09(A)(1), (B)-(C), (N)-(O), it appears the Act will affect at least the following NetChoice members: (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook, Instagram, and Threads; (4) Nextdoor; (5) Pinterest; and (6) X. Although the Act does not affect all of Plaintiff's members, this Complaint refers to members that the Act affects as "covered members" or "covered websites."

13.     NetChoice and its members also have standing to assert the First Amendment rights of their members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (collecting cases); *Bonta*, 2023 WL 6135551, at *4; *Griffin*, 2023 WL 5660155, at *11-12.

14.     NetChoice also has organizational standing to challenge the Act. NetChoice has incurred costs and will continue to divert finite resources to address the Act's implications and compliance costs for Internet companies. *See Online Merchs. Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021).

15.     Defendant Dave Yost is the Ohio Attorney General. The Act provides that the Ohio Attorney General has "exclusive authority to bring a civil action" to enforce the Act. Ohio Rev. Code § 1349.09(H). NetChoice sues Attorney General Yost in his official capacity.

## JURISDICTION & VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

17. This Court has personal jurisdiction over Defendant, because the Ohio Attorney General resides in and/or conducts a substantial proportion of his official business in Ohio. Venue is proper in this District under 28 U.S.C. § 1391(b) because the only Defendant resides, and the events giving rise to this civil action occurred, in this District. This action is properly maintained in the Eastern Division of this Court at Columbus because the Ohio Attorney General's main head-quarters is located there.

## BACKGROUND

18. **Plaintiff's members publish valuable expression to minors and adults alike.** NetChoice's members operate websites that both "publish," *Reno*, 521 U.S. at 853, and "disseminate" protected speech, *303 Creative LLC v. Elenis*, 600 U.S. 570, 594, (2023), including speech receiving the First Amendment's highest protections like art, literature, and political and religious expression. These websites do so by displaying text, audio, graphics, and video.

19. Dreamwidth, for example, provides a home for creative users of all types and allows them to share their writing, artwork, and innermost thoughts. "On Facebook . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about the causes they care about, showcase their art, keep up with the latest political commentary, and discover or start small businesses. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows its account holders to explore recipes, style, home decor,

and more. On TikTok, users going through a difficult experience can find advice, support, and empathy. On X, "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world in all its facets, from travel documentaries to step-by-step cooking instructions.

20. **Minors' use of covered websites.** Minors and adults alike use covered websites for myriad purposes that deserve the highest First Amendment protections from government interference. For example, people use these services to follow and discuss current events, participate in religious and civic life, show political support, advocate for issues, discover information about public institutions such as public schools and libraries, showcase their artistic abilities, entertain and be entertained, interact with friends, network, learn new skills, discover new interests, and explore old ones. These interactions provide users with countless benefits, including (among others) alleviating a sense of isolation, helping connect with people with shared experiences, providing an expressive outlet, and creating ongoing educational opportunities.

21. **Options for parental control and oversight of minors' use of covered websites.** As with other media, parents can choose from many tools to help control, influence, and oversee their minor children's use of the Internet and covered websites.

22. Parents can decide at the outset whether and when to let their children use Internet-connected devices—such as computers, tablets, and smartphones—in the first place.

23. Parents also have many means to control whether, when, how, and how frequently those devices can access the Internet. For instance, Internet providers (such as cell service providers and broadband providers) offer parents the option to block certain online services from certain devices altogether. *E.g.*, Verizon, Verizon Smart Family, https://perma.cc/79HS-JPNY; AT&T, Parental Controls, https://perma.cc/NMZ3-7YEU; T-Mobile, Family Controls and Privacy,

8

https://perma.cc/UMF9-S3T2; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/JN7H-MUL9. Wireless routers (which provide wireless Internet connectivity) generally have similar parental-control settings. *E.g.*, Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 11, 2021), https://perma.cc/KMT7-3439. These settings allow parents to block particular websites, impose content filters, and monitor Internet usage. *See* Netgear, Circle Smart Parental Controls, https://perma.cc/DW4A-YUKE. They also allow parents to turn off Internet service entirely at particular times of the day, pause service to a particular device, and limit Internet time. *See id.*

24.     Devices themselves provide additional controls that parents can employ. Apple devices like iPhones and iPads allow parents to limit the time spent on the device, curtail the services that can be used on the device, set content restrictions on those applications, filter online content that a parent finds inappropriate, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://perma.cc/ATX2-6GSS. Google and Microsoft devices offer similar controls. *See* Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/UL3B-L3X9; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/W8RK-QTXS.

25.     Numerous third-party applications also allow parents to control and monitor their children's online activities. *See* Ben Moore & Kim Key, *The Best Parental Control Apps for Your Phone*, PCMag (Mar. 29, 2022), https://perma.cc/PPG2-65VJ. These applications allow parents to impose time restrictions, block certain applications, and impose Internet filters, among other things.

26.     Finally, NetChoice members themselves provide parents with many tools to decide for themselves what their children can see and do on these websites.

