**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

NETCHOICE, LLC,                    )
                                   )   Case No. 2:24-cv-00047-SDM-EPD
    *Plaintiff,*                  )
                                   )   Judge Sarah D. Morrison
    v.                            )
                                   )   Magistrate Judge Elizabeth A. Preston
DAVE YOST, in his official capacity as Ohio )   Deavers
Attorney General,                  )
                                   )
    *Defendant.*                  )   ORAL ARGUMENT REQUESTED
                                   )

**PLAINTIFF NETCHOICE'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

The Parental Notification by Social Media Operators Act, Ohio Revised Code § 1349.09 ("Act"), set to take effect on January 15, 2024, unconstitutionally requires a broad but ill-defined set of Internet websites to obtain parental consent for minors under the age of 16 to access and engage in protected speech on those websites. The Act's unconstitutional content- and speaker-based coverage provisions undermine the free speech rights of minors—and perhaps even adults. Moreover, the Act is unconstitutionally vague, including in how it defines the set of websites that are subject to its onerous restrictions. The entire Act violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

Plaintiff NetChoice, LLC moves the Court for an order preliminarily enjoining Defendant Dave Yost, in his official capacity as Ohio Attorney General, from enforcing the Act against Plaintiff's members from no later than January 14, 2024 until this matter may be resolved on the merits. NetChoice members face immediate and irreparable harm absent an injunction—as do their users, and countless other websites across the Internet. *See* Szabo Decl. ¶¶ 13-18; Paolucci Decl. ¶ 13-20; Roin Decl. ¶¶ 15-22; Masnick Decl. ¶¶ 14-21.

Should it prove impractical to resolve this Motion prior to January 15, 2024, NetChoice respectfully requests a temporary restraining order of 14 days, or of such length as the Court deems appropriate, to preserve the status quo while the motion for preliminary injunction is considered.

Defendant received notice of this Motion on January 5, 2024, as detailed in the attached certification. A memorandum of law in support of the Motion is attached.

Dated: January 5, 2024

Respectfully submitted,

s/Matthew H. Rice

Matthew H. Rice (97290)
*Trial Attorney*
SPERLING & SLATER, LLC
55 W. Monroe Street, 32nd Floor
Chicago, Il 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
mrice@sperling-law.com

Joshua P. Morrow*
Michael C. Cotton*
Alexis Swartz*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
michael@lkcfirm.com
alexis@lkcfirm.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

*(Applications for admission pro hac vice forthcoming)*

*Attorneys for Plaintiff NetChoice, LLC*

# MEMORANDUM OF LAW

## Table of Contents

Introduction ............................................................................................................... 1

Background ................................................................................................................ 3

    A.  Internet websites disseminate vast amounts of protected speech. .............................. 3

    B.  Parents have many tools to oversee how their children use the Internet. .................... 4

    C.  Ohio's Parental Notification by Social Media Operators Act ..................................... 5

Argument ................................................................................................................... 9

  I.  NetChoice is likely to succeed on the merits of its challenges against the Act. .............. 10

    A.  The Act violates the First Amendment by imposing parental-consent requirements
to access protected speech. ....................................................................... 10

    B.  The Act violates the First Amendment by restricting access to protected speech on
the basis of content and speaker ................................................................. 15

    C.  The Act is unconstitutionally vague. .......................................................... 17

  II.  The remaining factors support a preliminary injunction or a temporary restraining
order if necessary. .................................................................................... 19

Conclusion ................................................................................................................ 20

## Introduction

Like other States before it, Ohio has unconstitutionally limited minors' access to protected Internet speech. Specifically, the Parental Notification by Social Media Operators Act would require countless Internet websites to obtain parental consent before allowing minors younger than 16 to hold an account. Ohio Rev. Code § 1349.09(B).[1] Unlike other States, Ohio has targeted "much more . . . than traditional social media companies." Dave Yost, FAQ: What is the Parental Notification by Social Media Operators Act, https://perma.cc/NE24-T3L9 ("Yost, FAQ").

The Supreme Court has squarely held that governments cannot require minors to secure parental consent to access protected speech. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). That is why another federal district court recently enjoined Arkansas's attempt to impose similar requirements on "social media" websites. *See NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023); *see also NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *13 (N.D. Cal. Sept. 18, 2023) (enjoining state law that imposed an age-estimation requirement).

