# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| NETCHOICE, LLC, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| DAVE YOST, in his official capacity as Ohio Attorney General, | ) |
| | ) |
| *Defendant*. | ) |

## DECLARATION OF CARL SZABO
## IN SUPPORT OF PLAINTIFF'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION

I, Carl Szabo, declare as follows:

1. I am the Vice President and General Counsel of Plaintiff NetChoice, LLC ("NetChoice"). In addition to providing legal counsel to NetChoice, I coordinate NetChoice's advocacy before legislative bodies, courts, and government agencies to promote NetChoice's mission of advancing free enterprise and free expression on the Internet. My role at NetChoice has made me broadly familiar with member companies' business practices, the benefits they provide the public, and their efforts to keep minors safe online. My role has also made me familiar with other websites, applications, and digital services more broadly.[1]

2. I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal

---

[1] This Declaration uses "websites" to refer to all digital services, unless necessary to distinguish different kinds of digital services.

knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

**I.      About NetChoice**

3.      NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.

4.      For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular websites, including: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluid Truck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pindrop, Pinterest, Snap Inc., StubHub, Swimply, TikTok, TravelTech, Travelocity, Trivago, Turo, Verisign, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo!.[3] Some of these members own or operate what are commonly referred to as "social media" websites, including some of the Internet's most popular destinations. Other members own and operate other websites that are not generally understood as—and do not consider themselves to be—"social media" websites.

---

[2] NetChoice, *Home*, https://perma.cc/6DS5-2FYU.
[3] NetChoice, *About Us*, https://perma.cc/CJN5-RUCG.

2

5.  NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that the Social Media Parental Notification Act ("Act"), should it take effect, would irreparably harm our members and those who interact with members' websites. Though the Act does not regulate all of NetChoice's members, this Declaration will refer to those members the Act does regulate as "covered members" or just "members."

**II.     NetChoice Member Websites Are Full of Valuable Expression and Communities That Provide People—Minors and Adults Alike—with Profound Benefits.**

6.  NetChoice members' websites are full of a wide range of incalculably valuable expression and communities. Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the world (both adults and minors, including minors under 16) use these websites every day to explore and engage in protected speech. They do so in a wide variety of ways—socially (to connect with friends from school and church, form groups, find communities of those with likeminded interests), artistically (to showcase their creative talents, including their photography, writing, or other forms of creative expression), informatively (to keep up with the news and current events), politically (to participate in public discussion, or to raise awareness about social causes), and educationally (to get help with math problems, learn about financial literacy, listen to college course lectures). Unsurprisingly, therefore, people—minors and adults alike—greatly benefit from access to these websites. Because these websites help minors learn about and engage with the world around them, the websites can play a profound role in minors' learning and development. In general, each covered member's website publishes, disseminates, creates, curates, and distributes protected speech. They do this by displaying text, audio, graphics, or video to their

users. Some of this content is generated by the websites themselves. Much of this content is also generated by users themselves, who use these websites to share content with a website-specific list of "friends" or connections, or with the world at large.

### III.    NetChoice Members Go to Great Lengths to Protect Minors

7.    NetChoice's members take the safety of all their users and account holders seriously and place a special emphasis on minors' safety. To that end, many NetChoice members have developed content-moderation policies and other safeguards to protect minors online.

