IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| NETCHOICE, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> DAVE YOST, in his official capacity as Ohio Attorney General, <br><br> *Defendant*. | ) ) ) ) ) ) ) ) ) ) ) )   Case No. _____ |

**DECLARATION OF DENISE PAOLUCCI
IN SUPPORT OF PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION**

I, Denise Paolucci, declare:

1. I am the co-owner of Dreamwidth Studios, LLC, which operates the website dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles for the website, including as the head of the Trust and Safety team and head of product development. I am older than 18 and I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business.

2. Dreamwidth is an open source social networking, content management, and personal publishing website, in operation since 2009. Registering an account requires a user to choose a username, provide an email address, and explicitly agree to the provisions of our Terms of Service. Dreamwidth's registered users can create public profiles that contain multiple pieces of information about themselves, post content to their "Journal" and comment on others' posts, send direct messages to users in accordance with the privacy settings those users have

chosen, post and comment in shared community forums, and construct and populate and browse a feed that presents the user with aggregated content posted by other users they have chosen to follow. Dreamwidth operates according to a set of Guiding Principles and a Diversity Statement that encapsulate our business philosophy. *See* https://www.dreamwidth.org/legal/principles; https://www.dreamwidth.org/legal/diversity. Dreamwidth provides a number of privacy, security, and content-control features, allowing our users a high degree of control over their own data and their own online experience. Our users can choose who sees their content, restrict access to their content in multiple ways, and control the visibility of everything they post to the site.

3. *Business model and data sharing.* Dreamwidth does not accept any form of advertising and does not engage in the sale, trade, or brokering of user data. Our revenue comes entirely from our "freemium" model, where approximately 20% of our users pay a fee to access extra services and fund the site for the approximately 80% of our active users who use the site on an unpaid basis. We do not accept payment to promote posts, change the order or priority of content, or to target content or posts to a subset of users. We do not offer any algorithmic sorting or display of user timelines that adjusts the display of content based on a prediction that a particular user will be more or less interested in a particular piece of content, and we do not collect or store the data about user behavior that would allow us to make those predictions. Our Privacy Policy (https://www.dreamwidth.org/legal/privacy) and Guiding Principles promise users that we will collect the minimum amount of personally-identifying data about them that is necessary in order to operate the service.

4. Dreamwidth.org has approximately 4 million registered accounts, and has approximately 2 million unique visitors annually. We operate on a limited budget, and are staffed by myself and the company's other co-owner, two part-time employees, and approximately 200 volunteers.

5. Dreamwidth does not deliberately target children (those younger than 13) as an audience and our intended audience is adults looking for a social media service that will respect their privacy. However, in order to ensure compliance with the Children's Online Privacy Protection Act (COPPA), we do collect a date of birth from all users at registration. When a user signs up for a Dreamwidth account, they must enter a username, an email address that can be verified through an automatic email link, a password, and a birthdate. The birthdate field displays a notice that "This information is required by law" and "You must enter your real birthdate". In accordance with COPPA, we have chosen not to create a system that will verify parental consent for children under the age of 13 to maintain an account on the service. Therefore, we do not accept registration from users whose birthdate provided at registration indicates they are under 13 years old. Accounts owned by users whose birthdate indicates they are under the age of 18 have further restrictions placed on those accounts for the purposes of user safety.

6. Dreamwidth does not collect address, location, or geolocation data of our users, at the time of account registration, login, or posting. Users are able to voluntarily provide their location information if they choose to do so in order to display it on their profile. Approximately 4500 Dreamwidth users have chosen to voluntarily identify themselves as residents of Ohio, and at least one of those users has provided a birthdate indicating they are under the age of 16 as of the date of

execution of this declaration. This does not count users who may be located in the state of Ohio but have not chosen to provide their location information.

7. Because we have empirical evidence regarding our audience composition in accordance with the definitions set forth in 1349.09(C)(10), and because our collection of features meet the definitions set forth in 1349.09(A)(1), it is my understanding Dreamwidth qualifies as an "operator" under the law.

8. *User safety.* Privacy is one of Dreamwidth's core business principles, and Dreamwidth provides its users a significant amount of control over who can see their content. Registered users can specify privacy settings for nearly every piece of information they post to the site. Privacy settings can be applied to entire user accounts or community accounts, to individual posts, and even to individual pieces of information users have chosen to add to their profiles such as their email address, their location, or their birthday. For example, posts made to Dreamwidth can be set as "public" (visible to anyone who accesses the user's URL), "access locked" (visible only to other users the poster has affirmatively authorized to see the post), "custom filtered" (visible only to a user-defined subset of the other users the poster has affirmatively authorized to see the post) or "private" (visible only to the user). These privacy settings are per-post and can be individually changed at any time, even after posting.

