**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| NETCHOICE, LLC, | : | |
| | : | |
| Plaintiff, | : | **Case No. 2:24-cv-00047** |
| | : | |
| v. | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| DAVE YOST, in his official capacity as | : | **Magistrate Judge Elizabeth Preston Deavers** |
| Ohio Attorney General, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER

This matter is before this Court on Plaintiff NetChoice, LLC's ("NetChoice") Motion for

a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") against Defendant

Ohio Attorney General David Yost. (ECF No. 2). This Court held a conference on Plaintiff's

Motion for a TRO pursuant to S.D. Ohio Civ. R. 65.1 on Monday, January 8, 2024. This Opinion

and Order only addresses Plaintiff's Motion for a TRO. For the reasons set forth below, this Court

**GRANTS** Plaintiff's Motion for a TRO.

### I.      BACKGROUND

#### A. Factual Background

This case is about whether an Ohio state law, the Parental Notification by Social Media

Operators Act, Ohio Rev. Code § 1349.09(B)(1) ("Act"), set to take effect on January 15, 2024,

violates the First and Fourteenth Amendment rights of popular websites including Facebook, X

(formerly Twitter), and YouTube, in addition to violating the First Amendment rights of those

websites' users. The websites' and users' interests are represented by Plaintiff NetChoice, an

Internet trade association, which brought this suit against Ohio Attorney General David Yost, in

his official capacity, seeking declaratory and injunctive relief to prevent Yost from enforcing the law against NetChoice's members.

## 1. NetChoice and the Internet Landscape

NetChoice is an Internet trade association that represents several popular websites and platforms including Google, Meta, X, Nextdoor, and Pinterest, each of which, NetChoice contends, publish, disseminate, create, or distribute speech protected by the First Amendment. (ECF Nos. 2 at 6-7; 2-1 ¶ 11). Adults and teens alike flock to NetChoice's member websites and generate billions of "posts" every day. (ECF Nos. 2 at 7; 2-1 ¶ 6). NetChoice details the non-legislative tools that parents have at their disposal to oversee their children's use of the internet, including restrictions made available by devices, networks, software, and even by NetChoice's member organizations on their platforms. (ECF No. 2 at 7-8; 2-1 ¶ 8).

## 2. The Entities that the Act Seeks to Regulate

The Act, which resembles legislation enacted in other states, seeks to require certain website operators to obtain parental consent before allowing any unemancipated child under the age of sixteen to register or create an account on their platform. Specifically, the Act regulates "operator[s]" of "online web site[s], service[s], or product[s]" that (1) "target[] children," or are "reasonably anticipated to be accessed by children"; (2) have users in the state of Ohio; and (3) allow users to do all of the following:

> (a) Interact socially with other users within the confines of the online web site, service, or product;
> (b) Construct a public or semipublic profile for the purpose of signing into and using the online web site, service, or product;
> (c) Populate a list of other users with whom an individual shares or has the ability to share a social connection within the online web site, service, or product;
> (d) Create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users.

2

§ 1349.09(A)(1); (B).  The Act explains that in order to determine "whether an operator's online web site, service, or product targets children, or is reasonably anticipated to be accessed by children, the attorney general or a court may consider the following factors":

> (1) Subject matter;
> (2) Language;
> (3) Design elements;
> (4) Visual content;
> (5) Use of animated characters or child-oriented activities and incentives;
> (6) Music or other audio content;
> (7) Age of models;
> (8) Presence of child celebrities or celebrities who appeal to children;
> (9) Advertisements;
> (10) Empirical evidence regarding audience composition; and
> (11) Evidence regarding the intended audience.

§ 1349.09(C).

The Act contains several exceptions.  Of relevance here, the Act does not apply to corners of the Internet where "interaction between users is limited to": "(1) Reviewing products offered for sale by electronic commerce or commenting on reviews posted by other users; (2) Comments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events."  § 1349.09(O).

### 3.  *The Act's Requirements of Covered Operators*

If an operator falls within the above-enumerated parameters, it is required to: (1) "[o]btain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product, from the child's parent or legal guardian" through a variety of acceptable methods; and (2) present to the parent or guardian a list of features related to content moderation and a link where they may review those features.  *See* § 1349.09(B).  In the absence of parental consent, children under the

age of sixteen "shall" be denied access to the "use of the online web site, service, or product." §
1349.09(E).

