## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| **NETCHOICE, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:24-cv-00047** |
| | : | |
| v. | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **DAVE YOST, in his official capacity as** | : | |
| **Ohio Attorney General,** | : | |
| | : | |
| **Defendant.** | : | |

---

## ATTORNEY GENERAL DAVE YOST'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*

JULIE M. PFEIFFER (0069792)*
   *\*Lead and trial counsel*
ELIZABETH HANNING SMITH (0076701)
STEPHEN P. TABATOWSKI (0099175)
PHILLIP T. KELLY (0102198)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH  43215-3428
Tel: (614) 466-2872 | Fax: (614) 728-7592
Julie.Pfeiffer@OhioAGO.gov
Elizabeth.Smith@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
Phillip.Kelly@OhioAGO.gov

*Counsel for Defendant Ohio Attorney General*

**TABLE OF CONTENTS**

Table of Authorities ...................................................................................................... iv

Memorandum ................................................................................................................ 1

I.     Introduction ....................................................................................................... 1

II.    LAW AND ARGUMENT.................................................................................... 4

     A.     Legal Standard ...................................................................................... 4

     B.     NetChoice is unlikely to succeed on the merits. ................................... 4

          1.     NetChoice lacks standing to challenge the Act under the
               First Amendment. ..................................................................... 4

               i.     NetChoice's alleged diversion of resources is
                    insufficient to confer organizational standing. ........................... 5

               ii.     NetChoice has not alleged a certainly-impending,
                    cognizable First Amendment injury to its
                    members that could supply associational
                    standing. ..................................................................................... 8

               iii.     NetChoice lacks standing to assert the free-speech
                      rights of Ohio children.................................................................. 11

          2.     The Act passes constitutional muster regardless. ................................. 13

               i.     The Act is subject to rational-basis review
                      because it regulates ordinary commercial
                      transactions, not speech.............................................................. 14

               ii.     Alternatively, the Act is subject to intermediate
                      scrutiny because its limited free-speech
                      implications are incidental to its regulation of
                      ordinary commercial transactions............................................. 17

                    a.     The Act is content-neutral and its burden
                          on speech—if any—is incidental...................................... 17

                    b.     The Act does not use its speaker-based
                          distinctions as a proxy for regulating
                          disagreeable content......................................................... 19

               iii.     The Act satisfies any level of First Amendment
                      scrutiny....................................................................................... 22

a. Ohio has important and compelling regulatory interests both in protecting minors and the fundamental right of parental decision-making. ................................ 22

b. The Act burdens no more speech than is necessary and is narrowly tailored to advance Ohio's regulatory interests. ............................ 24

iv.    The Act is not unconstitutionally vague. .................................. 28

a. Constitutional scrutiny is relaxed because the Act does not impose criminal sanctions and does not regulate speech. .......................................... 28

b. Even if a stricter standard controls, the Act sufficiently defines prohibited conduct and enforcement parameters. ......................................... 29

c. A person of ordinary intelligence can reasonably know what is prohibited. ............................ 30

d. The statute contains objective, non-discriminatory enforcement standards. ........................ 31

C.    The remaining preliminary injunction factors weigh against NetChoice's requested relief. .......................................................... 33

III.    Conclusion .......................................................................................... 34

Certificate Of Service ........................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*44 Liquormart v. Rhode Island*,
    517 U.S. 484 (1996)..................................................................................................15

*Am. Express Travel Related Servs. Co. v. Kentucky*,
    641 F.3d 685 (6th Cir.2011) ...................................................................................15

*Amato v. Wilentz*,
    952 F.2d 742 (3d Cir. 1991).....................................................................................12

*Ass'n of Am. Physicians & Surgs v. United States FDA*,
    13 F.4th 531 (6th Cir. 2021) ................................................................................8, 10

*Bays v. City of Fairborn*,
    668 F.3d 814 (6th Cir. 2012) .....................................................................................4

*Belle Maer Harbor v. Charter Twp. of Harrison*,
    170 F.3d 553 (6th Cir.1999) ....................................................................................28

*Bellotti v. Baird*,
    443 U.S. 622 (1979)..................................................................................................24

*Birmingham v. Nessel*,
    No. 21-1297, 2021 U.S. App. LEXIS 35896 (6th Cir. Dec. 2, 2021).......................11

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)............................................................................................11, 12

*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011).....................................................................................23, 24, 25

*C.M.D. v. Facebook, Inc.*,
    621 F. App'x 488 (9th Cir. 2015) .........................................................................1, 16

*Chambers v. Stengel*,
    256 F.3d 397 (2001)..................................................................................................30

*Columbia Natural Resources v. Tatum*,
    58 F.3d 1101 (6th Cir. 1995) ...............................................................................28, 31

*Craig v. Boren*,
    429 U.S. 190 (1976)..................................................................................................12

*Dayton Area Visually Impaired Persons v. Fisher*,
    70 F.3d 1474 (6th Cir. 1995) ...................................................................................22

**Cases**                                                                    **Page(s)**

*Doe v. Michigan Dept. of State Police*,
    490 F.3d 491 (6th Cir. 2007) ............................................................................15

*Fair Elections Ohio v. Husted*,
    770 F.3d 456 (6th Cir. 2014) ..............................................................................6

*FCC v. Fox TV Stations, Inc.*,
    567 U.S. 239 (2012)................................................................................29, 30

*Frazier v. Winn*,
    535 F.3d 1279 (11th Cir. 2008) ...................................................................19, 23

*Grayned v. City of Rockford*,
    408 U. S. 104 (1972).........................................................................................30

*Heffron v. Int'l Soc'y For Krishna Consciousness*,
    452 U.S. 640 (1981)...........................................................................................9

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...........................................................................................24

*I.B. v. Facebook, Inc.*,
    905 F. Supp. 2d 989 (N.D. Cal. 2012) .............................................................1

*Kenamerican Res., Inc.*, 33 F.4th at 893 ................................................................17, 18

*Lassiter v. Dept. of Soc. Servs. of Durham Cnty., N.C.*,
    452 U.S. 18 (1981)......................................................................................22, 33

*Libertarian Party of Ohio v. Husted*,
    751 F.3d 403 (6th Cir. 2014) .............................................................................17

*Lichtenstein v. Hargett*,
    83 F.4th 575 (6th Cir. 2023) ..............................................................................14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................................8

*Maryland v. King*,
    567 U.S. 1301, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012)....................................3, 33, 34

*McCoy v. Meridian Automotive Systems, Inc.*,
    390 F.3d 417 (6th Cir. 2004) .............................................................................33

*McGee v. City of Warrensville Heights*,
    16 F. Supp. 2d 837 (N.D. Ohio 1998)................................................................12

**Cases**                                                      **Page(s)**

*Memphis A. Philip Randolph Inst. v. Hargett*,
  978 F.3d 378 (6th Cir. 2020) ...................................................................................5, 7

*Miller v. Wilkinson*,
  No. 2:98-cv-275, 2010 U.S. Dist. LEXIS 103364 (S.D. Ohio Sept. 30, 2010) .......................30

*Munaf v. Geren*,
  553 U.S. 674 (2008)..................................................................................................4

*MX Grp., Inc. v. City of Covington*,
  293 F.3d 326 (6th Cir. 2002) .....................................................................................5

*NetChoice, LLC v. AG Fla.*,
  34 F.4th 1196 (11th Cir. 2022) ...................................................................................7

*NetChoice, LLC v. Bonta*,
  No. 22-cv-08861-BLF, 2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) ...................................7

*NetChoice, LLC v. Griffin*,
  No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)......................................7

*Netchoice, LLC v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ......................................................................................7

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................................................33

*Online Merchants Guild v. Cameron*,
  995 F.3d 540 (6th Cir. 2021) ..................................................................................5, 7

*Police Dept. of Chicago v. Mosley*,
  408 U. S. 92 (1972).................................................................................................14

*Prime Media, Inc. v. City of Brentwood*,
  485 F.3d 343 (6th Cir. 2007) ....................................................................................11

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)................................................................................................18

*Roberts v. Wamser*,
  883 F.2d 617 (8th Cir. 1989) ....................................................................................12

