**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| NETCHOICE, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 2:24-cv-00047 |
| | ) | |
| v. | ) | Chief Judge Algenon L. Marbley |
| | ) | |
| DAVE YOST, in his official capacity | ) | Magistrate Judge Elizabeth Preston Deavers |
| as Ohio Attorney General, | ) | |
| | ) | |
| *Defendant*. | ) | |

---

**PLAINTIFF NETCHOICE'S REPLY**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

---

**Table of Contents**

I.    NetChoice is likely to succeed on the merits of its challenges to the Act. ......................... 2

   A.   NetChoice has standing to challenge the Act. ............................................... 2

     1.   NetChoice has associational standing. ................................................... 2

     2.   NetChoice has organizational standing. .................................................. 5

     3.   NetChoice has standing to protect its members' users. ......................................... 6

   B.   The Act violates the First Amendment. ........................................................ 7

     1.   The Act regulates protected speech. ...................................................... 7

     2.   The Act triggers strict scrutiny. ......................................................... 10

     3.   The Act fails all levels of heightened First Amendment scrutiny. ...................... 14

   C.   The Act is unconstitutionally vague. ......................................................... 18

II.   The remaining factors support a preliminary injunction................................................. 20

Conclusion ......................................................................................................... 20

On January 9, this Court issued a temporary restraining order, enjoining the enforcement of the Act against NetChoice's members pending this Court's disposition of NetChoice's motion for a preliminary injunction.[1] Order 6-17. Based on the record at the time, this Court concluded that "several aspects of the Act" are "troublingly vague," that the "Act appears to be exactly [the] sort of law" that would be "subject to strict scrutiny," and that given the "breathtakingly blunt" and "untargeted" scope of the Act, "it is unlikely that the government will be able to show that the Act is narrowly tailored to any ends that it identifies." Order 13, 16-17. This Court's initial ruling was correct, and nothing in Defendant's response supports any different conclusions now.

Defendant's primary response is that the Act "regulates contracts, not speech." Resp. 3; *see id.* at 8-9 (invoking this argument to oppose NetChoice's "standing"); 14 (same for whether the Act "regulates" protected speech); 18 (same for whether the Act is "content based"); 24 (same for "strict scrutiny"); 29 (same for "vagueness"); 33 (same for "irreparable harm").

This argument is meritless. The Act regulates protected speech in myriad ways, all triggering First Amendment strict scrutiny. *See* Order 15. Most obviously, the Act's text expressly requires covered websites to "deny" both "access to" and "use of" the website for any minor who lacks parental consent. § 1349.09(E). Defendant ignores this language. Nor is there some "contract" exception to the First Amendment. Governments cannot evade the First Amendment's protections by couching laws that limit protected speech as mere contract regulations: *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), would not have come out differently had California enacted a law prohibiting any "contract for sale" of a violent video game to a minor.

---

[1] This Reply uses the same terms and citation conventions that appear in NetChoice's Motion for Preliminary Injunction ("Motion") (ECF No. 2). Also, "Compl." refers to ECF No. 1; "Order" refers to ECF No. 27 (this Court's Order and Opinion granting NetChoice's Motion for Temporary Restraining Order); and "Resp." refers to ECF No. 28 (Defendant's Response to the Motion).

There is no defending the Act's exclusions for things like certain favored "media outlets." § 1349.09(O)(2). That is why Defendant conceded (at the January 8 preliminary conference) that the Act is content-based, and also now concedes that the Act is speaker-based. Thus, strict scrutiny is required. Yet Defendant's attempts to assert a governmental interest are inconsistent, toggling between the State's purported interests in regulating: "contract[s]" for minors (Resp. 22); minors' "engage[ment] with" covered websites (Resp. 22); and the "features and functions" covered websites offer (Resp. 20). Even if those interests were compelling, the Act's attempts to advance them are insufficiently tailored. For instance, while Defendant attacks *some* of the terms of service that *some* websites use, the Act bans *all* covered websites from using *all* terms of service for minors who lack consent. Finally, Defendant's assertion that the Act is not vague fails to address many of the provisions that courts—including this one—have already identified as vague. Order 12-13.

Defendant's subsidiary arguments about standing and irreparable injury likewise fail. As this Court correctly recognized, NetChoice has standing on several grounds—but at minimum because the Act threatens NetChoice's members with business-ending compliance costs. Order 6-10.

This Court should grant NetChoice's motion for a preliminary injunction.

## I.     NetChoice is likely to succeed on the merits of its challenges to the Act.

### A.     NetChoice has standing to challenge the Act.

#### 1.     NetChoice has associational standing.

NetChoice has associational standing "to sue on behalf of its members." *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004); *see* Compl. ¶ 11. This "well-worn theory" has three elements. Order 7 (listing the elements). Defendant disputes only the first element, arguing that NetChoice has "failed to set forth a cognizable First Amendment injury to any of its members" that would allow them to sue in their own right. Resp. 8. Defendant is wrong, as this Court has already indicated. Order 6-8; *see NetChoice, LLC v. Griffin*,

No. 5:23-CV-05105, 2023 WL 5660155, at *10 (W.D. Ark. Aug. 31, 2023) (similar).

