```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION

NETCHOICE, LLC,                    )
                                   )
   PLAINTIFF,                      )    CASE NO. 2:24-cv-47
                                   )
        vs.                        )
                                   )
DAVE YOST, in his official         )
capacity as Ohio Attorney General,)
                                   )
   DEFENDANT.                      )
_____)
```

```
      TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
               BEFORE THE HONORABLE ALGENON L. MARBLEY
                    UNITED STATES DISTRICT JUDGE
                    FEBRUARY 7, 2024; 9:30 A.M.
                         COLUMBUS, OHIO
```

```
    APPEARANCES:

    FOR THE PLAINTIFF:
         Sperling & Slater P.C.
         By:  Matthew H. Rice, Esq.
         55 West Monroe Street, Suite 3200
         Chicago, Illinois  60603

         Lehotsky Keller Cohn LLP
         By:  Joshua P. Morrow, Esq.
         408 West 11th Street, 5th Floor
         Austin, Texas  78701

         Lehotsky Keller Cohn LLP
         By:  Steven P. Lehotsky, Esq.
         200 Massachusetts Avenue, NW, Suite 700
         Washington, D.C.  20001

    FOR THE DEFENDANT:
         Ohio Attorney General's Office
         By:  Julie M. Pfeiffer, Esq.
              Stephen P. Tabatowski, Esq.
         30 East Broad Street, 16th Floor
         Columbus, Ohio  43215
                        - - -
         Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

2

1      WEDNESDAY MORNING SESSION

2      FEBRUARY 7, 2024

3                     - - -

4      (The following proceeding was held in chambers with

5      Mr. Lehotsky and Mr. Tabatowski present.)

6          THE COURT:  I just wanted to go over the rules of

7      engagement.  I think that -- well, let me start off by having

8      you all state your names for the record.  Counsel for the

9      plaintiff.

10          MR. LEHOTSKY:  Steven Lehotsky for plaintiff

11      NetChoice.

12          MR. TABATOWSKI:  And Stephen Tabatowski for the

13      defendant, Yost.

14          THE COURT:  Mr. Tabatowski, you didn't argue.  It was

15      Ms. Pfeiffer who argued the TRO; is that right?

16          MR. TABATOWSKI:  That's correct.

17          THE COURT:  Were you here, though, for the --

18          MR. TABATOWSKI:  I was, Your Honor.

19          THE COURT:  If any of this is redundant, just please

20      forgive me.  What I always want to do for my oral arguments is

21      go over some really basic rules for engagement.  I do that at

22      the risk of being called Captain Obvious, but you would be

23      amazed at things that happen in the heat of argument.

24          So my primary rule for oral argument is please answer

25      the question as asked.  And I know that that's counterintuitive

1   for most of us as litigators because we want to answer the

2   question our way, and there's nothing wrong with that.  I want

3   you to answer the question your way so long as you're answering

4   the question as asked.

5        The reason is twofold.  First, I ask the question not to

6   exact a concession but to fill in gaps in my knowledge.

7   Sometimes even the best written briefs will leave gaps in a

8   judge's knowledge because you know what you're saying.  I may

9   not know as well what you're saying.

10       And secondly and importantly to the advocates, my

11  questions are also an opportunity to persuade.  And if you

12  don't answer them, then that redounds to your detriment in

13  every case.

14       So I just -- and here is my deal with the advocates.  In

15  exchange for you answering my questions as asked, I will

16  always, always, without exception, give you a chance to

17  elaborate on the answer that you wish you could have had an

18  opportunity to give if the question had been phrased

19  differently.  So you're still going to get a chance to make the

20  statement or make the argument that you wanted to make, but I

21  need, first, my question answered.  Sometimes my questions are

22  yes or no questions.  And even if it is, I'm going to give

23  you -- unlike a witness on cross-examination, I'm going to give

24  you an opportunity to elaborate on the yes or no.  But I'm

25  going to great pains to make you know that I'm not exacting

1  concessions, but I'm just trying to fill in gaps in my

2  knowledge in giving you an opportunity to persuade.

3      The other thing I wanted to talk about was I would

4  appreciate it if you would structure the argument along the

5  lines of the four PI factors.  We all understand that the most

6  important one certainly in this case is the likelihood of

7  success on the merits.  The public interest, the balancing of

8  harms, you know, I can appreciate how they might be left at the

9  end, if we get to them at all.  But more significant arguments

10  will center on the likelihood of success on the merits.

11      Mr. Lehotsky, are you going to move for a merger with

12  the trial on the merits?

13      MR. LEHOTSKY:  I know we had previously discussed

14  whether to merge briefing.  And I think we had decided not to

15  do that.  But what would the position of Ohio be on merging the

16  merits at this stage for the argument?

17      MR. TABATOWSKI:  We're in agreement to not consolidate

18  at this point.  And I believe Your Honor's orders made it

19  pretty clear that had to be preserved in the initial motion

20  or -- excuse me, memorandum in opposition of the reply.  We

21  didn't do so for that reason.

22      MR. LEHOTSKY:  We do not intend to move --

23      THE COURT:  That's fine.

24      Did either of you plan to spend an appreciable amount of

25  time on the standing argument, Mr. Lehotsky?

1    MR. LEHOTSKY:  I was only planning on addressing it if

2  Your Honor has question.

3    MR. TABATOWSKI:  Likewise, Your Honor, with the

4  exception of yesterday's filing, would stand on our briefs in

5  terms of standing but maybe briefly address the -- how we see

6  that supplemental evidence is impacting standing.

7    THE COURT:  All right.  I'm fine with you standing on

8  the briefs with respect to standing.  That's awfully phrased.

9  But that's fine with me because I do think we have a lot to

10  talk about with respect to the likelihood of success and the

11  various First Amendment arguments, your argument as to whether

12  this is really an action in contract and not really a First

13  Amendment action, but those issues, void for vagueness, et

14  cetera.

15    How much -- I did not, I don't believe, in my order

16  include a specific time because, at the time, I didn't know

17  whether there would be witnesses, whether it would be more an

18  evidentiary hearing or oral argument.  But I was thinking 30

19  minutes per side.  Would that be adequate for you,

20  Mr. Lehotsky?

21    MR. LEHOTSKY:  Yes, Your Honor.

22    THE COURT:  For you, Mr. Tabatowski?

23    MR. TABATOWSKI:  Yes, Your Honor.

24    THE COURT:  Tabatowski.

25    MR. TABATOWSKI:  Well done.  And, yes, Your Honor.

1          THE COURT:  When you grow up with a name like Algenon,

2    you work hard to get people's names right.

3          MR. TABATOWSKI:  I bet you're a good speller too.

4          THE COURT:  I'm decent in that regard.

5       Mr. Lehotsky, you may reserve time for rebuttal,

6    whatever you think is appropriate.

7          MR. LEHOTSKY:  Okay.

8          THE COURT:  And since I had allotted pretty much the

9    day because I did not know whether there would be an

10   evidentiary aspect of this hearing, if we run over a few

11   minutes because I may have a few more questions, that's not

12   going to be the end of the world.

13         MR. LEHOTSKY:  That's right.

14         THE COURT:  Any questions for me before we begin?

15         MR. LEHOTSKY:  No, Your Honor.

16         MR. TABATOWSKI:  No, Your Honor.

17         THE COURT:  Thank you very much.

18      (End of chambers conference.)

19                         - - -

20      (The following proceeding was held in open court.)

21         THE COURT:  Good morning.  Ms. Stash, would you please

22   call the case.

23         THE DEPUTY CLERK:  Case No. 2:24-cv-47, NetChoice LLC

24   versus Dave Yost in his capacity as Ohio Attorney General.

25         THE COURT:  Would counsel please identify themselves

7

1  for the record beginning with counsel for the plaintiff.

2          MR. LEHOTSKY:  Steve Lehotsky for plaintiff NetChoice,

3  Your Honor.

4          MR. MORROW:  Josh Morrow for plaintiff NetChoice.

5          MR. RICE:  Matthew Rice for plaintiff NetChoice.

6          THE COURT:  And counsel for the defendant.

7          MR. TABATOWSKI:  Stephen Tabatowski for defendant Dave

8  Yost.

9          MS. PFEIFFER:  Julie Pfeiffer for Dave Yost.

10          THE COURT:  Thank you.  Mr. Lehotsky, this is your

11  motion for a preliminary injunction.  Are you ready to proceed?

