**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

| | | |
|---|---|---|
| NETCHOICE, LLC, | : | |
| | : | |
| *Plaintiff,* | : | **Case No. 2:24-cv-00047** |
| | : | |
| v. | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| DAVE YOST, in his official capacity as | : | |
| Ohio Attorney General, | | |
| | : | |
| *Defendant.* | : | |

---

**DEFENDANT OHIO ATTORNEY GENERAL DAVE YOST'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant Ohio Attorney General Dave Yost hereby moves this Court to grant summary judgment in his favor. There is no genuine issue of material fact and Attorney General Yost is entitled to judgment as a matter of law. A memorandum in support of this motion is attached.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069792)*
    *\*Lead and Trial counsel*
ELIZABETH HANNING SMITH (0076701)
STEPHEN P. TABATOWSKI (0099175)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH 43215-3428
Tel: (614) 466-2872 | Fax: (614) 728-7592
Julie.Pfeiffer@OhioAGO.gov
Elizabeth.Smith@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov

*Counsel for Defendant Ohio Attorney General*

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

Table of Authorites ............................................................................................................ iii

Memorandum ....................................................................................................................... 1

   I.    Introduction ................................................................................................................ 1

   II.   Background ................................................................................................................. 4

   III.  Law and Argument .................................................................................................... 5

     A.   Legal Standard .................................................................................................... 5

     B.   NetChoice lacks standing to assert the free-speech rights of Ohio
         children. ................................................................................................................ 5

     C.   The Act is constitutional and Attorney General Yost is entitled to
         judgment as a matter of law. ............................................................................... 7

       1.   The Act is subject to rational-basis review because it regulates
           ordinary commercial transactions, not speech. ......................................... 8

       2.   Alternatively, the Act is subject to intermediate scrutiny because it is
           content-neutral and, at worst, only incidentally implicates speech. ........ 14

         i.   The Act is not facially content-based. ................................................. 14

         ii.   The Act does not use speaker- or medium-based distinctions as a
            proxy for regulating disagreeable content ........................................... 19

       3.   The Act satisfies any level of First Amendment scrutiny. ....................... 26

         i.   Ohio has important and compelling regulatory interests both in
            protecting minors and the fundamental right of parental decision-
            making.................................................................................................. 26

         ii.   The Act burdens no more speech than is necessary and is narrowly
            tailored to advance Ohio's regulatory interests................................... 29

         iii.   The Act is not unconstitutionally vague............................................... 32

           a.   Constitutional scrutiny is relaxed because the Act does not
              impose criminal sanctions and does not regulate speech.............................. 32

           b.   Even if a stricter standard controls, the Act sufficiently defines
              prohibited conduct and enforcement parameters. ........................................... 34

      c.     A person of ordinary intelligence can reasonably know what is prohibited. ................................................................................................. 35

      d.     The statute contains objective, non-discriminatory enforcement standards. ................................................................................................. 37

IV.     Conclusion ................................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                  **Page(s)**

*Am. Express Travel Related Servs. Co. v. Kentucky*,
   641 F.3d 685 (6th Cir.2011) ...................................................................................9

*Amato v. Wilentz*,
   952 F.2d 742 (3d Cir. 1991) ...................................................................................6

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
   515 U.S. 687, 115 S. Ct. 2407, 132 L. Ed. 2d 597 (1995) .....................................36

*Belle Maer Harbor v. Charter Twp. of Harrison*,
   170 F.3d 553 (6th Cir.1999) ..................................................................................33

*Bellotti v. Baird*,
   443 U.S. 622 (1979) ...............................................................................................28

*Birmingham v. Nessel*,
   No. 21-1297, 2021 U.S. App. LEXIS 35896 (6th Cir. Dec. 2, 2021) .......................5

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) .................................................................................................5

*Brown v. Entertainment Merchants Association*,
   564 U.S. 786 (2011) ...................................................................................... *passim*

*C.M.D. v. Facebook, Inc.*,
   621 F. App'x 488 (9th Cir. 2015) ...........................................................................12

*Chambers v. Stengel*,
   256 F.3d 397 (2001) ...............................................................................................35

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC*,
   596 U.S. 61, 142 S. Ct. 1464 (2022) ................................................................ *passim*

*Columbia Natural Resources v. Tatum*,
   58 F.3d 1101 ....................................................................................................33, 37

*Componentone, L.L.C. v. Componentart, Inc.*,
   W.D.Pa. No. 02: 05cv1122, 2007 U.S. Dist. LEXIS 89772 (Dec. 6, 2007) ...........36

*Covenant Media of S.C., LLC v. City of N. Charleston*,
   493 F.3d 421 (4th Cir. 2007) .................................................................................26

*Craig v. Boren*,
   429 U.S. 190 (1976) .................................................................................................6

**Cases**                                                                   **Page(s)**

*Dayton Area Visually Impaired Persons v. Fisher*,
   70 F.3d 1474 (6th Cir. 1995) ...............................................................26

*Doe v. Michigan Dept. of State Police*,
   490 F.3d 491 (6th Cir. 2007) .................................................................9

*In re Facebook, Inc.*,
   402 F. Supp. 3d 767 (N.D. Cal. 2019) ..................................................12

*FCC v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012) ...............................................................................34

*Frazier v. Winn*,
   535 F.3d 1279 (11th Cir. 2008) ......................................................23, 27

*Free Speech Coalition, Inc. v. Shurtleff*,
   D.Utah No. 2:05CV949DAK, 2007 U.S. Dist. LEXIS 21556 (Mar. 23, 2007) .....................36

*FTC v, Google, LLC*,
   D.D.C. No. 1:19-cv-02642 ....................................................................38

*Ginsberg v. New York*,
   390 U.S. 629 (1968)..........................................................................24, 31

*Grayned* v. *City of Rockford*,
   408 U. S. 104 (1972)...................................................................34, 36, 37

*Green v. United States DOJ*,
   54 F.4th 738 (D.C. Cir. 2022) ...............................................................18

*Gutierrez v. Lynch*,
   826 F.2d 1534 (6th Cir. 1987) ................................................................5

*Guys v. Meta Platforms, Inc.*,
   Civil Action No. 3:23-CV-0217-X, 2023 U.S. Dist. LEXIS 215851 (N.D. Tex.
   Dec. 4, 2023) ........................................................................................12

*Hershey v. Jasinski*,
   86 F.4th 1224 (8th Cir. 2023) ...............................................................17

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)..................................................................................29

*Jones v. Google LLC*,
   73 F.4th 636 (9th Cir.2023) ..................................................................38

**Cases**      **Page(s)**

*Kenjoh Outdoor, LLC v. Marchbanks,*
23 F.4th 686 (6th Cir. 2022) ................................................................18

*Lassiter v. Dept. of Soc. Servs. of Durham Cnty., N.C.,*
452 U.S. 18 (1981)................................................................................27

*Lichtenstein v. Hargett,*
83 F.4th 575 (6th Cir. 2023) ..................................................................8

*State ex rel. Maurer v. Sheward,*
71 Ohio St. 3d 513, 644 N.E.2d 369 (Ohio 1994) ...............................16

*Mazo v. N.J. Sec'y of State,*
54 F.4th 124 (3d Cir. 2022) ............................................................17, 18

*McGee v. City of Warrensville Heights,*
16 F. Supp. 2d 837 (N.D. Ohio 1998)....................................................6

*Miller v. Wilkinson,*
No. 2:98-cv-275, 2010 U.S. Dist. LEXIS 103364 (S.D. Ohio Sept. 30, 2010) ......................34

*Mobilize the Message, LLC v. Bonta,*
50 F.4th 928 (9th Cir. 2022) ............................................................18, 23

*Nat'l Press Photographers Ass'n v. McCraw,*
90 F.4th 770 (5th Cir. 2024) ................................................................18

*Netchoice, L.L.C. v. Paxton,*
49 F.4th 439, 480-81 (5th Cir. 2022) ...................................................16

*Police Dept. of Chicago v. Mosley,*
408 U. S. 92 (1972)................................................................................8

*Prime Media, Inc. v. City of Brentwood,*
485 F.3d 343 (6th Cir. 2007) .................................................................5

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015)....................................................................... *passim*

*Reno v. ACLU,*
521 U.S. 844 ........................................................................................31

*Roberts v. United States Jaycees,*
468 U.S. 609, 104 S. Ct. 3244 (1984) (O'Connor, J., concurring in part and
concurring in judgment)..........................................................................8

**Cases** **Page(s)**

*Roberts v. Wamser,*
883 F.2d 617 (8th Cir. 1989) ....................................................................6

*Sable Communications of Cal. v. FCC,*
492 U.S. 115 (1989)..................................................................................26

*Sagan v. United States,*
342 F.3d 493 (6th Cir. 2003) ....................................................................5

*Sarah v. Google LLC,*
No. 1:23-cv-223, 2023 U.S. Dist. LEXIS 182611 (W.D. Mich. Oct. 11, 2023) ..............12, 13

*Sec'y of Md. v. Joseph H. Munson Co.,*
467 U.S. 947 (1984)..............................................................................5, 6

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) (Breyer, J., dissenting) ......................................2, 8

*Specht v. Netscape Commc'ns Corp.,*
150 F.Supp.2d 585 (S.D. N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002) ..................9

*State v. Hochhausler,*
76 Ohio St. 3d 455 (Ohio 1996)..............................................................16

*Stevens v. City of Columbus,*
No. 21-3755, 2022 U.S. App. LEXIS 20829 (6th Cir. 2022) . Civil ......................32

*Stevens v. City of Columbus,*
S.D.Ohio No. 2:20-CV-1230, 2020 U.S. Dist. LEXIS 118743 (July 7, 2020)................36, 39