27.    All NetChoice members prohibit minors under 13 from accessing their general-audience services. Some NetChoice members also offer separate experiences for users under 13. Specifically, TikTok offers a separate experience specifically designed for users under 13 that has heightened protections and that does not offer many design tools like the ability to post, to communicate with others, maintain a profile, or have followers. YouTube offers two services (YouTube Kids and a supervised experience on YouTube) for minors younger than 13 with parental consent; these services offer parents the ability to oversee their children's use of the services in various ways.

28.    NetChoice members also provide parents with oversight tools. For example, parents can use Instagram's "supervision tools" to see how much time their teen spends on Instagram, set time limits and scheduled breaks, receive updates on what accounts their teen follows and the accounts that follow their teen, and receive notifications if a change is made to their teen's settings. TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit, restrict exposure to certain content, decide whether their teen's account is private or public, and decide who can comment on their teen's videos.

29.    To facilitate parental control for minors under 13, the federal Children's Online Privacy Protection Act also imposes age-related restrictions on access to online services "directed to children" younger than 13 and from any online service "that has actual knowledge that it is collecting personal information from a child" younger than 13. 15 U.S.C. § 6502(a)(1). For example, it requires parental consent for the collection of certain personal information from children under the age of 13. *Id.* § 6502(b)(1)(A).

30.    **Covered websites' dedication to beneficial user experiences and user security.** NetChoice members expend vast resources—time, monetary, and human resources—into

improving their services and curating the content that they disseminate on their services. Through these efforts, NetChoice members promote certain types of expressive communities. According to their terms of service, members restrict the publication of content they consider harmful, like violent and sexual content, bullying, harassment, and content that encourages body shaming. Conversely, they promote age-appropriate content and positive content. Covered websites enforce these policies through a mix of human review, human-programmed computer algorithms, and automated editing tools.

31.     Many NetChoice members also allow users to further curate the content they see. For instance, users can choose who they follow, they can choose to block people, and they can control who sees and interacts with their content. Additionally, some members allow users to block categories of content. TikTok users, for example, can opt into "restricted mode," which automatically filters certain content and permits users to tailor the content they see with keyword filters (*e.g.*, not showing content featuring terms like "diet"). Facebook users can alter the content that Facebook recommends by hiding certain types of content or opting to see fewer posts from a specific person or group. Instagram users can select a "not interested" button to filter out content they do not wish to see.

32.     Many covered websites also restrict minors' abilities to engage in private communications on their websites. For instance, TikTok bans users under age 16 from sending or receiving direct messages. Facebook, Instagram, and Pinterest take other steps to limit messaging between unconnected adults and teens. Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected. Some websites like YouTube do not allow private communications at all.

## PARENTAL NOTIFICATION BY SOCIAL MEDIA OPERATORS ACT

33.    Ohio has decided that the government—in the first instance—should decide what speech is appropriate for minors on the Internet. The Act restricts minors' access to covered websites unless a parent provides "verifiable" consent through a state-mandated means. The Act also has a litany of content- and speaker-based definitions and exclusions, which expressly favor certain types of online speech (and speakers) over others.

34.    **Coverage definition and content- and speaker-based exceptions.** The Act applies to any "operator of an online web site, service, or product that targets children, or is reasonably anticipated to be accessed by children." Ohio Rev. Code § 1349.09(B).

35.    The Act provides a vague, eleven-factor test by which the Attorney General or a court "may" determine whether an operator's website "targets children" or is "reasonably anticipated to be accessed by children" and thus is subject to the Act's restrictions. These factors are:

> (1) Subject matter; (2) Language; (3) Design elements; (4) Visual content; (5) Use of animated characters or child-oriented activities and incentives; (6) Music or other audio content; (7) Age of models; (8) Presence of child celebrities or celebrities who appeal to children; (9) Advertisements; (10) Empirical evidence regarding audience composition; and (11) Evidence regarding the intended audience.

*Id.* § 1349.09(C). These criteria—both individually and in aggregate—are vague, hopelessly subjective and open-ended, and certain to result in selective enforcement. None of these criteria explains what it means for a website to be "reasonably anticipated to be accessed by children." Terms like "subject matter," "design elements," "visual content," and "music or other audio content" are so broad as to capture every possible aspect of a website, which would require operators to take painstaking efforts to determine whether there is anything about their websites that could bring them within the Act's ambit. These terms are also subjective: Whether any aspect of a website may "target[] children" depends on Defendant's appraisal of the subjective effect of a websites' "design" or "visual content" on any one of many minors under 16 across the State.

36.     Further, a "child" is defined as "any consumer of an online web site, service, or product who is under the age of sixteen and who is not emancipated." *Id.* § 1349.09(A)(2). This means that website operators will need to consider whether their services are "target[ed]" at or "reasonably anticipated to be accessed" by a 15-year-old versus a 16-year-old (according to the 11-factor test described above), which will compound the vagueness problems inherent in the multi-factor test. Moreover, subject matter, design elements, language, and music (among others) likely to appeal to adults and teens older than 15 are also likely to appeal to younger teens deemed to be "children" under the Act, meaning that the test is, by nature, overbroad.