The websites that the Act covers join a long line of media that governments have tried to regulate on the grounds that they are harmful to the minors who use them—such as "dime novels," "[r]adio dramas," "movies," "comic books," "television," "music," and "video games." *Brown*, 564 U.S. at 797-98. But minors enjoy a "significant measure of First Amendment protection," and the government's power to protect children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794-95 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). Because Ohio's law oversteps these important First Amendment bounds, this Court should declare the Act unconstitutional and should enjoin Defendant from enforcing it. Plaintiff NetChoice requests a ruling on this motion on or before January 14, 2024—

---

[1] Unless otherwise noted, statutory citations in this Motion refer to the Ohio Revised Code.

the day before the Act is scheduled to take effect.

Plaintiff NetChoice, LLC is a leading Internet trade association. Some of its members operate widely used websites[2] that the Act regulates. These include Dreamwidth, Facebook, Instagram, Nextdoor, Pinterest, Threads, X (formerly Twitter), and YouTube. On these websites, adults and minors alike can "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017)). Yet the Act would significantly restrict some minors' abilities to speak, hear, and otherwise engage in speech or access these websites—along with an enormous range of other covered websites, including "message boards, chat rooms," and Internet forums. § 1349.09(A)(1)(d). This Act is fatally flawed for multiple reasons.

*First*, the Act imposes blanket parental-consent requirements for minors to access protected speech across many websites. Courts have invalidated similar efforts to limit the speech by and to minors. *Brown*, 564 U.S. at 799; *Griffin*, 2023 WL 5660155, at *21.

*Second*, the Act's coverage provisions, § 1349.09(A)(1), (B), (O), render the Act an unconstitutionally content- and speaker-based restriction on protected speech. As just one example of an exemption that is both content- *and* speaker-based, the Act expressly does not cover certain "established and widely recognized media outlet[s]." § 1349.09(O)(2). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional . . . ." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And the Supreme Court is "deeply skeptical of laws that distinguish among different speakers." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) ("*NIFLA*") (cleaned up). The Act thus triggers and fails

---

[2] This Motion refers to websites, applications, and other digital services covered by the Act as "covered websites."

strict scrutiny, and it also cannot satisfy any other form of heightened First Amendment scrutiny.

*Third,* the Act is unconstitutionally vague. Its central coverage provision applies to websites that "target[] children, or [are] reasonably anticipated to be accessed by children." § 1349.09(B). The Act goes on to provide an eleven-factor list that a court "may" use to determine whether a website is covered, but the list does nothing to solve the coverage provision's underlying vagueness. *Id.* § 1349.09(C). The First Amendment demands that lawmakers "eschew [such] open-ended rough-and-tumble of factors" when enacting laws regulating speech. *Citizens United v. FEC*, 558 U.S. 310, 336 (2010) (cleaned up). Other vague terms—such as what entities qualify as a "widely recognized media outlet," § 1349.09(O)(2)—feature prominently in the Act's content- and speaker-based exceptions. So, while many websites know that they will be covered by the Act, many more are left guessing about whether they must shoulder the Act's burdens.

Therefore, before the Act takes effect on January 15, 2024, this Court should enter a preliminary injunction that prohibits Defendant from enforcing the Act against NetChoice's members. If a ruling by that date is not feasible, and if Defendant does not disclaim enforcement against Plaintiff's members while this motion is pending, the Court should enter a temporary restraining order that prohibits Defendant from enforcing the Act against NetChoice's members.

## Background

### A.    Internet websites disseminate vast amounts of protected speech.

NetChoice's members affected by the Act ("covered members") include (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; and (6) X. Szabo Decl. ¶ 11. Each of these members operates a website that "publish[es]," *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 853 (1997), "disseminate[s]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023), "creat[es]," and "distribut[es]," *Brown*, 564 U.S. at 792 n.1, protected speech. Szabo Decl. ¶ 6. They do so by

displaying text, audio, images, or video. *Id.* ¶ 6.

Together, these websites disseminate billions of user-generated "posts" per day, all protected by the First Amendment. *See* Szabo Decl. ¶ 6. These websites are among the Internet's most popular destinations, in part because of the First Amendment expression they publish and facilitate. *Id.* ¶ 4. Teens are among those who use social media websites for expression, education, and civic engagement. *Id.* ¶ 6. They read local news, track world events, follow sports teams, research universities, and explore careers. *See id.* ¶ 6. They also pursue academic and extracurricular activities, publish artistic works, shine a light on meaningful causes, find communities, share advice, and support their peers. *See id.* ¶ 6. These websites are an indispensable bridge for keeping teens connected with friends and family across any distance. *See id.* ¶ 6.

**B.     Parents have many tools to oversee how their children use the Internet.**

Because of the tools that the industry has developed, parents have many choices for shaping and controlling their children's online experiences. Szabo Decl. ¶ 8.