a.    **Limiting Access by Age.** Many NetChoice members do not allow minors younger than 13 to create accounts on their services. *E.g.*, Dreamwidth, Terms of Service, https://perma.cc/MB33-4QBE ("The Website is available only to individuals who are at least 13 years old."); Facebook, Terms of Service, https://perma.cc/RGX4-ZHR7 ("We try to make Facebook broadly available to everyone, but you cannot use Facebook if: You are under 13 years old."); Goodreads, Terms of Use, https://perma.cc/JFQ8-D55A ("This Service is intended solely for Users who are thirteen (13) years of age or older, and any registration, use or access to the Service by anyone under 13 is unauthorized, unlicensed, and in violation of this Agreement."); Instagram, Terms of Use, https://perma.cc/BX53-AES4 ("You must be at least 13 years old."); Nextdoor, Help Center, https://perma.cc/C6N8-Z27E ("Nextdoor is a family-friendly platform, open to neighbors ages 13 and over."); Pinterest, Terms of Service, https://perma.cc/HD4B-CGUR ("Any use or access by anyone under the age of 13 is not allowed."); Threads, Threads Terms of Use, https://perma.cc/3NJ9-JZS7 (incorporating Instagram's terms of use); X, X Terms of Service, https://perma.cc/GZ8K-UHUH ("[Y]ou must be at least 13 years old to use X"). While YouTube and TikTok have developed separate services for minors younger than 13 that have parental consent, these members (1) put extensive limits on the content that these minors see; (2) ensure parents' abilities to oversee their children on the services; and (3) limit the interactions that these

4

minors may have on the services. *See* TikTok, TikTok for Younger Users, https://perma.cc/X8E9-G29M; YouTube, My Family, https://perma.cc/FN7H-ZDF4.

   b. **Minor-Specific Policies.** Some NetChoice members have adopted policies or practices specifically for minors' accounts on their websites. Instagram, for instance, imposes default restrictions that make it more difficult for people under 16 years old to come across potentially sensitive content. Instagram, Updates to the Sensitive Content Control, https://perma.cc/6Q7R-EUZK. Similarly, YouTube has a standalone "Child Safety Policy." YouTube, Child Safety Policy, https://perma.cc/H3YJ-TFVN.

   c. **Content Moderation.** NetChoice members have chosen to balance disseminating large amounts of user-authored expression while also limiting publication of speech that NetChoice's members consider harmful, objectionable, or simply not conducive to their communities. Though the policies vary, they recognize that free expression requires people to feel comfortable expressing themselves. All of NetChoice's covered members have content-moderation policies that address the publication of content that they deem objectionable or harmful to the communities that use their websites—that can include content that promotes or glorifies suicide, self-harm, or eating disorders, substance abuse, stalking, bullying, harassment, grooming, trafficking, child pornography, sexual exploitation, abuse, or content that is sexually explicit or pornographic. Based on our research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why (2021), https://perma.cc/UC8A-92WN.

  8. Parents and guardians, too, can control whether their minor children have access to Internet-connected devices in the first place. For parents who do allow their children to access the

Internet, NetChoice members empower parents to oversee their children's use of members' websites. And members' app-specific tools exist alongside other tools provided by device manufacturers, Internet access providers, and software manufacturers that parents can use to further supervise their minor children.

  a.  **Network-Level Restrictions.** Many cell service and broadband Internet providers have designed tools for parents to block certain apps, sites, and contacts from their children's phones and to restrict screen time on their children's devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/E8T7-DY75; AT&T, Secure Family, https://perma.cc/8G7Q-92PW; T-Mobile, Family Controls and Privacy, https://perma.cc/B7AM-3MUD; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/R8AT-FBJJ. Similarly, many wireless routers contain parental control settings that parents can use to block specific online services, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services their children visit. *See* Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 11, 2021), https://perma.cc/5MRW-X5VH; Netgear, Circle Smart Parental Controls, https://perma.cc/SFV2-8J6F.

  b.  **Device-Level Restrictions.** Many devices themselves contain ways parents can restrict their use. Many of the most popular phone manufacturers like Apple, Google, and Microsoft allow parents to limit screen time across their devices and provides parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings. *See, e.g.*, Google, Family Link, Help Keep Your Family Safer Online, https://perma.cc/KT7A-LANZ; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/E7SY-L5X6. For example, Apple allows parents to lock or limit specific apps and features on a minor's device, restrict the device settings to limit content