9. Users also have the option to add one of two different content restrictions to a post, or to an entire journal or community (in which case each post inherits the same restriction by default). The first form of content restriction, "Viewer Discretion Advised," puts the content behind a click-through warning notice that the poster has advised the content "should be viewed with discretion." Clicking

an acknowledgment button will reveal the content. Users who apply this restriction can also enter a specific reason that discretion is advised, which the warning will display. Reasons may include that the content contains "spoilers," may upset or trigger certain audiences, or may contain content someone might not want to view in public. The second content restriction, "Adult Content," prevents users who are under eighteen years old (based on the birthdate entered by the user during account set up) from loading the content at all. Users registered as over eighteen will get a click-through warning reading "you are about to view content that [username] marked as inappropriate for anyone under the age of 18," though they can disable these warnings in their account settings. If the content is posted publicly, users who are not logged in to Dreamwidth will receive a click-through warning that the content has been "marked as inappropriate for anyone under the age of 18," and have to click a button reading "Yes, I am at least 18 years old" before viewing. We ask users to set the Adult Content restriction on any content they believe is inappropriate for someone under the age of 18 to view. We do not proactively search for mislabeled content, but when mislabeled content is reported to us, we will set the Adult Content restriction on individual posts containing sexually explicit or violent imagery if the account contains only incidental adult content or on the journal as a whole if we believe the majority of the journal qualifies as adult content.

10. **Age Verification.** The only way to conclusively identify which of our users are under the age of 16, and therefore to ensure our compliance with 1349.09, would be to require identity verification. To the best of my knowledge, there is no technology -- much less any technology available to a site with Dreamwidth's limited resources -- that could allow us to even estimate our users' ages with the

sufficient degree of accuracy necessary to comply with the law. The only method that can determine a user's age to a sufficient degree of confidence to avoid the assumption of significant levels of liability under 1349.09 would be to require identity verification through forcing every single one of our users, no matter what age they claim to be, to upload government-issued identification, deanonymizing themselves and jeopardizing their privacy. Because people can move at any time and can travel to states they don't reside in, in order to avoid liability, we would need to require identity verification of all users, no matter where their connection came from, to guard against the possibility that someone under the age of 16 residing in Ohio was creating an account while on vacation to another state or by using a location-concealing VPN service. This will place a significant burden on the speech and conduct of every adult that uses Dreamwidth's services, not only people under the age of 16 in Ohio or even only on Ohio residents who are of legal age.

11. Dreamwidth's users are extremely privacy-conscious and come to our website expecting their privacy and anonymity to be respected. Our users are highly aware of the security risk inherent in providing personally-identifying information to any website, and they frequently cite our privacy practices as a reason to choose our website over other websites. To be forced by the state of Ohio to demand that our users prove their identity to us or secure parental consent in order to use the website would alienate our users, violate the promises we have made to them, and be contrary to our principles. We do not want to be forced to collect this data, and our users do not want to be forced to provide it to us.

12. Because of our strong commitment to privacy, a large percentage of our userbase consists of marginalized people who experience heightened personal security concerns online. A nonexhaustive list of these groups includes:

(a) Russian or Chinese activists protesting their government's human rights abuses, who are comfortable using our site because we do not cooperate with their government's mandated censorship and do not require them to provide us personally identifying information that may be discoverable by their government;

(b) disabled people who are looking for community or seeking to share information on their conditions, who are comfortable using our site because we do not require them to provide us personally identifying information that may be used against them by doctors, insurance companies, employers, etc., and because we employ significant effort to make sure the site is accessible to multiple conflicting disability access needs;

(c) blind people who can use our site easily because of the significant effort we employ to ensure the site is one of the most screenreader-accessible products on the internet and because we minimize the steps it takes to create an account;

(d) people of marginalized genders and sexualities, who are comfortable using our site because we don't accept advertising and therefore are not affected by companies who are more likely to treat LGBTQ content as age-inappropriate while heterosexual content is treated as acceptable.

These groups and many others rely on our promise of privacy and anonymity to feel comfortable engaging in online speech. If Dreamwidth is forced to impose identity verification and parental-consent requirements, it will have a significant

chilling effect on these groups' willingness to engage in online speech. Our users frequently cite our ability to protect their anonymity and our refusal to engage in data selling practices as a primary reason they use Dreamwidth rather than any other service.

13. **Compliance burdens.** Dreamwidth does not have any full-time employees. In addition to myself and my co-owner, both of whom operate Dreamwidth in our spare time, we have two part-time employees. We depend on a pool of approximately 200 volunteers, all of whom donate their time to make programmatic improvements to the site, provide technical support on a peer-to-peer basis, and protect the community from spam and malicious traffic. We do not have the resources to add more employees: because we are funded only by the users who choose to pay us, not by advertising, our budget is severely constrained and we are unable to absorb additional expenses. The standards of parental consent set forth in 1349.09(B)(1) are impossible for us to meet without significant additional expense. We do not have an office for people to send physical mail to. We do not have the capacity to receive faxed documents. We do not have the resources or the staffing to operate a toll-free hotline or a videoconferencing system, and we not only do not have the resources to hire a third-party contractor to do it on our behalf but also object to that practice because it inherently involves the transfer of user data to a third party, something that is against our Guiding Principles. We do not have the capacity to build a system of payment verification or a secure document upload system. We are also opposed to accepting identity verification documents via email without first counseling the sender that email is an insecure system that may place their personal identity documents at risk of interception. We do not have the capacity to utilize any of

the methods of establishing parental consent provided by the law without significant additional burden.