### 4. The Act's Enforcement Mechanism and Penalties for Non-Compliance

Should a covered operator be found to be in noncompliance with the Act, the Ohio Attorney
General "shall investigate" the issue and may bring suit. § 1349.09(G); (H). A court that finds
that an operator has violated the terms of the Act "shall impose a civil penalty" under the following
scheme: (1) up to $1000 per day for the first 60 days of noncompliance; (2) up to an additional
$5000 per day for days 61-90; and (3) up to an additional $10,000 per day for days 91 and beyond.
*See* § 1349.09(I). "If an operator is in substantial compliance with this section," however, the
attorney general may not commence civil action until providing the operator with written notice
of the suspected violations, and a 90-day opportunity to cure, in which the operator must provide
the attorney general with "written documentation that the violation has been cured and that the
operator has taken measures sufficient to prevent future violations." § 1349.09(M).

### B. Procedural Background

The Governor of Ohio signed the Act into law in July 2023, and it is set to take effect in
one week—on January 15, 2024. Plaintiff NetChoice filed this lawsuit and a Motion requesting
both a TRO and PI on January 5, 2024. (ECF No. 2).

This Court held a conference on Plaintiff's Motion for a TRO pursuant to S.D. Ohio Civ.
R. 65.1 on Monday, January 8, 2024. This Court has considered the arguments made orally by the
parties at the Rule 65.1 conference, in addition to the Plaintiff's written submission.

### II. STANDARD OF REVIEW

A TRO is an emergency measure, meant "to prevent immediate and irreparable harm to the
complaining party during the period necessary to conduct a hearing on a preliminary injunction."

*Hartman v. Acton*, 613 F. Supp. 3d 1015, 1021 (S.D. Ohio 2020) (quoting *Dow Chemical Co. v. Blum*, 469 F. Supp. 892, 901 (E.D. Mich. 1979)).  Federal Rule of Civil Procedure 65(b) requires a Court to examine on application for a TRO, whether "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant."  Fed. R. Civ. P. 65(b)(1)(A).  The Sixth Circuit has explained that courts may also consider the traditional preliminary injunction factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc).

To obtain temporary injunctive relief, it is of paramount importance that the party establish immediacy and irreparability of injury.  *See Doe v. Univ. of Cincinnati*, 2015 WL 5729328, at *1 (S.D. Ohio Sept. 30, 2015) (noting that "standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo") (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).  While a Court is permitted to consider the other factors, immediacy and irreparability of harm are threshold considerations since "[a] temporary restraining order is an extraordinary remedy whose purpose is to preserve the status quo."  *Marshall v. Ohio Univ.*, 2015 WL 1179955, at *4 (S.D. Ohio Mar. 13, 2015) (citing *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir.1996)).  The "burden of proving that the circumstances 'clearly demand' such an extraordinary remedy is a heavy one" since the party seeking "the injunction must establish its case by clear and convincing evidence.'"  *Id.*

(citing *Overstreet v. Lexington-Fayette UrbanCnty. Gov't*, 305 F.3d 566, 573 (6th Cir.2002); *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir.1998)).

## III.    LAW & ANALYSIS

### A.  Standing

Before turning to the TRO considerations outlined above, this Court must first determine whether NetChoice has standing to bring these claims on behalf of: (1) its members; and (2) its members' users.  A litigant has standing if it "is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  There are two constraints that govern a party's standing: "[c]onstitutional standing addresses *who* has the right to invoke the power of a court (e.g., by filing a lawsuit), while prudential standing addresses *what arguments* a party may raise as a claim or defense."  *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *8 (W.D. Ark. Aug. 31, 2023) (emphasis in original) (citing Curtis A. Bradley, Ernest A. Young, *Unpacking Third-Party Standing*, 131 Yale L.J. 1, 26 (2021)).

Recall that NetChoice not only brings First Amendment and Fourteenth Amendment claims on behalf of its member organizations, but it also brings a First Amendment claim on behalf of the users of those member organizations' websites and platforms.