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006)..................................................................................................10

*Sable Communications of Cal. v. FCC*,
  492 U.S. 115 (1989)...........................................................................................22, 33

| **Cases** | **Page(s)** |
|---|---|

*Schickel v. Dilger,*
925 F.3d 858 (6th Cir. 2019) ........................................................................................20

*Sec'y of Md. v. Joseph H. Munson Co.,*
467 U.S. 947 (1984).................................................................................................11, 12

*Shelby Advocates for Valid Elections v. Hargett,*
947 F.3d 977 (6th Cir. 2020) .......................................................................................6, 7

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011)........................................................................................................14

*Specht v. Netscape Commc'ns Corp.,*
150 F.Supp.2d 585 (S.D. N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002) ...............15

*Stevens v. City of Columbus,*
No. 21-3755, 2022 U.S. App. LEXIS 20829 (6th Cir. 2022) . Civil ......................28

*Trump v. Twitter, Inc.,*
No. 22-15961, 2023 U.S. App. LEXIS 25931 (9th Cir. Mar. 22, 2023) ...................7

*Turner Broad. Sys. v. FCC,*
512 U.S. 622 (1994)................................................................................17, 18, 19, 20

*United States v. Avant,*
907 F.2d 623 (6th Cir. 1990) .........................................................................................28

*United States v. Carolene Prods. Co.,*
304 U.S. 144 (1938)........................................................................................................15

*United States v. Carpenter,*
2022 U.S. Dist. LEXIS 220562 .....................................................................................28

*United States v. Kettles,*
970 F.3d 637 (6th Cir.) ..............................................................................................28, 29

*United States v. Marmolejo,*
No. 3:04-cr-132, 2007 U.S. Dist. LEXIS 26524 (S.D. Ohio Apr. 10, 2007)..........32

*United States v. Nat'l Dairy Prods. Corp.,*
372 U.S. 29, 32 (1963)), *cert. denied*, 141 U.S. 924 (2020)...................................28

*United States v. Williams,*
553 U.S. 285 .....................................................................................................................29

*Warner Cable Communications, Inc. v. City of Niceville,*
911 F.2d 634 (11th Cir. 1990), *cert. denied*, 501 U.S. 1222 (1991).........................9

vii

**Cases**                                                                                          **Page(s)**

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)................................................................................................15, 23

*Williams-Yulee v. Fla. Bar,*
    575 U.S. 433 (2015)........................................................................................................25

*Wilson v. Williams,*
    961 F.3d 829 (6th Cir. 2020) ...........................................................................................4

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008).......................................................................................................4, 33

*Young v. American Mini Theatres, Inc.,*
    427 U.S. 50 (1976) (Powell, J., concurring) ...................................................................9

**Statutes**                                                                                       **Page(s)**

15 USC §§ 6501-6506 .....................................................................................................27

Children Online Privacy Protection Act of 1998 ................................................... *passim*

O.R.C. § 1340.09(C)(1)-(11) ...........................................................................................18

O.R.C. § 1349 ..................................................................................................................29

O.R.C. § 1349.09 .............................................................................................................31

O.R.C. § 1349.09(A)(1)(a)-(d)........................................................................................31

O.R.C. § 1349.09(A)(2) ..................................................................................................25

O.R.C. § 1349.09(B)........................................................................................................31

O.R.C. § 1349.09(B)(1) .........................................................................................1, 10, 31

O.R.C. § 1349.09 (C)(1)-(11) .........................................................................................31

O.R.C. § 1349.09(M) .......................................................................................................33

O.R.C. § 1349.09(M)(1)-(2) ...........................................................................................27

O.R.C. § 1349.09(O)(1)-(2) ............................................................................................18

O.R.C. § 1349.094(B)(1) .................................................................................................18

O.R.C. § 3319.321 (B)......................................................................................................24

O.R.C. § 3730.06 ...............................................................................................................24

O.R.C. § 4713.50 ...............................................................................................................24

O.R.C. § (M)(2)(a)-(b) ...................................................................................................31, 32

**Other Authorities**

16 C.F.R. § 312.2 ...............................................................................................................32

16 CFR § 312 .................................................................................................................24, 32

16 CFR § 312.11 .................................................................................................................32

2023 Advisory, "Social Media and Youth Mental Health" ...............................................13

Amanda Raffoul, *et al.*, *Social Media Platforms Generate Billions of Dollars in Revenue From U.S. Youth: Findings From a Simulated Revenue Model,* 18 PLOS ONE (2023). ..........................................................................................................21

*FAQ What is the Parental Notification by Social Media Operators Act*, https://www.ohioprotects.org/faq ...................................................................................23

*Service,* FACEBOOK.COM, https://m.facebook.com/legal/terms (last visited January 17, 2024) ..................................................................................................................16

*Service,* TIKTOK.COM, https://www.tiktok.com/legal/page/row/terms-of-service/en (last visited January 17, 2024) ..................................................................................16, 17

U.S. Const. amend. I ...........................................................................................................14

U.S. Const., First Amendment ..................................................................................... *passim*

**MEMORANDUM**

## I.  Introduction

On July 4, 2023, Governor DeWine signed the Parental Notification by Social Media Operators Act, Ohio Revised Code Section 349.09 ("the Act") into law. The Act prohibits a minor child under the age of sixteen from entering into a contract with a covered "operator" without parental consent. Specifically, the Act requires "the operator of an online web site, service, or product that targets children, or is reasonably anticipated to be accessed by children. . . ." to ". . .*[o]btain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username* to access or utilize the online web site, service, or product, from the child's parent or legal guardian. . . ." (Emphasis added.) O.R.C. § 1349.09(B)(1).

The Act was passed in response to growing citizen concern about well documented physical- and mental-health risks posed by the effects of certain functions and features common to many internet media platforms. Exhibit E, Affidavit of Ohio Lieutenant Governor Jon Husted. Specifically, the Act is concerned with such platforms that also require their users that are under the age of sixteen to enter into a contract prior to use. *Id*. Facebook, an operator covered by the Act, has argued that minors "cannot disaffirm" such contracts once the minor has "received the expected benefits of the contract." *I.B. v. Facebook, Inc*., 905 F. Supp. 2d 989, 998 (N.D. Cal. 2012). Facebook has successfully enforced its terms of service against minors; including, for instance, a term permitting Facebook to utilize minors' names and likenesses in its advertisements. *C.M.D. v. Facebook, Inc*., 621 F. App'x 488 (9th Cir. 2015). Given this backdrop, and without uniform or federal legislation to adequately address these compelling interests, Ohio acted to vindicate the health and safety of children and the rights of parents to guide their children's upbringing. The Act protects the consumer public and assists Ohio parents in the onerous task of

1

ensuring, amidst the whirlwind of an increasingly digital era, their children's safety and mental well-being in a manner they see fit.

The Act is challenged by NetChoice, LLC ("NetChoice"), a trade association of social media operators apparently ranging from the mom-and-pop to the megacorporate. At bottom, NetChoice's request for injunctive relief should be denied. It has failed to establish a likelihood of success on the merits. It has failed to demonstrate irreparable harm. And, should an injunction issue, the public interest and resultant harm to third parties weigh in favor of denial.

NetChoice is unlikely to succeed on the merits for multiple reasons. First, it lacks constitutional and prudential standing. Its vague relationship to the interests at play in this lawsuit is concerning at best. Organizational standing fails because the vaguely alleged "diversion of resources" is no diversion at all. Associational standing fails because no cognizable First Amendment injury to NetChoice members as a result of the Act is discernible from the allegations or evidence. And, without organizational or associational standing, NetChoice cannot invoke the overbreadth exception to prudential standing.

NetChoice primarily asserts the speech rights of its members' users—including those minors its members expose to the risks mentioned above. Likening its members to traditional media publishers or distributors, NetChoice uses the First Amendment like a cudgel against any law that might impose accountability upon its members, even when the health and welfare of minors is at stake. But operators subject to the Act ("covered operators") are not like those traditional entities. Their primary product is their *users*—including Ohio children—and userdata, not the content they host. Some of NetChoice's largest members require minors to agree to one-sided contractual terms, then harvest their data while increasing their risk of adverse health effects like depression, eating disorders, addiction (including to the platform) and sexual abuse. *See*

2

*generally* Exhs. A through E. This cyclical, exploitative relationship makes covered operators different from traditional media entities. They should not be able to hide under the same umbrella.