The Act directly injures NetChoice members by requiring them to "incur substantial compliance costs should the Act go into effect." Order 7. This is an independent ground for associational standing, because "compliance costs are a recognized harm for purposes of Article III." *Kentucky v. Yellen*, 54 F.4th 325, 342 (6th Cir. 2022). Defendant never disputes that the Act's compliance costs are an unrecoverable *economic injury* that NetChoice members face. *See* Resp. 9. Instead, Defendant argues that compliance costs "do[] not constitute a *first amendment injury*." Resp. 9 (cleaned up). That misses the point, because "[t]he standing inquiry is not a merits inquiry." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021). Defendant's repeated references to a "first amendment injury" conflate those separate inquiries. *E.g.*, Resp. 2, 3, 8, 9, 11. Because compliance costs pose an Article III injury for its members, NetChoice has associational standing.

Defendant responds by suggesting that this injury to NetChoice's members is not "certainly impending." Resp. 10. But, absent this Court's Order, the Act would be in effect *now*. Order 10; *see* Compl. ¶ 58. If the Act were to come into effect, members would face an immediate choice between substantial compliance costs or enormous liability and fines under the Act's enforcement provisions. NetChoice member Dreamwidth, for instance, "do[es] not have capacity to" comply with the Act. Paolucci Decl. ¶¶ 15, 16, 17. That is because the Act's standards are "impossible for [Dreamwidth] to meet." Paolucci Decl. ¶ 13. Compliance is also "impossible" for "many" other members. Szabo Decl. ¶ 14; *see* Roin Decl. ¶ 22. For all those reasons, members' injuries are certainly impending. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).

Defendant ignores these points, instead focusing on the declaration of Michael Masnick. Resp. 9-11. But while that testimony helps illustrate the Act's massive scope, Techdirt is not a NetChoice member, and NetChoice never invoked Techdirt to support standing. Compl. ¶ 62.

3

Even if a separate "first amendment injury" were somehow required, the Act also violates NetChoice's members' rights to publish and disseminate protected speech. Motion 9-10. Members' websites disseminate billions of user-generated "posts" per day, and they allow adults and minors alike to "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017)). Defendant never disputes the existence or scale of this protected speech. Instead, Defendant argues that NetChoice "does not allege" any actual First Amendment injury to its members, but rather "relies upon the speech rights of its users." Resp. 9. But NetChoice *expressly* alleges that "[t]he Act violates the First Amendment rights of both *NetChoice's covered members* and those members' current and prospective users." Compl. ¶ 62 (emphasis added).

Defendant next argues that the declarations supporting NetChoice's motion for preliminary injunction do not support these allegations. Resp. 9. But as this evidence shows, *e.g.*, Szabo Decl. ¶ 14; Paolucci Decl. ¶ 12; *see* Roin Decl. ¶ 22, the Act creates far more than the mere "chill[]" that Defendant says is lacking, Resp. 9. Instead, the Act creates a direct First Amendment injury by requiring members like Dreamwidth to *either* stop disseminating protected speech altogether *or* face business-ending penalties for even small missteps. Paolucci Decl. ¶ 18 ("[T]he fines for a single mistake would exceed our net profit for 2022 by day 19.").

Defendant also argues that NetChoice members have no "right to an audience of their choosing," at least where minors are involved. Resp. 8-9. On the contrary, "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Brown*, 564 U.S. at 794 (cleaned up). Defendant does not grapple with the black-letter law that NetChoice's members *do* have a well-established First Amendment right to "disseminat[e]" protected speech to minors. *Id.* And, besides again conflating standing with the merits,

4

Defendant's focus on *minor's* access to speech construes NetChoice's challenge far too narrowly. The Act injures members by interfering with their right to publish and disseminate speech altogether, to *any* audience. *See* Motion 13. Private publishers' ability to decide to whom they wish to disseminate collections of lawful speech is a core First Amendment right.

This Court was thus correct to reason that, "[m]ore conclusively," NetChoice's members' "First and Fourteenth Amendment rights will be violated by the Act" because NetChoice has sufficiently alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Order 7 (cleaned up); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

## 2. NetChoice has organizational standing.

NetChoice's own injuries support organizational standing, too. Compl. ¶ 14. Defendant argues that NetChoice itself lacks an injury because the Act does not require NetChoice to divert resources away from its normal "operations, activities, or strategies." Resp. 5 (cleaned up). But an organization can "establish direct standing to sue in its own right" by "demonstrat[ing] that the 'purportedly illegal action *increases* the resources the group must devote to programs independent of its suit challenging the action.'" *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) (emphasis added) (cleaned up). NetChoice has demonstrated just that. Compl. ¶ 14; *see* Szabo Decl. ¶ 5; *id.* ¶ 18 ("If the Act takes effect on January 15, 2024, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt.").