12          MR. LEHOTSKY:  Yes, Your Honor.

13          THE COURT:  Please proceed.

14          MR. LEHOTSKY:  Thank you.

15          THE COURT:  Mr. Lehotsky, do you know, of the 30

16  minutes that you have for argument, how much time would you

17  wish -- do you wish to preserve for rebuttal?

18          MR. LEHOTSKY:  Your Honor, I'd like to reserve five

19  minutes, please.

20          THE COURT:  All right.

21          MR. LEHOTSKY:  Good morning, Your Honor.  May it

22  please the Court, Steven Lehotsky on behalf of NetChoice.

23      I know the Court has already read the briefs, and we've

24  already had an oral argument on the motion for a temporary

25  restraining order.  I'm happy to take Your Honor's questions at

1    any time.  If you don't have any questions at the outset, I'll

2    proceed to discuss first the merits, the likelihood of success

3    argument, then irreparable injury, and then finally the balance

4    of the equities and public interest factors that I'll group

5    together at the end.

6              THE COURT:  Please proceed.

7              MR. LEHOTSKY:  Thank you, Your Honor.  Under *Brown v.*

8    *Entertainment Merchants Association*, Ohio's parental

9    notification by Social Media Operators Act is plainly an

10   unconstitutional restriction upon minors' access to protected

11   Internet speech.  There is a sentence in the defendant's brief

12   that I want to highlight.  I believe it's on page 19.  Quote,

13   "Should a parent consent to his or her minor child engaging

14   with certain Internet operators, the Act," that is to say, the

15   government, quote, "allows it," end quote.

16        If you replace engaging with certain Internet operators

17   with buying a violent video game, that's the *Brown* case.

18        For three different reasons we think Ohio's Social Media

19   Act is unconstitutional.  First, notwithstanding its name,

20   Ohio's law applies to myriad Internet websites beyond just the

21   well-known social media businesses, the six that are targeted

22   in the different studies submitted by the defendant.  As

23   Attorney General Yost stated publically just before Christmas,

24   Ohio's law applies to, quote, "much more than traditional

25   social media companies," end quote.  The Act would

1   significantly restrict minors' abilities to speak, hear,

2   otherwise engage in speech on the Internet with countless

3   websites, an enormous number of message boards, chat rooms and

4   Internet forums; for example, educational sites such as

5   Blackboard, Canvas and Moodle; gaming sites such as PlayStation

6   Plus, Steam, Xbox Live; general interest such as Medium, Imgur,

7   Substack; informational sites such as Quora, Stack Overflow,

8   and TripAdvisor.  And the definition also expressly includes

9   message boards.  So the Act reaches discussion forums that

10  focuses on every conceivable topic.

11        THE COURT:  Mr. Lehotsky, the Act, which resembles

12  legislation enacted in other states, seeks to require certain

13  website operators to obtain parental consent before allowing an

14  unemancipated child under the age of 16 to register or create

15  an account on the various platforms.  The attorney general

16  maintains that this is really an act that -- this is an action

17  that deals with contract and not the First Amendment.

18        So, as a threshold matter, Mr. Lehotsky, would you

19  address whether we're really dealing here merely with a

20  contract issue, or are we dealing with a First Amendment issue

21  in its most pristine form?

22        MR. LEHOTSKY:  I believe we're dealing with a First

23  Amendment issue in its most pristine form, Your Honor, because

24  our members' websites, all they do is speech.  This is not the

25  type of regulation that you would have where speech is

1    incidental.  Speech is all that we do.  By saying they are

2    regulating a contract in order to have access to speech, that

3    necessarily regulates speech.

4        And I would say that what the State is doing is not

5    really regulating the process of contracting; instead, it's

6    controlling access to speech.  I think this is laid clear by

7    Section 1349.09(E) which we cited in our briefs, which is that

8    the text of the Act unambiguously requires websites to deny

9    both access to and use of any website any minor under the age

10   of 16 who lacks parental consent.

11       This is just clearly regulating the ability to engage in

12   speech directly.  It is not a pure economic contract

13   regulation.  It is not something that's incidental to speech.

14   And I think the *Brown* case highlights this.  *Brown* would not

15   have turned out differently if the state of California had

16   purported to regulate the contract for purchasing a video game,

17   whether the minor would go to GameStop and buy the video game

18   or, more likely these days, go online and enter into an online

19   contract, a license to play the video game on your Xbob or

20   Nintendo Switch or whatever it is.  It would not have come out

21   differently if that was what California was purporting to do.

22   The reason is there is no contract exception to the First

23   Amendment.

24       The attorney general does not have any cases, I think,

25   that supports the type of restriction access to speech that the

1    State of Ohio is imposing here.  They certainly don't have any

2    case that would support the type of consent-based and

3    speaker-based exceptions.

4           THE COURT:  What about a variation on the theme,

5    though, where the Act -- any effect that the Act has on the --

6    on First Amendment rights is really incidental to the primary

7    purpose of protecting Ohio's youth?

8           MR. LEHOTSKY:  So I don't believe it's incidental at

9    all, certainly for our members who have a First Amendment right

10   to publish and disseminate non-obscene speech to minors and to

11   adults.  This law directly burdens their ability to do that.

12   They either have to get parental consent or they have to close

13   down access to the website.

14          Our member Dreamwidth, for instance, the declaration

15   from Ms. Paolucci makes this clear that for a small website

16   like Dreamwidth which is clearly covered by the Act, they have

17   no ability to comply.  Because of the breadth of this law,

18   there are a myriad of websites out there that will either be

19   faced with shutting off speech for minors or taking other more

20   drastic actions that could affect access to adults.

21          That's not an incidental effect on our First Amendment

22   rights.  I also think it's not an incidental effect on the

23   First Amendment rights of minors, of those children between the

24   ages of 13 and 16 who would not be able to access all of the

25   sites I mentioned earlier in my presentation unless they have

1    parental consent.  This is far from an incidental burden upon

2    both our members' First Amendment rights and the First

3    Amendment rights of minors in the state of Ohio.

4            THE COURT:  Do minors enjoy the same level of First

5    Amendment rights as do adults, Mr. Lehotsky?

6            MR. LEHOTSKY:  No, Your Honor.

7            THE COURT:  If that is the case -- because I know that

8    you can envision that minors aren't permitted -- and there will

9    be a justification for minors to be restricted from watching

10   porn, for instance.  We would all agree to that.  And adults

11   are not restricted from watching porn.

12            If the Act were just designed to prevent them from

13   watching porn, we probably wouldn't be here.  You would agree

14   with that, I'm assuming?

15           MR. LEHOTSKY:  That's correct.  Certainly my client

16   would not be here.  I would not be here.

17           THE COURT:  That's right.  By the same token, can't

18   the State take the same steps to regulate what minors are

19   exposed to if the State has data that these minors are being

20   exposed to websites that are bad for minors?  They might have

21   things that are addictive, things that are -- you know, some

22   chat rooms that might have nefarious content, might even have

23   pornographic content.  So the fact that it may have an effect

24   on minors in that they can't see it and an incidental effect on

25   adults, is that permissible under the First Amendment, as you

13

1    see it?

2            MR. LEHOTSKY:  No, I don't believe so.

3        Under *Brown* -- so *Brown* expressly rejects that sort of

4    broad, kind of free-floating interest.  In *Brown*, the Supreme

5    Court wrote, quote:

6            "A state possesses legitimate power to protect

7            children from harm, but that does not include a

8            free-floating power to restrict the ideas to which

9            children may be exposed."

10        Certainly, there are some categories.  There is a

11   well-established category of speech that is obscene as to

12   minors.  Playboy would not be obscene for adults but it is for

13   children for -- you know, under the age of 18.  There are

14   certainly some categories where, yes, if the State could

15   establish some very, you know, well-grounded evidence and a

16   narrowly tailored statute to address a particular type of

17   speech and say this is obscene as to minors, perhaps.  But the

18   Supreme Court rejected that in *Brown*.

19        That was the exact argument that California tried, was

20   these video games, the violence.  And, in fact, many of the

21   same types of arguments -- the interactive nature of the video

22   games, the way they're first-person shooter games and

23   encourages violence by children, school shootings, et cetera --

24   the Supreme Court rejected those arguments just as we think

25   *Brown* would reject the arguments about things such as the

1    infinite scroll features and other things of social media that

2    supposedly make social media so pernicious.