*Turner Broad. Sys. v. FCC,*
512 U.S. 622 (1994)................................................................... *passim*

*United States v. Avant,*
907 F.2d 623 (6th Cir. 1990) ..................................................................33

*United States v. Carolene Prods. Co.,*
304 U.S. 144 (1938)..................................................................................9

*United States v. Carpenter,*
2022 U.S. Dist. LEXIS 220562 ..............................................................32

*United States v. Kettles,*
970 F.3d 637 (6th Cir.) ......................................................................32, 33

*United States v. Marmolejo,*
No. 3:04-cr-132, 2007 U.S. Dist. LEXIS 26524 (S.D. Ohio Apr. 10, 2007)..........................38

**Cases** **Page(s)**

*United States v. Musical.ly*,
 C.D. Cal. No. 2:19-cv-01439 ...................................................................................38

*United States v. Nat'l Dairy Prods. Corp.*,
 372 U.S. 29, 32 (1963), *cert. denied*, 141 U.S. 924 (2020) ........................................32

*United States v. Williams*,
 553 U.S. 285 .............................................................................................................33

*Ward v. Rock Against Racism*,
 491 U.S. 781, 105 L. Ed. 2d 661, 109 S. Ct. 2746 (1989) .......................................19

*Washington v. Glucksberg*,
 521 U.S. 702 (1997).................................................................................................9, 27

*Williams-Yulee v. Fla. Bar*,
 575 U.S. 433 (2015)................................................................................................29, 30

*Women's Med. Prof'l Corp. v. Voinovich*,
 130 F.3d 187 (6th Cir. 1997) ....................................................................................16


**Statutes** **Page(s)**

15 U.S.C. § 6501 - 6506 ...................................................................................................32

O.R.C. 1349.09 ............................................................................................................ *passim*

O.R.C. 1349.09(A)(1)(a)-(d)...........................................................................................15

O.R.C. 1349.09(B)(1) ......................................................................................................15

O.R.C. 1349.09(M)(1)-(2) ...............................................................................................31

O.R.C. 1349.09 (M)(2)(a)-(b) ....................................................................................36, 38

O.R.C. 1349.09(O)(1)-(2) ................................................................................................15

O.R.C. 1349.09(O)(2) ......................................................................................................35

O.R.C. § 1.50 ....................................................................................................................16

O.R.C. § 1349.09(I)(1)-(3)...............................................................................................36

O.R.C. § 1349.09(A)(1)(a)-(d).............................................................................17, 21, 35

**Statutes**        **Page(s)**

O.R.C. § 1349.09(A)(1)(b) & (d) ...................................................................22

O.R.C. § 1349.09(A)(2) ...............................................................................29

O.R.C. § 1349.09(B) ....................................................................................35

O.R.C. § 1349.09(B)(1) .............................................................................4, 36

O.R.C. § 1349.09(C) ....................................................................................16

O.R.C. § 1349.09 (C)(1)-(11) ...................................................................37, 38

O.R.C. § 1349.09(O) ................................................................................16, 22

O.R.C. § 1349.09(O)(1)-(2) .........................................................................17

O.R.C. § 3319.321(B) ..................................................................................28

O.R.C. § 3730.06 ........................................................................................28

O.R.C. § 4713.50 ........................................................................................28


**Other Authorities**        **Page(s)**

16 C.F.R. § 312 .................................................................................... *passim*

16 CFR § 312.9 & 312.11 ...............................................................................38

Article III ........................................................................................................5

Fed. R. Civ. P. 56(c) .......................................................................................5

Robert Post & Amanda Shanor, *Article: Adam Smith's First Amendment*, 128
    Harv. L. Rev. ..........................................................................................13

*Terms of Service*, DREAMWIDTH.ORG .............................................................12

*Terms of Service,* FACEBOOK.COM ............................................................10, 11

*Terms of Service,* TIKTOK.COM .................................................................11, 12

U.S. Const. amend. I ........................................................................... *passim*

## MEMORANDUM

## I.    INTRODUCTION

---

*"[W]e sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create something useful and fun. We took a page from Big Tobacco's playbook, working to make our offering addictive at the outset."*

-Tim Kendall, former Director of Monetization, Facebook, Inc., testifying to the United States House Committee on Energy and Commerce[1]

---

NetChoice's largest, most powerful members and their subsidiary companies—including Facebook, Instagram, Snapchat, X (formerly Twitter), and TikTok—are ubiquitous. Facebook alone boasts three billion users, a staggering 40% of the world's population.[2] But the monkey's paw curls: the medium's ubiquity brings with it a business problem, in need of a business solution. With a dwindling pool of potential new users, how is a social-media megacorporation supposed to generate continued growth?

The obvious answer to this problem is that these companies must capture a larger share of their billions of users' time and attention. This incentivizes them, now more than ever, to make their services addictive. Their continued growth depends on it. And it's working. Especially on adolescent users, nearly half of whom in 2022 were online "almost constantly"—up from 24% in 2015. Ex. A, Amanda Raffoul, Zachary Ward, Monique Santoso, Jill Kavanaugh, & S. Bryn Austin, *Social media platforms generate billions of dollars in revenue from U.S. youth: Findings from a simulated revenue model*, PLoS ONE 18(12) (Dec. 27, 2023) at 1. In a survey of 8th and 10th graders, 25% reported spending over five hours a day on social media specifically. Ex. B, *U.S.*

---

[1] https://docs.house.gov/meetings/IF/IF17/20200924/111041/HHRG-116-IF17-Wstate-KendallT-20200924.pdf (last accessed April 30, 2024).
[2] https://investor.fb.com/investor-news/press-release-details/2023/Meta-Reports-Second-Quarter-2023-Results/default.aspx (last accessed April 30, 2024).

*Surgeon General's 2023 Advisory, "Social Media and Youth Mental Health*," at 10. It would be problematic if the sole deleterious effect posed by social-media platforms was addiction to social-media platforms. But the reality is far more concerning.

It begins with a contract: these platforms inconspicuously condition use on an individuals' agreement to one-sided contractual terms. These include irrevocable grants of licensure to user-generated likeness and content, forum-selection and choice-of-law clauses, liability limitations, indemnity/hold-harmless provisions, and warranty disclaimers (to name a few). Having agreed to emaciate their intellectual-property and potential remedial rights simply by using the platforms, adolescent users are then "constantly online" in virtual spaces whose features and functions encourage behavioral dysregulation, facilitate sexual abuse, and cause myriad issues that—while studied extensively—are not yet fully understood. With a one-sided contract in hand that helps foreclose any hope of redress, covered operators have little incentive to mitigate these risks.

While social-media platforms generally acknowledge the growing public concern with the risks they pose to adolescent users, any state regulation is resisted under the guise of the First Amendment. They insist that internal governance and self-regulation are the only constitutionally permissible means by which to address these problems, lest the First Amendment be violated. These efforts are not grounded in First Amendment liberalism, however, but First Amendment *Lochner*ism.

Courts that allow platforms to opportunistically avoid economic regulations targeting exploitative consumer relationships wherever speech is tangentially implicated threaten to "reawaken[] *Lochner*'s pre-New Deal threat of substituting judicial for democratic decisionmaking where ordinary economic regulation is at issue." *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 603 (2011) (Breyer, J., dissenting) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*

*of N. Y.*, 447 U.S. 557, 589 (1980) (Rehnquist, J., dissenting)). Every economic regulation should not be subject to judicial review simply because it arguably has a tangential effect on conduct that might be deemed expressive. Most human acts, after all, could conceivably be expressive.

NetChoice's challenge to Ohio's Parental Notification by Social Media Operators Act, Ohio Revised Code Section 1349.09 ("the Act") is a case in point. The Act is an economic regulation that applies to a limited subset of website operators (based on their use of design features and functions that pose unique risks) who wish to contract with minors. Thus, the Act is valid under rational-basis review as an economic regulation of certain contracts—not speech. The First Amendment is not implicated by an economic regulation just because it applies to contracts with entities that host speech.

And even if the Act implicates *some* speech, it remains valid under intermediate scrutiny because it does so only incidentally and in a content-neutral manner—without regard to or preference for any particular topic. The Act makes constitutionally-permissible distinctions based on the speaker or medium—not their message. As a result, the Act should not be subject to heightened scrutiny under the First Amendment.

No matter the standard, however, the Act survives constitutional scrutiny. Ohio has an important and compelling interest in protecting minors by restricting their ability to contract with covered operators absent parental consent—particularly given the unique health and safety risks adolescents face on covered operators' platforms. Moreover, Ohio has an important and compelling interest in vindicating parents' fundamental right to control their children's care and upbringing. The Act places parents in control of who can collect and use their children's personal information or subject them to onerous contract terms. It is narrowly tailored to accomplish these goals.

Moreover, the Act is not vague. It is sufficiently specific; an ordinary person would understand to whom it applies, what conduct it prohibits, and how penalties are to be assessed and meted out. It provides explicit standards for the Attorney General and the courts to enforce the statute in a non-arbitrary and non-discriminatory manner.

Despite NetChoice's assertions otherwise, the Act withstands the First Amendment and vagueness challenges. For the following reasons, Attorney General Yost is entitled to summary judgment.

## II.    BACKGROUND

On July 4, 2023, Governor DeWine signed the Parental Notification by Social Media Operators Act, Ohio Revised Code Section 1349.09 ("the Act") into law. The Act prohibits a minor child under the age of sixteen from entering into a contract with a covered "operator" without parental consent. Specifically, the Act requires "the operator of an online web site, service, or product that targets children, or is reasonably anticipated to be accessed by children. . . ." to ". . .*[o]btain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username* to access or utilize the online web site, service, or product, from the child's parent or legal guardian. . . ." (Emphasis added.) O.R.C. § 1349.09(B)(1).