37.     "Operator" includes "any business, entity, or person that operates an online web site, service, or product that has users in this state and that allows those users to do all of the following":

> (a) Interact socially with other users within the confines of the online web site, service, or product;
> (b) Construct a public or semipublic profile for the purpose of signing into and using the online web site, service, or product;
> (c) Populate a list of other users with whom an individual shares or has the ability to share a social connection within the online web site, service, or product;
> (d) Create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users.

*Id.* § 1349.09(A)(1). Thus, the Act's base coverage definition seems to encompass all social media websites (conventionally understood), and much more. *See* Yost, FAQ ("This law defines 'operator' much more broadly than traditional social media companies.").

38.     The Act would therefore reach a slew of educational (*e.g.*, Blackboard, Canvas, Moodle); gaming, (*e.g.*, PlayStation Plus, Steam, Xbox Live); general interest (*e.g.*, Medium, Imgur, Substack); informational (*e.g.*, Quora, Stack Overflow, TripAdvisor); and professional websites (*e.g.*, Fishbowl, GitHub, LinkedIn), among many others.

39.    The Act also adopts speaker- and content-based exceptions that further discriminate on the basis of speech, rendering the entire Act a content- and speaker-based speech regulation.

40.    The Act does not apply to websites where "interaction between users is limited to . . . (1) [r]eviewing products offered for sale by electronic commerce or commenting on reviews posted by other users; [or] (2) [c]omments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events." Ohio Rev. Code § 1349.09(O). Defendant has stated that these exceptions are limited to "e-commerce websites that allow for posting of reviews or to media outlets that report the news." Yost, FAQ. The Act also does not apply to "[s]earch engine services." Ohio Rev. Code § 1349.09(N)(1)(c).

41.    The Act likewise exempts websites "where the predominant or exclusive function is": (1) "[c]loud storage or cloud computing services"; and (2) "[b]roadband internet access services." *Id.* § 1349.09(N)(1)(a)-(b). The Act does not define the vague term "predominant . . . function."

42.    **Parental-consent requirement.** For websites covered by the Act, the operator "shall . . . [o]btain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product from the child's parent or legal guardian." *Id.* § 1349.09(B)(1).

43.    The Act provides five possible methods for obtaining such consent:

(a) Requiring a parent or legal guardian to sign and return to the operator a form consenting to the contract by postal mail, facsimile, or electronic mail;
(b) Requiring a parent or legal guardian, in connection with a monetary transaction, to use a credit card, debit card, or other online payment system that provides notification of each discrete transaction to the primary account holder;
(c) Requiring a parent or legal guardian to call a toll-free telephone number implemented by the operator and staffed by trained personnel;

(d) Requiring a parent or legal guardian to connect to trained personnel by vide-oconference;
(e) Verifying a parent's or legal guardian's identity by checking a form of government-issued identification against databases of such information, and promptly deleting the parent's or legal guardian's identification from the operator's records after such verification is complete.

*Id.* § 1349.09(B)(1).

44.     These prescribed methods raise more questions than they answer. For example, the Act does not define "trained personnel." The Act does not provide any guidance for how operators must safeguard the financial data of parents. And "verifying a parent's . . . identity" is not a means of obtaining parental consent at all. *Id.* § 1349.09(B)(1)(e).

45.     Most fundamentally, the Act does not attempt to address the difficulties involved in verifying a parent-child relationship. For example, in invalidating Arkansas's parental-consent requirement to access "social media" websites, the Western District of Arkansas credited the State's own expert testimony that "the biggest challenge you have with parental consent is actually establishing the relationship, the parental relationship" and "establishing" that a person purporting to be a parent or guardian "is a parent or a legal guardian." *Griffin*, 2023 WL 5660155, at *4. These difficulties are compounded when parents do not, for example, have the same last name or address as their children or cases in which parents disagree about whether to grant consent. As a result, covered websites may "err on the side of caution and require detailed proof of the parental relationship." *Id.* at *15. Thus, "parents and guardians who otherwise would have freely given consent to open an account will be dissuaded by the red tape and refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Id.* More generally, any requirement to provide their own personal information and identification—especially a "form of government-issued identification," Ohio Rev. Code § 1349.09(B)(1)(e)—may dissuade parents from providing consent.

46.     In all events, when a covered website secures parental consent, it also must: (1) "[p]resent to the child's parent or legal guardian a list of the features offered by an operator's online web site, service, or product related to censoring or moderating content, including any features that can be disabled for a particular profile"; and (2) "[p]rovide to the child's parent or guardian a web site link at which the parent or legal guardian may access and review the list of features described in division (B)(2) of this section at another time." *Id.* § 1349.09(B)(2)-(3); *accord* Yost, FAQ ("*Before* allowing a child to agree to the terms of service or otherwise register . . . ." (emphasis added)).