Foremost, parents control what *devices* minors can access. Today's Internet-connected devices come with a full suite of parental-control options. Szabo Decl. ¶ 8. For example, Apple allows parents to lock or limit specific apps and features on a minor's device, restrict the device settings to limit content and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* ¶ 8. Google also offers similar parental controls. *Id.* ¶ 8.

Parents also control many of the *networks* that minors can use to connect to the Internet. The wireless routers that provide home Internet access have controls allowing parents to manage which Internet websites minors can use (and at what times). Szabo Decl. ¶ 8. Cellular and broadband Internet providers offer a similar set of parental controls. *Id.* ¶ 8.

Control via *software* is another avenue of parental authority. Szabo Decl. ¶ 8. The leading web browsers offer tools that allow parents to monitor and limit their children's online activity. *Id.*

¶ 8. Third-party parental-control software is also available for many devices, including smartphones and computers. *Id.* ¶ 8. Many NetChoice member websites have also developed their own parental controls. *Id.* ¶ 8. These controls supplement the substantial resources that members spend crafting and enforcing "content moderation" policies that aim to prevent harmful or objectionable speech from reaching minors (and other users). *Id.* ¶ 8. Finally, covered websites require account holders to be at least 13 years old or have parental consent. *Id.* ¶ 8.

### C. Ohio's Parental Notification by Social Media Operators Act

The Governor signed the Act into law on July 5, 2023. It takes effect on January 15, 2024. *See* Yost, FAQ.

**Broad coverage definitions that distinguish by content and speaker.** The Act regulates most "operator[s]" that are "reasonably anticipated to be accessed by children." § 1349.09(B).

The Act defines "operator[s]" as any "online web site, service, or product" (together, "websites") that has users in Ohio and that "allows those users to do all of the following":

(a) Interact socially with other users within the confines of the [website];

(b) Construct a public or semipublic profile for the purpose of signing into and using the [website];

(c) Populate a list of other users with whom an individual shares or has the ability to share a social connection within the [website];

(d) Create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users.

§ 1349.09(A)(1).

This definition sweeps in a vast swath of the Internet—including, but not limited to, what have commonly been referred to as "social media" websites. *See* Yost, FAQ. Along with many NetChoice members, the Act reaches educational (*e.g.*, Blackboard, Canvas, Moodle); gaming, (*e.g.*, PlayStation Plus, Steam, Xbox Live); general interest (*e.g.*, Medium, Imgur, Substack);

informational (*e.g.*, Quora, Stack Overflow, TripAdvisor); and professional websites (*e.g.*, Fishbowl, GitHub, LinkedIn), among others. The definition also expressly includes "message boards," *id.*, so the Act reaches discussion forums that focus on every conceivable topic.

After defining "operator," the Act creates an eleven-factor test for determining whether a website is "reasonably anticipated to be accessed by children." § 1349.09(C). The Act says that:

> [T]he attorney general or a court may consider . . . : (1) Subject matter; (2) Language; (3) Design elements; (4) Visual content; (5) Use of animated characters or child-oriented activities and incentives; (6) Music or other audio content; (7) Age of models; (8) Presence of child celebrities or celebrities who appeal to children; (9) Advertisements; (10) Empirical evidence regarding audience composition; and (11) Evidence regarding the intended audience.

*Id.* Many of these factors are so broad and vague as to be meaningless, and none limits the Act's scope. And all sorts of websites can "reasonably anticipate[]," *id.*, being accessed by teens under 16, many of whom engage in pervasive expressive and educational activities online.

However, despite this sweeping scope, the Act expressly creates certain categories of favored speech that are *not* regulated. The Act "does not apply" to any website "respecting which interaction between users is limited to the following" content- and speaker-based categories:

> (1) Reviewing products offered for sale by electronic commerce or commenting on reviews posted by other users; [or]
>
> (2) Comments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events.

§ 1349.09(O); *see* § 1349.09(N) (the Act also "does not apply" to any website "where the predominant or exclusive function is: (a) Cloud storage or cloud computing services; (b) Broadband internet access services; [or] (c) Search engine services").