6

and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://perma.cc/V9AU-QR9W. There are also many third-party applications parents can install on their children's devices to monitor their activity, set limits on screen time, and filter content. *See* Ben Moore & Kim Key, *The Best Parental Control Apps for Your Phone*, PCMag (Mar. 29, 2022), https://perma.cc/3Q7F-KAKW.

      c.      **Browser-Level Restrictions.** There are also parental controls on Internet browsers that allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/BYS8-6RLY. Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/HRL2-Z2ZU; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/5SRM-PZ38. Third-party software and browser extensions are also widely available to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PC Mag (Dec. 15, 2023), https://perma.cc/T2EU-ASKZ.

      d.      **App-Level Restrictions.** Layered on top of external restrictions, many NetChoice members have developed their own internal tools that allow parents to set further restrictions on their children's use of the websites. For instance, Meta has developed its own "Family Center," which provides for parental supervision on Instagram and allows parents to, among other things, (1) see their minor children's followers and who their minor children are following; (2) see how long the minor spends on Instagram; and (3) set time limits and scheduled breaks. Meta, Family Center Tools, https://perma.cc/9BW9-4J95. Likewise, TikTok's "Family Pairing features let parents link their TikTok account to their teen's to enable a variety of content, privacy, and well-being settings. . . . Even without Family Pairing enabled, parents can help their teens enable our

7

app's Screen Time offerings, including Daily Screen Time and Restricted Mode, which are protected by a passcode set by the parent or guardian." Tik Tok, Guardian's Guide, https://perma.cc/JT6E-YLJU.

## IV. The Act's Effect on NetChoice Members and the Internet

9. Although the Act's coverage provisions are unclear on their face, the Act appears to regulate some NetChoice's member companies. The Act imposes requirements on "[t]he operator of an online web site, service, or product that targets children, or is reasonably anticipated to be accessed by children." Ohio Rev. Code §§ 1349.09(B). The Act defines "operator" to mean "any business, entity, or person that operates an online web site, service, or product" with users in Ohio that "do all of the following":

> (a) Interact socially with other users within the confines of the online web site, service, or product;
>
> (b) Construct a public or semipublic profile for the purpose of signing into and using the online web site, service, or product;
>
> (c) Populate a list of other users with whom an individual shares or has the ability to share a social connection within the online web site, service, or product;
>
> (d) Create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users.

*Id*. § 1349.09(A)(1).

10. Under the Act, "the attorney general or a court may consider … subject matter, language, design elements, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, advertisements, empirical evidence regarding audience composition, and evidence regarding the intended audience" in determining whether a website "targets children, or is reasonably anticipated to be accessed by children." *Id*. § 1349.09(C)

8

(cleaned up). The Act defines "child" as "any consumer of an online web site, service, or product who is under the age of sixteen and who is not emancipated." *Id*. § 1349.09(A)(2).

11. **Scope.** Based on my understanding, the Act appears to cover or affect many NetChoice members—including websites like Facebook, Instagram, and Threads (owned by Meta), YouTube (owned by Google), Dreamwidth, Nextdoor, Pinterest, and X. The Act also likely affects a host of traditional social media and networking websites, including websites like Behance, Cameo, Citizen, Discord, Fishbowl, Gettr, LinkedIn, Origin, Substack, and Yelp.

12. Moreover, the Act covers an untold number of other websites across the Internet, including websites that adults and minors (including minors under 16) use for myriad purposes including art, education, gaming, general interest, information gathering, professional activities, and research. Thus, the Act is not limited to what is normally referred to as "social media" websites. At a minimum, thousands of websites across the Internet fall within the Act's scope because they allow users to: sign in via a "profile"; "[i]nteract socially with other users"; generate a list of friends, connections, or "other users"; post "content"; and view content on a "landing page or main feed." Ohio Code § 1349.09(A)(1). Indeed, the Act expressly mentions websites that offer "message boards, chat rooms, video channels, direct or private messages or chats." *Id.* § 1349.09(A)(1)(d). Accordingly, the Act appears to sweep in countless message boards and community forums that are a home for discussion on every topic under the sun—everything from politics and religion to classical music, backpacking, homeschooling, board games, gardening, and hundreds of other subjects.