14. From my twenty-two year career in online Trust and Safety, both at Dreamwidth and at prior jobs, I know that confirming a parent-child relationship is significantly more complicated than a single action to establish parental consent. At a previous employer, who utilized credit card verification to confirm parental consent under COPPA to allow children under 13 to create an account, a relatively common social engineering vector adopted by parties who maliciously wished to fool the website into closing a user's account was to write to the website and falsely claim the user was under the age of 13 and did not have parental consent to hold an account, even though the user was over the age of majority. On Dreamwidth, we have likewise experienced malicious actors writing to us and falsely claiming that a user is under the age of 13 and does not have parental permission to hold an account. Dealing with these social engineering attempts, verifying the user's actual age, and confirming that the person writing to us was not the user's parent or guardian is a significant support burden that would only increase under 1349.09 as it became known that someone could maliciously force us to close a user's account simply by claiming them to be under the age of 16. These tactics are already relatively common, and I believe the use of them would increase if this law goes into effect. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity.

15. From my twenty-two year career in online Trust and Safety, I know that familial relationships are often far more complicated than conventional wisdom believes, and identifying which person is a child's parent or guardian with legal decision-

making authority is often not a simple task. For instance, if a child has two divorced parents who disagree about whether their child should be permitted to hold an account on a website, the website must confirm the legal relationship between the parties and the child involved, and determine which of the people at hand has the legal decision-making authority to provide sufficient parental consent. In a particularly contentious divorce, this can require the website to review divorce decrees, examine legal paperwork, and determine the authenticity and provenance of the documents supplied to them. Because someone who lives in Ohio may have obtained their divorce from any one of the thousands of court systems across the United States, or even from another country, before moving to Ohio, this would require us to become experts in authenticating court documents from anywhere in the world. We do not have the capacity to perform this authentication, nor do we have the financial resources necessary to increase staffing to increase that capacity.

16. There is no national identity database that allows someone to verify a child's identity, the legal relationship between a parent and a child, or which parent has the authority to make binding decisions for a child. There is no way to verify a user's identity beyond requiring the upload of government-issued identifying documents, which many children under the age of 16 do not have. There is no way for a website to verify that the documents uploaded for identity verification purposes belong to the person who is uploading them or that the person who controls the account is the same person who provided the identifying documents. Disputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and unfortunately

common. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity.

17. The provisions of 1349.09 allowing for parental consent to be ex post facto terminated also will increase the support burden. Each contact to withdraw consent will require us to begin the process of establishing the parties' identity and legal relationship over again, in addition to re-verifying the user's identity and age in order to determine whether they are still under the age of 16 and therefore still subject to the provisions of the law. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity.

18. I am extremely concerned that the schedule of the fines set forth by 1349.09(I) does not take business revenue, number of website registered users or visitors, or severity of violations into account. For small websites such as Dreamwidth, even a single day's fine of $1000 would represent a significant increase in our average monthly expenses, and our limited staffing and constrained engineering capacity means that it is extremely unlikely a single day would be sufficient notice to rectify any deficiencies in our compliance with the law. We also do not have the resources to retain a lawyer licensed in Ohio who can advise us on the steps necessary to initially comply with the law, evaluate whether any technical measures we might implement are sufficient to qualify under the vague "substantial compliance" provision of 1349.09(M)(1) that would entitle us to receive written notice before commencement of civil action, or provide guidance on specific situations that arise in the ordinary course of business regarding disputes as to whether an account qualifies as belonging to someone under the

age of 16 and the person contacting us about the account has sufficient legal authority to withdraw consent for the account owner to hold an account. Under this fine schedule, the fines for a single mistake would exceed our net profit for 2022 by day 19 and exceed our total gross income for the entirety of 2022 by day 95.

19. Even in the absence of any fines, and even if we were accorded the warning before fines were assessed for any potential violations of the law, the cost of the engineering and support time necessary to implement the requirements of the law will be substantially prohibitive. Our engineering resources are limited, and the time it would take to implement the changes required by this law would significantly delay our ability to provide other feature enhancements, security fixes, and bugfixes to our users due to the engineering time that compliance would require.

20. Because of the uncertainty and vagueness of the law, the lack of any guidance on how to handle disputes over identity, the uncertainty of what consists of "substantial compliance" sufficient to receive written notice of deficiency before fines are imposed, and the impossibility of identifying which users are residents of Ohio and which residents of Ohio are under the age of 16 without deanonymizing and forcibly identifying every user who creates an account, 1349.09 will force us to err on the side of caution, require our users to provide us significantly more personal data than we wish to collect, force us to restrict access to the site beyond the restrictions we wish to place, and require us to place significant burdens on the speech and anonymity of adults in order to avoid the possibility of fines that will jeopardize our ability to offer the service at all.

I declare under penalty of perjury that the foregoing is **true and correct** to the best of my knowledge.

Executed this 4 day of Jan, 2024, in Baltimore, MD.

Denise Paolucci

Co-Owner, Dreamwidth Studios, LLC