#### 1.  Constitutional Standing

First, this Court considers whether NetChoice is entitled to bring a suit challenging the Act at all.  It is.  The Supreme Court has established an "irreducible constitutional minimum" of standing containing three elements: (1) an "injury in fact" that is concrete and particularized and actual and imminent; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood that the injury will be redressable by the court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

To show injury, NetChoice may proceed under a now well-worn theory of associational standing. To establish associational standing, NetChoice must show that: "(1) its members would have standing to sue in their own right; (2) the suit seeks to protect interests germane to the association's purpose; and (3) neither the claim asserted nor the relief requested requires the individual members of the association to participate in the lawsuit." *Griffin*, 2023 WL 5660155, at *9 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

With respect to the first prong, many of NetChoice's member organizations would incur substantial compliance costs should the Act go into effect. Each member organization that believed it was covered by the Act would need to develop a protocol for the processing of parental consent notifications in compliance with the Act. Otherwise, each faces the risk of civil liability to the tune of thousands of dollars a day for each unauthorized minor using its site. NetChoice argues that the economic risk is particularly acute because the Act is vague, therefore insufficiently apprising its members as to whether they must comply with it. As a result, some websites may needlessly accumulate expenditures to comply with the Act, even though the Attorney General has no intention of enforcing it against them. These sorts of "compliance costs *may* constitute injury depending on 'the peculiarity and size of a harm.'" *Kentucky v. Env't Prot. Agency*, 2023 WL 2733383, at *6 (E.D. Ky. Mar. 31, 2023) (quoting *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)).

More conclusively, however, NetChoice argues that its member organizations' First and Fourteenth Amendment rights will be violated by the Act. And a plaintiff satisfies the injury-in-fact requirement when it alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129 (2007).

The second and third prongs of the associational standing test can be resolved simply. As NetChoice's Vice President and General Counsel explains, NetChoice's purpose is "to make the Internet safe for free enterprise and free expression." (ECF No. 2-1 ¶ 3). As a result, this lawsuit centered on protecting these interests is germane to its purpose. Nor would this lawsuit require each member of the association to participate, as the nature of the suit is unlikely to require fact-intensive inquiry of each member. *See Griffin*, 2023 WL 566015 at \*10 (reaching the same conclusion with respect to a similar lawsuit brought by NetChoice challenging a parental notification law in Arkansas).

### 2. *Prudential Standing*

Having established that NetChoice has constitutional standing to bring a lawsuit challenging the Act, this Court considers whether NetChoice is entitled to bring its specific claims. In other words, whether it has prudential standing. The "prudential standing rule . . . normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth*, 422 U.S. at 509. There are exceptions, however. It is uncontroverted that NetChoice, a member-based organization, has prudential standing to bring a claim on behalf of its members. *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 557 (6th Cir. 2021) ("There is no prudential standing bar when member-based organizations advocate for the rights of their members.").

What requires closer scrutiny, however, is NetChoice's attempt to vindicate the First Amendment rights of minor Ohioans who may wish to access its member organizations' websites. In *NetChoice v. Griffin*, NetChoice brought a lawsuit challenging a similar Arkansas state law that imposes an age-verification requirement on many of NetChoice's member organizations. The district court in *Griffin* conducted a robust analysis of NetChoice's standing to advocate on behalf

of minor Arkansans, which this Court finds persuasive.  *See* 2023 WL 5660155, at \*10-12. Specifically, the court analogized NetChoice's claim on behalf of minor website users to several Supreme Court cases in which vendors and vendors' associations challenged legislation that arguably infringed on the constitutional rights of their customers.  *See Craig v. Boren*, 429 U.S. 190, 193-95 (1976) (concluding that a beer vendor had standing to challenge Oklahoma's gender-based liquor age restrictions); *Carey v. Population Services Inter'l*, 431 U.S. 678, 682-84 (1977) (concluding that a contraceptive vendor had standing to challenge a law that restricted the sale of contraceptives on behalf of its potential customers).

Most on point on this issue is *Virginia v. American Booksellers Assoc., Inc.*, in which the Supreme Court concluded that a booksellers' association and two bookstores had standing to challenge a law requiring that material with adult themes not be placed in view of minors.  484 U.S. 383, 393 (1988).  Like NetChoice, the plaintiffs argued that the law violated book buyers' First Amendment rights.  *Id.* at 389.  The *Booksellers* Court explained that "in the First Amendment context, '[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"  *Id.* at 393 (quoting *Sec'y of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 956-57 (1984)).  This is because would-be speakers, like the Ohioan minors here, may choose to refrain from engaging in protected activity instead of running the risk of challenging the law.  *Munson*, 467 U.S. at 956.  In other words, individuals may succumb to a speech restriction's chilling effect.  "Society as a whole then would be the loser."  *Id.*

This exception to the traditional prudential standing rule, sometimes known as the "overbreadth exception," *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir.