Regardless, the Act regulates contracts, not speech. Regulations like the Act which concern ordinary commercial transactions are typically constitutional under rational-basis review. To the extent the Act arguably implicates speech, it does so only incidentally. Thus, it should be subject to intermediate scrutiny at most. No matter the standard, however, the Act survives constitutional scrutiny. The State has an important and compelling interest in protecting minors by restricting their ability to contract with covered operators without parental consent. Moreover, the State has an important and compelling interest in vindicating parents' fundamental right to control their children's care and upbringing. The Act does not burden any more speech than necessary and is narrowly tailored to accomplish these goals.

Moreover, the Act is not vague. It is sufficiently specific; an ordinary person would understand to whom it applies, what conduct it prohibits, and how penalties are to be assessed and meted out. Moreover, it provides explicit standards for the Attorney General and the Courts to enforce the statute in a non-arbitrary and non-discriminatory manner. Despite NetChoice's assertions, the Act withstands a vagueness challenge.

Finally, the remaining preliminary injunction factors weigh against NetChoice's requested relief. Its insufficient allegations and evidence of financial injury and theoretical compliance costs do not support irreparable harm. Moreover, it has failed to adduce a cognizable First Amendment injury upon which this factor can hang. Indeed, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 133 S.Ct. 1, 3, 183 L.Ed.2d 667 (2012) quoting *New Motor Vehicle Bd. of Cal. Orrin W. Fox Co.*, 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439

(1977). Finally, the balance of equities and the public interest also weigh against granting an injunction. The Act will protect minors from the often-deleterious effects of social media without parental oversight or consent, including mental-health effects and exposure to crimes of sexual abuse. Such harm is unquestionably irreparable to any child that suffers them. The Court should deny NetChoice's requested preliminary injunction.

## II.     LAW AND ARGUMENT

### A.     Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy[,]" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008), and should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). NetChoice bears the burden of justifying such extraordinary relief. *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020).

In determining whether a plaintiff has clearly shown it is entitled to preliminary injunctive relief, courts are guided by four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012).

### B.     NetChoice is unlikely to succeed on the merits.

#### 1.     NetChoice lacks standing to challenge the Act under the First Amendment.

NetChoice advances three theories on standing. First, it alleges organizational standing as a result of "incurred costs" and the "diver[sion of] finite resources to address the Act's implications and compliance costs for Internet companies." Compl. at ¶ 14. Second, it alleges it has

associational standing on behalf of its members. *Id.* at ¶ 11. Finally, it claims to have standing to assert the First Amendment rights of its members' current and prospective users. *Id*. at ¶ 13. Each theory withers under scrutiny.

### i.    NetChoice's alleged diversion of resources is insufficient to confer organizational standing.

"An association or organization may assert standing in one of two ways: (1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions; or (2) as the representative of its members." *MX Grp., Inc. v. City of Covington,* 293 F.3d 326, 332-33 (6th Cir. 2002). NetChoice lacks standing under either category.

"To establish direct standing to sue in its own right, an organizational plaintiff" like NetChoice "must demonstrate that the 'purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action.'" *Online Merchants Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) (quoting *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc*., 943 F.2d 644, 646 (6th Cir. 1991)). The organization also "may not manufacture standing from its pre-existing work, but must demonstrate a significant shift in [its] operations, activities, or strategies." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 402 (6th Cir. 2020). "The question is what additional or new burdens are created by the law the organization is challenging. It must show that the disruption is real and its response is warranted." *Id.*, citing *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019). NetChoice has not demonstrated that the Act has resulted in a "significant shift" in its "operations, activities, or strategies," that might supply it with organizational standing. *Id.*

Consider first NetChoice's alleged mission: to "promote online commerce and speech and to increase consumer access and options via the Internet, while also minimizing the burdens that would prevent businesses from making the Internet more accessible and useful." Compl. at ¶ 9. To

5

that end, the vice president and general counsel of NetChoice attests that the organization has spent "two decades … advocating for online businesses and for the principles of free speech and free enterprise on the internet." Szabo Dec. at ¶ 5. Next, consider NetChoice's sole allegation regarding resource diversion: that it has "incurred costs and will continue to divert finite resources to address the Act's implications and compliance costs for Internet companies." Compl. at ¶ 14. Tellingly, NetChoice's vice president and general counsel generically attests that NetChoice's mission "would be directly and substantially hurt" if the Act takes effect—but he, too, fails to explain how. Szabo Dec. at ¶ 18. Indeed, the only alleged injuries Szabo discusses in any detail are those that will purportedly inure to NetChoice's members and users. *See, e.g., id.* at ¶¶ 5, 14-15, 17.

But an organization cannot obtain standing "merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014). Indeed, the Sixth Circuit recently rejected an attempt to invoke organizational standing based on similar allegations. *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020). In *Shelby Advocates*, the organization focused on "research, advocacy, and education to ensure the fundamental right to vote in public elections." *Id.* at 979. Given the organization's mission, it did not divert resources by making expenditures "'to address the voting inequities and irregularities' throughout the county.'" *Id*. at 982. The same is true here. NetChoice's alleged expenditures to "address the Act's implications and compliance costs for Internet companies" do not supply standing because its express mission is to do exactly that. Before the Act passed through Ohio's General Assembly, NetChoice was a self-styled "national trade association of online businesses that works to protect free expression and promote free enterprise online. To this end, NetChoice is actively engaged in litigation and advocacy to challenge efforts to undermine these principles." Brief for NetChoice as

6

Amicus Curiae in Support of Defendants-Appellees and Affirmance at 1, *Trump v. Twitter, Inc.*, No. 22-15961, 2023 U.S. App. LEXIS 25931 (9th Cir. Mar. 22, 2023). In simpler terms, NetChoice's alleged diversionary actions "do not divert resources from its mission. That is its mission." *Shelby Advocates,* 947 F.3d at 982

Compare NetChoice with the organizational plaintiff in *Online Merchs. Guild v. Cameron,* 995 F.3d 540 (6th Cir. 2021). There, some of a merchant guild's members received subpoenas and investigative demands related to price-gouging investigations by the Kentucky Attorney General. *Id*. at 544-45. Before the investigations, the guild had "spent 'little to no time' on price gouging issues.'" *Id.* at 548. The guild showed it had diverted resources in direct response to the investigations for work specifically related to them. *Id*. These facts warranted an inference that the guild had suffered a resource diversion sufficient to confer standing. *Id*.

No such inference is warranted here. The specificity of NetChoice's allegations and evidence regarding resource diversion—e.g., the "what," "when," and "what for"—falls well short of the diversion alleged in *Online Merchs. Guild*. More importantly, free-speech litigation on behalf of online businesses is hardly an issue NetChoice "had previously spent a negligible amount of time on," *Online Merchs. Guild*, 995 F.3d at 548, like price-gouging investigations were to the guild. Far from it. *See, e.g., NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)*; NetChoice, LLC v. Bonta*, No. 22-cv-08861-BLF,  2023 WL 6135551 (N.D. Cal. Sept. 18, 2023); *NetChoice, LLC v. AG Fla.*, 34 F.4th 1196 (11th Cir. 2022); *Netchoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022).  That *is* NetChoice's mission. *See Shelby Advocates*, 947 F.3d at 982. NetChoice cannot "manufacture standing from its pre-existing work." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 402 (6th Cir. 2020). Its failure to show the Act

has caused a sufficient diversion of its resources from its everyday purpose destroys its organizational standing theory.

### ii. NetChoice has not alleged a certainly-impending, cognizable First Amendment injury to its members that could supply associational standing.