Defendant responds that any new expenditures that are part of NetChoice's overall mission to "protect free expression and promote free speech online" are not sufficient to establish organizational standing. Resp. 6. But the Sixth Circuit rejected this argument in *Online Merchants Guild*, recognizing that "within-mission organizational expenditures are enough to establish direct organizational standing." 995 F.3d at 548-49. Defendant responds that "NetChoice's alleged

expenditures to 'address the Act's implications and compliance costs for Internet companies' do not supply standing because its express mission is to do exactly that." Resp. 6 (citing *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2021)). But the Sixth Circuit has said that *Shelby Advocates* "stands for no such thing." *Online Merchs. Guild*, 995 F.3d at 548.

Under "controlling[ ]cases . . . from this circuit, not to mention Supreme Court precedent," NetChoice's organizational standing is therefore secure. *Id.*; *see* Compl. ¶ 14 (discussing "costs").

### 3. NetChoice has standing to protect its members' users.

Defendant also argues that NetChoice lacks standing to assert the rights of minor users of members' websites. Resp. 11. This Court has already rejected that argument, Order 10, and Defendant's response offers no reason for this Court to reach a different conclusion now.

"The Supreme Court has . . . held that a litigant may assert the rights of a third party 'when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights.'" *Griffin*, 2023 WL 5660155, at *10 (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975)). Thus, "in the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Am. Booksellers Ass'n*, 484 U.S. at 392 (cleaned up); *see also NetChoice, LLC v. Bonta*, No. 22-CV-08861, 2023 WL 6135551, at *4 (N.D. Cal. Sept. 18, 2023) (similar); *Griffin*, 2023 WL 5660155, at *10-11 (similar). So too here.

Defendant's arguments about the "policies underpinning" third-party standing, Resp. 11-12, do not change these holdings. Nor should the Court credit Defendant's unsupported claim that there is a "significant and pervasive conflict" between NetChoice's members and their users. Resp. 12-13. The *Griffin* court rejected that idea entirely, noting instead that "[t]he relationship between NetChoice members and their users is analogous to the relationship between vendors of goods and

their customers," and also that "NetChoice members are well positioned to raise these concerns." 2023 WL 5660155, at *10, 12. As in *Griffin*, and as this Court already observed, any supposed "tension between the interests of minor users and NetChoice's members [does not] overwhelm[] the shared interest that the two groups have in free expression." Order 10 (cleaned up).

> **B.      The Act violates the First Amendment.**
>
> **1.      The Act regulates protected speech.**

The Act regulates swaths of protected speech spanning everything "from message boards (*e.g.*, Homeschool World Forum) to sites for service reviews (*e.g.*, Yelp) to traditional social media (*e.g.*, Facebook)." Motion 13. Defendant never disputes that these covered websites—and countless others like them—publish, disseminate, create, and distribute protected speech.

Instead, Defendant repeatedly insists that the Act does not even "regulate[]" this protected speech. Resp. 14. But the Act's text requires websites to "deny the child *access to* or *use of* the online web site, service, or product"—*i.e.*, all of the information and expression made available by the website—absent parental consent. § 1349.09(E) (emphases added). Defendant's response does not even cite this language. This is fatal to Defendant's argument, because "the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002). Just like "protected books, plays, . . . movies, . . . [and] video games," covered websites "communicate ideas." *Brown*, 564 U.S. at 790. "That suffices to confer First Amendment protection." *Id.* Defendant never identifies a meaningful First Amendment difference between regulating speech creation and publication versus regulating "access" to speech or "use of" media that contains protected speech. § 1349.09(E). And there is none.

Defendant responds that the Act just "limits covered operators' ability to *contract* with minors absent parental consent." Resp. 13. But by denying "access" and "use," § 1349.09(E), the Act's *text* does far more than address contracts. Heightened First Amendment scrutiny applies to

laws that "deny minors *access to*" speech—especially because the Act also "effectively suppresses a large amount of speech that *adults* have a constitutional right to receive." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997) (emphases added). Defendant cannot escape that scrutiny by using contracts as a pretense to regulate speech. *See, e.g.*, *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.16 (1984) (applying the First Amendment to a law regulating contracts for charities, and rejecting argument that law was a mere "economic regulation[]").

Even if Defendant were correct that the relationship between users and websites has some aspects of a "commercial-consumer" relationship, that would not save the Act from "regulat[ing]" protected speech. Resp. 17. For example, the law in *Brown* "restrict[ed]" speech even though it involved only the sale (or rental) of video games. 564 U.S. at 799. That decision would not have come out differently had California treated those sales as contracts. So too for the other types of protected speech that Defendant's theory would give the State a free hand to regulate—such as subscribing to a newspaper, buying a book, renting a movie, or purchasing concert tickets.