3         I'll point to the declaration of Dreamwidth.  Dreamwidth

4    doesn't have those features and yet it is one of the myriad

5    websites that is swept up in this statute.  That's true for

6    countless other websites that don't have those same features

7    that Ohio identifies.

8         The second related point that I wanted to make about

9    Your Honor's question is there's this kind of remarkable

10   sentence in the defendant's brief, again, I believe at page 19.

11   It is, quote, "Should a platform offer content to minors

12   without requiring a contract, the Act allows that too," which I

13   take that to mean that if our members' websites eliminated

14   their terms of service and just said, okay, you know, minors

15   between the ages of 13 and 16, you're free to sign up; just go

16   ahead, sign up for Facebook or Instagram or whatever you want,

17   but, if there's no contractual requirement, then they can just

18   come on the Internet.  That proves how completely untailored

19   this statute is.

20        Our terms of service for our members contain all sorts

21   of features, anti-bullying, anti-harassment requirements,

22   requirements that you can't post pornography.  If what the

23   State of Ohio is trying to suggest is that our members could

24   get around this law by eliminating all of those prohibitions

25   that our members currently place on minors getting access to

15

1   websites, I mean, that would be remarkable.  It would

2   completely undermine all of their own goals.  I don't think the

3   State of Ohio wants 14- and 15-year-olds engaging in more

4   bullying behavior and with our websites unable to do anything

5   about it.

6        It's, again, just one of the ways in which this

7   purported attempt to regulate contracts where they never

8   identify in the statute what the offending features of the

9   contract are, what the problems with the terms of service are,

10  this is not remotely tailored to addressing that contractual

11  problem which the attorney general identifies.

12       THE COURT:  And under the attorney general's theory,

13  under that theory that this is regulating the process of

14  contracting, that would bespeak a content neutral regulation

15  that would require intermediate scrutiny.  Wouldn't that be

16  correct?  If the Court were to accept the State's argument,

17  wouldn't that allow me to apply intermediate scrutiny to the

18  Act to determine its constitutionality?

19       MR. LEHOTSKY:  So I think we have an argument that we

20  have preserved in the briefing, Your Honor, that if this is a

21  parental consent requirement, it is categorically

22  unconstitutional under *Brown*.  I don't think Your Honor needs

23  to reach that.

24       THE COURT:  My question was slightly different.  If I

25  accept the State's proposition that this is an act which

16

1    regulates the process of contracting, then I evaluate the Act

2    using the intermediate scrutiny standard as opposed to strict

3    scrutiny if it's not content neutral of which you're arguing.

4         MR. LEHOTSKY:  Are you asking me to assume that the

5    statute is content neutral?

6         THE COURT:  Yes.  Because that is what the State is

7    arguing.  The State is arguing that the statute is content

8    neutral.  They're arguing that this is really about regulating

9    the process of contracting, not about regulating speech.  It's

10   content neutral.  If that is the case, then the level of

11   scrutiny is intermediate, correct?

12        MR. LEHOTSKY:  Yes, Your Honor.  If you assume --

13        THE COURT:  All right.  I'm not assuming --

14        MR. LEHOTSKY:  If you reject our arguments.

15        THE COURT:  I'm not rejecting your argument.  I'm just

16   saying that that would be one of the consequences, if you will,

17   were I to accept the argument that this is a contracting

18   statute.

19        MR. LEHOTSKY:  Yes, that's correct.  It would then be

20   subject to intermediate scrutiny.  We still think, as we argued

21   in our brief, that the statute would fail intermediate scrutiny

22   even in that situation because it is overinclusive and

23   underinclusive for the goals it purportedly sets out of

24   protecting minors from harmful speech conduct on the Internet

25   and then also facilitating parental controls and parents'

1    controls of their minor children's social media.  We still

2    think it fails for lack of tailoring.  We also think that it

3    doesn't satisfy *Brown* because it doesn't advance those goals in

4    any respect.

5        We argued in our briefing that Ohio hasn't identified a

6    problem where the government is the necessary solution through

7    a statute like this.  We identified all sorts of less

8    restrictive alternatives, other things that the State of Ohio

9    could do to try to improve parents' ability to control their

10   children's use of social media and the Internet such as public

11   education campaigns, advertising, all manner of things that the

12   State of Ohio could do through government speech and through

13   government action to try to encourage better parental

14   monitoring of their kids' social media use before you get to

15   sort of a categorical access ban on a wide swath of the

16   Internet even if it is content neutral.

17            THE COURT:  All right.  Please continue, Mr. Lehotsky.

18            MR. LEHOTSKY:  Thank you, Your Honor.

19        So I would be happy to take Your Honor's questions about

20   whether it is content-based or speaker-based.  As I think we've

21   argued in our briefing, for three reasons we think it's clearly

22   a content-based statute, first, because of the nature of what

23   it's targeting, targeting speech that children are reasonably

24   anticipated to access, websites that have subject matter or

25   content such as animated characters or celebrities that appeal

1  to children.  That, just by definition, is a content-based

2  definition about the scope of the Act and what type of websites

3  it applies to and what types it doesn't.

4      It also contains two exceptions, one for reviewing

5  products that are offered for sale by Internet commerce.  If

6  you're reviewing a product, you're exempt.  If you're reviewing

7  film or music or a service and a trip, then you're not.

8      And second, there's this exception for an established or

9  widely recognized media outlet so that if you are NBC through

10  its Hulu service, you're exempt, but YouTube is not.  And so we

11  think under well-established Supreme Court precedent that makes

12  this a content-based statute subject to strict scrutiny.  And

13  for the reasons I provided on intermediate scrutiny, it

14  wouldn't satisfy that.

15      It's also speaker-based.  And the attorney general says

16  it's, quote, "justifiably speaker-based," end quote.

17      THE COURT:  It's justifiably speaker-based, the

18  attorney general argues, because it doesn't disfavor particular

19  communicative content.  At least that's how I interpreted the

20  State's.

21      Why does it not disfavor particular communicative

22  content, Mr. Lehotsky?

23      MR. LEHOTSKY:  I think that's wrong because it does

24  create this exception for communicative content about product

25  reviews.  So that's favored content whoever the speaker might

1    be.  And then also it has the news exception, the established

2    and widely recognized media that's reporting on current events

3    and news.  And so, again, you know, these are clearly

4    content-based.

5         It's a little circular when we say it's content-based,

6    the attorney general says no, no, no, it's speaker-based.  And

7    then the attorney general, at least initially, tries to say,

8    no, no, no, it's not speaker-based, it's kind of based on what

9    the content is.  We think that doesn't work.

10        THE COURT:  A 15-year-old could theoretically get his

11   news from the NYT but -- without being a part of this contract

12   but could not get his news from TikTok without the contract.

13        MR. LEHOTSKY:  Correct.  Correct, Your Honor.

14        And the *New York Times*, just like many of these

15   websites, has its own term of service with a term of sale, a

16   privacy policy that explains how that particular website can

17   monetize the data that it gets about its readers and

18   subscribers, the same thing that a website like Facebook or

19   YouTube has.  You're going to also see that on *New York Times*

20   and ESPN and all of these other websites, and yet the states

21   want to regulate these bad contracts, these bad terms of

22   service that allows these websites, our members' websites, to

23   monetize the data of minors but they don't do anything about

24   other websites.

25        I know they rely a lot upon *Turner* -- thank you, Your

20

1    Honor.  They rely upon *Turner* to say that this law is

2    justifiably speaker-based.  But *Turner* was a statute dealing

3    with regulation between different or across different types of

4    media: broadband Internet versus classic distribution, cable

5    versus broadcast TV.

6         Here what we have are speaker distinctions within the

7    same medium of the Internet and websites.  And some websites

8    are favored by Ohio and others are pushed out.  And we submit

9    that's really because of the ability of our members to publish

10   and disseminate speech and to engage in speech with minors in

11   Ohio which we have an absolute First Amendment right to do.

12   They say there's no right to an audience of your choosing.  We

13   think that is totally wrong.  Again, *Brown* says that is

14   categorically false.  We think we do have a well-established

15   right to disseminate speech.  That's established in cases like

16   *303 Creative* most recently, and it's up before the Supreme

17   Court right now as well.

18        The final aspect --

19        THE COURT:  On that one point, let me pose this

20   question to you.  And I -- it's a question that I would pose to

21   Mr. Tabatowski.  That is, these websites are either likely or

22   unlikely to be accessed by children because of their content,

23   and, as a result, the language distinguishes between speakers

24   on the basis of content; is that right?