The Act is a commonsense commercial regulation which mirrors similar federal regulations. It seeks to regulate a covered operator's ability to contract with minors in the absence of parental consent. It was passed in response to growing concern about the well documented physical- and mental-health risks posed to children by certain functions and features common to many internet media platforms. Ex. E, Husted Aff. at ¶ 5-8. The Act seeks to protect the health and safety of Ohio's children and vindicate the rights of Ohio's parents to guide their children's upbringing, amidst the whirlwind of an increasingly dangerous digital era.

## III. LAW AND ARGUMENT

### A. Legal Standard

Summary judgement is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgement is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)).

### B. NetChoice lacks standing to assert the free-speech rights of Ohio children.

First Amendment overbreadth claims are subject to a relaxed application of ordinary prudential standing tenets. *Birmingham v. Nessel*, No. 21-1297, 2021 U.S. App. LEXIS 35896, *7 (6th Cir. Dec. 2, 2021) (citing *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009)). Overbreadth, however, is not an exception to Article III standing requirements, including the requirement to establish injury-in-fact. *Prime Media, Inc. v. City of Brentwood,* 485 F.3d 343, 349-50 (6th Cir. 2007).

However, regardless of Article III standing, the policies underpinning the overbreadth exception do not support its application here. Its fundamental concern is the possibility that a person actually engaging in a protected activity might refrain from that activity "rather than risk punishment for his conduct in challenging the statute." *Sec'y of Md. v. Joseph H. Munson Co*., 467 U.S. 947, 956 (1984). Further, the exception is "limited." *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973). *Broadrick* cautions for a case-by-case review of its application because the exception

5

"attenuates" depending on where the regulation in question falls on the spectrum between "pure speech" and conduct unprotected by the First Amendment. *Id*.

Moreover, third-party standing exceptions in other contexts generally scrutinize the relationship between the litigant and third party and whether their interests align. *See, e.g.*, *Sec'y of State v. J.H. Munson Co.*, 467 U.S. 947, 956 (1984) (third-party standing proper where the litigant is an effective advocate for an interest that a third-party is impeded from asserting); *Craig v. Boren*, 429 U.S. 190, 194-95 (1976) (third-party standing proper due to the "close relationship" between the litigant and the third party); *see also Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (rejecting candidate standing under Section 2 of the VRA due to "potential divergence between the interests of a candidate seeking office and citizens attempting to enforce their right to vote") (cited by *McGee v. City of Warrensville Heights*, 16 F. Supp. 2d 837, 846, n.8 (N.D. Ohio 1998)). The alignment of interests between a third party and a litigant asserting a right on its behalf should not be disregarded when considering the overbreadth exception. "[G]enuine conflicts strongly counsel against third party standing." *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991).

The same is true with respect to a First Amendment overbreadth claim—particularly where, as here, there is evidence of a significant and pervasive conflict. *See* Ex. A. Covered operators— many of them NetChoice members—burden children and parents with one-sided contractual terms of questionable enforceability, and do so to generate billions of dollars collecting and selling the userdata of American kids. Minors simply do not have the capacity to understand the magnitude of these provisions before engaging with these operators. To that end, they employ user interfaces that are specifically designed to maximize user engagement (and profits) while exacerbating the risks of mental health illnesses and sexual abuse—just to name a few. *See* Ex. A; Ex. B; Ex. C. To

permit NetChoice to allegedly vindicate the rights of its child users would turn the concepts of associational and prudential standing on their heads.

Accordingly, the Court should not grant a litigant like NetChoice standing to facially invalidate a statute, in a pre-enforcement posture, based on the purported First Amendment rights of minors whom its members eagerly exploit.

### C.  The Act is constitutional and Attorney General Yost is entitled to judgment as a matter of law.

The Act does not violate the First Amendment and is not vague. Initially, the Act simply does not implicate the First Amendment—it limits covered operators' ability to *contract* with minors absent parental consent. This is squarely within Ohio's regulatory authority.

Even if the First Amendment is implicated, the Act makes no distinctions based upon a particular topic, message, or subject matter. Nor are any speaker- or medium-based distinctions in the Act a proxy for regulation of disagreeable content. Thus, the Act is valid as a content-neutral regulation that only incidentally burdens speech. *See City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 142 S. Ct. 1464 (2022); *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994)*.* The appropriate constitutional standard of review is intermediate scrutiny—which the Act easily satisfies.

But the Act passes constitutional muster under any level of First Amendment scrutiny. Ohio has an important and compelling interest in protecting minors by restricting covered operators' ability to contract with them absent parental consent, ultimately decreasing minors' risk of (1) involuntary releases of personally identifiable and other personal information and data, (2) addiction caused by user-engagement features, (3) mental-health issues including depression, anxiety, self-harm and suicide, and (4) susceptibility to sexual predators. Moreover, Ohio has a compelling interest in vindicating parents' fundamental right to control their children's care and

upbringing. The Act does not burden any more speech than is necessary and is narrowly tailored to accomplish these goals.

Finally, the Act is not unconstitutionally vague. As an initial matter, the Court should employ a lenient standard given that the Act does not impose criminal sanctions and does not implicate speech. However, even if the Court employs a more stringent standard, the Act passes constitutional muster, as any reasonable person of ordinary intelligence would understand its terms and the Act provides explicit standards for enforcement.

### 1. The Act is subject to rational-basis review because it regulates ordinary commercial transactions, not speech.

The Act regulates contracts, not speech. Businesses do not have a First Amendment right to contract with minors. The Act does not compel or restrict what content businesses may make available to consumers. It tells operators what they must do, not what they must or must not say. It is a facially neutral business regulation and not subject to any heightened scrutiny.

The First Amendment provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I. Above "all else, the First Amendment means that government" generally "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U. S. 92, 95 (1972). The First Amendment bars a state from "abridging" oral expression (the freedom of "speech") or written expression (the freedom of the "press"); "it does not bar the state from restricting [nonexpressive] conduct." *Lichtenstein v. Hargett*, 83 F.4th 575, 582 (6th Cir. 2023) (citing *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006)). Restrictions on economic activity are distinct from regulations on protected expression. *Sorrell*, 564 U.S. at 567. Generally, the Constitution does not guarantee a right to choose those with whom one engages in simple commercial transactions without government restraint. *Roberts v. United States Jaycees*, 468 U.S. 609, 634, 104 S. Ct. 3244,

3258 (1984) (O'Connor, J., concurring in part and concurring in judgment) (in contrast to the right of expressive association, "there is only minimal constitutional protection of the freedom of *commercial* association," because "the State is free to impose any rational regulation on the commercial transaction itself") (emphasis in original).

"[R]egulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938); *see also Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 689 (6th Cir.2011). Under the rational basis standard of review, courts determine a statute's constitutionality by asking whether the statute in question is "rationally related to legitimate government interests." *Washington v. Glucksberg*, 521 U.S. 702, 705 (1997). This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances. *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 501 (6th Cir. 2007). The Act is a vehicle to regulate commercial transactions between covered operators and Ohio minors. It is necessary due to the dangers that these contracts impose on minors. Accordingly, the Act passes constitutional muster under the rational basis standard.

The Act explicitly applies only where minors are required to enter into a contract with covered operators. When that contract is created, an exchange occurs: a minor is given access to a particular platform, and the operator of that platform often gains an opportunity to advertise to the minor, collect the minor's data, and engage in a wide array of other activities intended to benefit the operator financially. This commercial relationship is well demonstrated by an operators' terms of service, which are binding contracts. *Specht v. Netscape Commc'ns Corp.*, 150 F.Supp.2d 585,

594 (S.D. N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002) (noting the courts that have considered digital "click-wrap" contracts have found them enforceable). These contracts are typically extensive.

For example, Meta Platforms, Inc. is a NetChoice member and a corporate conglomerate whose subsidiaries include multiple covered operators. One of those is Facebook. Facebook requires a user to agree to its terms of service prior to creating an account. Its terms of service permit it to "transfer, store and distribute content and data to our data centers, partners, service providers, vendors and systems around the world, including outside [the user's] country of residence." *Terms of Service,* FACEBOOK.COM.[3] Facebook's terms give it a vast "non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of [the user]'s content." *Id.* Once the user agrees to the terms, Facebook has permission "to use [the user's] name and profile picture and information about actions [the user has] taken on Facebook next to or in connection with ads, offers, and other sponsored or commercial content that we display across our Products, without any compensation to [the user]." *Id.*

Facebook also disclaims all warranties and liability for, *inter alia,* consequential, special, incidental, or punitive damages "however caused and on any theory of liability, including negligence." *Id.* It further limits its aggregate liability to the greater of $100 or the amount a user has paid Facebook in the last 12 months. *Id.* The terms also contain a forum selection clause requiring its users to submit to personal jurisdiction in the U.S. District Court for the Northern District of California, or in state court in San Mateo county—while retaining its own right to, "in its sole discretion," bring any claim it has against a user in any competent court in the country

---

[3] https://m.facebook.com/legal/terms (last visited April 30, 2024).

where the user resides that has jurisdiction over the claim. *Id.* Facebook further retains the right to modify its terms of service, which users "will be bound by" if they "continue to use our Products." *Id.* "Products" includes not only Facebook, but Messenger, Instagram, and "[a]ny other features, apps, technologies, software, or services offered by Meta Platforms . . . ." *What are the Meta Products? Facebook Help Center*, FACEBOOK.COM.[4]