47.     After obtaining consent, the operator must send the parent "written confirmation" of the consent; or it may "verify consent via telephone" if the operator cannot "secure an address, electronic mail address, or facsimile number." Ohio Rev. Code § 1349.09(D)(1)-(2).

48.     If websites cannot obtain verifiable parental consent in a form mandated by the Act, they must "deny the child access to or use of the online web site, service, or product." § 1349.09(E); *accord* Yost, FAQ ("If you do not give your consent, the operator must deny the child use or access of the website, service or product."). The Act does not explain what this entails.

49.     Finally, parents and guardians can revoke consent after receiving notice of their child's access to the website. Ohio Rev. Code § 1349.09(F). This requires covered websites to develop a process by which parents can terminate the minors' access within 30 days:

> If a parent or legal guardian receives confirmation of consent . . . and determines that consent was given in error, or if the parent or legal guardian chooses to withdraw consent for any reason, the parent or legal guardian shall notify the operator, and the operator shall terminate the child's use of or access to the online web site, service, or product within thirty days after receiving such notification.

*Id.*

50.     Because the Act designates a broad range of actions as "contract[s]"—"includ[ing]" things like "register[ing]," "sign[ing] up" and "creat[ing] a unique username," *id.* § 1349.09(B)(1)—minors must obtain parental consent to access many of NetChoice's members' websites, as well as countless other forums, message boards, and other websites.

51.     It will be costly for websites to develop and adopt the infrastructure necessary to process parental consent, revocation of consent, and access-denial. It will take investment into technology and human resources, as well as continuous maintenance and improvement. Plus, continuing to allow minors under 16 onto their websites will expose operators to liability, as no system of processing parental consent will be error-free. Thus, covered websites will face compliance costs and substantial liability risks.

52.     **Age verification.** Though the Act does not require age verification on its face, if Defendant interprets the Act to require age verification, that would exacerbate the Act's constitutional flaws.

53.     For users, age verification is invasive and chills access to protected speech. Some people are unable or unwilling to share the personal information or identification necessary to verify their ages. And those who are willing to subject themselves to age verification must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Griffin*, 2023 WL 5660155, at *17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) ("relinquish their anonymity to access protected speech").

54.     For websites, adopting the infrastructure necessary to verify user ages is costly and cumbersome—and it comes with risk, as no system of age verification is foolproof. Thus, covered

websites will face compliance costs and substantial liability risks if Defendant atextually interprets the Act to require age verification.

55. **Penalties for noncompliance.** The Act provides highly onerous penalties for violations:

> If a court finds that an operator . . . entered into a contract with a child without consent of the child's parent or guardian . . . the court *shall* impose a civil penalty on the operator as follows: . . . Up to one thousand dollars for each of the first sixty days the operator failed to comply with this section; . . . up to five thousand dollars for each subsequent day the operator failed to comply with this section, commencing with the sixty-first day and ending with the ninetieth day; . . . [and] up to ten thousand dollars for each subsequent day the operator failed to comply with this section, commencing with the ninety-first day.

Ohio Rev. Code § 1349.09(I) (emphasis added).

56. **Potentially illusory defense for undefined "substantial compliance."** "If an operator is in *substantial compliance* with this section, the attorney general shall provide written notice to the operator before commencing a civil action . . . . The attorney general shall not commence a civil action . . . , and a court shall not impose a civil penalty, . . . if the operator does both of the following within ninety days after the date such notice is sent: (a) Cures the violation; (b) Provides the attorney general with written documentation that the violation has been cured and that the operator has taken measures *sufficient to prevent* future violations." § 1349.09(M) (emphases added).

57. The Act does not define the vague term "substantial compliance," nor does it explain what it would mean for a measure to be "sufficient to prevent future violations." So this purported defense may not provide regulated entities with anything near the certainty necessary for them to continue providing their services to minors younger than 16.

58. The Act takes effect on January 15, 2024. According to Defendant, "Operators are not required to notify parents or legal guardians of use, access or accounts created before the law's effective date of Jan. 15, 2024." *See* Yost, FAQ.

## CLAIMS

### COUNT I
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT

59. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

60. As incorporated against the States, the First Amendment's Free Speech and Free Press Clauses provide that government "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. Among other things, the First Amendment protects "publish[ing]," *Reno*, 521 U.S. at 853; "disseminat[ing]," *303 Creative*, 600 U.S. at 594; and "creating, distributing, [and] consuming" speech. *Brown*, 564 U.S. at 792 n.1. Those rights apply to all manner of private entities. *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) ("The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.").

61. This First Amendment claim raises both (1) a traditional facial challenge and, (2) alternatively, a First Amendment overbreadth facial challenge. Under a traditional facial challenge, "no set of circumstances exists under which [the Act] would be valid." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) ("*AFP*") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Under a First Amendment overbreadth facial challenge, "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (cleaned up).