**Parental consent.** Covered websites must "[o]btain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the [website]." § 1349.09(B)(1). To provide consent, parents can: (1) "sign and

6

return . . . a form"; (2) "use a credit card, debit card, or other online payment system"; (3) "call a toll-free telephone number"; (4) "connect to trained personnel by videoconference"; or (5) provide a "government-issued identification" that the operator must check "against databases of such information." *Id.* After obtaining parental consent, the operator must send the parent written confirmation of the consent. § 1349.09(D)(1). Covered websites also must "[p]resent to the child's parent or legal guardian a list of the features offered by [the website] related to censoring or moderating content, including any features that can be disabled for a particular profile," and "[p]rovide to the child's parent or guardian a web site link at which the parent or legal guardian may access and review th[is] list of features . . . at another time." § 1349.09(B)(2)-(3).

The Act does not address how websites should resolve a host of practical problems the Act is certain to create. For example, the Act does not address how websites should proceed if one parent provides consent but the other does not, or if a parent without custody over a child provides consent. When enjoining Arkansas's similar parental-consent requirement, the Western District of Arkansas credited that State's own expert testimony that "the biggest challenge . . . with parental consent is actually establishing the relationship, the parental relationship." *Griffin*, 2023 WL 5660155, at *15. The Arkansas court thus concluded that even parents that might otherwise "freely" provide consent "will be dissuaded by the red tape and refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Id.*

For any covered website where "a child's parent or legal guardian does not affirmatively consent to the terms of service or other contract, the operator *shall* deny the child access to or use of the [website]." § 1349.09(E) (emphasis added). The Act designates a broad range of actions as "contract[s]"—"including" things like "register[ing]," "sign[ing] up" and "creat[ing] a unique username." § 1349.09(B)(1). Minors therefore must obtain parental consent to access many of

7

NetChoice's members' websites, as well as countless other forums, message boards, and other Internet websites. *See, e.g.*, Szabo Decl. ¶ 12; Paolucci Decl. ¶¶ 13, 20. The Act also requires websites to "terminate" the account of a minor for whom "consent was given in error" or for whom a "parent or legal guardian chooses to withdraw consent." § 1349.09(F).

**Age verification.** The Act does not require age verification. Any contrary interpretation from Defendant would be atextual—but would also exacerbate the Act's constitutional flaws. For users, age verification is invasive and chills access to protected speech. Masnick Decl. ¶¶ 11-13; Paolucci Decl. ¶ 12. Some people are unable or unwilling to share the personal information necessary to verify their ages. And those who are willing to do so must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Griffin*, 2023 WL 5660155, at *17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)). For websites, adopting the infrastructure necessary to verify user ages is costly and cumbersome—and it comes with risk, as no system of age-verification is foolproof. Paolucci Decl. ¶¶ 10, 13.

**Liability.** Liability is gargantuan for websites that "enter[] into a contract with a child without consent of the child's parent or guardian." § 1349.09(I) The "court *shall* impose a civil penalty on the operator as follows": (1) "Up to one thousand dollars for each of the first sixty days the operator failed to comply with this section"; (2) "up to five thousand dollars for each subsequent day the operator failed to comply with this section . . . [through] the ninetieth day"; and (3) "up to ten thousand dollars for each subsequent day the operator failed to comply with this section, commencing with the ninety-first day." *Id.* (emphasis added). This cascading penalty regime means that a covered website "faces liability of almost $3 million for every misidentified 15-year-old who accesses an account during the year before turning 16." Szabo Decl. ¶ 16.

The Act provides a defense, but it is potentially illusory, and it comes only at the expense

8

of accepting the Act's unconstitutional restraints. If a covered website is in "substantial compliance," then Defendant "shall not commence a civil action" and "a court shall not impose a civil penalty" if the website "[c]ures the violation" and "[p]rovides the attorney general with written documentation that . . . the operator has taken measures sufficient to prevent future violations." § 1349.09(M). But the Act does not define "substantial compliance." It also does not explain what measures could be "sufficient to prevent" a determined minor from evading a website's parental-consent protocols. *See, e.g.*, Paolucci Decl. ¶¶ 14-17.

## Argument

NetChoice is entitled to a preliminary injunction because: "(1) [NetChoice is] likely to succeed on the merits, (2) [it is] likely to suffer irreparable harm without a preliminary injunction, (3) the balance of equities favor[s] an injunction, and (4) an injunction is in the public interest." *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) (cleaned up). "The Sixth Circuit has held that the standard for obtaining a temporary restraining order and the standard for obtaining a preliminary injunction are the same." *Planned Parenthood of Greater Ohio v. Hodges*, 188 F. Supp. 3d 684, 688-89 (S.D. Ohio 2016) (citing *Workman v. Bredesen*, 486 F.3d 896 (6th Cir. 2007)).