13. **Compliance Burdens.** The Act requires each covered member (and an untold number of other covered websites) to "[o]btain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or

9

utilize the online web site, service, or product, from the child's parent or legal guardian." *Id.* § 1349.09(B)(1).

14. These parental consent requirements will prove costly and difficult for NetChoice members to implement, and many members may find it impossible. These requirements pose at least four major hurdles for websites—on top of the burdens they impose on users and account holders.

   a. First, most of NetChoice's covered members' websites (and most websites in general) do not have internal compliance tools or processes to verify parental consent. Designing and maintaining a comprehensive and foolproof system to comply with the Act will be costly, time-consuming, and resource-intensive.

   b. Second, covered members will be required to obtain and store sensitive personal identifying information about minors and their parents or guardians. Minors in particular are an attractive target for identity thieves. Complying with the Act will thus amplify the risks of data security breaches, necessitating even more investment in heightened cybersecurity measures.

   c. Third, there will be no foolproof mechanism for ensuring an account holder's genuine parent-child relationship without infringing significantly on the privacy rights of both minors and parents or guardians. As just one example of the many difficulties in securing parental consent, the law does not account for situations in which there might be a dispute among parents and guardians as to consent.

   d. Fourth, new processes at sign up inevitably affect account holder growth, as cumbersome registration processes might dissuade people from signing up. Any decline in account holder sign-ups will have a ripple effect on companies' advertising revenues, brand partnerships,

and overall vitality. In sum, these broad dictates make it impossible for nearly all covered members to comply fully, leading to uncertainty over which covered members will face enforcement actions.

15. The Act's requirements will also harm the First Amendment interests of users, including users under 16. Those requirements will also make it more difficult for NetChoice's members to provide their services to minors and will burden adults' access to highly valuable and protected speech. Rather than attempt to comply with onerous verification procedures, many users may choose to abandon covered websites altogether. Furthermore, the Act's requirements may be counterproductive to the goals of preserving minors' well-being online. Compliance would require websites to maintain records, which could infringe on the user's privacy and personal security.

16. NetChoice's covered members' websites will face massive potential liability if they fail to comply with the law. The Act requires the court to impose a civil penalty on the operator as follows: "Up to one thousand dollars for each of the first sixty days the operator failed to comply with this section; . . . up to five thousand dollars for each subsequent day the operator failed to comply with this section . . . [through] the ninetieth day; [and] . . . up to ten thousand dollars for each subsequent day the operator failed to comply with this section, commencing with the ninety-first day." § 1349.09(I). This means that covered members and other websites face potential liability of almost $3 million for every misidentified 15-year-old who accesses an account during the year before turning 16 ((60 days × $1,000) + (30 days × $5,000) + (265 days × $10,000)).

17. If the Act takes effect, it will cause irreparable to harm to NetChoice's members and to Internet users. The Act requires covered members to risk massive liability or to incur substantial, unrecoverable costs in reconfiguring their websites to comply with the law. The Act also presents members with significant uncertainty about their compliance obligations (for instance, websites have no way to determine whether they are an "established and widely

11

recognized media outlet"). NetChoice's members' account holders (current and prospective) will also suffer harms, because the Act will place burdens on their access to protected and valuable speech. The Act may require websites to stop providing their current range of services (for instance, some websites may ban minors altogether rather than attempt to navigate the uncertainties that are inherent in obtaining "verifiable" parental consent). On the other end, users will face more hurdles to access the protected speech on the broad range of websites the Act covers. In some cases, those hurdles may be outright bans.

*   *   *

18. If the Act takes effect on January 15, 2024, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing to be true and correct to the best of my knowledge. Executed on this 4th day of January, 2024, in Washington, DC.

_____
Carl Szabo