2007), applies so long as the plaintiff has constitutional standing, specifically, an injury-in-fact. As established above, NetChoice has constitutional associational standing. In *Booksellers*, just as in the case at hand, the legislation was "aimed directly" at the member bookstores (here, the websites), "who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures." 484 U.S. at 393.

Nor is this Court is persuaded that any tension between the interests of minor uses and NetChoice's members overwhelms the shared interest that the two groups have in free expression. In sum, based on the record before this Court at this time, NetChoice has standing to bring both its claims on behalf of its member organizations and Ohioan minors.

## B. Immediacy of Harm

Turning to the TRO factors, this Court considers the immediacy of harm Plaintiff faces. Fed. R. Civ. P. 65(b)(1)(A). Given that the Act is set to go into effect on January 15, 2024, six days from the issuance of this Order, any harm that NetChoice members and Ohioan minors would face surely requires immediate, emergency action for which a TRO is well-suited.

This conclusion is not altered by Defendant's argument at conference that this Court ought not to grant the requested TRO because of the equitable doctrine of laches. The Sixth Circuit has described laches as a "'negligent and unintentional failure to protect one's rights.'" *United States v. City of Loveland, Ohio*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). In asserting laches, a party "must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.* at 473. Defendant argues that the doctrine of laches should be applied to Plaintiff's request for relief because the Act was signed into law over six months ago and Plaintiff waited to file this case until ten days before the law is set to go into effect. On its face, Defendant's

point is well-taken.  Plaintiff, however, responds that any delay was not out of a lack of diligence, but in part because of NetChoice's ongoing efforts to contest similar laws in other states, and in part because the Attorney General only disseminated a "Frequently Asked Questions" page about the Act in late December, which heightened concern among NetChoice's members.   Since Plaintiff's explanations satisfy this Court that the emergency nature of its request is not due to a lack of diligence, this Court declines to apply the doctrine of laches.

### C. Irreparability of Harm

This Court next considers whether either NetChoice's members or minor Ohioans will suffer irreparable harm absent an injunction.  *See* Fed. R. Civ. P. 65(b)(1)(A).  Generally, "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

NetChoice asserts that its members will be irreparably harmed through unrecoverable compliance costs and the risk of civil liability were the Attorney General to enforce the Act against them.  In particular, NetChoice asserts that its members will need to spend money on engineering and compliance procedures, among other things, in order to comply with Ohio's law.  For some of its members, these requirements are extremely burdensome.  (*See* ECF No. 2-2).  Although these are monetary harms, NetChoice persuasively argues that there is no cause of action through which they could seek to recover those compliance costs.

NetChoice also argues that the Act violates both NetChoice members' and Ohioan minors' constitutional rights, and that as a result, they will suffer irreparable harm absent a TRO.  "When constitutional rights are threatened or impaired," however, "irreparable injury is presumed." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (cleaned up).  In fact,

"'[t]he loss of First Amendment freedoms," like the ones NetChoice asserts are violated here, "for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Accordingly, this Court considers the merits of NetChoice's claims for the issuance of a temporary restraining order, even though Defendant Yost has not had an opportunity to submit written arguments in opposition to NetChoice's Motion.

In its Motion, NetChoice mounts a facial challenge to the Act's constitutionality, or, in the alternative, an overbreadth challenge. In other words, NetChoice argues that the Act is unconstitutional under all circumstances, or even if it is constitutional in some circumstances, it is unconstitutional in such a great number of circumstances that it should be struck down. Specifically, NetChoice makes three central arguments: (1) that the Act violates NetChoice's member organizations First and Fourteenth Amendment rights because it is so vague that NetChoice's member organizations do not have fair notice as to whether they must comply with the Act's dictates, and if so, how; (2) that the Act imposes impermissible speaker- and content-based restrictions on First Amendment protected speech; and (3) that the Act imposes an impermissibly overinclusive and underinclusive ban on minors' access to First Amendment protected speech.