The doctrine of associational standing sometimes permits an organization to sue over injuries suffered by its members even if the organization has suffered no injury of its own. *Ass'n of Am. Physicians & Surgs v. United States FDA*, 13 F.4th 531, 537 (6th Cir. 2021) (citations omitted). An organization must establish "(1) its 'members would otherwise have standing to sue in their own right'; (2) the 'interests' that the suit 'seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Here, NetChoice must "identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct" to satisfy the first element. *Id.* at 542-43 (6th Cir. 2021). Importantly, that injury must be to a cognizable First Amendment interest. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 734-35 (1972)). NetChoice has failed to set forth a cognizable First Amendment injury to any of its members.

NetChoice alleges that "some of" its members "have individual standing to sue in their own right, as those members are subject to the Act." Compl. at ¶ 11. And while NetChoice contends this standing is grounded in the Act's violation of its members' rights in "publishing," "disseminating," and "creating, distributing [and] consuming" speech, it fails to demonstrate how the Act infringes on these rights. *Id.* at ¶ 60. It cannot, because NetChoice members' right to publish, disseminate, and distribute speech does not equate to the right to an audience of their

8

choosing. *See Heffron v. Int'l Soc'y For Krishna Consciousness*, 452 U.S. 640, 647 (1981) ("The First Amendment does not guarantee the right to communicate one's views at all times and places and in any manner that may be desired.") Nor does the First Amendment guarantee the right to contract with minors absent parental consent, which is the only thing the Act prohibits covered operators from doing.

Notably, NetChoice does not allege that its members will be required to engage in self-censorship, or that its members' speech rights are chilled by the Act. Instead, it relies upon the speech rights of its users to conjure a First Amendment injury. Compl. at ¶¶ 5, 53. The declarations on behalf of its members fare no better. The vast majority of any potential direct injuries attested to are economic—lost revenue and speculative compliance costs—rather than constitutional. Roin Dec. at ¶¶ 15-22; Paolucci Dec. at ¶¶ 10-20; Szabo Dec. at ¶ 14(d). "Such economic loss, however, does not constitute a *first amendment injury*." *Warner Cable Communications, Inc. v. City of Niceville*, 911 F.2d 634, 638 (11th Cir. 1990) (emphasis original), *cert. denied*, 501 U.S. 1222 (1991); *see also Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 78 (1976) (Powell, J., concurring) ("The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression."). NetChoice has failed to allege an effect on its members' speech rights that could constitute an injury-in-fact.

The closest NetChoice gets is via the declaration of Michael Masnick, founder and CEO of Techdirt. Masnick attests that Techdirt understands the Act to "require covered parental consent for any registration or sign-up, or the creation of a unique username to express themselves on Techdirt." Masnick Dec. at ¶ 14. This, Masnick claims, interferes "with my company's and my own expressive rights by limiting to whom and how we can communicate to others." *Id*. At the outset, this specious interpretation is belied by the statute's plain language which requires parental

9

consent "for *any contract with a child* . . .to register, sign up, or otherwise create a unique username. . . ." O.R.C. § 1349.09(B)(1).. If Techdirt did not require minors to agree to its terms of service before "register[ing], sign[ing] up, or otherwise creat[ing] a unique username," the statute would not be implicated. It follows, then, that the statute does not interfere with "to whom and how" Techdirt can communicate—only with whom it may contract without parental consent. Put another way, the Act affects what Techdirt "must do"—obtain verifiable parental consent for any contract with a child—rather than "what [it] may or may not say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 60 (2006). Masnick's claim that the law creates "chilling ambiguity," Masnick Dec. at ¶ 15, also fails to move the needle because he offers zero explanation as to why or how Techdirt's speech has been or will be chilled by its uncertainty as to its status as an operator as to its status as an operator.

Moreover, in the pre-enforcement context, an alleged but "yet-to-happen 'injury must be *certainly impending* to constitute injury in fact'; the mere possibility that the injury will arise in the future does not suffice." *Ass'n of Am. Physicians & Surgs v. United States FDA*, 13 F.4th 531, 546 (6th Cir. 2021) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (Emphasis original.)). Neither NetChoice nor Masnick come close to describing his potential future injuries as certainly impending. On the same principle, "[m]any cases thus hold that a plaintiff failed to establish that an injury was traceable to a defendant when the injury would arise only if some third party decided to take the action triggering the injury." *Id.* at 546 (6th Cir. 2021) (collecting cases). Masnick's averments, Masnick Dec. at ¶ 20, regarding how the Act "might" limit Techdirt's expressive interests through its effect on third-party vendors also fail to supply NetChoice with standing.

10

NetChoice has therefore failed to demonstrate that any of its members have Article III standing to bring its claims in their own right. This is fatal to NetChoice's associational standing.

### iii. NetChoice lacks standing to assert the free-speech rights of Ohio children.

NetChoice's First Amendment claim "raises both (1) a traditional facial challenge and (2) alternatively, a First Amendment overbreadth challenge." Compl. at ¶ 61. NetChoice's failure to establish organizational or associational standing forecloses standing for its alternative overbreadth claim.

First Amendment overbreadth claims are subject to a relaxed application of ordinary prudential standing tenets. *Birmingham v. Nessel*, No. 21-1297, 2021 U.S. App. LEXIS 35896, *7 (6th Cir. Dec. 2, 2021) (citing *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009)). Overbreadth, however, is not an exception to Article III standing requirements, including the requirement to establish injury-in-fact. *Prime Media, Inc. v. City of Brentwood,* 485 F.3d 343, 349-50 (6th Cir. 2007). As addressed above, NetChoice has failed to establish a diversion of resources that could amount to an injury-in-fact for organizational standing purposes. And, it has failed to establish a cognizable First Amendment injury to its members that could supply it with associational standing. Because it has failed to establish either a direct or associational injury-in-fact, NetChoice cannot rely on the overbreadth exception to prudential standing in order to assert the rights and interests of third parties.

It is worth noting that, regardless of Article III standing, the policies underpinning the overbreadth exception do not support its application here. Its fundamental concern is the possibility that a person actually engaging in a protected activity might refrain from that activity "rather than risk punishment for his conduct in challenging the statute." *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Further, the exception is "limited." *Broadrick v. Oklahoma*, 413 U.S.

11

601, 611 (1973). *Broadrick* cautions for a case-by-case review of its application because the exception "attenuates" depending on where the regulation in question falls on the spectrum between "pure speech" and conduct unprotected by the First Amendment. *Id*.

Moreover, third-party standing exceptions in other contexts generally scrutinize the relationship between the litigant and third party and whether their interests align. *See, e.g.*, *Sec'y of State v. J.H. Munson Co.*, 467 U.S. 947, 956 (1984) (third-party standing proper where the litigant is an effective advocate for an interest that a third-party is impeded from asserting); *Craig v. Boren*, 429 U.S. 190, 194-95 (1976) (third-party standing proper due to the "close relationship" between the litigant and the third party); *see also Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (rejecting candidate standing under Section 2 of the VRA due to "potential divergence between the interests of a candidate seeking office and citizens attempting to enforce their right to vote") (cited by *McGee v. City of Warrensville Heights*, 16 F. Supp. 2d 837, 846, n.8 (N.D. Ohio 1998)). The alignment of interests between a third party and a litigant asserting a right on its behalf should not be disregarded when considering the overbreadth exception. "[G]enuine conflicts strongly counsel against third party standing." *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991). The same is true with respect to a First Amendment overbreadth claim—particularly where, as here, there is evidence of a significant and pervasive conflict. *See* Exhibit A, "Social media platforms generate billions of dollars in revenue from U.S. youth: Findings from a simulated revenue model". Covered operators—many of them NetChoice members—burden children and parents with one-sided contractual terms of questionable enforceability, and do so to generate billions of dollars collecting and selling the userdata of American kids. Minors simply do not have the capacity to understand the magnitude of these provisions before engaging with these operators. To that end, they employ user interfaces that are specifically designed to maximize user

12

engagement (and profits) while exacerbating the risks of mental health illnesses and sexual abuses just to name a few. *See* Exhibit B, U.S. Surgeon General's 2023 Advisory, "Social Media and Youth Mental Health"; Exhibit C, "Windows of developmental sensitivity to social media." To permit NetChoice to allegedly vindicate the rights of its child users would turn the concepts of associational and prudential standing on their heads.