Defendant's lone cited case—*44 Liquormart v. Rhode Island*, 517 U.S. 484 (1996) (plurality op.)—is not to the contrary. The plurality there addressed "commercial speech restrictions" that "strike at the substance of the information communicated rather than the commercial aspect of it." *Id.* at 499 (cleaned up). But Defendant does not even argue that the Act regulates "commercial speech." *Id.* Rather, Defendant says that the Act simply "does not regulate" any speech at all—commercial or otherwise. *E.g.*, Resp. 18. That aside, the Act never mentions any of the aspects of the contracts Defendant portrays as objectionable. Instead, the Act uses the mere existence of *any* contract to regulate minors' access to *all* of "the substance of the information communicated" on covered websites. *44 Liquormart*, 517 U.S. at 499 (plurality op.) (citation omitted).

Defendant quotes some websites' terms of service as examples of the contracts the Act

targets. Resp. 15-17. The Act sweeps far more broadly than just those websites. *See* Motion 5-6. But Defendant's examples are also inapt, because the Act expressly exempts many websites that have similar terms of service. *See* § 1349.09(O). For example, to create an account for the New York Times online, a minor must agree to detailed terms of sale, terms of service, and a privacy policy. *See Checkout*, New York Times, https://perma.cc/TA7Z-5X65 (last visited Jan. 26, 2024); *see also* Order at 17 (discussing this exact point). Yet the Act leaves all those "contracts" and "terms of service"—and many more—unregulated. That is a tailoring problem, *see infra* pp.15-16, but it also shows that the State's true interest is in regulating protected speech, not contracts.

Defendant's inconsistent descriptions of the Act's purpose also confirm that the Act regulates speech. Defendant describes the Act's purpose as "[p]rotecting minors from the extensive terms and conditions." Resp. 17. But elsewhere, Defendant describes the Act's purpose as responding to the purported "physical- and mental-health risks posed by the effects of certain functions and features common to many internet media platforms." Resp. 1; *see also* Resp. 22 (similar). If the Act aims to *protect* minors from certain terms of service, then the Act is an utter failure (not to mention wildly overbroad), because the Act never even identifies the terms that Defendant finds objectionable, and it also leaves *all* terms totally unregulated on exempted websites. On the other hand, if the Act's purpose is to *prohibit* minors from using "certain functions and features" of websites, Resp. 1, then Defendant cannot use contracts as a fig leaf to disguise the Act's true aims.

Finally, if the Act were limited to a minor's ability to contract, Defendant's press release announcing the Act presumably would have said so. News Release, Dave Yost, Parental Notification by Social Media Operators Act Takes Effect in January (Dec. 27, 2023), https://perma.cc/WRF3-KH3K. Likewise for the "FAQs" about the Act that Defendant has provided to the public—where again the word "contract" is nowhere to be found. Dave Yost, FAQ:

9

What is the Parental Notification by Social Media Operators Act?, https://perma.cc/3AH5-L6PX. That is because the purpose and effect of the Act is to block access to protected speech.

### 2. The Act triggers strict scrutiny.

The Act regulates protected speech, so it cannot escape heightened First Amendment scrutiny. *See* Order 13-14. Strict scrutiny is required because the Act imposes parental-consent requirements for minors to access protected speech, is content-based, and is speaker-based. Defendant responds only to the latter two arguments, Resp. 17-22, yet even those responses fail.[2]

**a.** The Act is content-based in multiple respects. Motion 15-17; Compl. ¶¶ 69-73. For example, the Act exempts websites where "interaction between users is limited to" the following types of *content*: "[r]eviewing products"; "commenting on reviews"; and "[c]omments incidental to *content* posted by" certain favored media outlets that "report news and current events." § 1349.09(O) (emphasis added). The Act is also content-based because it regulates only websites that "target[]" children or that "reasonably anticipate[]" being accessed by children—*e.g.*, websites that publish child-related "[s]ubject matter" or "[v]isual content" such as "animated characters" or "celebrities who appeal to children," § 1349.09(B)-(C)—while ignoring other websites.

Defendant argues that these content-based exclusions are permissible because the Act uses them only to "distinguish between certain *speakers*." Resp. 18. But this is just a roundabout concession that the Act distinguishes between *content*. It is also circular: the speaker-based distinctions turn on the content that exempted websites publish. Defendant also argues that "some operators are exempt because of the functions they offer." Resp. 18. But "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter

---

[2] Defendant also never responds to NetChoice's *separate* argument that, even without recourse to balancing or the tiers of scrutiny, the Act necessarily "violates the First Amendment by requiring websites and minors to secure parental consent to access covered websites." Motion 10.

distinction for a 'function or purpose' proxy that achieves the same result." Motion 15-16 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022)). Nor does Defendant ever rebut that content-based exceptions render an entire statute content-based. *See* Motion 16 (citing *Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2346 (2020) (plurality op.)).