25        MR. LEHOTSKY:  I think that's right, Your Honor.  For

1   instance, some websites imagine a very boring, dry, academic

2   website.  Maybe everybody has their own version of what's dry

3   and boring.  Imagine that it might be accessed by adults in

4   that field who have a Ph.D., unlikely to be accessed by

5   children.  This also goes into the vagueness concern that we

6   have.  And that's my final point on the merits before

7   proceeding to irreparable injury.  But there are a lot of

8   websites that are at the margins, and there are a lot of

9   websites that might have questions as to whether they're

10  reasonably likely to be accessed by children.

11          Certainly there are going to be some cases that are

12  easy: Disney Kids website or maybe Disney in general, likely to

13  be accessed by children.  For a lot of others, whether children

14  will access them, whether a website has to comply, these are

15  going to be hard questions.  That's just one of many examples

16  of vague, unusual.

17          In our briefing we highlight the established and widely

18  recognized media outlet which, as far as we can tell, is a

19  phrase that exists nowhere on the Internet except with respect

20  to this bill.  It's very hard to understand what some of these

21  provisions are.  The State points out there are no criminal

22  penalties, which is, admittedly, a relief, but it doesn't save

23  the statute from vagueness defects.  That's what the Court in

24  *Griffin* in Arkansas found, and we think this is a statute that

25  suffers from the exact same type of vagueness problems.

1          I would note the chief justice of the United States in I

2     believe it was 2010 said that courts must issue the rough and

3     tumble of factors in trying to identify First Amendment rights.

4     This is an area where you absolutely have to have clear

5     guidance about what's covered and what's not so that it doesn't

6     chill First Amendment rights.

7          With respect to irreparable injury, the State has made

8     the argument that we don't have any First Amendment rights that

9     are being chilled here.  We think that's virtually wrong.

10    Again, it's disproven by our declarations, the declaration from

11    Mr. Szabo of NetChoice and then our two member declarations,

12    especially the Dreamwidth declaration which establishes the

13    chilling effect that I identified at the beginning.  That

14    injury happens immediately if this law is allowed to take

15    effect and can be enforced against our members.

16         The State has also never provided any answer to our

17    argument that there are compliance costs that have to begin

18    immediately if this law is taking effect and can be enforced.

19    Those compliance costs are unrecoverable.  We can't get that

20    money back from the State.  We can't get that money back from

21    anyone else.  In our declarations we identify those costs will

22    be substantial for a company like Dreamwidth.  It might be

23    existential.  Even if it's only a dollar, it's still

24    irreparable injury and still money that we will never get back.

25         The final point that I would make is with respect to the

1   risk of penalties here.  As we noted, the penalties are very

2   severe, potentially running to millions of dollars.

3           THE COURT:  There is a safe harbor provision.

4           MR. LEHOTSKY:  There is only for companies that are

5   in, quote, "substantial compliance."  There is no guidance on

6   what that means, what's substantial when you're talking about

7   the scale of the Internet.  There's nothing in the statute that

8   provides any comfort around that.  There's nothing from the

9   attorney general that provides any comfort around that.  So

10  even that 90-day cure period that would apply only for a

11  company that is in substantial compliance isn't any comfort to

12  someone, especially someone who is trying to figure out what to

13  do now about providing access to minors, about restructuring

14  their website, doing all the engineering work that's necessary

15  to come into compliance.

16          THE COURT:  One final question, Mr. Lehotsky.  How can

17  this statute, based on your theory of the case, be tailored to

18  be saved to meet the State's legitimate interest in protecting

19  youth, unemancipated youth?

20          MR. LEHOTSKY:  I think there is a lot the State would

21  have to change with respect to this particular statute.

22          THE COURT:  Just limit it to -- limit the answer to

23  narrow tailoring.

24          MR. LEHOTSKY:  With respect just to narrow

25  tailoring -- so, for instance, there is no tailoring at all

1    about the types of terms of service provisions that are

2    offensive to the State of Ohio that Ohio finds problematic.

3    The statute applies to any contract.  If it's a term of

4    service, it's covered by the Act regardless of whether the

5    terms are anti-bullying, anti-pornography, whatever those terms

6    are.  So there's nothing in the statute that limits the types

7    of contracts that the State is trying to address with respect

8    to its -- what I'll call its sort of terms of service harm from

9    minors.

10           Likewise, I think there is a massively overbroad, as I

11   said at the outset, scope to the statute with respect to the

12   other category of injury that I would identify from the State,

13   which is the harm to minors from using social media.  As I

14   said, they've got these six websites that they've identified

15   and a couple of academic studies that they've submitted to the

16   Court.  There are a myriad, countless websites that don't have

17   any of those features that the State has identified in its

18   briefing that are swept into this act.  There are other

19   statutes out there that contain many more exceptions, and that

20   would be one place that the State could start.

21           But I would say, just sort of circling back around to my

22   initial point, the parental consent provision, I'm not sure

23   there's anything that the State of Ohio could do to get around

24   that.  I'm not sure they could tailor their way out of that

25   particular problem.

25

1      THE COURT:  Thank you, Mr. Lehotsky.  You will have

2  five minutes for rebuttal.

3      Mr. Tabatowski, are you ready to proceed?

4      MR. TABATOWSKI:  Yes, Your Honor.

5      THE COURT:  Please proceed.

6      MR. TABATOWSKI:  Thank you, Your Honor.  May it please

7  the Court.

8      Obviously we are here today on the plaintiff's motion

9  for a preliminary injunction.  That being the case, it's the

10  plaintiff's burden to establish their standing.  It's the

11  plaintiff's burden to establish that they're entitled to

12  preliminarily injunctive relief based on the four factors.  The

13  attorney general believes that they have failed to meet both of

14  these burdens.

15      With respect to standing, very briefly, the allegations

16  and the evidence simply don't meet the threshold standing

17  requirements under Sixth Circuit precedent for their First

18  Amendment claims, whether it's organizational or associational

19  or prudential standing.  Neither can the plaintiffs show

20  they're entitled to injunctive relief based on those four

21  factors.  They're not likely to succeed on the merits of either

22  of their claims.

23      The Act does regulate the conduct of contracting and not

24  content.  It should be afforded rational basis review.  But

25  even to the extent --

1        THE COURT:  Drill down on that, Mr. Tabatowski.

2   Explain to the Court why you believe that this act only

3   regulates the process of contracting but doesn't regulate

4   speech where you have an act that targets speech providers, if

5   you will.  They target platforms.  It doesn't target contracts.

6   Its contract is also like a gateway to get to the speech.

7        I will admit and agree with you that there is a contract

8   that, you know, is sort of the center of this statute, but the

9   contract is just a step that you have to complete to be able to

10  participate in speech activities.

11       MR. TABATOWSKI:  That is true, Your Honor.  That is a

12  requirement for the statute to be applicable.  But the Supreme

13  Court has rejected the idea that a statute is content-based

14  when it tells an individual or a company what they must or

15  mustn't do as opposed to what they must or mustn't say.

16       THE COURT:  Here is the thing.  The Act requires

17  covered websites to deny both access to and use of their

18  platforms if a child doesn't get a parental consent; right?

19       So why does that not bespeak an act that really is

20  designed to regulate speech?

21       MR. TABATOWSKI:  Your Honor, the attorney general's

22  position would be that the contract is required to access

23  whatever speech may be on these websites.  That is true.  But,

24  again, denying access without verifiable parental consent in

25  the event of a contract that's required, that's something that

1   these sites must or mustn't do.  It's not compelling them to

2   speak or --

3           THE COURT:  Doesn't it regulate the operators, the

4   operators of these platforms, their ability to publish and to

5   distribute speech to minors and by minors?  How is that not so

6   under the Act?

7           MR. TABATOWSKI:  Only if they require minors to enter

8   into a contract in the first instance.  But the First Amendment

9   doesn't --

10          THE COURT:  Doesn't it also regulate minors' ability

11  either to produce speech or to receive speech or both?