TikTok, another NetChoice member and covered operator, allows users to create, watch, and share 15-second videos often accompanied by popular songs or audio recordings. Its terms of service are also sweeping. Once a user signs up to the platform and agrees to its terms, TikTok and its parent company gain an "unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide license to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and/or distribute." *Terms of Service,* TIKTOK.COM.[5] The company (and unnamed third parties) are given authority to "view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit" content created by users "in any format and on any platform, either now known or hereinafter invented." *Id.* TikTok has "the right to use . . . User Content without the obligation to pay royalties to any third party." *Id.* The operator "may generate revenues, increase goodwill or otherwise increase our value from your use of the Services, including, by way of example and not limitation, through the sale of advertising, sponsorships, promotions, usage data." *Id.* TikTok requires users to agree to indemnify and hold it harmless for any claim arising out of a breach of its terms, while broadly disclaiming all warranties and limiting its own liability. *Id.* The terms are governed by Singaporean law and any dispute must be resolved by arbitration in Singapore. *Id.* Users "accept the Terms by accessing or

---

[4] https://www.facebook.com/help/1561485474074139?ref=tos (last accessed April 30, 2024).
[5] https://www.tiktok.com/legal/page/row/terms-of-service/en (last visited April 30, 2024).

using our Services." *Id.* Similarly, TikTok may unilaterally update its terms which users then accept by continued use of its services. *Id.*

Many operators covered by the Act require users, merely by virtue of their use of the operators' website, to agree to terms of service like the ones required by Facebook or TikTok. *See, e.g., Terms of Service*, DREAMWIDTH.ORG, (containing indemnity/hold-harmless provision, liability limitations, warranty disclaimers, choice-of-law/forum-selection provision, license to user-submitted content).[6] These contracts permit the operators to harness user content, likeness, and personal data to further their financial interests. Their commonly-included forum-selection clauses force individuals to litigate their claims in an unfamiliar state at great personal expense. *See, e.g., Sarah v. Google LLC*, No. 1:23-cv-223, 2023 U.S. Dist. LEXIS 182611, at *6 (W.D. Mich. Oct. 11, 2023) (enforcing a forum selection clause against a plaintiff alleging grooming and sex trafficking that occurred via Google's YouTube platform); *Guys v. Meta Platforms, Inc.*, Civil Action No. 3:23-CV-0217-X, 2023 U.S. Dist. LEXIS 215851, at *5 (N.D. Tex. Dec. 4, 2023). Changes to terms of service can be unilateral and without notice. *See, e.g., In re Facebook, Inc.*, 402 F. Supp. 3d 767, 793 (N.D. Cal. 2019) (discussing Facebook's unilateral decision to give app developers access to certain information even though users who established Facebook accounts before this time did not agree to these terms when they signed up). And Facebook has successfully enforced its terms of service against minors in order to use their names and likenesses in its advertisements. *C.M.D. v. Facebook, Inc.*, 621 F. App'x 488 (9th Cir. 2015).

These exemplar terms demonstrate that the relationship between operators and their userbase is fundamentally commercial-consumer in nature. The Constitution does not guarantee the right of covered operators to engage in commercial transactions with minors without state

---

[6] https://www.dreamwidth.org/legal/tos (last accessed April 30, 2024).

oversight. The terms minors must agree to before they can access covered operators' platforms, including granting royalty-free licenses on content that these minors produce, permission to harvest minors' personal data, and permission to use their names and likenesses in advertising, pose significant risks. Moreover, like in *Sarah v. Google LLC,* unsuspecting users may be subject to contract provisions that they did not or were not able to understand—such as enforceable forum selection clauses—after serious harm results from their use of an operator's platform. Regardless of whether the platform might generally be held liable for that harm, the restrictive terms of service that users must agree to can make the pursuit of relief cost-prohibitive or otherwise unavailable. Minors are particularly susceptible to the harms posed by covered operators' platforms. *See* Section III(C)(ii)(b) and III(C)(iii)(b), *infra*. And as minors, they are likely equally incapable of understanding the enormity of agreeing to covered operators' seemingly-innocuous terms of service.

It is well within Ohio's authority to regulate these commercial transactions and oversee the well-being of minors entering contracts within its borders. NetChoice dresses up its members in First Amendment garb to subvert this authority so its members might continue benefiting from Ohio minors. "The echoes of *Lochner* are palpable." Robert Post & Amanda Shanor, *Article: Adam Smith's First Amendment*, 128 Harv. L. Rev. F. 165, 167. The First Amendment should not prevent Ohio from regulating operators who inconspicuously condition minors' use of their platforms on extensive, one-sided contracts.

Requiring covered operators to obtain parental consent before they enter into one-sided commercial arrangements with minors mitigates potential risks to Ohio's youth. Further, it affords parents a concrete opportunity to manage the risks or eliminate them at their source. With these

aims in mind, the Act is neither arbitrary nor irrational. Accordingly, the Act passes muster under the rational basis test and should be upheld.

### 2. Alternatively, the Act is subject to intermediate scrutiny because it is content-neutral and, at worst, only incidentally implicates speech.

If the Court finds that the Act does implicate the First Amendment, it should apply intermediate scrutiny because the Act is content-neutral and only incidentally impacts speech. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broad. Sys.*, 512 U.S. at 643 (1994). The determination of whether a law is content-based or content- neutral is guided by the "principal inquiry" of whether the government has regulated particular speech because it agrees or disagrees with the message. *Id.*, (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 105 L. Ed. 2d 661, 109 S. Ct. 2746 (1989)).

A law may be considered content-based (and, therefore subject to strict scrutiny) in one of two ways. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). The first is where a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. *Id.* at 163 (quoting *Sorrell*, 564 U.S. at 564). The second is where a law cannot be "'justified without reference to the content of the regulated speech,'" or where it was adopted by the government "because of disagreement with the message [the speech] conveys." *Reed*, 576 U.S. at 164 (quoting *Ward*, 491 U. S. at 791). The Act is content-neutral by either metric.

### i. The Act is not facially content-based.

First, the Act is not facially content-based. Determination of whether a law is facially content-based requires consideration of whether the law textually "singles out specific subject matter for differential treatment . . . ." *Reed*, 576 U.S. at 163 (2015). In *Reed*, the Court invalidated an ordinance as content-based because it facially imposed different permitting requirements on

three categories of publicly displayed signs based on their message. *Id.* at 155. Signs "designed to influence the outcome of an election" ("political signs") were subject to less restrictions than those "directing the public to a church or other 'qualifying event'" ("temporary directional signs") *Id.* at 159-61. Signs "communicating a message or ideas for noncommercial purposes" and which were otherwise undefined ("ideological signs") were subject to even less restrictions. *Id.*

In *City of Austin v. Reagan National Advertising of Austin, LLC*, the Supreme Court reaffirmed that *Reed*'s concern was with textual distinctions singling out "'specific subject matter for differential treatment.'" 596 U.S. 61, 142 S. Ct. 1464, 1472-73 (2022) (quoting *Reed*, 576 U.S. at 169). However, *City of Austin* clarified that the content-discrimination analysis focuses on whether the law draws distinctions based on a speaker's "substantive message." *City of Austin*, 142 S. Ct. at 1472. The *City of Austin* ordinance prohibited any new construction of off-premises signage—that is, signs or advertising directing readers to businesses or events at another location. 142 S. Ct. at 1469. Enforcement of the ordinance required considering a sign's "message" but "only in service of drawing neutral, location-based lines." *Id.* at 1471. Unlike in *Reed*, the ordinance was content-neutral because a signs' "*substantive* message"—like the "political" or "ideological" messages, or messages "concerning specific events, including those sponsored by religious and nonprofit organizations" called out in *Reed*—was "irrelevant" to application of the Austin ordinance. *Id.* at 1473-74. Consequently, the ordinance was "agnostic to content." *Id.* at 1473-74 (emphasis added).

So, too, is the Act. Its operative prohibition requires covered operators who wish to contract with minors to first obtain parental consent because of extrinsic qualities unrelated to any "substantive message" they might convey. O.R.C. 1349.09(A)(1)(a)-(d) & (B)(1). Consistently, the Act's exceptions, O.R.C. 1349.09(O)(1)-(2), are also unconcerned with a website's

"substantive message." Fundamentally, the exceptions are based on *how* or *where* user interaction occurs on a website—in public or private—and not on *what* message is being conveyed. While the Act specifically identifies product-review and news websites for exclusion, the distinction is drawn based on how those particular *mediums* of websites "limit" *how or where* "interaction between users" occurs virtually. *See* O.R.C. § 1349.09(O). The difference between an exception based on the medium of speech rather than the substantive message is nothing new. *Turner Broad. Sys.*, 512 U.S. at 660 (strict scrutiny is not mandated for a speech regulation that applies to one medium (or a subset thereof) but not others). *City of Austin* simply drove the notion home.[7]

Courts have consistently recognized as much. In *Netchoice, L.L.C. v. Paxton*, the Fifth Circuit held that statutory exceptions like those contained in the Act were content-neutral. 49 F.4th 439, 480-81 (5th Cir. 2022). The law at issue in *Paxton* generally prohibited certain social-media platforms from engaging in viewpoint-based censorship. *Id.* at 445-46. The law exempted websites consisting "primarily of news, sports, entertainment, or other information or content that is not

---

[7] The Act's exceptions were a primary reason this Court found the Act to be content-based. Order, ECF No. 33 at PageID # 21-22. They were also a primary focus of the Court's vagueness analysis, along with several of the factors in O.R.C. § 1349.09(C). *Id.* at PageID # 26-27. If the Court finds the exceptions and identified factors offend the Constitution, it may sever them from the rest of the statute. Severability is a matter of state law. *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997) (citing *Leavitt v. Jane L.*, 518 U.S. 137, 135 L. Ed. 2d 443, 116 S. Ct. 2068, 2069 (1996) (per curiam). The Supreme Court of Ohio has explained that severing part of a statute is proper where it "will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." *State ex rel. Maurer v. Sheward*, 71 Ohio St. 3d 513, 644 N.E.2d 369, 377 (Ohio 1994). O.R.C. § 1.50 provides a statutory presumption of severability. With that presumption in mind, Ohio uses a three part-test to weigh the propriety of severance:

(1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only? *State v. Hochhausler*, 76 Ohio St. 3d 455, 464-65 (Ohio 1996). Under this test, the Court may sever the exceptions and factors it identified as constitutionally problematic.

user generated but is preselected by the provider," and "for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of" that type of information. *Id.* at 480. Relying on *Reed, City of Austin,* and *Turner*, the Court held that these exceptions distinguished between websites as "fundamentally dissimilar mediums" and were not based on any particular message. *Id.* at 480-81. The Court correctly reasoned that singling out a website on this basis, rather than on the basis of message, does not make a statute content-based. *Id*. (quoting *Turner Broad. Sys.*, 512 U.S. at 660).