62. The Act violates the First Amendment rights of both NetChoice's covered members and those members' current and prospective users. *Am. Booksellers*, 484 U.S. at 393; *Bonta*, 2023 WL 6135551, at *4; *Griffin*, 2023 WL 5660155, at *11-12.

63. The entire Act cannot survive any form of First Amendment scrutiny.

64. **The Act triggers strict scrutiny.** Minors have robust First Amendment rights, and websites that publish and disseminate speech have the right to publish and disseminate speech to minors absent governmental restraint. Although States have power to protect minors, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (citation omitted).

65. The Act requires covered websites and users to secure parental consent before allowing users to access protected speech. Ohio Rev. Code § 1349.09(B). But *Brown* recognized that laws requiring parental consent for protected speech are unconstitutional. *Brown*, 564 U.S. at 804-05. Such laws do not "enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.* at 795 n.3; *see id.* at 802 (expressing "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority").

66. Here, the Act may go even further than previous parental-consent laws. If parents do not "affirmatively consent," the law requires covered websites to "deny the child access to or use of the" website. § 1349.09(E). The Act does not explain whether this requires a covered website to deny access only to parts of the website that require users to create accounts, or to the entire

website—even publicly accessible portions of the website for which users need not agree to any "contract." § 1349.09(B). Yet it is not possible for covered websites to block individual people—especially across devices and IP addresses—from typing in a covered website's URL and accessing that website's landing page or accessing other publicly available pages.

67.     The constitutional problems would be compounded if Defendant interprets the Act to mean that covered websites must verify the ages of their users. Any atextual age-verification requirement for websites that disseminate protected speech is unconstitutional and would violate the rights of people of all ages. The Supreme Court has repeatedly reaffirmed that governments cannot require people to provide identification or personal information to access protected speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667 ("[A]dults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information"); *Reno*, 521 U.S. at 874 (similar). Lower courts, too, have consistently rejected age-verification requirements. *See, e.g.*, *Mukasey*, 534 F.3d at 196-97; *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004); *ACLU v. Johnson*, 4 F. Supp. 2d 1029, 1033 (D.N.M. 1998), *aff'd*, 194 F.3d 1149 (10th Cir. 1999); *Se. Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773, 782-84 (D.S.C. 2005). These principles apply with special force here given the vast amount of protected expression on the vast number of websites regulated by the Act. Accordingly, if Defendant interprets the Act to require covered websites to engage in age verification, it would burden adults' rights and "obviously burden[] minors' First Amendment Rights." *Griffin*, 2023 WL 5660155, at *17.

68.     The Act contains additional First Amendment deficiencies by making content- and speaker-based distinctions regulating speech.

69.     The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*,

564 U.S. at 790-91 (cleaned up). Because of that, content-based laws trigger strict scrutiny. *Reed*, 576 U.S. at 171. They are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve [a] compelling interest[]." *Id.* at 163 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). Moreover, the Supreme Court's "precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

70.     The Act targets websites where users can "interact socially"—as compared to websites where text, images, or videos are merely presented for viewing. Ohio Rev. Code § 1349.09(A)(1)(a). The Act therefore targets a *particular kind* of speech—interactive communication that flows both ways, as compared to minors' ability to simply access the speech of others.

71.     Further, the Act "singles out specific subject matter for differential treatment," *Reed*, 576 U.S. at 169, regulating only websites that "target[]" children or that "reasonably anticipate" being accessed by children and then delineating eleven content-based criteria for determining whether a website targets children or should reasonably anticipate being accessed by children. § 1349.09(C)(1)-(11) (content-based criteria include "Subject matter," "Language," "Design elements," "Visual content," "Use of animated characters or child-oriented activities and incentives," "Music or other audio content," "Age of models," "Presence of child celebrities or celebrities who appeal to children," "Advertisements," "Empirical evidence regarding audience

composition," and "Evidence regarding the intended audience"). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin*, 596 U.S. at 69 (cleaned up). The Act does just that.

72.     The Act's exceptions are also content based. The Act excludes "content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events." Ohio Rev. Code § 1349.09(O)(2). Because the Act makes an exception for websites whose "primary purpose" (however that may be defined) is reporting on "news and current events," it necessarily discriminates against other forms of content, such as literature, art, history, or religion. Thus, 15-year-olds must secure parental consent to join web forums devoted to United States history, but not to comment on contemporary news stories.

73.     The Act's exclusion of websites that feature only product reviews is also content based because it exempts speech related to one topic while regulating most others. *Id.* § 1349.09(O)(1).

74.     The "[Supreme] Court's precedents are deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others[,] [because] [s]peaker-based laws run the risk that the State has left unburdened those speakers whose messages are in accord with its own views." *NIFLA*, 138 S. Ct. at 2378 (cleaned up). Speaker-based laws thus trigger strict scrutiny. *Id.*

75.     As an initial matter, the Act singles out *Internet*-based speech. The Act specifically targets the speech of companies operating websites, while all other types of speech directed at minors and adults (like books, magazines, radio, and movies) are not covered. Ohio Rev. Code § 1349.09(A)(1)(a)-(d).