There is "no set of circumstances" under which the Act "would be valid" (a traditional facial challenge). *United States v. Stevens*, 559 U.S. 460, 472 (2010) (citation omitted). Alternatively, "a substantial number of [the Act's] applications are unconstitutional" (a First Amendment overbreadth facial challenge). *Id.* at 473. NetChoice asserts First Amendment harms to its members' and their users' rights. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).

The First Amendment's Free Speech and Free Press Clauses protect covered websites, which "publish," *Reno*, 521 U.S. at 853, and "disseminate" protected speech, *303 Creative*, 600 U.S. at 594. The "'basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown*,

564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938).

**I.      NetChoice is likely to succeed on the merits of its challenges against the Act.**

The entire Act violates the First Amendment and the Due Process Clause because it imposes unconstitutional parental-consent requirements, imposes restrictions on speech based on a content- and speaker-based central coverage definition that cannot survive any form of heightened First Amendment scrutiny, and is unconstitutionally vague.

**A.      The Act violates the First Amendment by imposing parental-consent requirements to access protected speech.**

The Act violates the First Amendment by requiring websites and minors to secure parental consent to access covered websites. § 1349.09(B). The Act triggers and fails strict scrutiny on this basis alone, but even more so if Defendant atextually interprets the Act to require age verification.

**1.** The Supreme Court has held that states do not have "the power to prevent children from hearing or saying anything *without their parents' prior consent*," because "[s]uch laws do not enforce *parental* authority over children's speech . . . ; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3; *see Griffin*, 2023 WL 5660155, at *21 (invalidating parental-consent law for "social media" websites).

For those minors who cannot obtain parental consent, the Act is an outright ban on accessing all covered websites. § 1349.09(B). Yet "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik*, 422 U.S. at 214. Minors have "robust First Amendment protections," *Mahanoy Area Sch. Dist. v. B. L.*, 141 S. Ct. 2038, 2048 (2021), and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393

U.S. 503, 511 (1969). Instead, "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Brown*, 564 U.S. at 794 (quoting *Erznoznik*, 422 U.S. at 212-13). The State could not impose parental-consent requirements for "political rall[ies]" or "religious" services. *Brown*, 564 U.S. at 795 n.3. Yet minors use covered websites for those very protected purposes—and many more. *E.g.*, Szabo Decl. ¶ 6.

The parental-consent provision is especially stark because it requires covered websites to "deny the child access to or use of the [website]" altogether if the website cannot secure "affirmative[] consent." § 1349.09(E); *see* Yost, FAQ ("If [a parent] do[es] not give . . . consent, the operator must deny the child use or access of the website[.]"). Denying *all* "access to or use of" a website could require covered websites to block those minors who fail to obtain parental consent from accessing even the portions of a website that are publicly available. § 1349.09(E). Such a blanket denial is not technologically feasible for all companies. *See* Masnick Decl. ¶ 19.

If Defendant atextually interprets the Act to require covered websites to conduct age verification, "[i]t is likely that many adults who otherwise would be interested in becoming account holders on regulated social media platforms will be deterred—and their speech chilled—as a result." *Griffin*, 2023 WL 5660155, at *17. The same is true for minors. The Supreme Court has rejected laws that require people to provide identification or personal information to access protected speech. *E.g.*, *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 662, 667 (2004); *Reno*, 521 U.S. at 856. "Requiring adult users to produce state-approved documentation to prove their age . . . imposes significant burdens on adult access to constitutionally protected speech . . . ." *Griffin*¸ 2023 WL 5660155, at *17. Such requirements mandate that users "forgo the anonymity otherwise available on the internet." *Id.* (quoting *Am. Booksellers Found.*, 342 F.3d at 99).

The cumulative burden that the Act will impose on users, parents, and covered websites is

hard to overstate. Covered websites will have to obtain "verifiable consent" for all covered minors—or else ban them. § 1349.09(B)(1). Websites that misstep face steep penalties if it turns out that a covered minor accessed the websites without parental consent. Parents and minors, too, face the massive paperwork headache of providing consent for the huge number of educational, informational, professional, and entertainment websites that the Act covers. *See* Szabo Decl. ¶ 6.

**2.** Because the Act requires parental consent as a prerequisite to access protected speech—and does so in a content- and speaker-based manner, as described below—it triggers strict scrutiny. *See Brown*, 564 U.S. at 799. Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). A law survives strict scrutiny only if a State "[1] [has] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) ("*AFP*") (citation omitted). The Act fails both prongs. In fact, the Act cannot survive *any* form of heightened First Amendment scrutiny, such as intermediate scrutiny. *See Griffin*¸ 2023 WL 5660155, at *16-21 (enjoining similar law as unconstitutional because it failed even the lesser standard of intermediate scrutiny).