### 1. Due Process: Void for Vagueness

Laws run afoul of the Due Process Clause of the Fourteenth Amendment if they fail to "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2009). In addition to affording regulated parties notice, precision is also essential to ensure that laws cannot be enforced in an arbitrary or discriminatory way. *Id.* The need for clarity is particularly acute when laws restrict speech. *See id.*

NetChoice identifies several aspects of the Act that this Court finds troublingly vague. Specifically, the Act purports to apply to operators that "target[] children" or are "reasonably anticipated to be accessed by children." § 1349.09(B). On its face, this expansive language would leave many operators unsure as to whether it applies to their website. The legislature's apparent attempt at clarity is also unilluminating. The Act provides an eleven-factor list that the Attorney General or a court may use to determine if a website is indeed covered, which includes malleable and broad-ranging considerations like "[d]esign elements" and "[l]anguage." § 1349.09(C). All of the listed considerations are undefined.

The Act also contains an eyebrow-raising exception for "established" and "widely recognized" media outlets whose "primary purpose" is to "report news and current events," the speaker- and content-based flavor of which are discussed further below. § 1349.09(O)(2). But the Act also provides no guardrails or signposts for determining which media outlets are "established" and "widely recognized." Such capacious and subjective language practically invites arbitrary application of the law. Acknowledging again that Defendant Yost has not yet had an opportunity to brief the issue at this very preliminary stage—but only to make an oral challenge—the Act does appear vague.

### 2. First Amendment: Restrictions on Protected Speech

As mentioned above, NetChoice argues that the Act violates the First Amendment rights of both its members and Ohioan minors. Not only does the First Amendment protect the right to speak, but also "the right to distribute, the right to receive, the right to read and freedom of thought . . . ." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). Here, NetChoice argues that the Act imposes content and speaker-based restrictions by discriminating between websites, and by preventing minors from accessing certain protected content.

When a law "applies to particular speech because of the topic discussed or the idea or message expressed" it is content-based on its face. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). Even if not facially content-based, a law can be content-based in its purpose or justification. *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015). At its core, content-neutrality is about "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Content-based restrictions on speech are presumptively unconstitutional and must satisfy strict scrutiny to survive. *Id.* at 163. The Supreme Court is also "deeply skeptical of laws that distinguish among different speakers, *Nat'l Inst. Of Fam. & Life Advocs. v. Becerra*, 138 S.Ct. 2361, 2378 (2018), but speaker-based restrictions "are not automatically content based or content neutral," *Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019). Speaker based restrictions are suspect only because they are often simply a proxy or pretext for regulation of content. *Id.*

Defendant, however, seeks to cast the Act—and this case—as not about the First Amendment, but about the right to contract. At the Rule 65.1 conference, Defendant's counsel explained that any effect that the Act has on First Amendment rights is incidental to its primary purpose, which is to require parental consent before minors under the age of sixteen enter into contracts with the operators to which the Act applies. Were this Court to accept Defendant's framing of the Act as a content-neutral regulation that only incidentally burdens speech, it would apply "'intermediate scrutiny' under which a 'content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 26–27 (2010) (quoting *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997)). Accordingly, to determine which level

14

of scrutiny would apply, this Court must consider whether the Act is content-based or content-neutral.

### a. Content-Based or Content-Neutral

NetChoice argues that the Act is content-based because it targets some sorts of websites while exempting others. Specifically, the Act only purports to govern websites that are targeted at children, or reasonably anticipated to be accessed by children. § 1349.09(B). The Act excludes from coverage, however, websites where interaction between users is "incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events." § 1349.09(O)(2). As NetChoice points out, a minor might be able to access and comment on an article published on the *New York Times*'s website, but not the same article on Facebook. (ECF No. 2 at 20). Similar is an exemption for websites where interaction is limited to reviews for "products for sale," but the Act does not exempt reviews of, for example, services or art. (*Id.*).

On its face, the Act distinguishes between different websites—exempting some and targeting others—and therefore, appears speaker-based. To determine conclusively whether the Act's speaker-based distinctions are a proxy for regulation of content that the government disfavors, this Court would benefit from a more complete record, including the legislative history. Nonetheless, based on the text of the Act itself, this Court suspects that NetChoice will succeed in showing that the Act is geared toward requiring parental consent before minors can access the sort of content that tends to appear on the websites that the Act seeks to govern. The Act's exemption of "widely recognized" "media outlets" and product review sites bolsters this conclusion.