The Court should not bless a litigant like NetChoice with standing to facially invalidate a statute, in a pre-enforcement posture, based on sparse and conclusory allegations about what it is, who its members are, and what injuries a not-yet-effective and never-enforced state law might impose. Article III requirements foreclose standing in this case, and prudential-standing concerns militate against it.

### 2.     The Act passes constitutional muster regardless.

The Act does not violate the First Amendment and is not void for vagueness. Initially, the Act simply does not implicate the First Amendment—it limits covered operators' ability to *contract* with minors absent parental consent. Even if the First Amendment is implicated, the appropriate standard of review is intermediate scrutiny because the Act is content neutral. Any burden on speech is merely incidental. On its face, it does not make any restrictions based on a certain message or idea being conveyed. Nor is the Act's purpose to suppress speech or ideas.

The Act passes constitutional muster under any level of First Amendment scrutiny. The State has an important and compelling interest in protecting minors by restricting covered operators' ability to contract with minors without parental consent, ultimately decreasing their risk of (1) involuntary releases of personally identifiable and other personal information and data, (2) addiction caused by user-engagement features, (3) poor mental health including but not limited to depression, anxiety, self-harm and suicide, and (4) susceptibility to sexual predators. Moreover, the State has a compelling interest in vindicating parents' fundamental right to control their

13

children's care and upbringing. The Act does not burden any more speech than is necessary and is narrowly tailored to accomplish these goals.

Moreover, the Act does not violate the void for vagueness doctrine. As an initial matter, the Court should employ a lenient standard given that the Act does not impose criminal sanctions and does not implicate speech. However, even if the Court employs a more stringent standard, the Act passes constitutional muster. First, a reasonable person of ordinary intelligence would understand its terms. Second, the Act provides explicit standard for enforcement.

   **i.  The Act is subject to rational-basis review because it regulates ordinary commercial transactions, not speech.**

The Act regulates contracts, not speech.  Businesses do not have a First Amendment right to contract with minors. The Act does not compel or restrict what content businesses may make available to consumers. It tells operators what they must do, not what they must or must not say. It is a facially neutral business regulation and not subject to any heightened scrutiny.

The First Amendment provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I. Above "all else, the First Amendment means that government" generally "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U. S. 92, 95 (1972). The First Amendment bars a state from "abridging" oral expression (the freedom of "speech") or written expression (the freedom of the "press"); "it does not bar the state from restricting [nonexpressive] conduct." *Lichtenstein v. Hargett*, 83 F.4th 575, 582 (6th Cir. 2023) (citing *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006)).

Restrictions on economic activity are distinct from regulations on protected expression. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). And "regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of

14

the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938); *see also Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 689 (6th Cir.2011).

Under the rational basis standard of review, courts determine a statute's constitutionality by asking whether the statute in question is "rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 705 (1997). This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances. *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 501 (6th Cir. 2007).

The ability to contract with minors falls under the state's authority to regulate commercial transactions. *44 Liquormart v. Rhode Island,* 517 U.S. 484, 499 (1996). The statute applies where minors must enter into a contract with covered operators in order to access their platforms. When that contract is created, the operator often gains an opportunity to advertise to the minor, collect the minor's data, and engage in a wide array of other activities intended to benefit the operator financially. This commercial relationship is well demonstrated by an operators' Terms of Service ("TOS"), which are generally binding contracts. *Specht v. Netscape Commc'ns Corp.*, 150 F.Supp.2d 585, 594 (S.D. N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002) (noting the courts that have considered digital "click-wrap" contracts have found them enforceable). These contracts are typically extensive.

For example, Meta Platforms, Inc. is a NetChoice member and a corporate conglomerate whose subsidiaries include multiple covered operators. One of those is Facebook. Facebook requires a user to agree to its terms of service prior to creating an account. Its terms of service permit it to "transfer, store and distribute content and data to our data centers, partners, service

15

providers, vendors and systems around the world, including outside [the user's] country of residence." *Terms of Service,* FACEBOOK.COM, https://m.facebook.com/legal/terms (last visited January 17, 2024). Facebook's terms give it a vast "non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of [the user]'s content." *Id.* Once the user agrees to the terms, Facebook has permission "to use [the user's] name and profile picture and information about actions [the user has] taken on Facebook next to or in connection with ads, offers, and other sponsored or commercial content that we display across our Products, without any compensation to [the user]." *Id.* Facebook has enforced its terms of service against minors in order to use their names and likenesses in its advertisements. *C.M.D. v. Facebook, Inc.*, 621 F. App'x 488 (9th Cir. 2015)

TikTok is another NetChoice member and covered operator. TikTok allows users to create, watch, and share 15-second videos often accompanied by popular songs or audio recordings. TikTok's Terms of Service are also broad. Once a user signs up to the platform and agrees to its terms, TikTok and its parent company gain an "unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide license to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute." *Terms of Service,* TIKTOK.COM, https://www.tiktok.com/legal/page/row/terms-of-service/en (last visited January 17, 2024). The company (and unnamed third parties) are given authority to "view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit" content created by users "in any format and on any platform, either now known or hereinafter invented." *Id.* TikTok has "the right to use . . . User Content without the obligation to pay royalties to any third party." *Id.* The operator "may generate revenues, increase goodwill or otherwise increase our value from your use

16

of the Services, including, by way of example and not limitation, through the sale of advertising, sponsorships, promotions, usage data." *Id.*

Many covered operators regulated under the Act require users to agree to terms of service that are similar to the ones required by Facebook or TikTok. These contracts permit the operators to harness user content, likeness, and personal data to further their financial interests. These exemplar contract terms demonstrate that the relationship between operators and their userbase is fundamentally commercial-consumer in nature. Protecting minors from the extensive terms and conditions required to use platforms covered by the Act is well within the State's authority and is neither arbitrary nor irrational. Therefore, the Act passes muster under the rational basis test as a regulation of commercial activity and should be upheld.

    **ii.  Alternatively, the Act is subject to intermediate scrutiny because its limited free-speech implications are incidental to its regulation of ordinary commercial transactions.**

Assuming, *arguendo*, the Act implicates speech, it does so only incidentally. A content-based law must be "narrowly tailored to serve a compelling state interest." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 414 (6th Cir. 2014) (internal quotations omitted). But law that incidentally implicates speech while targeting conduct is constitutional if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Kenamerican Res., Inc.*, 33 F.4th at 893, quoting *Holder*, 561 U.S. at 26-27 (internal quotations omitted).

    **a.  The Act is content-neutral and its burden on speech—if any—is incidental.**

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994). To determine whether a law is content neutral or content based, the

17

"principal inquiry" is whether the government has regulated particular speech because it agrees or disagrees with the message. *Id*., (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 105 L. Ed. 2d 661, 109 S. Ct. 2746 (1989)). If a content-based purpose is facially evident, strict scrutiny applies. *Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015). On the other hand, a law that incidentally affects speech while targeting conduct is constitutional if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Kenamerican Res., Inc.*, 33 F.4th at 893, quoting *Holder*, 561 U.S. at 26-27 (internal quotations omitted).