Defendant also argues that "[t]he Act's deference to parents' wishes . . . demonstrates content neutrality." Resp. 19. Beyond ignoring the Act's content-based exceptions, that argument is impossible to square with *Brown*'s holding that requiring parental consent before minors can access protected speech does "not enforce *parental* authority," but instead "impose[s] *governmental* authority, subject only to a parental veto." 564 U.S. at 795 n.3. Such a law does not somehow become content neutral and avoid strict scrutiny just by arguably supporting parental control. Nor is Defendant's claimed "content neutral purpose," Resp. 19, evident from the "statutory text," which is the "best evidence of a statute's purpose," *Walton v. Hammons*, 192 F.3d 590, 593 (6th Cir. 1999) (cleaned up). Instead, the Act's plain text is content-based. *See* Motion 15-17.

**b.** The Act is speaker-based too, as Defendant rightly concedes. Resp. 19-20. The Supreme Court is "deeply skeptical of laws that distinguish among different speakers." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (cleaned up). Defendant thus chooses an uphill battle by arguing that the Act is "justifiably speaker-based." Resp. 19. In particular, Defendant argues that the Act "does not distinguish between speakers based on their content, ideas, or speech," but rather "by virtue of the features and functions of their platforms." Resp. 20. That purported distinction falls flat for the reasons already discussed (*see supra* pp.10-11) and in any event comes nowhere near "justif[ying]" this speaker-based Act. *Contra* Resp. 19.

A speaker-based law triggers strict scrutiny if it is "facially content based," "cannot be 'justified without reference to the content of the regulated speech,'" *or* "was 'adopted by the

government because of disagreement with the message the speech conveys.'" *Schickel v. Dilger*, 925 F.3d 858, 876 & n.2 (6th Cir. 2019) (cleaned up) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015)). The Act checks all three boxes—any one of which is a sufficient basis to hold that the Act's speaker-based distinctions are *not* justifiable and thus trigger strict scrutiny. *Id.*

First, as discussed above, the Act *is* facially content-based. *See supra* p.10. Most obvious, the Act exempts "particular speech because of the topic[s] discussed." *Reed*, 576 U.S. at 163. Things like "news," "current events," and "products offered for sale," § 1349.09(O), are all "topics" that control whether protected speech on a website falls within the Act's scope of coverage.

Second, the Act "cannot be justified without reference to the content of the regulated speech." *Reed*, 576 U.S. at 164. (cleaned up). Here, just *describing* the Act requires referencing content. Even under Defendant's view, the Act uses content to identify the speakers that it covers. *See* Resp. 22. For example, some websites that focus on "news and current events" *are* exempt, § 1349.09(O)(2), while otherwise-covered websites that focus on trivia and historical events *are not* exempt. Similarly, some reviews and commentary for "products offered for sale" *are* exempt, whereas commentary relating to politics, social issues, film, or art *is not* exempt (unless published by an "established and widely recognized media outlet"). § 1349.09(O).

Regulating websites that offer movie reviews but exempting otherwise identical websites that offer product reviews plainly distinguishes among speakers based on content, not functionality. Defendant says the Act is *not* content-based, because it *is* speaker-based. Resp. 18-19. At the same time, Defendant cites the Act's content-based categories to identify the speakers that the Act covers. Resp. 18. As noted above, *supra* p.10, this argument is circular. Therefore, no matter what approach Defendant chooses, the Act "defin[es] regulated speech by particular subject matter." *Reed*, 576 U.S. at 163. That makes the Act an "obvious" candidate for "strict scrutiny." *Id.*

Third, there are good reasons to suspect that the Act reflects the State's "disagreement with the message" that covered websites "convey[ ]." *Schickel*, 925 F.3d at 876 (citation omitted). For if the Act were really about contracts, then it is hard to see why Defendant's own public characterizations of the law never mention contracts. *See supra* pp.9-10. It is also hard to see why an Act that purportedly targets specific, allegedly harmful terms of service makes no effort to identify those contractual terms. *See infra* p.14. Thus, this case is nothing like *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 645 (1994). There, the regulations distinguished between speakers "based only upon the manner in which speakers transmit their messages to viewers"—airwaves vs. cable—not based upon content or "upon the messages they carr[ied]." *Id.*; *contra* Resp. 20.

Defendant's argument also falls short because the Act itself never mentions the "features and functions" that Defendant finds objectionable. *See* Resp. 20-22. Nor does the Act regulate websites based on whether they have those features. Defendant's arguments fail to match the Act in other ways, too. For example, Defendant relies on an article that studied only "six major social media platforms," Resp., Ex. A at 1, to make broad generalizations about *all* covered websites under the Act, Resp. 21. But, as explained in NetChoice's Motion, the scope of the Act's coverage provisions cover all kinds of websites. Motion 5-6. Defendant never addresses that argument, and it ignores the host of smaller websites that—like Dreamwidth—do not "accept any form of advertising," do not "engage in the sale, trade, or brokering of user data," and do not offer features such as "algorithmic sorting." Paolucci Decl. ¶ 3. In sum, the "features and functions" that Defendant identifies do not even approach constituting a content-neutral reason for the Act itself, which expressly favors content- and speaker-based websites such as "recognized media outlet[s]." § 1349.09(O)(2). Because the Act is thus *not* content-neutral, strict scrutiny applies.