12          MR. TABATOWSKI:  If there is a contract required to

13  access that speech, then, yes, it would.  But the threshold

14  requirement there is still that the definition of operator --

15  obviously, they have to be a covered operator under the Act,

16  and they have to require a contract for the minor to register

17  or be an account holder.  So regardless -- assuming that the

18  speech is implicated, intermediate scrutiny should apply

19  because the statute makes distinctions based on speakers and

20  not on content.

21          As Your Honor noted in his TRO opinion, the inquiry at

22  its core as to whether a statute is impermissibly content-based

23  is whether the government is regulating because it agrees or

24  disagrees with the message of the speech.  There is nothing in

25  the record, in the statute, either textually or implicitly,

28

1    that suggests the government agrees or disagrees with any

2    content that's on any of these websites.

3          THE COURT:  Explain this to me.  If that is true, why

4    is it, then, that the government will allow a 15-year-old to

5    get news from, let's say, the *New York Times* without having one

6    of these contracts but will not allow a 15-year-old to get her

7    news from TikTok, let's say, or Facebook, without a contract?

8          MR. TABATOWSKI:  Your Honor, it's because the problems

9    that the statute is meant to address from which the State's

10   interest arise are compounding.  They build upon each other and

11   cascade in a way that -- for instance, *New York Times*, who may

12   or may not -- is likely not a covered operator, does not meet

13   the four requirements to be a covered operator in the first

14   place.  In that scenario, those compounding problems, because

15   they don't meet -- they don't create the atmosphere that those

16   four parts of the operator definition are meant to identify,

17   the problem with its -- the *New York Times*' terms of service

18   don't compound with that atmosphere to create this larger

19   problem and heightened interest of the State.

20         THE COURT:  Well, wouldn't it depend -- I mean, if you

21   listen, let's say, to Fox News, you would think that the *New

22   York Times* would create the kind of atmosphere that parents

23   should keep their kids from looking at.  They wouldn't want

24   their kids to look at the *New York Times*, let's say, because

25   it's too liberal.  I don't understand what it is about the

1    atmosphere, how you identify -- let's say Facebook is creating

2    an atmosphere that -- we don't have to use the *New York*

3    *Times* -- *USA Today* might create because, under the Act, a kid

4    could get -- a 15-year-old could get her news from *USA Today*

5    without a contract but could not get her news from Facebook

6    without a contract.

7       And many young people today get -- I didn't know this

8    was a thing, Mr. Tabatowski, until I was talking to a law clerk

9    who told me that she got a great bit of her news from Facebook.

10   Because I'm not on Facebook, I didn't even know about that news

11   feature.

12      But kind of walk the Court through why that is a

13   distinction without a difference.

14      MR. TABATOWSKI:  The difference between the *New York*

15   *Times* in that scenario, and Facebook, is that covered operators

16   like Facebook that create this atmosphere, there are unique

17   problems and risks associated with that atmosphere posed to

18   minors.  You could picture a scenario, sort of to elaborate on

19   those compounding problems, where a minor enters into onerous

20   terms of service with a covered operator, engages with that

21   potentially problematic environment, either harms someone or

22   has caused harm and then is without at least a contractual

23   remedy because even Dreamwidth, who I believe NetChoice sort of

24   advances as having maybe the least onerous terms of service,

25   has a hold harmless and indemnification clause, has choice of

1   venue, choice of law provisions.  So there is a unique problem

2   that covered operators, because by their definition in the

3   Act -- a unique problem because of the atmosphere that they

4   create in conjunction with those terms of service.

5           THE COURT:  Let me cause you to go on a degression for

6   a moment so that at least it will be clear in the Court's mind

7   of which you speak.  Because you referenced maybe now three

8   times about the atmosphere that some of the covered sites

9   creates, and the implication is that it's a negative atmosphere

10  for the youth of Ohio, the unemancipated youth of Ohio.

11          Tell me about the atmosphere of which you speak in which

12  the Act is trying to address, and the factual or evidentiary

13  basis for your belief that said atmosphere is harmful to those

14  15 and under.

15          MR. TABATOWSKI:  Yes, Your Honor.  I start with the

16  State's Exhibit B, the surgeon general report which states that

17  social media platforms' covered operators are often designed to

18  maximize user engagement that encourages excessive use,

19  behavioral dysregulation.  And this atmosphere is created

20  irrespective of content.  It's created by things like push

21  notifications, infinite scrolling and algorithm sorting.  This

22  is regardless of what the message is.  It's more akin to

23  *Turner*.  It's more akin to a particular type of technology

24  where this distinction lies.  It's not a content-based

25  distinction.  It's based on this particular form of technology,

1    in addition to things like peer-to-peer chatting, end-to-end

2    encrypted chatting which essentially means, Your Honor, that

3    once these private chats happen on these platforms, no one has

4    access to the content of that chat other than the minor and the

5    potential sexual predator, for instance.

6         So those are the type of non-content-related

7    environments that are created by these sites which are

8    compounded by the fact they require these contracts and do seek

9    to enforce them against minors.  That's the compounding sort of

10   problem from which the State's interest arises.

11        THE COURT:  All right.  I appreciate that.  That gives

12   me context.  So thank you.

13        MR. TABATOWSKI:  You're welcome, Your Honor.

14        THE COURT:  Please continue with your argument.

15        MR. TABATOWSKI:  Yes.  So, again, the *Turner*

16   *Broadcasting Systems*.  If the Court is not inclined to accept

17   the State's argument that this is a purely contractual statute

18   not regulating speech, *Turner Broadcasting* held that the

19   must-carry rules are distinguished between categories of

20   speakers based on the technology used to communicate.

21        That's what we have here.  There, intermediate scrutiny

22   applied because the regulation distinguished based only on the

23   manner in which the speakers transmitted their message to

24   viewers.  Again, it's the manner in which covered operators, by

25   definition, who target children or reasonably anticipated to be

1    accessed by children, transmit messages to those children.

2          Regardless of which standard Your Honor chooses to apply

3    to this statute, it survives constitutional scrutiny.  The

4    government has those intertwined compelling interests which

5    compound upon each other and cascade into this sort of larger

6    interest.  The Supreme Court has found a compelling interest in

7    protecting the physical and psychological well-being of minors.

8    It's also well established that parents have a fundamental

9    right to control their children's upbringing.

10         We heard my friend Mr. Lehotsky speak a little bit about

11   *Brown* sort of vitiating that idea, and I don't think the *Brown*

12   opinion, particularly footnote 3, goes that far.  I believe

13   it's a little bit more limited than that because I think *Brown*

14   is pretty easily distinguishable if one looks at the statute in

15   *Brown*.  It was obviously a moral judgment by the California

16   legislature on content.  It essentially took the obscenity test

17   and put in violence words.  That's an express facial

18   content-based regulation.  We don't have that here.

19         THE COURT:  But *Brown* also stands for the general

20   proposition that the State doesn't possess a, quote,

21   "Free-floating power to restrict the ideas to which children

22   may be exposed."  And *Brown* was dealing with something arguably

23   more compelling because it was dealing with violence and

24   certainly violence in an atmosphere where we routinely have

25   acts of violence perpetrated against vulnerable victims like

33

1    elementary school children or school children generally.

2         So, if the Supreme Court did not find that the statute

3    in *Brown* passed constitutional muster, then, *a fortiori*,

4    shouldn't I find that this statute doesn't pass constitutional

5    muster?

6         MR. TABATOWSKI:  Two points on that, Your Honor.

7    First, the State would agree there isn't a free-floating

8    interest in restricting the content that minors are able to

9    access.  And that's exactly why, Your Honor, that a minor might

10   access a news article on the *New York Times* but not on the

11   platform by a covered operator where that atmosphere is

12   created.

13        The second point is that that's -- I think Your Honor

14   would maybe be applying Justice Alito's dissent in *Brown* in

15   that the reason that *Brown* ended up deciding the way it did was

16   because there's no historical aspect of the First Amendment

17   where violence is an exception.  On the other hand here, there

18   are many examples where contracts and conduct that minors wish

19   to engage in, states have required parental consent.

20        THE COURT:  But what if I look at this as not a

21   contract case but a First Amendment case?  What does history

22   dictate in that instance?

23        MR. TABATOWSKI:  Well, I think it's fair to say, Your

24   Honor, that we are dealing with sort of a rapidly changing new

25   ground.

34

1      THE COURT:  If you are an originalist, where do you go

2  to find an answer to the questions posed in this case since the

3  framers of the Constitution didn't have these social media

4  platforms to consider then?  If you're a living

5  constitutionalist, however, a law professor Strauss, then

6  perhaps we can find a way to address that question.