The Act is no different. At worst, it distinguishes between mediums (or "subsets thereof") or speakers—not any particular message. *See Turner Broad Sys.*, 512 U.S. at 660. One medium of website is primarily driven by user-generated content, interactions, and social connections that occur both publicly and privately—no matter what the substantive message might be. O.R.C. § 1349.09(A)(1)(a)-(d). The other medium is the primarily product- or news-driven website where user interaction is limited to that which occurs publicly. O.R.C. § 1349.09(O)(1)-(2). Thus, the statute's application may turn on the fundamental characteristics of certain mediums of websites— how and where user interaction occurs on those websites—but it does so without regard to the "what" of any message they might contain. "It is the 'what' that matters in distinguishing content-based restrictions from content-neutral ones." *Hershey v. Jasinski*, 86 F.4th 1224, 1233 (8th Cir. 2023) (requirement that individuals provide a university with advance notice before distributing "non-University publications" is content-neutral).

Indeed, Circuit Courts have regularly affirmed state regulatory authority within the type of "neutral . . . lines" drawn by the Act. *See, e.g., Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 149 (3d Cir. 2022) (quoting *City of Austin*, 142 S. Ct. at 1471). For instance, New Jersey law allows primary-election candidates to have a six-word slogan printed on the ballot next to their name but

requires candidates to obtain the written consent of any person or corporation referenced in the slogan. *Id.* at 132-33. In *Mazo*, the Third Circuit held that this "consent requirement" was the type of "permissible neutral line-drawing" recognized in *City of Austin* and was content-neutral because it "distinguishes between speech based on extrinsic features unrelated to the message conveyed." *Id.* at 149. The same goes for the Act. The Act and its exceptions apply to "all" covered operators "regardless of message," and do not "'single out any topic or subject matter for differential treatment.'" *See id.* (quoting *City of Austin*, 142 S. Ct. at 1472).

The emerging view after *City of Austin* is that laws which draw textual distinctions based on something other than substantive message remain content-neutral. *See, e.g., Kenjoh Outdoor, LLC v. Marchbanks,* 23 F.4th 686, 693 (6th Cir. 2022) (an Ohio billboard compliance rule is content-neutral where it "applies to any speech, commercial or not, if the person responsible for it is compensated for the message"); *Mobilize the Message, LLC v. Bonta,* 50 F.4th 928, 937-38 (9th Cir. 2022) (exemptions for "direct sales salespersons, newspapers distributors, and newspaper carriers" from statutory employee-classification test "do not depend on the communicative content, if any, conveyed by the workers but rather on the workers' occupations"); *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 791-92 (5th Cir. 2024) (exemption from drone-surveillance ban for scholars using drones for "academic purposes" is content-neutral because it is based "not on *what* is in the picture" but "*how* the picture is taken") (emphasis in original); *Green v. United States DOJ*, 54 F.4th 738, 746 (D.C. Cir. 2022) ("Although the DMCA requires reading computer code to determine what digital act the code carries out, it is nonetheless content neutral because, in the words of *City of Austin*, it cares about the expressive message in the code 'only to the extent that it informs' the code's function.")

That is the case here. To the extent the Act implicates speech at all, it distinguishes between speakers or mediums—not substantive message. Accordingly, it is facially content-neutral.

### ii. The Act does not use speaker- or medium-based distinctions as a proxy for regulating disagreeable content.

As noted, not all laws or regulations that distinguish between different speakers or mediums warrant strict scrutiny. *Turner Broad. Sys.*, 512 U.S. at 657, 660. Instead, laws that are otherwise content-neutral warrant strict scrutiny only when speaker- or medium-based distinctions "reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Id.* at 658; *Reed*, 576 U.S. at 157.

In *Turner Broadcasting*, the Court analyzed "whether Congress preferred broadcasters over cable programmers based on the content of programming each group offer[ed.]" *Turner Broad. Sys.*, 512 U.S. at 658-659. The Court answered "no" because Congress' justification for enacting the speaker-based law was not based on speech. Rather, it was based "on the belief that the broadcast television industry is in economic peril due to the physical characteristics of cable transmission and the economic incentives facing the cable industry." *Id.* at 659. Because Congress did not prefer one speaker over the other based on content, strict scrutiny was not appropriate. *Id.*

Similarly, the Act does not warrant strict scrutiny simply because it may apply to some speakers or mediums and not others. If that were the case, all regulations distinguishing between internet providers would be subject to strict scrutiny. This cannot be true. Instead, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. A facially-neutral law will not be deemed content-based where the "overriding [legislative] purpose" for a medium- or speaker-based distinction regulation is "unrelated to the content disseminated" by them. *Turner Broad. Sys.*, 512 U.S. at 647. Here, the Act distinguishes between operators based on

the legislature's belief that covered operators pose significantly higher risks of harm to minors than uncovered operators—not by virtue of the content contained on the operators' platforms, but rather by (1) their contractual requirements for access, combined with (2) the health and safety risks posed by the features and functions that they widely adopt.

First, the Act applies only where covered operators wish to contract with minors. Online-contract literacy is a problem for adults—let alone children. According to a 2017 Deloitte Global Consumer Survey, 97% of adults aged 18 to 34 reported willingly accepting legal terms and conditions required for installing apps, registering Wi-Fi hotspots, accepting updates, and signing into online services without ever reading them. Ex. F, Deloitte, *2017 Global Mobile Consumer Survey: U.S. Edition, The dawn of next era in mobile*, at 12. Indeed, another study found that 93% of adults signing up for a fictitious social networking service agreed to a terms-of-service clause that required providing a first-born child as payment for access. Ex. G, Jonathan A. Obar & Anne Oeldorf-Hirsch, *The Biggest Lie on the Internet: Ignoring the Privacy Policies and Terms of Service Policies of Social Networking Services*, Information, Communication & Society, TRPC 44 Conference on Communication, Information and Internet Policy (2016), at 21-25.

These oppressive contracts are just the tip of the spear. Once minors agree to them, they gain access to online spaces where certain features and functions exacerbate health and safety risks. For example, operators that permit minors to construct public or semipublic profiles, populate friend lists, create or post public content, and interact socially with other users, generally pose a higher risk to minors by (1) releasing personally identifiable and other information, (2) causing addiction by way of user-engagement features, and (3) increasing susceptibility to sexual predators. Ex. D, North Aff. at ¶ 8. Evidence suggests that uncovered operators like the New York Times, the Wall Street Journal, or *any other website* that does not meet the definition contained in

O.R.C. § 1349.09(A)(1)(a)-(d) simply do not pose the same health or safety risks to minor children. *Id.* at ¶ 11.

Further, some social-media companies to whom the Act applies profit heavily from minors' personal information by collecting and selling behavioral data. Ex. A at 2.[8] Additionally, it is well-established that these companies utilize user interfaces which can be addictive to minors, given their interactive medium and features that maximize user engagement. Ex. B at 9. In fact, "[s]ocial media platforms are often designed to maximize user engagement, which has the potential to encourage excessive use and behavioral dysregulation." *Id*. These design features include "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'like'), and algorithms. . . ." *Id*. To little surprise of anyone who knows a teenager, these conscious design choices make it next to impossible for children to get off their platforms, with "nearly half of adolescents report[ing] being online 'almost constantly[.]'" Ex. A at 1. The habits generated by certain social media companies have been linked to depression, anxiety, and neuroticism in minors. *See* Exh. B at 10.

In addition, predatorial conduct directed towards minors is a huge concern on social media websites due to their extremely interactive nature. *Id.* at 9 ("[S]ocial media platforms can be sites for predatory behaviors and interactions with malicious actors who target children and adolescents. . . ."). Interactive website mediums often have features that create a hub for sexual predators, such as "secret chat" features that include end-to-end user encryptions. Exh. D. at ¶ 9. These private, secret chat functions allow predators to communicate with minors without the social media

---

[8] "Social media platforms are highly incentivized to keep youth online–children and adolescents' online experiences are heavily monetized through advertising revenue on platforms' websites and mobile applications. Platforms draw upon highly personalized computational advertising to match users' specific demographics and usage patterns with advertisers' financial interests." Ex. A at 2.

platform or any other third party overseeing or monitoring the chats. *Id.* Private chats, along with public profiles and populated friends lists, permit predators to gather information about potential victims, assess their susceptibility, and ultimately isolate, exploit, and abuse them. *Id.* at ¶ 9-14.