76. Within the broad category of Internet websites, the Act is also speaker-based because it targets websites where users can "interact socially," as compared to websites where text, images, or videos, are merely presented for viewing. *Id.* § 1349.09(A)(1)(a). Thus, the Act targets websites that are commonly called "social media websites" rather than other Internet speakers.

77. The Act also does not apply to websites where interaction between users is limited to reviewing or commenting on reviews of "products offered for sale by electronic commerce." *Id.* § 1349.09(O)(1). Thus, websites where a minor could read and post reviews about buying a toaster might not be covered, but websites where minors could make comments or read comments about political candidates, artistic expression, or religious texts are covered. Likewise, the same minor could review her toaster on Amazon but is prevented from posting the same review on Facebook, because Facebook does not *limit* user interaction to reviewing or commenting on reviews of "products offered for sale by electronic commerce." *See id.* As another example, a minor would be able to create an account to read and post reviews about televisions without parental consent, but would need parental consent to read and post reviews about television *shows*.

78. The Act likewise does not apply to websites where "interaction between users is limited to . . . [c]omments incidental to content posted by an *established and widely recognized media outlet*, the primary purpose of which is to report news and current events." *Id.* § 1349.09(O)(2) (emphasis added). Thus, under the Act, minors may not need parental consent to access the *New York Times* or *Wall Street Journal* (assuming the State agrees that these are "established and widely recognized" media outlets). But parental consent will be required for less "established" or less "widely recognized media outlet[s]"—in other words, websites that might publish non-mainstream, countercultural, or unpopular views or information. The Act thus explicitly burdens the speech of smaller (or non-mainstream) media outlets, as well media outlets whose

24

"primary purpose" is not reporting on "news and current events." It also burdens the speech of minors hoping to hear and participate in that speech.

79.     **The entire Act fails strict scrutiny.** Strict scrutiny requires a State to use "the least restrictive means of achieving a compelling state interest." *AFP*, 141 S. Ct. at 2383 (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)).

80.     The State does not have a compelling governmental interest justifying the Act.

81.     The Supreme Court has held that a law requiring parental consent for minors to purchase violent video games failed strict scrutiny. *Brown*, 564 U.S. at 805. The Court was skeptical that this law even "addresse[d] a serious social problem" if the problem could be alleviated by parental consent. *Id.* at 802; *see id.* ("At the outset, we note our doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority. Accepting that position would largely vitiate the rule that only in relatively narrow and well-defined circumstances may [the] government bar public dissemination of protected materials to [minors]." (cleaned up)). Here, as in *Brown*, the Act's parental-consent requirement is unconstitutional because it establishes an improper hurdle for minors' access to constitutionally protected speech. It requires minors to receive parental consent before engaging in *and hearing* protected speech on many websites. This requirement will bar many minors from accessing large amounts of protected speech entirely.

82.     If Defendant interprets the Act to require age verification, the Supreme Court has also held that age-verification requirements violate the First Amendment when they impede access to protected speech. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 874. Here, the Act will impede minors' rights by impeding their access to protected speech. And if Defendant interprets the Act to require age verification, the Act will infringe the First Amendment rights of adults as well.

25

83.     Relying on Supreme Court precedent, the Western District of Arkansas in *Griffin* thoroughly rejected Arkansas's parental-consent and age-verification requirements to access a similar collection of social media websites. 2023 WL 5660155, at *16-21. The court applied intermediate scrutiny, though it "tend[ed] to agree with NetChoice that the restrictions in [the Arkansas law] are subject to strict scrutiny." *Id.* at *16. Under the intermediate-scrutiny analysis, the court recognized that parental-consent requirements violate minors' rights under Supreme Court decisions like *Brown*. *Id.* at *17. It likewise recognized that age-verification requirements violate both adults' and minors' rights. *Id.* at *16-17. Finally, the court concluded the law was not properly tailored because, among other things, (1) the law was "not narrowly tailored to target content harmful to minors"; "[i]t simply impedes access to content writ large"; and (2) private alternatives— including those discussed above—are less restrictive *Id.* at *20-21.

84.     The Act cannot evade *Brown*'s and *Griffin*'s reasoning merely by labeling as "contracts" things like "registering" and "signing up" to access protected speech on covered websites. The Act expressly mandates that absent consent, covered websites must deny access to users altogether, regardless of any registration or contractual requirements. *Brown* would not have come out differently if the State had deemed the "purchase of violent video games," 564 U.S. at 802, as entering into a contract to access this protected speech.