As the Supreme Court has held, "a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. The Supreme Court has also registered "doubts" that any state has an interest in "punishing third parties for conveying protected speech to children *just in case* their parents disapprove." *Id.* at 802.

Abstract legislative concern for children's general wellbeing is also not a compelling interest. Rather, the State must "specifically identify an actual problem in need of solving" before restricting speech. *Brown*, 564 U.S. at 799 (cleaned up). Especially important here, the State must identify a problem in need of *governmental* solution. There is no such problem here—at minimum

12

because parents already have many tools to control how their children use covered websites and the Internet. *See supra* p.4. Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803. That is because "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9. Instead, Ohio must "show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to [covered websites] but cannot do so." *Id.* at 803. That showing is impossible here. No matter what interest Defendant may cite, it will not qualify as "compelling." *Id.* at 799. "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will a government's mere "predictive judgment[s]" about harm. *Id.* at 799.

The Act is also not the "least restrictive means" to satisfy any possible governmental interest. *AFP*, 141 S. Ct. at 2383. The State can only pursue its interests "by means that are neither seriously underinclusive nor seriously overinclusive." *Brown*, 564 U.S. at 805.

The Act is vastly overinclusive. It reaches all sorts of Internet websites—from message boards (*e.g.*, Homeschool World Forum) to sites for service reviews (*e.g.*, Yelp) to traditional social media (*e.g.*, Facebook). And it prohibits minors from accessing *any* speech on these websites absent parental consent—even if that speech is educational, religious, political, or otherwise protected and valuable (or even innocuous). Yet minors use covered websites for all those purposes. Szabo Decl. ¶ 6. Worse, if Defendant atextually interprets the Act to require covered websites to determine every user's age, then the Act would also restrict *adults*' access to protected speech. An age-verification requirement would render the Act overinclusive as to *any* interest focusing on minors. Requiring adults to provide their ages would also be an independent reason that the Act triggers and fails strict scrutiny. *See Playboy*, 529 U.S. at 812 ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.").

The Act is also underinclusive. For example, the Act permits "established and widely rec-
ognized media outlets" to disseminate comments from covered minors but does not permit less
established media outlets to permit those same comments. § 1349.90(O)(2). So too for the Act's
carve-out for product reviews. § 1349.90(O)(1). The Act allows covered minors to post product
reviews on some websites (*e.g.*, a manufacturer's website) but not on others (*e.g.*, Facebook). Fur-
thermore, if covered websites are indeed "dangerous and mindaltering . . . it d[oes] not make sense
to leave [them] in the hands of children so long as one parent . . . says it's OK." *Griffin*, 2023 WL
5660155, at *18 (cleaned up) (quoting *Brown*, 564 U.S. at 802).

Regardless, the Act is nowhere near the "least restrictive" way to accomplish whatever
interests the State might assert. *AFP*, 141 S. Ct. at 2383. For instance, Ohio could give "parents
the information needed to engage in active supervision" over their children's access to the Internet.
*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000). That would require little more
than the State itself publicizing the diverse array of blocking and monitoring tools that are already
widely available. *See supra* p.4. "Similarly, the State could always act to encourage the use of
filters . . . by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up). "It is no
response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not
go perfectly every time." *Playboy*, 529 U.S. at 824. Rather, "if a less restrictive means is available
for the Government to achieve its goals, the Government must use it." *Id.* at 815.

Such poor tailoring "raises serious doubts about whether the government is in fact pursuing
the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S.
Ct. at 2376 (quoting *Brown*, 564 U.S. at 802). In sum, the Act "is only in support of what the State
thinks parents *ought* to want." *Brown*, 564 U.S. at 804. "This is not . . . narrow tailoring." *Id.* The
Act therefore cannot survive strict scrutiny.

14

**B.    The Act violates the First Amendment by restricting access to protected speech on the basis of content and speaker.**

The Act violates the First Amendment in another independent way: Its central coverage-defining provisions, § 1349.09(A), (B), and (O), are content- and speaker-based. The Act therefore triggers strict scrutiny for this reason, too, and the Act's content- and speaker-based distinctions for restricting access to protected speech likewise fail all forms of heightened scrutiny.

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). Thus, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they" satisfy "strict scrutiny." *Reed*, 576 U.S. at 163-64. The Supreme Court is also "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *NIFLA*, 138 S. Ct. at 2378 (cleaned up). The Act's coverage definitions suffer from each of these constitutional flaws. *See* § 1349.09(A), (B), (O).