15

### b. *Ohioan Minors' Rights*

NetChoice also argues that the Act infringes on minors' rights to both access and produce First Amendment protected speech.[1]  Generally, First Amendment protections "are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975).  In other words, the State does not possess "a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011).

Particularly relevant here is the Supreme Court's holding that even if "the state has the power to enforce parental prohibitions"—for example, enforcing a parent's decision to forbid their child to attend an event—"it does not follow that the state has the power to prevent children from hearing or saying anything without their parents' prior consent." *Id.* at 795 n.3.  As the Court explained, "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*  The Act appears to be exactly that sort of law.  And like other content-based regulations, these sorts of laws are subject to strict scrutiny.

### c. *Strict Scrutiny*

If this Court does conclude, on a more complete record, that the Act is a content-based regulation, it would apply strict scrutiny.  Strict scrutiny requires the government to show that the law "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed*, 576 U.S. at 171.  It remains to be seen whether Defendant will be able to show a compelling

---

[1] This Court does not address NetChoice's argument that the Act may be atextually interpreted to require age verification procedures for all users, such that it would potentially also chill adult speech.  (*See* ECF No. 2 at 14).  As NetChoice acknowledges, such an interpretation would be atextual and Defendant's counsel assured the court at the Rule 65.1 conference that it did not intend to enforce an age verification requirement.

governmental interest justifying the Act. Certainly, the protection of children is a laudable aim. But whether it is a compelling one—or even an important one—may turn on how the government chooses to frame that interest going forward. Recall that NetChoice casts the potential government interest in the Act as protection of minors from harmful speech and content, whereas Defendant Yost argues that the Act is targeted at preventing children from contracting with social media companies without parental consent.

Nonetheless, it is unlikely that the government will be able to show that the Act is narrowly tailored to any ends that it identifies. Foreclosing minors under sixteen from accessing all content on websites that the Act purports to cover, absent affirmative parental consent, is a breathtakingly blunt instrument for reducing social media's harm to children. The approach is an untargeted one, as parents must only give one-time approval for the creation of an account, and parents and platforms are otherwise not required to protect against any of the specific dangers that social media might pose.

And even if the government can show that the interest in question is indeed protecting minors from entering into contracts, the Act's inclusions and exemptions are not tailored to that end. For example, the Act would arguably permit a minor to create an account, subject to contract, with the *New York Times*, raising similar concerns to the ones involved in contract formation with Facebook, which the Act appears to target. In other words, the Act appears, at this juncture, to be both underinclusive and overinclusive, irrespective of the government interest at stake.

## IV. CONCLUSION

For the reasons set forth above, this Court **GRANTS** Plaintiff's Motion for a TRO against Defendants. Specifically, Defendant is **ENJOINED** from enforcing the Act against Plaintiff or its member organizations.

Additionally, pursuant to Rule 65(B) Plaintiff is **ORDERED** to pay a nominal bond of **$1**.

An appendix outlining the expedited briefing schedule and trial procedures to be followed at the Preliminary Injunction hearing follows this Order.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: January 9, 2024**

## BRIEFING SCHEDULE & PRELIMINARY INJUNCTION HEARING

Consistent with this Court's order at the Rule 65.1 conference, the parties will observe the following briefing schedule. Defendant will file his Response to Plaintiff's Motion for Preliminary Injunction (ECF. No 2) by **January 19, 2024.** Defendant's brief should address specifically why Plaintiff does not satisfy the following four requirements for the issuance of a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.  *See Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590-91 (6th Cir. 2012). Plaintiff will file its Reply by **January 26, 2024,** and will address the aforementioned four criteria**.**

Plaintiff will pay its nominal bond of $1 to the Clerk of Court by **January 10, 2024, at 4:00 p.m.**

The Preliminary Injunction hearing will be held on **Wednesday, February 7, 2024, at 9:30 a.m.** before the Honorable Algenon L. Marbley, United States District Court, 85 Marconi Boulevard, Columbus, Ohio, Court Room 1, Third Floor. If the hearing is not complete in one day, the hearing will resume on Thursday, February 8, 2024, at 8:30 a.m. The Court will not continue the hearing date(s) except upon written motion supported by an affidavit demonstrating exceptional circumstances, made immediately upon the party's or counsel's receipt of notice of the existence of the exceptional circumstances.

The Court expects the evidence presented at the Preliminary Injunction hearing to be focused solely on the four-prong test for preliminary injunctions.