The Act is facially content neutral. It prohibits covered operators from entering into contracts with minors unless the operator "[o]btains verifiable consent for *any contract* with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product, from the child's parent or legal guardian. . . ." (Emphasis added.) R.C. 1349.094(B)(1). This operative prohibition does not regulate any expressive conduct or speech. In fact, the Act leaves it to parents to decide what content their children access on social media platforms. NetChoice's argument that the exemptions in the statute create content based distinctions fails as well. The exemptions distinguish between certain *speakers* who may contract with a minor absent parental consent. For example, some operators are exempt because of the functions they offer. *See* O.R.C. § 1349.09(N)(1)(a)-(c) and (O)(1)-(2). Likewise, the criteria for determining whether an operator "targets children, or is reasonably anticipated to be accessed by children," are also content neutral. *See* O.R.C. § 1340.09(C)(1)-(11). The criteria in subsections (C)(1)-(11) distinguish amongst speakers in an effort to concentrate the

18

Act's effect toward the State's professed interests—not because the State favors or disfavors content based upon those criteria. The Act is justifiably speaker-based.[1]

Moreover, the State's purpose—to prohibit covered operators from contracting with minors—is content neutral. The purpose is not to restrict the *type* of content the minor or covered operator can access or create or disseminate. It is to protect minor children from agreeing to contracts with operators whose platforms pose detrimental privacy, health, and safety risks to the child. *See* Exhibit E. NetChoice notes that the Act may restrict a minor's ability to read an article on one website, but not read the same article on another. But this is evidence of content neutrality. That is, the Act is not concerned with whether the child may read or speak about the article, but whether the child is subjected to an oppressive contract and health risks while doing so. The Act's deference to parents' wishes in this regard also demonstrates content neutrality. It simply gives deference to parents' wishes. *See, e.g.*, *Frazier v. Winn*, 535 F.3d 1279, 1285 (11th Cir. 2008) (finding the "statute is neutral on the Pledge in the statute's deference to a parent's expressed wishes"). Likewise, the Act protects the interests of those parents who do not consent to their minor entering into agreements with certain internet operators. Should a parent consent to his or her minor child engaging with certain internet operators, the Act allows it. Should a platform offer content to minors without requiring a contract, the Act allows that, too. The content which covered operators create or host or that minors would like to view is unrelated to the State's interests.

> **b.** **The Act does not use its speaker-based distinctions as a proxy for regulating disagreeable content.**

Not all laws or regulations that distinguish between different speakers warrant strict scrutiny. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 657 (1994). Such speaker-based restrictions

---

[1] An analysis of why the speaker-based distinctions are justifiable is more thoroughly explained below.

"are not automatically content based or content neutral." *Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019). This goes for regulations that apply "to one medium (or subset thereof) but not others." *Turner Broad. Sys.,* 512 U.S. at 660. Speaker-based laws "demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Id.* at 658.

In *Turner Broad Systems*, the Supreme Court found that a law with speaker-based distinctions did not warrant strict-scrutiny. Specifically, the Court analyzed "whether Congress preferred broadcasters over cable programmers based on the content of programming each group offer[ed.]" *Id.* at 658-659. The Court answered "no" because Congress' justification for enacting the speaker-based law was not based on speech. Rather, it was based "on the belief that the broadcast television industry is in economic peril due to the physical characteristics of cable transmission and the economic incentives facing the cable industry." *Id.* at 659. Because Congress did not prefer one speaker over the other based on content, strict scrutiny was not appropriate. *Id.*

Similarly, the Act does not warrant strict scrutiny simply because it may apply to some operators and not others. If that were the case, all regulations distinguishing between internet providers would be subject to strict scrutiny. This cannot be true. Simply put, the Act does not distinguish between speakers based on their content, ideas, or speech. Rather, any distinction is based on the legislature's belief that some operators pose significantly higher risks of harm to minors than other providers not by virtue of their content but by virtue of the features and functions of their platforms. For example, certain operators such as social media companies pose a higher risk to minors by (1) releasing personally identifiable and other information, (2) causing addiction to user-engagement features, and (3) increased susceptibility to sexual predators.

20

Some social-media companies to whom the Act applies profit heavily from minors' personal information by collecting and selling behavioral data. Exhibit A.[2] Additionally, it is well-established that these companies utilize user interfaces which can be addictive to minors, given their interactive medium and features that maximize user engagement. *Id*. In fact, "[s]ocial media platforms are often designed to maximize user engagement, which has the potential to encourage excessive use and behavioral dysregulation." *Id*. These design features include "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'like'), and algorithms. . . ." *Id.* at 9. To little surprise of anyone who knows a teenager, these conscious design choices make it next to impossible for children to get off their platforms, with "nearly half of adolescents report[ing] being online 'almost constantly[.]'" Amanda Raffoul, *et al.*, *Social Media Platforms Generate Billions of Dollars in Revenue From U.S. Youth: Findings From a Simulated Revenue Model,* 18 PLoS ONE (2023). These habits generated by certain social media companies have been linked to depression, anxiety, and neuroticism in minors. *See* Exh. B at 10.

In addition, predatorial conduct directed towards minors is a huge concern on social media websites due to their extremely interactive nature. *Id.* at 9 ("[S]ocial media platforms can be sites for predatory behaviors and interactions with malicious actors who target children and adolescents. . . ."). Interactive website mediums often have features that are a hub for sexual predators, such as "secret chat" features that include end-to-end user encryptions. Exh. D., North Aff. at ¶ 9. These secret chat functions allow predators to communicate with minors without the social media platform or any other third party overseeing or monitoring the chats. *Id.*

---

[2] "Social media platforms are highly incentivized to keep youth online–children and adolescents' online experiences are heavily monetized through advertising revenue on platforms' websites and mobile applications. Platforms draw upon highly personalized computational advertising to match users' specific demographics and usage patterns with advertisers' financial interests." Ex. A at 2.

These issues are not as prevalent in more widely recognized traditional media outlets whose primary purpose is to report the news. *Id.* at ¶ 11. Traditional media outlets do not have similarly interactive and potentially harmful design features such as populated friends lists or end-to-end-encrypted or "secret" chat functions. A minor reading comments and commenting on a public thread for a news article is far afield from her exchanging direct, almost absolutely private messages with a stranger. None of the Act's distinctions are based on the content of anyone's speech. They are based on the nature of a platform's user interface and business model and associated risks to children and parents. Therefore, intermediate scrutiny applies.

### iii. The Act satisfies any level of First Amendment scrutiny.

#### a. Ohio has important and compelling regulatory interests both in protecting minors and the fundamental right of parental decision-making.

The Act advances the State's important and compelling governmental interests in protecting minors by requiring parental consent before a covered operator can contract with a minor. *See Dayton Area Visually Impaired Persons v. Fisher*, 70 F.3d 1474, 1489 (6th Cir. 1995) ("It is indisputable that state governments have important interests in seeking to secure the safety of their minor citizens."). The Supreme Court has found a "*compelling* interest in protecting the physical and psychological well-being of minors." *Sable Communications of Cal. v. FCC*, 492 U.S. 115, 126 (1989) (emphasis added). There is a prevalent concern by the State, supported by scientific research, that minors engaged with covered operators' platforms are susceptible to harms including mental health issues, sexual abuse, and the sharing of personal  information and data. *See* Exh. E, Husted Aff. at 5-7. The State certainly has an important and compelling interest in combating these harms to minors. *Id.* at 8.

Equally important is the State's interest in protecting the fundamental right of parents to make decisions about their children's care and upbringing. *See id.* at 8; *see also Lassiter v. Dept.*

22

*of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981) ("[T]he companionship, care, custody and management of [one's] children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection.") (internal quotation marks omitted)); *see also Frazier v. Winn*, 535 F.3d 1279, 1284 (11th Cir. 2008) (advancing the protection of the constitutional rights of parents is an interest which the State may lawfully protect). It is well-established that parents have a fundamental right to control their children's upbringing. *See, e.g., Washington v. Glucksberg,* 521 U.S. 702 (1997) ("[T]he 'liberty' specially protected by the Due Process Clause includes the right[] . . . to direct the education and upbringing of one's children. . . ."). Accordingly, the State has an interest in protecting this fundamental right, which the Act vindicates, by "aim[ing] to give parents and legal guardians oversight of their children's online presence on certain websites, services or products by requiring parental consent for use and access." OHIO PROTECTS, *FAQ What is the Parental Notification by Social Media Operators Act*, https://www.ohioprotects.org/faq. Crucially, the Act, by requiring parental consent, "assists parents with obtaining the necessary information about social media operators, the types of products that they provide, and the terms and conditions of use." *See* Exh. E, Husted Aff. at 8.