**c.** Defendant nonetheless argues that intermediate scrutiny should apply, because "[a]ny

burden on speech is merely incidental." Resp. 13; *see* Resp. 17-18 (similar). But Defendant cannot defend this bare assertion. The Act expressly requires covered websites to "deny the child access to or use of the online web site, service, or product" absent parental consent. § 1349.09(E). That direct, total, and outright ban for minors who fail to secure parental consent is far more than an incidental burden. Worse, the Act's "impossible" compliance standards threaten "many" websites with closure. Szabo Decl. ¶ 14; *see supra* p.3. Such closure would prevent NetChoice members and their users—minors and adults alike—from accessing vast amounts of protected speech. Defendant is wrong to portray these effects as "merely incidental." Resp. 13.

### 3. The Act fails all levels of heightened First Amendment scrutiny.

The Act cannot survive strict scrutiny, and it is therefore unconstitutional. Compl. ¶¶ 80-92; Motion 12-14; *see* Order 16-17. Although "protection of children is a laudable aim," Order 17, Defendant has not framed that interest in a way that can support the Act. Nor has Defendant offered any justification for the Act's "breathtakingly blunt" and totally "untargeted" tailoring. Order 17. These failures doom the Act even if the Court applies intermediate scrutiny. Motion 12.

**a.** Defendant argues that the Act advances three state interests, Resp. 22-24, but all have serious shortcomings. First, Defendant asserts an interest in "requiring parental consent before a covered operator can contract with a minor." Resp. 22. Yet the Act does not focus on the terms, effect, or enforceability of a contract, but rather on "access to" and "use of" protected speech. § 1349.09(E). It is an access law masquerading as a contracting law. Second, Defendant asserts a compelling interest in "combating the[] harms" it alleges can befall minors who "engage[] with" covered websites. Resp. 22. But this argument belies the State's supposed concern with contractual "terms and conditions," Resp. 17, again showing that the State's true aim is to regulate speech. Third, Defendant relies on "the State's interest in protecting the fundamental right of parents to make decisions about their children's care and upbringing." Resp. 22. But the Supreme Court has

rejected that interest. *Brown*, 564 U.S. at 795 n.3.

Fatal to all three interests is that Defendant has not identified an "actual problem in need of solving." *Id.* at 799 (cleaned up). Defendant has not identified any harms flowing from contract terms, nor substantiated the idea that parents are unable to make decisions regarding their children's use of the Internet. And Defendant also does not overcome NetChoice's showing that parents *already* have many tools to control how their children use covered websites and the Internet. Motion 4-5. Therefore, whatever "modest gap in concerned parents' control" those tools leave open (if any), "[f]illing" it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

Finally, Defendant points to parental consent requirements for "tattoo[s]," "body piercing[s]," "tanning," and "the release of" student records as regulated activities that pose risks "separate and apart from any expressive content." Resp. 24. But these discrete examples are worlds apart from the protected speech at issue here. Laws regulating tattoos (injecting permanent ink into the skin), piercings, and tanning target health consequences of conduct *regardless* of content. The Act here directly regulates broad swaths of speech *because of* its content. *See supra* pp.10-13.

**b.** The Act also is not narrowly tailored, because the State has not used "the least restrictive means" of achieving any of these three interests (*even if* such interests qualify as compelling). *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (cleaned up).

First, even as a response to concerns about (some websites') terms of service, the Act is massively overinclusive. *Contra* Resp. 25-27. The Act does not target the terms that the State purports to find objectionable, but rather *all* terms and *all* conditions. *See* § 1349.09(B)(1) (regulating "any contract"). For example, the Act requires parental consent before a minor can agree not to "upload viruses," "send spam," or "disable" a website. Facebook, *Terms of Service* (July 26, 2022), https://perma.cc/RW2V-N2T2; *see* Resp. 16 (discussing same). By requiring consent for

*all* terms—even those Defendant identifies no quarrel with—the Act fails any tailoring analysis.

The Act's coverage of websites *no matter how* they treat things like "advertis[ing]" and "minor's data," Resp. 15, also fails the tailoring analysis. Dreamwidth, for instance, "does not accept any form of advertising" and collects only "the minimum amount of personally-identifying data about [users] that is necessary in order to operate the service." Paolucci Decl. ¶ 3. Yet the Act regulates Dreamwidth all the same. Such an omnibus approach is the very opposite of narrow tailoring. Defendant's "contract" argument also confirms that the Act is highly underinclusive. If terms of service pose such a problem for minors, it makes no sense to exempt otherwise-covered websites that allow minors to post comments incidental to "news" or "products." § 1349.09(O).