7      And that's going to be a question for you, Mr. Lehotsky,

8  because I know that you are a witness to the kind of history

9  that I just inquired about as your justice was one of the

10  original originalists.

11      Go ahead, Mr. Tabatowski.

12      MR. TABATOWSKI:  Yes, Your Honor.  I would say that if

13  you're viewing it as a speech case, then, for instance,

14  entering into a contract to get a tattoo obviously are, quite

15  arguably, expressive conduct.  But there are

16  non-content-related aspects to getting a tattoo that the State

17  has an interest in requiring parental consent to: permanence,

18  health and safety risk.

19      THE COURT:  My question was slightly different.  *Brown*

20  relied on a historical context vis-à-vis the First Amendment.

21  But can we find the same historical context for the Act in this

22  case upon which this Court could rely for guidance?

23      MR. TABATOWSKI:  In the context of the Internet, no, I

24  don't believe so, Your Honor, because this is pretty new

25  ground.

35

1          THE COURT:  Right.

2          MR. TABATOWSKI:  Which is why the caution should be

3    used in terms of applying cases about violent video games as

4    sort of a monolithic object of speech, of content.  Holdings in

5    cases regarding a violent video game are just not applicable to

6    social media which is a broader -- it's just a different thing

7    than an object of speech or content.  So we are treading new

8    ground here and it's worth another look, I believe.

9          Returning to the government's interest, if I may, Your

10   Honor.

11         THE COURT:  Yes.

12         MR. TABATOWSKI:  The -- again, the companionship,

13   care, custody, management of one's children is an important

14   interest.  It's one that warrants deference.  I would again

15   point to the State's Exhibit B, the surgeon general report,

16   which reported that nearly 70 percent of parents say that

17   parenting is more difficult than it was 20 years ago.  What are

18   the top two cited reasons?  Technology, social media.

19         Again, in *Brown*, one of the reasons that they found the

20   way they did was because California had not shown that parents

21   had a substantial interest in the assistance of the State.

22         THE COURT:  Is there a way to regulate social media

23   without regulating speech, Mr. Tabatowski?

24         MR. TABATOWSKI:  The State would say it's done it

25   here.  But, yes, I believe there is if we focus on these

1    platforms, these covered operators, not as existing of the

2    content that is on them.  They are a separate thing.  Again, I

3    believe that's why a minor might access content on the *New York*

4    *Times* but not on Facebook because of what Facebook is compared

5    to the *New York Times*.  I believe that's what the statute is

6    pointed at addressing.

7         There are just significant specific risks posed by these

8    operators.  The surgeon general report again points out that

9    people with frequent problematic social media use experience

10   changes in their brain structure which is similar to changes

11   seen in individuals that have substance abuse problems or

12   gambling addictions.

13        This is a result of conscious design choices by those

14   operators that we previously discussed.  And nearly half of

15   adolescents -- the State's Exhibit B [sic]; it's a Harvard

16   study by Dr. Raffoul -- reports that nearly half of adolescents

17   report being online almost constantly.  These habits ultimately

18   are linked to depression, anxiety, and neuroticism in minors.

19   That's regardless of what the content is they're viewing, but

20   it's because of the way the features --

21        THE COURT:  Would the better approach be to restrict

22   minors from being on social media at all?  Because you're

23   saying that regardless of the content, the fact that they're on

24   it is what is causing the problems with our youth.  So why not

25   just eliminate the problem if it's not the content?

1        MR. TABATOWSKI:  Not every minor is the same.  There

2   is good on the Internet and on these platforms.

3        THE COURT:  How do you identify the minors who are

4   going to become depressed as a result of their engagement with

5   social media and those who would not?

6        MR. TABATOWSKI:  The State wouldn't attempt to do

7   that.  That's the requirement --

8        THE COURT:  That's something that could be left to

9   parents?

10        MR. TABATOWSKI:  Correct.

11        THE COURT:  Leave it to the parents and the State gets

12   out of the business of trying to regulate content.

13        MR. TABATOWSKI:  Well, Your Honor, I believe going

14   back to that 70 percent of parents have said that these -- that

15   technology and social media are -- make parenting much harder

16   than it was 20 years ago.  And, frankly, that's where this case

17   is also different from *Brown*, is that, as opposed to violence

18   or violent video games, parents have identified a substantial

19   need for government assistance in vindicating their rights to

20   control the upbringing of their children.

21        The State, of course, would -- the statute would be much

22   more constitutionally problematic if the parental consent

23   requirement was not in place because it is leaving that

24   decision with the people that know the minors the best, and

25   that is the parents on a case-to-case basis.

38

1      THE COURT:  But I find that interesting in light of

2  note 3 that you referenced earlier in *Brown*, that even if,

3  quote, "The state has the power to enforce parental

4  prohibitions," for example, enforcing a parents' decision to

5  forbid their child like to attend an event or something, and I

6  resume the quote, "It does not follow that the State has the

7  power to prevent children from hearing or saying anything

8  without their parents' prior consent."

9      And then the Court explains further.  "Such laws do not

10  enforce parental authority over children's speech and religion;

11  they impose governmental authority, subject only to a parental

12  veto."

13      That was *Brown*'s concern with respect to your argument.

14  That was the Court's concern in *Brown* with respect to the

15  argument that you're making about bringing in governmental

16  authority to enforce these parental prohibitions.

17      MR. TABATOWSKI:  The difference from the State's

18  standpoint is the law.  The law in *Brown* targeted a particular

19  type of speech.  It was violence.  It was different from --

20      THE COURT:  But here it could be argued that what

21  you're targeting is even broader.  *Brown* was targeting

22  violence.  You're targeting basically any speech that's on

23  these platforms, right?

24      MR. TABATOWSKI:  No, Your Honor.  I believe that we're

25  targeting covered operators who require minors to contract.

1        THE COURT:  You're targeting any speech on these

2   covered operators' platforms.  *Brown* was targeting a finite

3   number of entities.  They were targeting people -- companies

4   who made these games that were arguably violent.

5        But, again, they were just targeting the violent video

6   games.  They weren't targeting Tetris.  Tetris is not a violent

7   game, but they were targeting other violent games.  I can't

8   recall whether *Brown* was targeting Mario Brothers.  And by my

9   questions, that tells you how old my sons are when I talk about

10  Tetris and Mario Brothers, Super Mario.

11       Here, you're targeting these operators and all of their

12  content because you aren't allowing them to get onto these

13  platforms without parental consent, which means you can't look

14  at any of their stuff without parental consent but you can look

15  at all of *The Wall Street Journal* stuff without parental

16  consent.

17       MR. TABATOWSKI:  I think the difference goes back to

18  that principle inquiry.  Perhaps what Your Honor is getting at

19  is a speaker-based distinction and not a content-based

20  distinction.  The State believes that's supported by the fact

21  that you could read -- a minor can read *The Wall Street Journal*

22  article on the journal.com which doesn't meet the definition of

23  a covered operator.

24       THE COURT:  Let's try this one, Mr. Tabatowski.  What

25  if *The Wall Street Journal* was doing a historical piece that

1    covered pornography; and, in the context of the covered piece,

2    it had to discuss and display pornographic images right smack

3    in the middle of the WSJ?  That's something that you would

4    otherwise try to prevent by the Act, but, because it was *The*

5    *Wall Street Journal*, it would fall through the cracks and my

6    15-year-old son would be able to look at it because it was *The*

7    *Wall Street Journal* and not Facebook.  That would be the only

8    reason.  I hadn't given the consent.  There was no contract,

9    but he could look at it on *The Wall Street Journal*.  What about

10   that?

11          MR. TABATOWSKI:  I think that illustrates that the

12   Acts' arguable speaker-based distinctions are not a proxy for

13   the regulation of content because the State is not saying it

14   favors or disfavors that material.  Again, it goes back to

15   those issues as unique risks and problems that are posed by

16   covered operators as defined by the statute, especially ones

17   that target children and obviously those ones that require

18   onerous terms of service.  I don't think the statute is

19   underinclusive in that regard because the statute is not

20   targeting content.  To the extent it does implicate a minor's

21   ability to access content, it's incidental to those important

22   and compelling interests that the State is seeking to

23   vindicate.