These issues are simply not as prevalent in more widely recognized traditional media outlets whose primary purpose is to report the news. *Id.* at ¶ 11. As an initial matter, most—if not all—traditional media outlets are not covered by the Act because they do not "populate a list of other users with whom an individual shares or has the ability to share a social connection within" their websites, nor do they have "a landing page or main feed that presents the user with content generated by other users." O.R.C. § 1349.09(A)(1)(b) & (d).

But even if a traditional media outlet were covered by the Act, they are subsequently exempted because the legislature has recognized that their platforms do not employ the same problematic features and functions that covered operators do. For example, the websites of traditional media outlets like the New York Times or the Wall Street Journal do not have similarly interactive and potentially harmful design features like populated friends lists or end-to-end-encrypted or "secret" chat functions. Relatedly, websites are exempted where "user interaction is limited" to public interactions. O.R.C. § 1349.09(O). A minor reading comments and commenting on a public thread for a news article is in stark contrast with her exchanging direct, absolutely private messages with a stranger.

Indeed, "[u]nlike in public chats or discussions," that occur on uncovered operators' sites, covered operators permitting "targeted messages, in most cases," offer an avenue for predators to "exploit an already existing online relationship with the other group members in the network. In cases where such prior relation does not exist, the malicious actor spends time building the relation, often referred to as online grooming, and eventually targets the victim." *See* Ex. H, Parisa Rezaee

Borj, Kiran Raja & Patrick Bours, *Online grooming detection: A comprehensive survey of child exploitation in chat logs*, Knowledge-Based Systems, Volume 259 (January 10, 2023), at 1. One survey demonstrated that 25% of minor participants reported speaking with adult strangers online, and 65% of those who had spoken with an adult stranger experienced sexual solicitation. *Id.* 23% of participants revealed conversations with adult strangers that followed a grooming pattern, and 38% of them established a confidential relationship with an adult stranger. *Id.* Thus, the *manner* in which covered operators permit minor users to interact—without regard to the substantive message being communicated—significantly increases risks to their health and safety.

NetChoice has argued that the Act is content-based because it may restrict a minor's ability to read or comment on an article on one website but not read or comment on the same article on another website. But this demonstrates the Act is content-*neutral*, not content-*based*. That is, the Act is not concerned with whether a minor may engage with the *message* of a particular article— it is concerned with *where* and in *what manner* the minor does so. Whether the Act applies depends on the latter, not the former. Ohio is concerned with the dangers posed by the platform these items are hosted on—not with the message, idea, or content being expressed. This is precisely why the Act covers certain websites and not others, even if the same substantive message is contained on both. Covered operators' contracts and platforms present risks to Ohio's youth that uncovered operators simply do not. To this point, the Act's deference to parents' wishes as to what platforms their children access is also evidence of content-neutrality. *See, e.g., Frazier v. Winn*, 535 F.3d 1279, 1285 (11th Cir. 2008) (finding the "statute is neutral on the Pledge in the statute's deference to a parent's expressed wishes").

NetChoice relies heavily on *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) to argue that strict scrutiny applies. NetChoice misreads *Brown* for the proposition that,

any time the government imposes a parental consent requirement implicating speech in any way, strict scrutiny applies. NetChoice carries *Brown* too far. Its overbroad reading ignores the importance of a fundamental, threshold question: is the regulation content-based, or content-neutral?

The California law in *Brown* was plainly content-based: it banned, wholesale, video games "in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being" if those acts were depicted in a manner "[a] reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors," that is "patently offensive to prevailing standards in the community as to what is suitable for minors," and that "causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors." *Brown*, 564 U.S. at 789. California modeled this statute after the New York law upheld in *Ginsberg v. New York*, 390 U.S. 629 (1968), a content-based regulation prohibiting the sale of certain sexually-related materials to minors. *Id.* at 807-08 (citing *Ginsberg*, 390 U.S. at 631-33).

Unlike in *Ginsberg,* however, the California law did not "adjust the boundaries of an existing category of unprotected speech"—i.e., obscenity—it attempted to create "a wholly new category" of unprotected speech—i.e., depictions of violence that are harmful to minors. *Id.* Thus, the core of *Brown*'s holding is that legislatures cannot "create a wholly new category of *content-based regulation* that is permissible only for speech directed at children." *Id.* at 794 (emphasis added).  In other words, the Court did not apply strict scrutiny merely because the law imposed a parental-consent requirement. It applied strict scrutiny because the law was a facially content-based regulation of protected speech. *Brown*, 590 U.S. at 786. Put simply, *Brown* tells us that a content-based regulation of protected speech is presumptively unconstitutional. It does not tell us

that a *content-neutral* regulation that *incidentally* burdens minors' access to protected speech is unconstitutional.

That distinction is why *Brown* is inapplicable to this case. The law in *Brown* was patently content-based: its application depended on the topic, subject matter, or substantive message conveyed—whether violence was depicted. *Brown*, 564 U.S. at 789; *see also, City of Austin,* 142 S. Ct. at 1471-72. The Act is not. It applies based on the speaker or medium, regardless of message. *See* Section III(C)(ii), *supra*.

Footnote 3 shows that the *Brown* Court's focus was on content-based consent requirements. There, the Court recognized that states do not have the power to require parental consent before children hear or say *particular messages*. *See Brown*, 564 U.S. at fn. 3. This is made clear by the examples supplied in footnote 3. The First Amendment would not permit, the Court explained, a parental-consent requirement prior to admitting a minor into a political rally, admitting her into church, or giving her a religious tract. *Brown*, 564 U.S. at fn. 3. That is because the application of such regulations would turn on the *substantive message* being communicated. Laws imposing a parental-consent requirement based on substantive message—whether a "political" or "religious" message, *see Reed*, 576 U.S. at 166-68, or a "violent" message, *see Brown*, 564 U.S. at 786—are facially content-based and subject to strict scrutiny. Laws that impose a parental-consent requirement based on *something other than* substantive message are facially content-neutral. *See City of Austin*, 142 S. Ct. at 1472; *Turner Broad. Sys.*, 512 U.S. at 643.

Thus, *Brown* did *not* vitiate a state's ability to require parental consent before a minor can access certain places, speakers, or mediums—so long as that consent requirement is not based on content. The types of parental-consent requirements discussed in *Brown* were content-based, and require strict scrutiny. The Act is not, and doesn't.

In sum, the Act is not content-based—whether textually, or by proxy of any speaker- or medium-based distinctions. Ohio has identified reasons for those distinctions unrelated to content. *See Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 434 (4th Cir. 2007) (noting that interests proffered by the city, including traffic safety and aesthetics, were unrelated to content of messages). Moreover, and as explained above, the Act is not facially content-based. Therefore, intermediate scrutiny applies, if the Act implicates the First Amendment at all. *See Turner Broad. Sys.*, 512 U.S. at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

### 3. The Act satisfies any level of First Amendment scrutiny.

No matter the standard of scrutiny this Court applies, the Act passes muster. Ohio's interests in protecting minors' health and safety and vindicating the fundamental right of parental decision making are both important and compelling. The Act burdens no more speech than necessary and is narrowly tailored in service of these interests. It is constitutional regardless of the standard applied.

### i. Ohio has important and compelling regulatory interests both in protecting minors and the fundamental right of parental decision-making.

The Act advances Ohio's important and compelling governmental interests in protecting the health and safety of minors by requiring parental consent before a covered operator can contract with them. *See Dayton Area Visually Impaired Persons v. Fisher*, 70 F.3d 1474, 1489 (6th Cir. 1995) ("It is indisputable that state governments have important interests in seeking to secure the safety of their minor citizens."). The Supreme Court has found a "*compelling* interest in protecting the physical and psychological well-being of minors." *Sable Communications of Cal. v. FCC*, 492 U.S. 115, 126 (1989) (emphasis added). There is a prevalent concern, supported by scientific research, that minors engaged with covered operators' platforms are susceptible to harms including mental health issues, sexual abuse, and the sharing of personal information and data. *See, e.g.,* Ex.

E at ¶ 5-7; Ex. B at 9-10; Ex. C at 7; Ex. D at ¶ 8-16; Ex. F at 1. Ohio certainly has an important and compelling interest in combating these harms to minors. *See* Ex. E at ¶ 8.

Equally important is Ohio's interest in protecting the fundamental right of parents to make decisions about their children's care and upbringing. *See id.* at ¶ 8; *see also Lassiter v. Dept. of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981) ("[T]he companionship, care, custody and management of [one's] children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection.") (internal quotation marks omitted)); *see also Frazier v. Winn*, 535 F.3d 1279, 1284 (11th Cir. 2008) (advancing the protection of the constitutional rights of parents is an interest which the state may lawfully protect). It is well-established that parents have a fundamental right to control their children's upbringing. *See, e.g., Washington v. Glucksberg,* 521 U.S. 702 (1997) ("[T]he 'liberty' specially protected by the Due Process Clause includes the right[] . . . to direct the education and upbringing of one's children. . . ."). Accordingly, Ohio has an interest in protecting this fundamental right, which the Act vindicates, by "aim[ing] to give parents and legal guardians oversight of their children's online presence on certain websites, services or products by requiring parental consent for use and access." OHIO PROTECTS, *FAQ What is the Parental Notification by Social Media Operators Act.*[9] Crucially, the Act, by requiring parental consent, "assists parents with obtaining the necessary information about social media operators, the types of products that they provide, and the terms and conditions of use." Ex. E at ¶ 8.