85.     Moreover, if the State's true interest were in regulating online contracts (or contracts more generally), it would not limit its coverage provisions in the ways that it did. Websites that do not allow users to "[i]nteract socially with other users," also permit minors to enter into "terms of service." Ohio Rev. Code § 1349.09(A)(1)(a), (B)(1). As do "[c]loud storage . . . services." *Id.* § 1349.09(N)(1)(a). Same with "widely recognized media outlet[s]" and websites for "[r]eviewing products offered for sale by electronic commerce." *Id.* § 1349.09(O). Yet all those

"contracts" and "terms of service"—and many more—are left unregulated by the Act, demonstrating that the State's true interest is in regulating *expression* on particular websites. In fact, the word "contract" does not even appear in Defendant's explanation of the Act. *See* Yost, FAQ.

86.     A compelling governmental interest exists only if the State can "specifically identify an actual problem in need of solving," such that "the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799 (cleaned up). "That is a demanding standard," and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Id.* (citation omitted). Here especially, the State must demonstrate that there is a problem needing *governmental* solution. Parents have many choices to help control, oversee, and guide their children's activities online. *E.g.*, *Ashcroft*, 542 U.S. at 666-69 (noting private, less-restrictive alternative); *Griffin*, 2023 WL 5660155, at *6-8, *21 (relying on same private tools described above to conclude that similar parental-consent requirement failed even intermediate scrutiny). These tools allow individual families to choose the approach that works best for them and their minor children.

87.     Nothing in the Act or its legislative history shows why those private alternatives are insufficient or why the Act's one-size-fits-all government intervention is necessary. *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (requiring more than "mere speculation or conjecture").

88.     The Act is not narrowly tailored to furthering any compelling government interest.

89.     The Act is overinclusive because it establishes parental consent for users to engage in any type of protected speech on covered websites, including on some of the most popular places for minors to engage in online speech. If Defendant interprets the Act to require covered websites to engage in age verification, those age-verification requirements would be overinclusive for similar reasons.

90.     The Act is also "seriously underinclusive" "because it permits a parental . . . veto." *Brown*, 564 U.S. at 805. If the websites and speech that the Act targeted really were harmful for minors, then parental consent should be insufficient to allow minors to be exposed to those harms. *See id.*; *see also Griffin*, 2023 WL 5660155, at *18 ("Using the State's analogy, if a social media [website] is like a bar, [Arkansas's law] contemplates parents dropping their children off at the bar without ever having to pick them up again." (emphasis omitted)).

91.     The Act is underinclusive because of its arbitrary exclusions, including for off-line speech, websites that do not offer the ability to interact, and "widely recognized media outlet[s]." Ohio Rev. Code § 1349.09(A)(1)(a), (O)(2).

92.     The Act's arbitrary distinction between regulated 15-year-olds and unregulated 16-year-olds is also a tailoring problem, as the State cannot demonstrate why the sixteenth birthday is the point at which a minor should gain her full First Amendment rights.

93.     For the reasons provided above, the Act would fail any form of heightened First Amendment scrutiny—much like the parental-consent and age-verification law enjoined in *Griffin* failed intermediate scrutiny. *Griffin*, 2023 WL 5660155, at *16-21. The Act here fails intermediate scrutiny for the reasons discussed above.

94.     The Parental Notification by Social Media Operators Act, Ohio Rev. Code § 1349.09, violates the First Amendment to the Constitution and thereby deprives Plaintiff, its members, and Internet users of enforceable rights—causing them irreparable harm.

## COUNT II
## 42 U.S.C. § 1983
## VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS

95.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

96.     "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) (collecting cases). Thus, a "law is unconstitutionally vague" if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so stand-ardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (collecting cases). The constitutional standard for vagueness is heightened when protected speech is implicated. *FCC v. Fox*, 567 U.S. at 253-54. When legis-latures draft laws regulating speech without precision, publishers and speakers tend "to steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (cleaned up).

97.     The Act's central coverage provision is unconstitutionally vague. It applies to web-sites that "target[] children, or [are] reasonably anticipated to be accessed by children," Ohio Rev. Code § 1349.09(B), but websites have no way to know what this means. The Act goes on to provide an eleven-factor list that Defendant and a court "may" use to determine whether a website is cov-ered under the Act. *Id.* § 1349.09(C). But the list is inherently indeterminate and does nothing to solve the coverage provision's underlying vagueness. The "open-ended rough-and-tumble of fac-tors" imposed by the Act does not satisfy First Amendment standards, *Citizens United*, 558 U.S. at 336 (citation omitted), because potentially covered operators will have no way of knowing whether they are ultimately subject to the Act. For example, these factors include (1) subject mat-ter, (2) language, (3) design elements, and (4) visual content, among seven others. Ohio Rev. Code § 1349.09(C)(1)-(4). But the Act does not specify what kinds of subject matter, language, design elements, or visual content might reveal to the Ohio Attorney General that a website is "reasonably anticipated to be accessed by children." *See id.* Moreover, those terms are capacious and

subjective: A website's "design elements" and "visual content," for instance, could encompass every part of the website, and thus websites may need to conduct a searching, open-ended inquiry into every single aspect of their services to determine whether they are subject to the Act's require-ments. And covered websites must apply those broad and subjective criteria to determine whether their services "target[]" or are "reasonably anticipated to be accessed by" 15-year-olds (in which case, they must comply with the Act), as compared to 16-year-olds (in which case, they need not comply with the Act). *Id.* § 1349.09(B)(1). Even after all that analysis, the Act does not provide guidance on how the Attorney General or a company should balance these factors, whether it is possible that one of these factors might outweigh another, or how the Attorney General or a com-pany should evaluate an operator's website in the absence of some of these factors. Without a clear definition to determine what each of these elements means or how to balance each of these factors, website operators are left to second guess whether Defendant would make arbitrary determinations about their websites.