A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). The Act meets that test.

First, the Act has a content-based exclusion for websites where "interaction between users is limited to . . . [c]omments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events." § 1349.09(O)(2). "[N]ews and current events" is a content-based category. *Id.* The Act is content-based because websites that focus on such content are exempt, while websites that focus on historical events are covered. A website that focuses on "news and current events" is not legally different from a website whose "purpose" is to "report" such content. *Id.* But "a regulation of speech cannot escape

classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin*, 596 U.S. at 74.

Second, the Act includes a content-based exclusion for websites where "interaction between users is limited to . . . [r]eviewing products offered for sale by electronic commerce or commenting on reviews posted by other users." § 1349.09(O)(1). This exclusion is content-based because it refers to "products," but not to services or protected expression. Thus, review of a toaster would be exempt, but review of a film would not. Likewise, this exclusion refers to "electronic commerce" but not to in-person commerce. Such content-based exclusions make the entire Act a content-based regulation and thus facially invalid. *Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2347 (2020) (content-based exceptions render entire statute content-based).

Third, the Act also restricts websites that allow users to "[p]opulate a list of other users with whom an individual shares or has the ability to share a social connection within the online web site, service, or product," § 1349.09(A)(1)(c), while exempting online services that have any number of other "predominant or exclusive function[s]," § 1349.09(N)(1). Those references to "function" are a proxy for other content-based restrictions. *See City of Austin*, 596 U.S. at 74.

Fourth, the Act "singles out specific subject matter for differential treatment," *Reed*, 576 U.S. at 169, regulating only websites that "target[ ]" children or that "reasonably anticipate" being accessed by children and then delineating eleven content-based criteria that "may" be used to help determine whether a website meets that definition. § 1349.09(C)(1)-(11) (listing content-based criteria, including "Subject matter," "Language," "Design elements," "Visual content," "Use of animated characters or child-oriented activities and incentives," "Music or other audio content," "Age of models," "Presence of child celebrities or celebrities who appeal to children," "Advertisements," "Empirical evidence regarding audience composition," and "Evidence regarding the

16

intended audience"). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin*, 596 U.S. at 69 (cleaned up). The Act does just that.

The Act is also speaker-based, because it applies to a narrow subset of speakers within the single medium of the Internet. Speaker-based laws "present serious First Amendment concerns" when they "discriminate . . . among different speakers within a single medium" or "f[a]ll upon only a small number" of speakers. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994). The Act exempts websites where "interaction between users is limited to" "[r]eviewing products" and those "established and widely recognized media outlet[s], the primary purpose of which is to report news and current events." § 1349.09(O)(1)-(2). Thus, a covered minor user does not need consent to "interact" and comment on an article posted on "established and widely recognized" media outlets like *The New York Times*, but, absent parental permission, could not comment on that same article reposted on a covered website like Facebook. All of this triggers strict scrutiny.

As explained above, the Act fails strict scrutiny. *See supra* pp.12-15. Ohio does not have a compelling interest justifying its content- and speaker-based restrictions on covered minors' access to protected speech. *See, e.g.*, *Brown*, 564 U.S. at 799. Moreover, these distinctions confirm that the Act is not the least restrictive means to achieve whatever interests the State might assert.

### C.     The Act is unconstitutionally vague.

The Act also violates the First Amendment and the Due Process Clause because its coverage provisions, including § 1349.09(A), (B), (C), and (O), are unconstitutionally vague. A "fundamental principle in our legal system is that laws . . . must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2009). The constitutional standard for vagueness is heightened for laws that restrict speech. *Id*. at 254-55.

The problems start with what websites the Act even covers. To be covered by the Act, a

website must be one that "targets children, or is reasonably anticipated to be accessed by children." § 1349.09(B). In order to determine whether that threshold requirement is satisfied, the Act delineates a vague eleven-factor test that the Attorney General or a court "may consider." § 1349.09(C). But the First Amendment prohibits speech restrictions that use "the open-ended rough-and-tumble of factors." *Citizens United*, 558 U.S. at 336 (cleaned up). The Act's incredibly open-ended coverage requirements fail to "give fair notice of conduct that is forbidden or required." *FCC v. Fox*, 567 U.S. at 253. Websites have no way to know what aspects of their services the Attorney General or a court will consider as "target[ing] children" or whether a website will be considered to "reasonably anticipate[]" being accessed by children. § 1349.09(B). Moreover, many of the Act's eleven factors are undefined and subjective—such as "[s]ubject matter," "[l]anguage," and "[d]esign elements." § 1349.09(C)(1)-(3). These factors are "so standardless that [the Act] authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). This "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements." *Id.* "Such ambiguity renders a law unconstitutional." *Griffin*, 2023 WL 5660155, at *13.