The parties shall engage in expedited discovery and agree upon an expedited discovery schedule that includes provisions for expert discovery.

The Court shall handle all discovery disputes for the purposes of the Preliminary Injunction.

The parties, or a party, in its opening Preliminary Injunction brief, may move to consolidate the Preliminary Injunction hearing with the trial on the merits. If the motion to consolidate is not raised in a party's opening brief, it will be considered waived.

An appendix outlining the trial procedures to be followed at the Preliminary Injunction hearing follows.

## APPENDIX

## I. TRIAL PROCEDURES

### Counsel Tables

Plaintiff will occupy counsel table next to the jury box. Defendant will occupy counsel table across from Plaintiff and, to the extent necessary, the pews in the gallery.

### Appearances

Counsel will enter their appearance with the Court Reporter and the Courtroom Deputy Clerk before the start of the opening session of the hearing.

### Addresses By Counsel

Counsel will address the Court in the following manner:

      (a)     All addresses to the Court will be made from the lectern facing the Court.

      (b)     Counsel shall stand when addressing the Court for any reason.

**<u>Objections</u>**

Counsel will stand when making an objection and will make the objection directly and only to the Court.

When objecting, state only that you are objecting and the succinct legal basis for your objection. Objections shall not be used for the purpose of making speeches, repeating testimony, or to attempt to guide a witness.

Argument upon an objection will not be heard unless permission is given or argument is requested by the Court. Either counsel may request a bench conference.

**<u>Decorum</u>**

Colloquy, or argument between counsel will not be permitted. All remarks shall be addressed to the Court.

Counsel shall maintain a professional and dignified atmosphere throughout the hearing.

During the hearing, counsel shall not exhibit familiarity with witnesses or opposing counsel and shall avoid the use of first names.

During opening statements and final arguments, all persons at counsel table shall remain seated and be respectful so as not to divert the attention of the Court.

Do not ask the Court Reporter to mark testimony. All requests for re-reading of questions or answers shall be addressed to the Court.

**<u>Demonstrative Evidence</u>**

If any sketches, models, diagrams, or other demonstrative evidence of any kind will be used during the proceeding, they must be exhibited to opposing counsel two days prior to the hearing. Objections to the same must be submitted to the Court prior to the commencement of the hearing. Demonstrative evidence prepared solely for the purpose of final argument shall be

displayed to opposing counsel at the earliest possible time but in no event later than one-half hour before the commencement of the arguments.

Counsel must supply his/her own easel, flip charts, etc. for the hearing.

### Exhibits

Counsel will assemble and mark all exhibits and deliver them to the courtroom deputy prior to the commencement of the hearing. Plaintiff's exhibits will bear the letter prefix P followed by Arabic numerals and Defendant's exhibits will bear the prefix D followed by Arabic numerals.

Counsel should keep a list of all exhibits and should supply the Court, courtroom deputy and opposing counsel with a copy of the same.

Each counsel is responsible for any exhibits secured from the courtroom deputy. At the end of each hearing session, all exhibits shall be returned to the courtroom deputy.

The parties shall use three-ring tabbed notebooks for their exhibits which will be submitted two (2) days before the hearing. The parties shall provide one (1) copy of their tabbed exhibit notebook(s) to opposing counsel, and three (3) copies to the Court—one each for the Judge, the law clerk, and the courtroom deputy (for use at the witness stand).

Exhibits which are produced for the first time during the hearing, as in the case of exhibits used for impeachment, shall be tendered to the courtroom deputy for marking and then displayed to opposing counsel.

### Sanctions

The parties and counsel shall comply fully and literally with this pre-hearing order. The Court will consider the imposition of appropriate sanctions in the event of non-compliance, including monetary sanctions, the dismissal of claims or defenses, or the exclusion of evidence. Fed. R. Civ. P. 16(f).

**<u>Questions</u>**

This order supersedes all previous orders in this case to the extent previous orders are inconsistent with this order.

The parties shall address questions about this Order to the Court's Law Clerk, Laura Follansbee, at (614) 719-3276, by way of a telephone conference with counsel for all parties participating, or with fewer than all counsel participating with express permission of non-participating counsel. Or, the parties may contact Ms. Follansbee at laura_follansbee@ohsd.uscourts.gov, by way of email with counsel for all parties carbon-copied, or with fewer than all counsel carbon-copied with express permission of non-participating counsel.