In *Brown v. Entm't Merchs. Ass'n,* 564 U.S. 786, 795 (2011), the Supreme Court rejected the argument that a content-based regulation of speech (restriction on violent video games) directed towards children was permissible. It reasoned that, while the State possesses power to protect harm from children, this "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown* at 795 (2011). The restriction on speech must be subject to some legitimate prescription and cannot be "solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* There needs to be some "longstanding tradition in this country of specially restricting children's access" to the conduct. *Id.* at 795. The

23

Court rejected the idea of any longstanding tradition in the Country to restrict children from access to depictions of violence. *Id.*

Unlike in *Brown*, the Act here does not regulate any particular kind of expressive conduct, such as "violent" video games, it regulates the ability of operators to contract with minors. Also unlike *Brown*, there are a myriad of longstanding situations where parental consent is traditionally required before a minor can engage in activities that, by their nature, pose health and privacy risks separate and apart from any expressive content. For example, parental consent is required for getting a tattoo or body piercing procedure [O.R.C. § 3730.06] or using a tanning facility [O.R.C. § 4713.50], and the release of personally identifying information of students [O.R.C. § 3319.321 (B)]. Getting a tattoo or piercing might easily be considered expressive conduct. Yet the State has required parental consent to do so since 1998. *See* O.R.C. 3730.06. It is not uncommon for the State to be concerned, or allow parents the opportunity to consent, when children are about to engage in choices with potentially serious consequences given "the inability of children to make mature choices[.]" *Bellotti v. Baird*, 443 U.S. 622, 636 (1979). Even Federal regulatory law imposes regulations on online operators—requiring verifiable parental consent—before collection, use or disclosure of personal information from children 13 and under. 16 CFR § 312.

Therefore, the State has important and compelling interests in protecting minors and vindicating the fundamental rights of parents in making decisions in their children's upbringing. And the law has always recognized this fundamental right.

> **b.      The Act burdens no more speech than is necessary and is narrowly tailored to advance Ohio's regulatory interests.**

Under intermediate scrutiny, the legislation must not "burden substantially more speech than necessary to further those interests." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010), quoting *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997). Under the strict scrutiny

24

analysis, the legislation must be narrowly tailored, but it does not need to be "perfectly tailored." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (quoting *Burson v. Freeman*, 504 U. S. 191, 209 (1992)). It requires the law to be neither seriously overinclusive, nor seriously underinclusive. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 805 (2011).

Here, the Act precisely targets the harms that the Act intends to protect against. *See* Exh. E, Husted Aff. Moreover, the Act protects parents' fundamental right to control their children's upbringing and to guide their children's social interactions on the internet. The Act accomplishes these goals by putting decision-making where it should be: in the hands of parents. The Act gives parents the opportunity to vet certain platforms before their children's engagement, to see if they addictive user-engagement features and are likely to contain features that attract sexual predators. *See* Husted Aff. at 8.

This Act is neither seriously overinclusive nor seriously underinclusive. It is not overinclusive because, as explained, its definition of operator encompasses only those who utilize functional features which pose the most harm to minors. Further, the Act does not burden adults as it only concerns a covered operator's ability to contract with children who are under sixteen. *See* O.R.C. § 1349.09(A)(2). The Act is also not underinclusive because it does not apply just to traditional social media companies—it applies much more broadly "to cover gaming platforms, shared message boards, etc." OHIO PROTECTS FAQ, *supra*. That is because, again, the Act targets operators with user interfaces and functions that pose particular, well-defined risks. Unlike the concern in *Brown*, where the legislation narrowly targeted violent video games and did not target other violent forms of media, the Act restricts *all* platforms with features that implicate these concerns. Thus, the Act is neither overinclusive nor underinclusive.

25

While it is true that parents have certain parental-control options for overseeing how their minor children use the internet, *see* Pl. Mot. at 4-5, 14, these options are simply not preventative enough and ignore the reality of the pervasiveness—both to children *and* their parents—of technology. Parents are not always aware of the different types of platforms their minor children use. Children may surf the internet and come across a website platform before parents even have a clue it exists. This is simply the nature of the internet in the age of information. Because of this, parents may not proactively know which websites to restrict for their children.

This is particularly problematic because, for children to use a platform, the first thing they must often do is agree to its terms and services. Once the minor enters the platform and agrees to the terms, it may well be far too late for the parent to intervene and prevent further unless the platform agrees to a remedy. It would not be enough for the State to simply educate parents on these blocking and monitoring tools, as NetChoice suggests, because often parents do not know which platforms their children are using until after their children have already engaged with the platform. The Act, however, precisely prevents this situation by mandating parental consent *before* the operator may contract with the minor. As noted, the Act allows minors to use the internet and the wide array of speech it contains in any manner they please, insofar as the covered operators' platforms they access do not require a contractual agreement. The Act assists parents by ensuring heightened awareness of the terms (and potential pitfalls) of the contracts their children are agreeing to. The parent, who typically knows their child best, can then decide based on that child's best interests.

Moreover, the enforcement provisions in the statute are narrowly tailored to advance the Act's goals. The Act contains a safe harbor provision which provides online operators the opportunity to cure any violations within ninety days before the Ohio Attorney General may

26

commence civil actions against them. *See* R.C. 1349.09(M)(1)-(2).   Thus, operators can easily avoid all civil enforcement proceedings and penalties simply by curing the violations that the Ohio Attorney General passes along to them.   This ninety-day cure period illustrates that the goal of the Act is not to impose fines on operators who violate the Act; instead, it is to protect children and the rights of parents by having operators remedy the violation.

Finally, the Act is not overinclusive because of what NetChoice deems an "arbitrary" age distinction. Compl. at ¶ 92. Instead, the Act narrowly targets an age window of particular susceptibility. Science demonstrates distinct, age-specific "windows of sensitivity to social media use in adolescence" where increased usage predicts a decrease in life satisfaction ratings. Exh. C, "*Windows of developmental sensitivity to social media*" at abstract, 5. These windows occur between the ages of eleven and fifteen. *Id.,* abstract. Federal law offers some protection to children under the age of thirteen via the Children's Online Privacy Protection Act ("COPPA"). 15 USC §§ 6501-6506. The Act therefore fills a regulation gap by offering protections when minors need it most—during the "distinct window[] of sensitivity to social media use" that occurs between the ages of thirteen and fifteen.

For these reasons, the Act does not burden any more speech than is necessary and is narrowly tailored to achieve its goal of protecting minors on the internet and allowing parents the right to make decisions for their children.

iv. **The Act is not unconstitutionally vague.**

"Few statutes meet the void-for-vagueness threshold: a 'strong presumptive validity' applies to all acts of Congress and mere 'difficulty' in determining a statute's meaning does not render it unconstitutional." *United States v. Kettles*, 970 F.3d 637, 650 (6th Cir.) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)), *cert. denied*, 141 U.S. 924 (2020). Accordingly, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *United States v. Carpenter,* 2022 U.S. Dist. LEXIS 220562, *13 quoting *Chapman v. United States*, 500 U.S. 453, 464 (1991).

a. **Constitutional scrutiny is relaxed because the Act does not impose criminal sanctions and does not regulate speech.**

"The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Stevens v. City of Columbus*, No. 21-3755, 2022 U.S. App. LEXIS 20829, *13 (6th Cir. 2022) (internal quotations omitted). Civil laws (not implicating the First Amendment) "are reviewed less stringently than criminal laws 'because the consequences of imprecision are qualitatively less severe.'" *Id.*, quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Where an enactment does not impose criminal sanctions and does not reach constitutionally protected conduct, the complainant may succeed in a vagueness claim "only if the enactment is impermissibly vague in all of its applications." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir.1999). Vagueness claims of this nature must be examined in light of the facts of the particular case at hand and not as to the Act's facial validity. *See Tatum*, 58 F.3d at 1109 n. 6 (limiting vagueness challenge to an "as applied" analysis since the case did not implicate First Amendment rights); *United States v. Avant*, 907 F.2d 623, 625 (6th Cir. 1990) (citing *United States v. Mazurie*, 419 U.S. 544, 550 (1975) (reviewing vagueness challenge to statute not involving First Amendment rights on the facts of

28

that specific case)). Therefore, to establish a vagueness claim "the statute must be unconstitutionally vague 'as applied to [t]his particular case.'" *Kettles*, 970 F.3d at 650 (quoting *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001)); *see also United States v. Williams*, 553 U.S. 285, 304 (observing that "ordinarily [one] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others").