Second, the Act is also overinclusive in relation to the State's asserted interest in protecting minors from "mental health issues, sexual abuse, and the sharing of personal information." Resp. 22. Defendant never disputes that the Act reaches a wide range of websites, including: Blackboard, Canvas, Fishbowl, GitHub, LinkedIn, Medium, Moodle, Quora, Stack Overflow, Steam, Substack, TripAdvisor, and Xbox Live (among many, many others). Motion 5-6. Yet Defendant also never explains how these websites pose "physical- and mental-health risks" to minors. Resp. 1. Instead, Defendant's lead exhibit is an article that studied only "six major social media platforms." Resp. Ex. A; *see* Resp. Ex. B (focusing on a similarly small set of websites). That article is not general-izable to the whole Internet, and it addressed "advertising revenue"—not Defendant's other con-cerns. Resp. Ex. A. The Act is also seriously underinclusive. For if *any one* covered website is truly as "dangerous" as Defendant says, "it d[oes] not make sense to leave [it] in the hands of children so long as one parent" consents. *Griffin*, 2023 WL 5660155, at *18 (cleaned up).

Third, Defendant claims—with no support—that parental control options and other less restrictive means are insufficient to help parents "oversee[] how their minor children use the

internet. Resp. 26; *but see* Motion 4-5; Compl. ¶¶ 21-32. Thus, Defendant says, the *State* must help parents by creating and enforcing a parental-consent regime. But binding precedent says otherwise. The Supreme Court has expressly held that parental-consent regimes for protected speech "*do not* enforce *parental* authority" but rather "impose *governmental* authority." *Brown* 564 U.S. at 795 n.3 (first emphasis added). That holding forecloses Defendant's "parental authority" argument.

And, even putting *Brown* aside, the "parental authority" argument still fails. For instance, one less restrictive alternative is that State could give "parents the information needed to engage in active supervision" over their children's use of the Internet. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000). If, as Defendant claims, the core problem is that "parents do not *know* which platforms their children are using," Resp. 26 (emphasis added), then the State could act to educate and encourage parents to use any of the abundant technologies that allow them to gain that knowledge. *See* Motion 4-5; Compl. ¶¶ 21-32. Ohio could run ads urging parents to monitor Internet usage, control devices, help their children adjust account settings, and talk to their children about the content they encounter online. Or the State could "act to encourage the use of [Internet] filters . . . by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up). Defendant's complaints about these less restrictive means amount to arguments that they "require[] . . . consumer[s] to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824. This response ignores that "if a less restrictive means is available . . . , the Government must use it." *Id.* at 815.

Importantly, too, *all* of Defendant's tailoring arguments ignore the broader effects that the Act will have on NetChoice members (who may find compliance impossible) and on covered websites' adult users (who may lose access to protected speech as a result). *See supra* pp.2-7.

**c.** Defendant fails to identify any sufficiently compelling state interest that the Act

advances. Nor is the Act anywhere near the least restrictive means of accomplishing even those interests Defendant does assert. *See Ams. for Prosperity Found.*, 141 S. Ct. at 2383. The Act thus fails strict scrutiny, and it is unconstitutional. But even if the Act were content-neutral, the Act also fails intermediate scrutiny. Motion 12; Compl. ¶¶ 83, 86, 93; *see Griffin,* 2023 WL 5660155, at *16-21 (concluding that another State's similar law failed even intermediate scrutiny).

### C. The Act is unconstitutionally vague.

The Act's "capacious and subjective" language is void for vagueness in multiple respects, including the "troubling" and "eyebrow-raising" provisions that this Court has already identified. Order 13 (discussing § 1349.09(B), (O)). Defendant offers several responses, but all of them fail.

Defendant first argues for "relaxed" scrutiny "because the Act . . . does not regulate speech." Resp. 28. As discussed above, *see supra* pp.7-10, this argument fails because the Act regulates huge amounts of speech, requiring untold numbers of websites to "deny" both "access" and "use" for minors who do not obtain parental consent. § 1349.09(E); *see* Compl. ¶ 38 (discussing the slew of "educational . . . gaming . . . general interest . . . informational . . . and professional websites" that the Act reaches); Motion 5-6 (similar). Thus, the Act must meet *heightened* vagueness standards, Compl. ¶ 96; Mot. 17, not the "relaxed" standard Defendant invokes, Resp. 28.

Next, Defendant's conclusory assertions that the Act "gives fair notice," "provides clear directives," and "clearly outlines what it requires," Resp. 30, nowhere address the vagueness of phrases such as "interact socially," "established and widely recognized," and "primary purpose." *See* Motion 18. Nor does Defendant distinguish the on-point analysis from *Griffin*, holding a similar law unconstitutionally vague because it "neither define[d] 'primary purpose' . . . nor provide[d] any guidelines about how to determine a forum's 'primary purpose,'" and left companies to choose between implementing costly requirements and "risking unpredictable and arbitrary enforcement." 2023 WL 5660155, at *13. Defendant also offers nothing beyond bare and conclusory

assertions to assuage many of *this* Court's *own* concerns about the Act's vague terms. *Compare* Order 13 *with* Resp. 29-30. Such assertions cannot save the Act from vagueness.