24          THE COURT:  You have two minutes to wrap up,

25   Mr. Tabatowski.

41

1          MR. TABATOWSKI:  I would note, Your Honor, also that

2     the Act targets a very narrow age window because there are

3     existing federal protections in the form of COPPA, at least for

4     privacy.  Many of NetChoice's members, by their own allegation,

5     do not allow minors under the age of 13 to access their

6     websites.  So primarily and practically, Your Honor, we're

7     talking about a narrow age window and one that the State's

8     evidence has shown, Exhibit C, windows of developmental

9     sensitivity to social media, that between the ages of 11 to 15

10    are when adolescents are at the highest risk of these problems.

11         I'd like to briefly touch on void for vagueness.  The

12    standard there is whether a reasonable person would understand

13    whether the statute applies to them and the conduct that it

14    prohibits.  And the State believes that the statute is clear to

15    whom it applies, that's social-media-defined operators who

16    target children or reasonably anticipated to be accessed by

17    children.

18         I would note that one of the factors in the 11-factor

19    list that the plaintiff takes issue with is --

20         THE COURT:  How is reasonably anticipated to be

21    accessed by children defined?

22         MR. TABATOWSKI:  I think as it's commonly understood.

23    I believe we --

24         THE COURT:  It's not defined in the statute, is it?

25         MR. TABATOWSKI:  No.  Well, it's not defined, but the

42

1   contours are outlined by those factors.

2          THE COURT:  Is targeting -- the phrase target children

3   defined anyplace in the Act?

4          MR. TABATOWSKI:  No.  But, again --

5          THE COURT:  Again, we know it's children under the age

6   of 16.

7          MR. TABATOWSKI:  Correct.

8          THE COURT:  Or 16 and under.

9          MR. TABATOWSKI:  Under the age of 16.

10         THE COURT:  Under the age of 16.

11       But what does targeting children mean?  What does to

12  target children mean?

13         MR. TABATOWSKI:  I believe that --

14         THE COURT:  I'm not asking you what -- and I don't

15  mean this in a facetious way, Mr. Tabatowski, because you've

16  done a marvelous job of answering the Court's questions.  I

17  want to know not what you think because you're in the AG's

18  office.  But, if I'm an operator, I might not be able to call

19  you.  You might be engaged in an argument before this Court; so

20  I can't call you and find out what this targeting children

21  means.  The operator should be able to find out in the statute

22  what targeting children means.

23       So, if I'm an operator, how would I understand or where

24  would I go to find an understanding for what the phrase

25  targeting children means?

1          MR. TABATOWSKI:  Again, I believe you can look at

2     Subsection C of the statute and the 11 factors, particularly

3     for, let's say, Dreamwidth, for instance, who purports to

4     collect the least amount of data, according to their terms of

5     service in the evidence that plaintiff has provided.  Factor 10

6     is empirical evidence regarding audience composition.

7     Dreamwidth admits they have that.  They know whether or not

8     they target children.  They have empirical evidence, and the

9     statute expressly sets forth that the attorney general and the

10    courts can consider that.

11         So sort of colloquially, in a general understanding,

12    targeting children is what those 11 factors are meant to

13    illustrate.

14         THE COURT:  It's interesting that you raise the 11

15    factors, Mr. Tabatowski, because the -- that's the 11-factor

16    list that, under the statute, the attorney general or the Court

17    may use to determine if a website is indeed covered.  Have I

18    gotten that right?  Isn't that what it is?

19         MR. TABATOWSKI:  The 11 factors go to whether a

20    website targets or is reasonably anticipated to be accessed.

21         THE COURT:  It's true that under the Act the attorney

22    general or a court -- the Act says that may use this 11-factor

23    list to determine whether the website is indeed covered, right?

24         MR. TABATOWSKI:  Correct.

25         THE COURT:  Okay.  But nowhere in the Act does the Act

44

1    define the 11 factors.  It lists the 11 factors, but it lists

2    them without definition.  Again, to the Court, that is of great

3    concern in terms of whether this act is void for vagueness.  Is

4    there -- do you have any understanding as to each of those 11

5    factors without resort to some definition?  Because sometimes

6    language -- the beauty of language is that it can be precise,

7    but the beauty of language is also that it can be subject to

8    multiple interpretations.  So what one of the terms means in

9    SoCal may be different from -- strike that.

10         What one term might mean to one operator might mean

11    something different to another operator.  A California operator

12    might view one term different than a Montana operator, for

13    instance.  We're that diverse as a country.  And the operators,

14    I believe, are worldwide operators; so they would need -- they

15    have been given permission to do business in the state of Ohio,

16    for instance.  So they have to understand what those terms mean

17    here or what those terms meant when the legislature enacted

18    them.  How are they to understand what those terms mean without

19    a definition within the statute?

20         MR. TABATOWSKI:  Your Honor, again, I think the

21    standard is whether a reasonable person would understand what

22    these words mean.  And we can't expect -- as you noted,

23    language can be ambiguous or vague and it can be very precise.

24    But the Court has held that mathematical certainty in drafting

25    legislation is not required.  The standard is whether a

1    reasonable person would understand whether or not they target

2    or reasonably anticipated to be accessed by children.  And

3    those 11 factors, though they are not defined, the State's

4    attempt to set the contours of that -- I would note, Your

5    Honor, that -- I'd like to briefly address the evidence that

6    was submitted yesterday.

7         Some of NetChoice's members support the Kids Online

8    Safety Act which has very similar language --

9         THE COURT:  Are you talking about the Children Online

10   Privacy Protection Act?

11        MR. TABATOWSKI:  No.  This is a bill.  It's not been

12   enacted yet.  It's detailed in that filing from yesterday, Your

13   Honor.

14        THE COURT:  I have it.

15        MR. TABATOWSKI:  The footnote, I believe it's the

16   second footnote there --

17        THE COURT:  Yes.  Number 2.

18        MR. TABATOWSKI:  X, which is a NetChoice member --

19   there's one other that's slipping my mind currently, Your

20   Honor, but they acknowledged support for this statute.  So it

21   has a very similar standard without factors to determine

22   whether it's -- essentially it's whether it's reasonably

23   anticipated to be accessed by children.  So I don't think that

24   NetChoice or its members should be able to hide under a

25   umbrella.

46

1          THE COURT:  I want to make sure I understand what your

2     argument is with respect to this footnote.  Because it says the

3     Kids Online Safety Act would generally apply to covered

4     platforms defined as a social media service, social network,

5     online video game including educational games, messaging

6     application, video streaming service, or an online platform

7     that connects to the Internet and that is used, or is

8     reasonably likely to be used, by an individual under the age of

9     17.

10          So there is a definition of covered platforms.  So let

11     me juxtapose that to the Act under consideration here where the

12     Act contains an exception for, quote, "established" and, quote,

13     "widely recognized," quotes closed, media outlets whose, quote,

14     "primary purpose," is to, quote, "report news and current

15     events," quotes closed.  But the Act doesn't provide any

16     guardrails or signposts for determining which media outlets

17     which are, quote, "established," and, quote, "widely

18     recognized," quotes closed.

19          My kind of Pavlovian response to that type of language

20     is that it invites arbitrary application of the law.  But at

21     least KOSA, the Kids Online Safety Act, seems to define covered

22     platforms.  So that juxtaposition confuses me in the context of

23     your argument.  Can you, as a parting argument, as your final

24     argument or final statement, just clear up that confusion in

25     your Court's mind?

1       MR. TABATOWSKI:  Two points on that.  The first is

2   that I was sort of in the realm there of whether a website is

3   reasonably anticipated to be accessed by children and comparing

4   that portion of the statute with KOSA which has very similar

5   language in terms of what might be reasonably accessed by

6   children but doesn't provide factors yet.  Some of NetChoice's

7   members support the Act and obviously know that it applies to

8   them.

9       With respect to the exemption, Your Honor, I believe

10  that you can sort of read the exemption as -- allow me to find

11  it.

12      THE COURT:  1349.09(O)(2).  That's where the exception

13  resides.

14      MR. TABATOWSKI:  The exemption, Your Honor, it

15  provides widely established and recognized I believe it's sort

16  of factors to be considered and whether a media outlet's

17  primary purpose is to report the news.  So, to that extent, I

18  believe there is some indication within that subsection itself

19  that guides that sort of definition.