To be sure, in *Brown*, the Court reasoned that while states possess the power to protect children from harm, this "does not include a free-floating power to restrict the ideas to which children may be exposed." 564 U.S. at 794. Instead, restriction on speech must be subject to some

---

[9] https://www.ohioprotects.org/faq (last accessed April 30, 2024).

legitimate prescription and cannot be "solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* Thus, *Brown* tells us that, for a content-based regulation of protected speech to satisfy strict scrutiny, there needs to be some "longstanding tradition in this country of specially restricting children's access" to that type of content. *Id.* at 795. The *Brown* Court rejected the idea of any longstanding tradition in the Country to restrict children from access to depictions of violence. *Id.*

Unlike the law in *Brown*, the Act is not content-based and the Court need not refer to historical tradition in its analysis. Regardless, there *are* a myriad of longstanding situations where parental consent is traditionally required before a minor can engage in activities that, by their nature, pose health, safety, and privacy risks separate and apart from any expressive content. For example, parental consent is required for getting a tattoo or body piercing procedure (O.R.C. § 3730.06) or using a tanning facility (O.R.C. § 4713.50), and for the release of personally identifying information of students (O.R.C. § 3319.321(B)). Getting a tattoo or piercing (or even a tan) might easily be considered expressive conduct, yet Ohio has long required parental consent for a minor to do so. It is not uncommon for states to be concerned, or allow parents the opportunity to consent, when children are about to engage in choices with potentially serious health and safety consequences given "the inability of children to make mature choices[.]" *Bellotti v. Baird*, 443 U.S. 622, 636 (1979). Even federal regulatory law imposes regulations on online operators— requiring verifiable parental consent—before collection, use or disclosure of personal information from children 13 and under. 16 C.F.R. § 312.

Therefore, Ohio has important and compelling interests in protecting minors, as well as in vindicating the fundamental rights of parents in making decisions in their children's upbringing (a fundamental right the law has always recognized).

### ii.   The Act burdens no more speech than is necessary and is narrowly tailored to advance Ohio's regulatory interests.

Under intermediate scrutiny, the legislation must not "burden substantially more speech than necessary to further those interests." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010), quoting *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997). Under the strict scrutiny analysis, the legislation must be narrowly tailored, but it does not need to be "perfectly tailored." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (quoting *Burson v. Freeman*, 504 U. S. 191, 209 (1992)). It requires the law to be neither seriously overinclusive, nor seriously underinclusive. *Brown*, 564 U.S. at 805.

Here, the Act precisely targets the harms that the Act intends to protect against. *See* Exh. E at ¶ 5-8. Moreover, the Act protects parents' fundamental right to control their children's upbringing and to guide their children's social interactions on the internet. The Act accomplishes these goals by putting decision-making where it should be: in the hands of parents. The Act provides parents the opportunity to vet certain platforms before their children's engagement, to see if they addictive user-engagement features and are likely to contain features that attract sexual predators. *See* Ex. E at ¶ 8.

In turn, the Act is neither seriously overinclusive nor seriously underinclusive. It is not overinclusive because, as explained, its definition of operator encompasses only those who utilize functional features which pose the most harm to minors, and it applies only to those operators seeking to contract with minors. Further, the Act does not burden adults as it only concerns a covered operator's ability to contract with children who are under sixteen. *See* O.R.C. § 1349.09(A)(2). The Act is also not underinclusive because it does not apply just to traditional social media companies—it applies much more broadly "to cover gaming platforms, shared

message boards, etc." OHIO PROTECTS FAQ, *supra*. That is because, again, the Act targets operators with user interfaces and functions that pose particular, well-defined risks.

Moreover, "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). At most, an underinclusive law is relevant to whether a law is atextually content-based: it may raise a "red flag" by "rais[ing] 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Id.* (quoting *Brown*, 564 U.S. at 802). Unlike the concern in *Brown*, where the legislation narrowly targeted and outright banned the sale of violent video games without targeting other violent forms of media, the Act requires parental consent from *all* platforms with features that implicate Ohio's concerns wishing to contract with minors. Thus, the Act is neither overinclusive nor underinclusive.

While it is true that parents have certain parental-control options for overseeing how their minor children use the internet, *see* Pl. Mot. for PI, ECF No. 2 at PageID# 41-42, 51, these options are simply not preventative enough and ignore the reality of the pervasiveness—both to children *and* their parents—of technology. Parents are not always aware of the different types of platforms their minor children use. Children may surf the internet and come across a website platform before parents even have a clue it exists. This is simply the nature of the internet in the age of information. Because of this, parents may not proactively know which websites to restrict for their children.

This is particularly problematic because, for children to use a platform, the first thing they must often do is agree to its terms of service. Once the minor agrees to the terms by simply using the platform, it may well be far too late for the parent to intervene and prevent harm unless the platform agrees to a remedy. It would not be enough for Ohio to simply educate parents on these

blocking and monitoring tools, as NetChoice suggests. Often parents do not know which platforms their children are using until after their children have already engaged with the platform, or some problem arises that brings the usage to their attention. The Act, however, precisely prevents this situation by mandating parental consent *before* the operator may contract with the minor. As noted, the Act allows minors to use the internet and the wide array of speech it contains in any manner they please, insofar as the covered operators' platforms they access do not require a contractual agreement. The Act assists parents by ensuring heightened awareness of the terms (and potential pitfalls) of the contracts their children are agreeing to. The parent, who typically knows their child best, can then decide based on that child's best interests. This further tailors the Act toward the state's interests. *See Ginsberg*, 390 U.S. at 639 ("Moreover, the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children."); *Reno v. ACLU*, 521 U.S. 844, 865 (distinguishing statute in *Ginsberg* as "narrower" because of ability for parents to consent). Moreover, the enforcement provisions in the statute narrowly tailor the Act in service of its goals. The Act contains a safe harbor provision which provides online operators the opportunity to cure any violations within ninety days before the Ohio Attorney General may commence civil actions against them. *See* R.C. 1349.09(M)(1)-(2). Thus, operators can easily avoid all civil enforcement proceedings and penalties simply by curing the violations that the Ohio Attorney General passes along to them. This ninety-day cure period illustrates that the goal of the Act is not to impose fines on operators who violate the Act; instead, it is to protect children and the rights of parents by having operators remedy the violation.

Finally, the Act is not overinclusive because of what NetChoice deems an "arbitrary" age distinction. Compl., ECF No. 1 at PageID# 28 ¶ 92. Instead, the Act narrowly targets an age of particular susceptibility. Science demonstrates distinct, age-specific "windows of sensitivity to

social media use in adolescence" where increased usage predicts a decrease in life satisfaction ratings. Ex. C at 1, 5. These windows occur between the ages of eleven and fifteen. *Id.,* abstract. Federal law offers some protection to children under the age of thirteen via the Children's Online Privacy Protection Act ("COPPA"). 15 U.S.C. § 6501 through 6506. The Act therefore fills a regulatory gap by offering protections when minors need it most—during the "distinct window[] of sensitivity to social media use" that occurs between the ages of thirteen and fifteen.

For these reasons, the Act does not burden any more speech than is necessary and is narrowly tailored to achieve its goal of protecting minors on the internet and protecting parents' right to make decisions for their children.

### iii.    The Act is not unconstitutionally vague.

"Few statutes meet the void-for-vagueness threshold: a 'strong presumptive validity' applies to all acts of Congress and mere 'difficulty' in determining a statute's meaning does not render it unconstitutional." *United States v. Kettles*, 970 F.3d 637, 650 (6th Cir.) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)), *cert. denied*, 141 U.S. 924 (2020). Accordingly, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *United States v. Carpenter,* 2022 U.S. Dist. LEXIS 220562, *13 (quoting *Chapman v. United States*, 500 U.S. 453, 464 (1991)).

### a.    Constitutional scrutiny is relaxed because the Act does not impose criminal sanctions and does not regulate speech.

"The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Stevens v. City of Columbus*, No. 21-3755, 2022 U.S. App. LEXIS 20829, *13 (6th Cir. 2022) (internal quotations omitted). Civil laws (not implicating the First Amendment) "are reviewed less stringently than criminal laws 'because the consequences of imprecision are qualitatively less severe.'" *Id.*, quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455

U.S. 489, 498 (1982). Where an enactment does not impose criminal sanctions and does not reach constitutionally protected conduct, the complainant may succeed in a vagueness claim "only if the enactment is impermissibly vague in all of its applications." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir.1999). Vagueness claims of this nature must be examined in light of the facts of the particular case at hand and not as to the Act's facial validity. *See Columbia Natural Resources v. Tatum*, 58 F.3d 1101 at fn. 6 (6th Cir. 1995) (limiting vagueness challenge to an "as applied" analysis since the case did not implicate First Amendment rights); *United States v. Avant*, 907 F.2d 623, 625 (6th Cir. 1990) (citing *United States v. Mazurie*, 419 U.S. 544, 550 (1975) (reviewing vagueness challenge to statute not involving First Amendment rights on the facts of that specific case)). Therefore, to establish a vagueness claim "the statute must be unconstitutionally vague 'as applied to [t]his particular case.'" *Kettles*, 970 F.3d at 650 (quoting *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001)); *see also United States v. Williams*, 553 U.S. 285, 304 (observing that "ordinarily [one] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others").

NetChoice's void for vagueness claim presumes that the Act impacts free speech. But, as outlined *supra,* the Act is a commercial regulation that regulates the ability of operators to contract with minors in the absence of parental consent. Indeed, the Act is located within Title 13 ("Commercial Transactions"), Section 1349 ("Consumer Transactions") of the Ohio Revised Code and tracks the long-standing Federal Trade Commission's Children's Online Protection and Privacy Act of 1998 (COPPA). It does not target free speech or First Amendment rights. The regulation of businesses and the protection of consumers is a well-recognized government role. Moreover, the Act imposes civil, and not criminal sanctions. Thus, heightened judicial scrutiny

does not apply and NetChoice must show the Act is void for vagueness *as applied to it*. They cannot do so.