98.    The Act's exceptions are also impermissibly vague, leaving operators with uncer-tainty over whether they are subject to the Act. For example, websites are exempt from the Act's coverage if interaction between users is limited to "comments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events." *Id.* § 1349.09(O)(2). But the Act does not explain *whose* purpose the Act refers to. Many people use Facebook "primarily" for news, for example. The Supreme Court has repeat-edly rejected intent- or purpose-based standards for evaluating speech for precisely this reason. *See, e.g.*, *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 468 (2007) (controlling plurality op. of Roberts, C.J.) ("Far from serving the values the First Amendment is meant to protect, an intent-

based test would chill core political speech[.] . . .  An intent-based standard blankets with uncertainty whatever may be said, and offers no security for free discussion." (cleaned up)).

99.     Likewise, the term "established and widely recognized media outlet," § 1349.09(O)(2), is also impermissibly vague. Of course, the Supreme Court has held time and again that the First Amendment's protections apply beyond the journalistic "press." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 797 (1988). Regardless, the Act does not explain what constitutes an "established" media outlet—whether it is years in publication, or number of subscribers, or any number of other possible qualifying factors. Nor does the Act define "widely recognized," as that could refer to recognition within (1) the general population; (2) the media consuming population; (3) the media industry; (4) or something else entirely. The Act does not explain whether "recognized" entails a qualitative (recognized as sound, reliable) or quantitative (number of people who have heard of the media outlet) evaluation. It is also not clear how a website would measure how *wide* its recognition is to understand whether the website is subject to the Act's restrictions.

100.    The Act's "substantial compliance" defense is also vague. Ohio Rev. Code § 1349.09(M). It offers operators no way of knowing what constitutes substantial compliance and whether their actions qualify.

101.    If Defendant atextually interprets the Act to impose an age-verification requirement, covered websites have no guidance about how to properly age verify.

102.    The means of securing parental consent are vague as well. For instance, none of the methods explain how covered websites are supposed to verify the parent-child relationship. The Act also leaves key terms undefined. For example, the Act allows covered websites to use "toll-free telephone number[s]" and "videoconference[s]" with "trained personnel," but it does not

define what "trained personnel" means. *Id.* § 1349.09(B)(1)(c)-(d). One method of securing consent is not even a method of securing consent at all. *Id.* § 1349.09(B)(1)(e) ("Verifying a parent's or legal guardian's identity by checking a form of government-issued identification against databases of such information.").

103.  The Parental Notification by Social Media Operators Act, Ohio Rev. Code § 1349.09, violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its members, and Internet users of enforceable rights—causing them irreparable harm.

## COUNT III
### 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
### DECLARATORY RELIEF

104.  Plaintiff incorporates all prior paragraphs as though fully set forth herein.

105.  With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

106.  The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

107.  This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional.

## COUNT IV
### EQUITABLE RELIEF

108.  Plaintiff incorporates all prior paragraphs as though fully set forth herein.

109.  The Act violates the Constitution and deprives Plaintiff, its members, and its members' users of enforceable federal rights, causing them irreparable harm. Federal courts have the

power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

110.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act and any of the challenged provisions of the Act against Plaintiff and its members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.  Declare that the Parental Notification by Social Media Operators Act, Ohio Rev. Code § 1349.09, is unlawful.

B.  Declare that Ohio Rev. Code § 1349.09 violates the First Amendment to the Constitution.

C.  Declare that Ohio Rev. Code § 1349.09 is unconstitutionally vague in violation of the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution.

D.  Enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce the Act against Plaintiff or its members;

E.  Enter judgment in favor of Plaintiff;

F.  Award Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

G.  Award Plaintiff all other such relief as the Court deems proper and just.

Dated: January 5, 2024

Respectfully submitted,

*s/ Matthew H. Rice*

Matthew H. Rice (97290)
   *Trial Attorney*
SPERLING & SLATER, LLC
55 W. Monroe Street, 32nd Floor
Chicago, Il 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
mrice@sperling-law.com

Joshua P. Morrow*
Michael C. Cotton*
Alexis Swartz*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
michael@lkcfirm.com
alexis@lkcfirm.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

*(Applications for admission
pro hac vice forthcoming)*

*Attorneys for Plaintiff NetChoice, LLC*