In addition, other provisions will leave many operators guessing as to their potential liability. A website is covered only if it allows users to "[i]nteract socially" with other users, but the Act does not explain what that means. § 1349.09(A). Therefore, it is unclear whether the ability to comment on another user's post is a social interaction that could subject a website offering that functionality to the Act's requirements. The Act's exception for commenting on "established" and "widely recognized" media outlets whose "primary purpose" is to "report news and current events" is likewise unconstitutionally vague. § 1349.09(O)(2). The Act fails to define what makes a media outlet "established" or "widely recognized," or even what constitutes a "media outlet." *Id.* Many

18

people get their news through websites like Facebook or X. But the Act leaves it ambiguous whether these websites, or aspects of these websites, would be exempted. The Act is also unclear whether this exemption encompasses local news outlets that are not "widely recognized." *Id.*

## II.    The remaining factors support a preliminary injunction or a temporary restraining order if necessary.

When a party seeks a preliminary injunction on the basis of a constitutional violation, "the likelihood of success on the merits often will be the determinative factor." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (internal quotation marks and citation omitted). Here, the other factors also overwhelmingly favor an injunction. NetChoice members and their users face irreparable injury absent injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (internal quotation marks and citation omitted). "When constitutional rights are threatened or impaired, irreparable injury is presumed." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (cleaned up).

The Act's drastic penalties make the harm especially severe for NetChoice's members. Each time a court finds that an operator contracted with a child without parental consent, the Act imposes a $1,000 per day penalty for the first 60 days an operator fails to comply, $5,000 per day after 60 days, and then $10,000 per day after 90 days. § 1349.09(I). This increasing penalty regime means that covered websites face almost $3 million in potential liability for each misidentified 15-year-old who accesses an account during the year before turning 16. Szabo Decl. ¶ 16.

The Act's overbearing dictates make perfect compliance impossible for nearly all covered websites. Szabo Decl. ¶ 14; *see* Paolucci Decl. ¶ 13. But even spotless compliance would not save covered websites from irreparable injury. As NetChoice and its members have explained in their accompanying declarations, complying with the Act would be quite burdensome and expensive.

*Szabo Decl.* ¶ 14; Paolucci Decl. ¶ 13; *see* Roin Decl. ¶ 22. Compliance costs "with no guarantee of eventual recovery" constitute irreparable injury too. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). Irreparable harm is therefore a certainty absent a preliminary injunction.

The final two factors are "harm to the opposing party" and "the public interest," but these factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Maintaining the status quo will preserve minors' access to some of the Internet's most popular websites (and many more) without the Act's onerous burdens. The Act's unmistakable constitutional defects should be fully adjudicated before websites are forced to fundamentally change the nature of their services. Nor would a speech-preserving preliminary injunction harm the State. Instead, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jones*, 569 F.3d at 278 (internal quotation marks and citation omitted).

This Court should enter a preliminary injunction that prohibits Defendant from enforcing the Act against NetChoice's members. If a ruling is not feasible before the Act takes effect on January 15, 2024, and if Defendant does not disclaim enforcement against Plaintiff's members while this motion is pending, the Court should enter a temporary restraining order that prohibits Defendant from enforcing the Act against NetChoice's members. Such a ruling would maintain the status quo and forestall the immediate and significant irreparable injury described above.

## Conclusion

Plaintiff respectfully requests that this Court enter a preliminary injunction prohibiting Defendant Ohio Attorney General from enforcing the Act against NetChoice's members. Plaintiff requests that this Court enter the preliminary injunction before this Act takes effect on January 15, 2024. If a ruling by that date is not feasible, and if Defendant does not disclaim enforcement against Plaintiff's members while this Motion is pending, Plaintiff requests a temporary restraining order that prohibits Defendant from enforcing the Act against NetChoice's members.

Dated: January 5, 2024

Respectfully submitted,

s/Matthew H. Rice

Matthew H. Rice (97290)
   *Trial Attorney*
SPERLING & SLATER, LLC
55 W. Monroe Street, 32nd Floor
Chicago, Il 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
mrice@sperling-law.com

Joshua P. Morrow*
Michael C. Cotton*
Alexis Swartz*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
michael@lkcfirm.com
alexis@lkcfirm.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

*(Applications for admission
pro hac vice forthcoming)*

*Attorneys for Plaintiff NetChoice, LLC*