NetChoice's void for vagueness claim presumes that the Act impacts free speech. But, as discussed, the Act is a commercial regulation that regulates the ability of operators to contract with minors in the absence of parental consent. Indeed, the Act is located within Title 13 ("Commercial Transactions"), Section 1349 ("Consumer Transactions") of the Ohio Revised Code. It does not target free speech or First Amendment rights. The regulation of businesses and the protection of consumers is a well-recognized government role. Moreover, the Act imposes civil, and not criminal sanctions. Thus, heightened judicial scrutiny does not apply and NetChoice must show the Act is void for vagueness as applied to it.

        **b.**      **Even if a stricter standard controls, the Act sufficiently defines prohibited conduct and enforcement parameters.**

Even if the Court finds a First Amendment implication, the Act still passes constitutional muster. It is true that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.,* 567 U.S. 239, 253-254 (2012), quoting *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926). "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.,* quoting *Grayned* v. *City of Rockford*, 408 U. S. 104,

29

108-109 (1972). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* In this instance, the Ohio statute does not implicate speech. However, even if this Court finds that it might, the statute meets the rigorous standard. It gives fair notice and it provides clear directives for enforcement by the Attorney General.

Even so, the law does not expect the drafters of laws to write with crystal clear perfection. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. Laws must, "in order to comport with due process, 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.'" *Miller v. Wilkinson,* No. 2:98-cv-275, 2010 U.S. Dist. LEXIS 103364, *13 (S.D. Ohio Sept. 30, 2010). Setting aside NetChoice's hypothesizing on all possible interpretations of the Act, it provides clear directives (as far as common language permits) and clearly outlines what it requires and to whom it applies. Indeed, the statute gives a person of ordinary intelligence the opportunity to know what is prohibited and provides explicit enforcement standards.

### c. A person of ordinary intelligence can reasonably know what is prohibited.

The statute outlines what operators this applies to and what is prohibited. Terms do not necessarily need to be defined so long as a person of ordinary intelligence would know what is prohibited. The Sixth Circuit has struck similar arguments that attempt to undermine the general understanding of what simple terms mean. *Chambers v. Stengel,* 256 F.3d 397, 401 (2001). (holding that the terms "solicit," "victim," "accident or disaster," and "general public" are common terms, and individuals of common intelligence do not have to guess at their meaning.) Here,

30

NetChoice attempts to create uncertainty about basic terms. But the Act is specific as to whom it applies to—social media operators "who target[] children or are reasonably anticipated to be accessed by children." O.R.C. § 1349.09(B). "Operator" is expressly defined as "any business, entity, or person that operates an online web site, service, or product that has users in this state" and allows its users to engage in certain specific conduct set forth in O.R.C. § 1349.09(A)(1)(a)-(d).

Moreover, the statute explicitly sets forth the requirements for compliance. It demands that "operators" obtain verifiable parental consent before contracting "with a child including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product." *See* O.R.C. § 1349.09(B)(1). If a violation is found, the Act further outlines the civil penalty imposed, with a chance for the operator to remedy any violation within 90 days of notice. *See* O.R.C. § 1349.09(I)(1)-(3), (M)(2)(a)-(b). NetChoice's attempt to parse the language of the Act in an effort to obfuscate ordinary meanings is unpersuasive and has no merit.

### d.	The statute contains objective, non-discriminatory enforcement standards.

"[T]he more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Columbia Natural Resources v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995), quoting *Smith v. Goguen,* 415 U.S. 566, 574 (1974).

O.R.C. § 1349.09 provides explicit standards for the Attorney General and the Courts to enforce the statute. The Act specifically lays out eleven factors for the Attorney General to follow in making its determination whether an operator's product targets children. *See* O.R.C. § 1349.09 (C)(1)-(11). They include "[e]mpirical evidence regarding audience composition" and the "[p]resence of child celebrities or celebrities who appeal to children." *Id.* While NetChoice claims that these eleven factors render the Act "broad and vague," nearly identical factors are incorporated

31

in a long-standing federal regulation which govern similar of operators and online activity. *See* Children Online Privacy Protection Act of 1998 ("COPPA"), 16 C.F.R. § 312.2.[3] These are concrete, identifiable metrics that put operators on fair notice of what will be considered in the Attorney General's review and what platforms will be subject to enforcement. *United States v. Marmolejo*, No. 3:04-cr-132, 2007 U.S. Dist. LEXIS 26524, *6 (S.D. Ohio Apr. 10, 2007). Further, if a violation is found, the Act specifically outlines the civil penalty imposed, with a chance for the operator to remedy their violation within 90 days of notice. *See* O.R.C. § 1349.09(I)(1)-(3), (M)(2)(a)-(b). This safe harbor provision is again similar to one provided under COPPA. 16 CFR § 312.11.

The Act does more than just establish minimal guidelines to govern law enforcement. It outlines, in ordinary terms and with sufficient specificity, to whom the statute applies to, the conduct that is prohibited, and how penalties are to be assessed and meted out. Indeed, despite NetChoice's assertion that these factors render the Act vague and meaningless, it is certain that many of NetChoice's members are subject to the same framework under Federal regulatory law. 16 CFR § 312.   Under either level of scrutiny that the Court applies, the Act is not unconstitutionally vague and NetChoice's vagueness challenge is unlikely to succeed on the merits.

---

[3] COPPA provides the following direction "*Web site or online service directed to children*" means a commercial Web site or online service, or portion thereof, that is targeted to children.
(1) In determining whether a Web site or online service, or a portion thereof, is directed to children, the Commission will consider its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.

32

**C.     The remaining preliminary injunction factors weigh against NetChoice's requested relief.**

A plaintiff must establish that it will likely suffer irreparable harm if the injunction is not granted. *McCoy v. Meridian Automotive Systems, Inc.*, 390 F.3d 417, 421 (6th Cir. 2004). As discussed above, NetChoice has not been deprived of any constitutional right. And because the Act contains a safe harbor provision permitting covered operators to rectify any parental consent issues that may arise, any allegation of imminent enforcement fails. O.R.C. § 1349.09(M). Ultimately, NetChoice's vague and speculative allegations of financial injury and theoretical compliance costs are insufficient to support a finding of irreparable harm. *Winter v. NRDC, Inc.*, 555 U.S. 7, 8 (2008). On the other hand, the State is irreparably harmed every day that it cannot implement the Act. *Maryland v. King*, 567 U.S. 1301, 133 S.Ct. 1, 3, 183 L.Ed.2d 667 (2012) quoting *New Motor Vehicle Bd. of Cal. Orrin W. Fox Co.*, 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977)("any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

The balance of equities and the public interest also weigh against issuing an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (factors merge when government is party). The Supreme Court recognizes the State's "compelling interest in protecting the physical and psychological well-being of minors." *Sable Communications of Cal. v. FCC*, 492 U.S. 115, 126 (1989). The State also has a strong interest in protecting parents' fundamental right to make decisions regarding the care and upbringing of their children. *Lassiter v. Dept. of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981). Rejecting NetChoice's request for an injunction will protect minors from the often-deleterious effects of social media without parental oversight or consent. Moreover, an injunction would inflict irreparable harm on Ohio by preventing enforcement of a statute enacted

33

by representatives of the people. *Maryland v. King*, 567 U.S. 1301, 1303 (2012). The balancing of factors weighs sharply against granting NetChoice's motion.

## III.   Conclusion

Based on the foregoing, NetChoice's Motion should be denied.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*

JULIE M. PFEIFFER (0069792)*
    *Lead and trial counsel*
ELIZABETH HANNING SMITH (0076701)
STEPHEN P. TABATOWSKI (0099175)
PHILLIP T. KELLY (0102198)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH  43215-3428
Tel: (614) 466-2872 | Fax: (614) 728-7592
Julie.Pfeiffer@OhioAGO.gov
Elizabeth.Smith@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
Phillip.Kelly@OhioAGO.gov

*Counsel for Defendant Ohio Attorney General*

34

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing was electronically filed with the U.S. District Court for the and copies were served upon all counsel of record by means of the Court's electronic filing system.


*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER
Assistant Attorney General

35