Defendant also argues that the Act uses only "simple," "basic," and "common" terms that do not require any "pars[ing]." Resp. 30-31. But the *Griffin* court disagreed—at least for the term "primary purpose." 2023 WL 5660155, at *13. And this Court has already expressed its own concerns that "the Act does appear vague" in multiple respects. Order 13. Terms like "widely recognized media outlet" (which is inherently subjective) and "interact socially" do not have dictionary definitions—unlike the other terms that Defendant cites as analogous. *Compare* Resp. 30 *with* *Oxford English Dictionary Online* (giving entries for "accident," "disaster," "general public," "solicit," and "victim," but not for "interact socially" or other terms at issue here). On the contrary, the critical term "established and widely recognized media outlet," § 1349.09(O)(2), appears to be entirely bespoke. An internet search for that term shows only a few results—all tracing to *this* Act.

Finally, Defendant argues that the Act's definition of a website that "targets children[] or is reasonably anticipated to be accessed by children," § 1349.09(C), is not vague because it overlaps with factors evaluated under the "Children Online Privacy Protection Act of 1998 ('COPPA'), 16 C.F.R. § 312.2." Resp. 31-32. But the COPPA factors inform whether a website "targets" or is "directed to" children under 13. 16 C.F.R. § 312.2. By contrast, the question under the Act is whether a website might be "accessed" by any minor under age 16. § 1349.09(B). "Content" and "subject matter" that *might* be "accessed" by minors is a far broader and more amorphous universe than "content" and "subject matter" "directed to" children under 13. Even if adopting another law's vague test could satisfy due process concerns (doubtful), Defendant is wrong in at least one other important particular. COPPA says the factors "will" be considered. 16 C.F.R. § 312.2. But the Act says only that the factors "may" be considered. § 1349.09(C). "Will" offers far more certainty than

"may," again separating the Act from COPPA. Nor does the COPPA comparison address the other vague terms that NetChoice has identified and that Defendant all but ignores.

## II.    The remaining factors support a preliminary injunction.

Defendant's perfunctory discussion of the remaining factors is unpersuasive. NetChoice, its members, and their users all face irreparable injury absent injunctive relief. Motion 19-20. Defendant's argument that no harm is present because "NetChoice has not been deprived of any constitutional right," Resp. 33, fails for the reasons discussed above. *Supra* pp.2-3. Also, the Act *does* burden the First Amendment rights of NetChoice's members (and their users), *see supra* pp.4-7, and those injuries are in no way "speculative," *contra* Resp. 33. Defendant next argues that no harm is imminent because of the Act's "safe harbor." Resp. 33. But the provision Defendant cites, § 1349.09(M), only covers operators that are in "substantial compliance" (whatever that may mean) and protects only against "civil action[s]"—not against investigations or other enforcement.

Defendant also sidesteps the unrecoverable costs that members must incur to comply with the Act. *See* Motion 19-20. Defendant dubs these as "theoretical," Resp. 33, but common sense says the opposite, as do the declarations. Szabo Decl. ¶ 14; Paolucci Decl. ¶ 13; Roin Decl. ¶ 22.

As for the balance of equities, Defendant argues that "the State is irreparably harmed every day that it cannot implement the Act." Resp. 33. But "the State has no interest in enforcing laws that are unconstitutional." *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 591 F. Supp. 3d 205, 215 (W.D. Ky. 2022) (cleaned up); *see Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982) (similar). Finally, even the strong public interest in protecting minors (Resp. 33) must yield to First Amendment "limits on governmental action." *Brown*, 564 U.S. at 805.

## Conclusion

Plaintiff respectfully requests that this Court enter a preliminary injunction prohibiting Defendant Ohio Attorney General from enforcing the Act against NetChoice's members.

Dated: January 26, 2024

Respectfully submitted,

*s/ Matthew H. Rice*
Matthew H. Rice (97290)
   *Trial Attorney*
SPERLING & SLATER, LLC
55 W. Monroe Street, 32nd Floor
Chicago, Il 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
mrice@sperling-law.com

Joshua P. Morrow*
Michael C. Cotton*
Alexis Swartz*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
michael@lkcfirm.com
alexis@lkcfirm.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

*Admitted pro hac vice*

*Attorneys for Plaintiff NetChoice, LLC*

**Certificate of Service**

I hereby certify that on January 26, 2024, and in accordance with S.D. Ohio Civ. R. 65.1(b)(1), a true and correct copy of the foregoing Reply in Support of Motion for Preliminary Injunction was electronically filed with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

*s/ Matthew H. Rice*
Matthew H. Rice
*Trial Attorney*