20      The second point there is that that language is

21  contained in a discrete exemption which may or may not have

22  much applicability at all because most of those websites that

23  may or may not fall under that exemption would not be covered

24  operators because they wouldn't meet those four definitions.

25      The State's final point is that if the Court is inclined

1   to find that that limited exemption is impermissibly vague, it

2   shouldn't let that vagueness in that exemption infect the rest

3   of the statute.  And that statute can be severed -- or excuse

4   me, that exemption could be severed from the rest of the

5   statute which the State maintains is --

6           THE COURT:  And just for clarity of the record, what I

7   call an exception, that is, established and widely recognized,

8   you're calling an exemption, but we're both talking about the

9   same thing.

10          MR. TABATOWSKI:  Correct.  Yes.

11          THE COURT:  Thank you, Mr. Tabatowski.

12          MR. TABATOWSKI:  Thank you, Your Honor.

13      The State --

14          THE COURT:  Before you begin your rejoinder,

15  Mr. Lehotsky, I need just one second.

16          Mr. Lehotsky, your retort.

17          MR. LEHOTSKY:  Thank you, Your Honor.

18      I know Your Honor had a question about originalism.  I'm

19  happy to begin there.  I've got, I believe, six different

20  points to make.  But if you'd like me to begin --

21          THE COURT:  I'll tell you what.  You can begin there

22  just because, in theory, at least, it will give me a structure,

23  or it will give me your insights on a structure within which to

24  approach this issue and opinion because I think that

25  Mr. Tabatowski was correct.  I don't think you would disagree

1   that *Brown* could resort to the history -- could resort to the

2   kind of historical analysis that many originalists would find

3   necessary in considering whether the Constitution forbade this

4   or the First Amendment forbade this.  And the framers could not

5   have imagined -- even Ben Franklin would not have imagined the

6   Internet and social media.  He was probably the most

7   forward-thinking tech person of that era.

8          MR. LEHOTSKY:  I think someone who is an originalist

9   would approach the question by saying what do the phrases the

10  freedom of speech and I think also the freedom of the press

11  mean?  What do those phrases mean at the time of founding?  I

12  think whether you apply that framework or a living

13  constitutionalist framework, you sort of get largely to the

14  same place.

15         I think the question of what does the freedom of speech

16  mean at the founding, at the time of the founding there were

17  things like paintings and writing and the printing press.  That

18  certainly evolved into photographs and radio and television and

19  now the Internet.  The Supreme Court has been very clear that

20  sort of technological innovation, when we're still talking

21  about speech, whether it's what I'm doing right now or whether

22  it's writing, whether it's listening in music or recording, all

23  of those just fundamentally go to the freedom of speech however

24  people are communicating in whatever medium without regard to

25  technology.

50

1          I think *Brown* is somewhat instructive on this because

2    Justice Scalia's opinion in *Brown* does say I've seen this movie

3    before.  Back in the 1950s everybody was scandalized with Elvis

4    on TV swinging his hips.  People said we should stop kids from

5    watching television.  Same thing with all manner of other

6    communication.  Radio is poisoning the minds of children, and

7    now I guess it's things like infinite scroll.

8          One of the things that -- I keep coming back to this

9    point of sort of favored and disfavored speakers.  For some

10   websites, I suppose -- the State of Ohio says Disney, Netflix

11   can serve an infinite number of videos to your children to

12   watch on their sites, but similar video sites, whether it's

13   Facebook or Instagram or YouTube or whoever it is, they don't

14   get to.  It's just -- there is a complete lack of fit between

15   the purported goals of the State of Ohio and the statute that

16   they have enacted.

17         A few more points briefly, Your Honor.  The State says

18   that this really is regulating conduct and not content.  But

19   their argument that what they're really doing is regulating

20   contract, it just has no limiting principle under the First

21   Amendment.  Every type of speech that is available, whether

22   it's for profit or maybe even not for profit, you usually have

23   some type of contract that comes along with it.  We gave

24   examples in our briefing about tickets for a concert, a

25   subscription to a newspaper.  You could purportedly regulate

1  all of these things by saying, you know, we're saying kids

2  can't have contracts for, you know, ticket -- for concert sales

3  to go to a concert.  All of these would purportedly regulate

4  the contract and not the underlying speech regardless of

5  content.

6       But this brings me to a second point which is, as Your

7  Honor noted, sort of regulating more broadly when it comes to

8  speech is a vice, not a virtue.  The breadth of this statute,

9  the fact that it regulates such a wide swath of the Internet is

10 its primary problem.  It does so by drawing certain lines

11 around content and speakers that undermines the State's

12 purported goals.

13      Maybe just two, I believe, more points in response to

14 the State.  First, the -- sorry.  I already made that point.

15 Hold on.

16      With respect to KOSA, I think that's the final point I

17 wanted to make.  With respect to the Kids Online Safety Act,

18 this is a piece of hypothetical legislation.  It hasn't been

19 enacted.  It hasn't passed by either house of Congress.  It is

20 a very different law from the one that Ohio has enacted.  They

21 do both have parental consent requirements.  There are some

22 differences in what those requirements would be.

23      More importantly, the KOSA is a much narrower bill.  I'm

24 not at all saying it's constitutional.  I'm not at all saying

25 it's a good thing to pass.  But it has the type of provisions

1  regarding advertising and privacy and default settings and

2  design and parental controls, many of the features that are

3  nowhere to be found in Ohio's act and can be found only in the

4  briefing from the attorney general.  All of the different

5  problems that the State has identified in its briefing, those

6  are nowhere in this statute.  So this is at least a narrower

7  bill at the federal level.  And I think whether there are some

8  members of my client NetChoice that support it is really

9  entirely irrelevant, not at all probative to the constitutional

10  question before the Court.

11        A company like X, I believe, doesn't even allow minors

12  on the website because X allows pornography.  If you're under

13  18, I don't think you're allowed to sign up for an X account.

14  Likewise, Snap has said it supports it.  That's perfectly fine.

15  Member companies are perfectly allowed to enforce whatever

16  legislation they want and to comply with it.  I believe Snap

17  has said they're already in compliance.  That is not any reason

18  that the State of Ohio gets to impose these types of parental

19  restraint restrictions on the entirety of the Internet, on a

20  vast swath of the Internet, even if there are a couple of

21  companies supporting it.

22        If there are no further questions.

23        THE COURT:  I have no further questions.

24        MR. LEHOTSKY:  Thank you, Your Honor.

25        THE COURT:  Thank you, Mr. Lehotsky.

1       Mr. Lehotsky and Mr. Tabatowski, I want to commend you

2  on very well-made arguments on both sides.  You were very

3  thorough.  You've given the Court quite a bit to think about.

4  Of course, I've done a great deal of background work, and we

5  had the benefit of the arguments on the motion for a temporary

6  restraining order; so I'm far along in this decisional process.

7       I hope to have a final written decision by close of

8  business on Friday because I want the State to be in a position

9  to do whatever we're going to do, as well as -- I mean, this is

10  a state statute that is under consideration and it deserves all

11  of my complete and immediate attention.  So I'm going to try to

12  render a decision as soon as possible without, at the same

13  time, not dotting all Is and crossing all Ts.  I want to make

14  sure that this is a thorough analysis to which this is subject,

15  just like all of my cases, but it's with some expedition that I

16  must approach this because it is a state statute and reflects,

17  in some respects, the will of the people as through its

18  legislators.

19       If there's nothing else -- I take it there's nothing

20  else from the plaintiff, Mr. Lehotsky?

21          MR. LEHOTSKY:  No, Your Honor.

22          THE COURT:  I take it there's nothing else from the

23  State.

24          MR. TABATOWSKI:  Nothing further, Your Honor.

25          THE COURT:  Thank you very much, everyone.

54

1        (Proceedings concluded at 11:12 a.m.)

2                                    - - -

3

4

5

6

7

8                    C E R T I F I C A T E

9

10        I, Shawna J. Evans, do hereby certify that the

11   foregoing is a true and correct transcript of the proceedings

12   before the Honorable Algenon L. Marbley, Judge, in the United

13   States District Court, Southern District of Ohio, Eastern

14   Division, on the date indicated, reported by me in shorthand

15   and transcribed by me or under my supervision.

16

17

18                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
19                              Official Federal Court Reporter

20

21                              February 14, 2024

22

23

24

25