### b. Even if a stricter standard controls, the Act sufficiently defines prohibited conduct and enforcement parameters.

Even if the Court assumes a First Amendment implication, the Act still satisfies the Constitution. Of course, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.,* 567 U.S. 239, 253-254 (2012), quoting *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926). "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.,* quoting *Grayned* v. *City of Rockford*, 408 U. S. 104, 108-109 (1972). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* Even if the Court finds the Act implicates the First Amendment, this rigorous standard is met. The Act gives fair notice and it provides clear directives for enforcement by the Attorney General.

The law does not expect the drafters of statutes to write with crystal clear perfection. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. Laws must, "in order to comport with due process, 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.'" *Miller v. Wilkinson,* No. 2:98-cv-275, 2010 U.S. Dist. LEXIS 103364, *13 (S.D. Ohio Sept. 30, 2010). The Act provides clear directives (as far as common language permits) and clearly outlines what it requires and to whom it applies.

Indeed, the statute gives a person of ordinary intelligence the opportunity to know what is prohibited and provides explicit enforcement standards.

### c. A person of ordinary intelligence can reasonably know what is prohibited.

The Act sufficiently outlines the operators to whom it applies and what conduct it prohibits. Importantly, terms do not necessarily need to be defined so long as a person of ordinary intelligence would know what conduct is prohibited. The Sixth Circuit has rejected similar arguments that attempt to undermine the commonly-understood meaning of simple terms. *See Chambers v. Stengel,* 256 F.3d 397, 401 (2001) (holding that the terms "solicit," "victim," "accident or disaster," and "general public" are common terms, and individuals of common intelligence do not have to guess at their meaning.) NetChoice attempts to obfuscate the Act's simple language. But the Act is sufficiently specific as to whom it applies—social media operators "who target[] children or are reasonably anticipated to be accessed by children." O.R.C. § 1349.09(B). "Operator" is expressly defined as "any business, entity, or person that operates an online web site, service, or product that has users in this state" and allows its users to engage in certain specific conduct set forth in O.R.C. § 1349.09(A)(1)(a)-(d).

It also clearly delineates to whom it *does not* apply. The Act's carve-outs again employ common terms which are easily understood in context. For instance, R.C. 1349.09(O)(2) provides that the Act does not apply to operators where the interaction between users is limited to "Comments incidental to content posted by an *established* and *widely recognized* media outlet, the *primary purpose* of which is to report news and current events." (emphasis added). While at the preliminary injunction stage, the Court expressed concern about the terms "established", "widely recognized" and "primary purpose," when viewed in context these terms are easy to decipher. Plaintiff's attempt to interject vagueness is just an effort to create confusion where none exists. A law can have "flexibility and reasonable breadth, rather than meticulous specificity" and still pass

the vagueness test. *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) quoting *Esteban* v. *Central Missouri State College*, 415 F.2d 1077, 1088 (CA8 1969). Indeed, this Court has held that "[t]he failure to define a term in a statute or an ordinance does not automatically 'render the statute unconstitutionally vague' where the common meaning of the word provides both adequate notice of the conduct prohibited and of the standards for enforcement." *Stevens v. City of Columbus*, S.D.Ohio No. 2:20-CV-1230, 2020 U.S. Dist. LEXIS 118743, at *13 (July 7, 2020) (quoting *Belle Maer*, 170 F.3d at 558 (6th Cir. 1999).

In construing the terms of a statute, a court must recognize that a word "gathers meaning from the words around it." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 702, 115 S. Ct. 2407, 132 L. Ed. 2d 597 (1995). In other words, statutory terms are defined by their statutory context. *Free Speech Coalition, Inc. v. Shurtleff*, D.Utah No. 2:05CV949DAK, 2007 U.S. Dist. LEXIS 21556, at *48 (Mar. 23, 2007) (the term "primary purpose" is easily understood and, in context, has a clear meaning). *See also*, *Componentone, L.L.C. v. Componentart, Inc.*, W.D.Pa. No. 02: 05cv1122, 2007 U.S. Dist. LEXIS 89772, at *10 (Dec. 6, 2007) (finding that the phrase "widely recognized by the general consuming public of the United States" has a readily ascertainable meaning and is sufficiently definite to render it constitutionally acceptable).

Moreover, the statute explicitly sets forth the requirements for compliance. It demands that "operators" obtain verifiable parental consent before entering into a contract "with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product." *See* O.R.C. § 1349.09(B)(1). If a violation is found, the Act further outlines the civil penalty imposed, with a chance for the operator to remedy any violation within 90 days of notice. *See* O.R.C. § 1349.09(I)(1)-(3), (M)(2)(a)-(b). NetChoice's

36

attempt to parse the language of the Act to obfuscate ordinary meanings is unpersuasive and has no merit. The Act uses ordinary language which a person of ordinary intelligence can understand and clearly delineates prohibited conduct. Thus, it passes constitutional scrutiny.

### d. The statute contains objective, non-discriminatory enforcement standards.

"[T]he more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Tatum*, 58 F.3d at 1105 (6th Cir. 1995) (quoting *Smith v. Goguen,* 415 U.S. 566, 574 (1974)). In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered. *Grayned*, 408 U.S. at 110.

O.R.C. § 1349.09 provides explicit standards for the Attorney General and the Courts to enforce the statute. The Act specifically lays out eleven factors for the Attorney General to consider in making its determination as to whether an operator's product targets children. *See* O.R.C. § 1349.09 (C)(1)-(11). They include "[e]mpirical evidence regarding audience composition" and the "[p]resence of child celebrities or celebrities who appeal to children." *Id.* While NetChoice claims that these eleven factors render the Act "broad and vague," nearly identical factors are incorporated in the Federal Trade Commission's regulations which govern similar operators and online activity. *See* Children Online Privacy Protection Act of 1998 ("COPPA"), 16 C.F.R. § 312.[10] These are

---

[10] COPPA provides that "Web site or online service directed to children" means "a commercial Web site or online service, or portion thereof, that is targeted to children," and further provides:
(1) In determining whether a Web site or online service, or a portion thereof, is directed to children, the Commission will consider its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable

concrete, identifiable metrics that put operators on fair notice of what will be considered in the Attorney General's review and what platforms will be subject to enforcement. *United States v. Marmolejo*, No. 3:04-cr-132, 2007 U.S. Dist. LEXIS 26524, *6 (S.D. Ohio Apr. 10, 2007). Further, the Act outlines the civil penalty imposed for violations, and provides a chance for the operator to remedy their violation within 90 days of notice. *See* O.R.C. § 1349.09(I)(1)-(3), (M)(2)(a)-(b). This safe harbor provision is again similar to one provided under COPPA. 16 CFR § 312.9 & 312.11.

NetChoice members are certainly familiar with and already subject to the rules set forth in COPPA.[11] NetChoice's assertion that the factors set forth in § 1349.09(C)(1)-(11), which tracks many of the same criteria set forth in COPPA, are "inherently indeterminate" and that "[w]ebsites have no way to know what this means" is a patently false. Compl., ECF No. 1 at PageID # 4, ¶ 7. State laws that are *consistent* with COPPA's substantive requirements have been found constitutional by other Courts. *Jones v. Google LLC*, 73 F.4th 636, 639 (9th Cir.2023) (emphasis original). Here, Ohio's Act strived to be *consistent* with COPPA, employing some of the same factors and lending clarity to those operators subject to compliance about how the Act would be applied to them.

The Act does more than just establish minimal guidelines to govern law enforcement. It outlines, in ordinary terms and with sufficient specificity, to whom the statute applies to, the

---

empirical evidence regarding audience composition, and evidence regarding the intended audience.

[11] Google and TikTok (through its corporate predecessor) have both been subject to COPPA Enforcement in recent years. *FTC v, Google, LLC,* D.D.C. No. 1:19-cv-02642, Stipulated Order for Permanent Injunction and Civil Penalty Judgment (Sept. 10, 2019) (available at: https://www.ftc.gov/system/files/documents/cases/172_3083_youtube_coppa_consent_order_sig ned.pdf); *United States v. Musical.ly*, C.D. Cal. No. 2:19-cv-01439, [Proposed] Stipulated Order for Civil Penalties, Permanent Injunction, and Other Relief (Feb. 27, 2019) (available at: https://www.ftc.gov/system/files/documents/cases/musical.ly_proposed_order_ecf_2-27-19.pdf).

conduct that is prohibited, and how penalties are to be assessed and meted out. Indeed, despite NetChoice's assertion that these factors render the Act vague and meaningless, it is certain that many of NetChoice's members are subject to the same framework under federal law. 16 CFR § 312. The fact that NetChoice "take[s] issue with the substance of this law does not detract from its clarity." *See Stevens v. City of Columbus*, S.D.Ohio No. 2:20-CV-1230, 2020 U.S. Dist. LEXIS 118743, at *19 (July 7, 2020).

Under either level of scrutiny that the Court applies, the Act is not unconstitutionally vague and Attorney General Yost is entitled to summary judgement.

## IV.    CONCLUSION

For the foregoing reasons, there is no genuine issue of material fact and Attorney General Yost is entitled to judgment as a matter of law.

<div style="margin-left:40%">

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069792)*
    *Lead and Trial counsel*
ELIZABETH HANNING SMITH (0076701)
STEPHEN P. TABATOWSKI (0099175)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH 43215-3428
Tel: (614) 466-2872 | Fax: (614) 728-7592
Julie.Pfeiffer@OhioAGO.gov
Elizabeth.Smith@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov

*Counsel for Defendant Ohio Attorney General*

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the U.S. District Court for

the and copies were served upon all counsel of record by means of the Court's electronic filing

system.

/s/ Julie M. Pfeiffer
_____
JULIE M. PFEIFFER
Assistant Attorney General