## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

NETCHOICE, LLC,                          )
                                         )
    *Plaintiff,*                     )    Case No. 2:24-cv-00047
                                         )
    v.                               )    Chief Judge Algenon L. Marbley
                                         )
DAVE YOST, in his official capacity      )    Magistrate Judge Elizabeth Preston Deavers
as Ohio Attorney General,                )
                                         )    **ORAL ARGUMENT REQUESTED**
    *Defendant.*                     )

---

### PLAINTIFF NETCHOICE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and the scheduling order entered by this Court, Plaintiff NetChoice, LLC moves for summary judgment.

This Court has preliminarily enjoined Ohio's Parental Notification by Social Media Operators Act, Ohio Rev. Code § 1349.09, holding Plaintiff likely to succeed on its claims that the Act is unconstitutional. The Court now should grant summary judgment and permanently enjoin the Defendant from enforcing the Act against Plaintiff's members. The Act requires a broad but ill-defined collection of covered websites to collect parental consent from minors younger than 16 before allowing those minors to "access" and engage in protected speech on those websites. This requirement violates the First Amendment and the Due Process Clause of the Fourteenth Amendment for multiple reasons, as set forth in the accompanying memorandum.

In support of this motion, NetChoice submits the accompanying Declaration of Jeremy Evan Maltz and relies on declarations previously submitted in support of NetChoice's Motion for Preliminary Injunction (ECF Nos. 2-1, 2-2, 2-3, 2-4).

This Court should grant Plaintiff summary judgment, enter a judgment declaring that the Act violates the Speech and Press Clauses of the First Amendment and is unconstitutionally vague

in violation of the First and Fourteenth Amendments of the U.S. Constitution, and permanently enjoin Defendant from enforcing the Act against NetChoice's members.

Dated: May 3, 2024

Respectfully submitted,

*s/Matthew H. Rice*
Matthew H. Rice (97290)
  *Trial Attorney*
SPERLING & SLATER, LLC
55 W. Monroe Street, 32nd Floor
Chicago, Il 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
mrice@sperling-law.com

Joshua P. Morrow*
Alexis Swartz*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
alexis@lkcfirm.com

Jared B Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

*admitted pro hac vice*

*Attorneys for Plaintiff NetChoice, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| NETCHOICE, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 2:24-cv-00047 |
| | ) | |
| v. | ) | Chief Judge Algenon L. Marbley |
| | ) | |
| DAVE YOST, in his official capacity | ) | Magistrate Judge Elizabeth Preston Deavers |
| as Ohio Attorney General, | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| *Defendant*. | ) | |

**PLAINTIFF NETCHOICE'S MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**Table of Authorities**

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023)................................................................3, 17

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021)......................................................................38

*Am. Amusement Mach. Ass'n v. Kendrick,*
    244 F.3d 572 (7th Cir. 2001) ......................................................15

*Am. Civil Liberties Union of Ky. v. McCreary Cnty.,*
    607 F.3d 439 (6th Cir. 2010) ....................................................2, 37

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021)......................................................27, 30, 31

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)......................................................................11

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002)......................................................................19

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963)........................................................................17

*Barr v. Am. Ass'n of Pol. Consultants,*
    140 S. Ct. 2335 (2020)............................................................22, 24

*Bd. of Educ. v. Pico,*
    457 U.S. 853 (1982)......................................................................14

*Boddie v. Am. Broad. Cos.,*
    881 F.2d 267 (6th Cir. 1989) ......................................................34

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011)............................................................ *passim*

*Carey v. Population Servs. Int'l,*
    431 U.S. 678 (1977)......................................................................13

*Citizens United v. FEC,*
    558 U.S. 310 (2010)................................................................25, 35

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022) ............................................................................................21, 23, 24

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ..............................................................................................27

*Craig v. Boren*,
    429 U.S. 190 (1976) ..............................................................................................13

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ..............................................................................................11

*EMW Women's Surgical Ctr., P.S.C. v. Friedlander*,
    591 F. Supp. 3d 205 (W.D. Ky. 2022) ..................................................................39

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ..................................................................................16, 17, 28

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................................34, 35

*Int'l Outdoor, Inc. v. City of Troy*,
    974 F.3d 690 (6th Cir. 2020) ................................................................................11

*Interactive Digital Software Ass'n v. St. Louis Cnty.*,
    329 F.3d 954 (8th Cir. 2003) ................................................................................15

*Jones v. Caruso*,
    569 F.3d 258 (6th Cir. 2009) ................................................................................39

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ..............................................................................................17

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938) ..............................................................................................17

*Mahanoy Area Sch. Dist. v. B. L.*,
    594 U.S. 180 (2021) ..............................................................................................16

*Martin-Marietta Corp. v. Bendix Corp.*,
    690 F.2d 558 (6th Cir. 1982) ................................................................................39

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    833 F.3d 656 (6th Cir. 2016) ................................................................................37

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ....................................................................................1, 21, 33

*NetChoice, LLC v. Attorney Gen., Florida,*
    34 F.4th 1196 (11th Cir. 2022) ..........................................................23

*NetChoice, LLC v. Bonta,*
    2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) ............................1, 13, 33

*NetChoice, LLC v. Griffin,*
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).................................. *passim*

*Nken v. Holder,*
    556 U.S. 418 (2009)..........................................................................39

*Packingham v. North Carolina,*
    582 U.S. 98 (2017)..............................................................................3

*Planet Aid v. City of St. Johns,*
    782 F.3d 318 (6th Cir. 2015) ...........................................................21

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)................................................................... *passim*

*Reno v. Am. Civil Liberties Union,*
    521 U.S. 844 (1997)..................................................................3, 17, 18, 37

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020)...........................................................................38

*Schickel v. Dilger,*
    925 F.3d 858 (6th Cir. 2019) ......................................................25, 26

*Sec'y of State of Maryland v. J.H. Munson Co.,*
    467 U.S. 947 (1984).....................................................................13, 19

*Smith v. California,*
    361 U.S. 147 (1959)..........................................................................17

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)..........................................................................17

*Thomas v. Bright,*
    937 F.3d 721 (6th Cir. 2019) ......................................................22, 24

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969)..........................................................................17

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994)....................................................................25, 26

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) .................................................................................................31

*United States v. Stevens*,
    559 U.S. 460 (2010) .................................................................................................12

*United States v. Williams*,
    553 U.S. 285 (2008) ...............................................................................................1, 35

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) .................................................................................................14

*Video Software Dealers Ass'n v. Schwarzenegger*,
    2007 WL 2261546 (N.D. Cal. Aug. 6, 2007) ........................................................13

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) .............................................................................................12, 13

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................................13

**Statutes, Regulations, and Rules**

16 C.F.R. § 312.2 .......................................................................................................35, 36

Fed. R. Civ. P. 56 .............................................................................................................11

Ohio Rev. Code § 1349.09 ........................................................................................ *passim*

**Other Authorities**

CNN, Sign Up for Your CNN Account, https://perma.cc/2BFQ-TCEK .....................20

Dave Yost, FAQ: What is the Parental Notification by Social Media Operators
    Act?, https://perma.cc/NE24-T3L9 .................................................................. *passim*

Dave Yost, News Releases: Parental Notification by Social Media Operators Act
    Takes Effect in January (Dec. 27, 2023), https://perma.cc/WRF3-KH3K ............20

New York Times, Checkout, https://perma.cc/TA7Z-5X65 ........................................20

The Washington Post, Sign Up, https://perma.cc/TV7N-C2KH ..................................20

**Table of Contents**

Summary of Arguments ................................................................................................ vii

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 2

    A. Internet websites disseminate vast amounts of protected speech. ............................... 2

    B. Parents have many tools to oversee how their children use the Internet. .................... 4

    C. Ohio's Parental Notification by Social Media Operators Act ..................................... 5

        1. The Act's vague and broad coverage provisions discriminate based on content and speaker. .................................................................................................. 5

        2. The Act requires covered websites to deny "access" to minors younger than 16 unless the minors secure parental consent. ........................................................ 8

        3. The Act imposes large penalties for non-compliance. ........................................... 10

    D. Procedural History ...................................................................................................... 11

Argument ........................................................................................................................ 11

I.  NetChoice has standing to assert its own interests, the interests of its members, and the interests of Internet users in challenging the Ohio Parental Notification by Social Media Operators Act. ................................................................................................................. 12

II.  The Ohio Parental Notification by Social Media Operators Act violates the First Amendment because it restricts covered websites' ability to disseminate speech and minors' ability to access and engage in speech. ...................................................................... 14

    A. The Act triggers First Amendment strict scrutiny by requiring minors to secure parental consent before accessing protected speech. .................................................. 14

    B. The Act violates the First Amendment by restricting access to protected speech on the basis of content and speaker ........................................................................... 21

        1. The Act's coverage provisions restrict access to speech based on content. ......... 21

        2. The Act's coverage provisions restrict access to speech based on speaker. ......... 24

    C. The Act cannot satisfy First Amendment strict scrutiny or any other form of heightened First Amendment scrutiny. ..................................................................... 27

        1. Defendant has failed to identify a sufficient governmental interest in restricting minors' access to protected speech. .................................................... 27

        2. The Act is not properly tailored. ........................................................................... 29

III. The Ohio Parental Notification by Social Media Operators Act is unconstitutionally vague... ......................................................................................................................... 34

IV. NetChoice meets all the requirements for a permanent injunction. ......................... 37

Conclusion ...................................................................................................................... 39

## Summary of Arguments

Pursuant to Local Rule 7.2(a)(3), NetChoice provides the following summary of arguments for this memorandum.

**I. NetChoice has standing to assert its own interests, the interests of its members, and the interests of Internet users in challenging the Ohio Parental Notification by Social Media Operators Act.** ................................................................................................ 12

As this Court has already concluded, NetChoice has standing to challenge the Ohio Parental Notification by Social Media Operators Act ("Act"), Ohio Rev. Code § 1349.09. PI Order, ECF No. 33 at PageID 336-42. Relevant here, "NetChoice has standing to bring both its claims on behalf of its member organizations and Ohioan minors." *Id.* at PageID 342. Under binding Supreme Court precedent, disseminators of speech (like covered websites) can raise the First Amendment interests of consumers of speech (like website users). *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *see NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *11-12 (W.D. Ark. Aug. 31, 2023). Furthermore, NetChoice can challenge the Act's parental-consent requirement because it infringes its members' right to disseminate speech under the First Amendment's Speech and Press Clauses.

**II. The Ohio Parental Notification by Social Media Operators Act violates the First Amendment because it restricts covered websites' ability to disseminate speech and minors' ability to access and engage in speech** ................................................................... 14

The Act violates the First Amendment by requiring minors to secure parental consent before accessing covered websites and the protected speech on those websites. § 1349.09(B).[1] By requiring parental consent and discriminating based on content and speaker, the Act triggers strict scrutiny. The Act cannot satisfy strict or any form of heightened First Amendment scrutiny.

**A. The Act triggers First Amendment strict scrutiny by requiring minors to secure parental consent before accessing protected speech.** ................................ 14

"[L]aws"—like the Act here—"that require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny." PI Order, ECF No. 33 at PageID 353-54. By requiring parental consent, the Act imposes two interrelated First Amendment injuries: "(1) it regulates operators' ability to publish and distribute speech *to minors* and speech

---

[1] Unless otherwise noted, statutory citations in this Motion refer to the Ohio Revised Code. This Motion refers to websites, applications, and other digital services covered by the Act as "covered websites."

*by minors*; and (2) it regulates minors' ability to both *produce speech* and *receive speech*." *Id.* at PageID 343. That is squarely prohibited under binding Supreme Court precedent. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 & n.3, 799 (2011). Defendant's arguments that the Act regulates conduct are belied by the Act's plain text and the undisputed record facts.

**B. The Act violates the First Amendment by restricting access to protected speech on the basis of content and speaker.** ............................................................. 21

The Act's central coverage-defining provisions, § 1349.09(A), (B), and (O), are content- and speaker-based, triggering strict scrutiny.

**1. The Act's coverage provisions restrict access to speech based on content.** ............................................................................................................ 21

The Act is content-based. A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). First, the Act's content-based exclusions for (1) "[c]omments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events" and (2) "[r]eviewing products offered for sale by electronic commerce or commenting on reviews posted by other users," § 1349.09(O)(1)-(2), demonstrate that the "State is [] favoring engagement with certain topics[] to the exclusion of others." PI Order, ECF No. 33 at PageID 353. Second, the "Act's distinction on the basis of [websites'] functionalities"—their means of disseminating speech and facilitating users' speech—are "content based." *Id.* at PageID 352. These "functionalities" are a proxy for content-based restrictions. *See City of Austin*, 596 U.S. at 74. Third, the Act "singles out specific subject matter for differential treatment," *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015), by regulating only websites that "target[]" children or that "reasonably anticipate" being accessed by children. At a minimum, the State favors expression and websites that do not appeal to minors. § 1349.09(B)-(C).

**2. The Act's coverage provisions restrict access to speech based on speaker.** ............................................................................................................ 24

The Act is also speaker-based. A speaker-based law triggers strict scrutiny if it is "facially content based," "cannot be justified without reference to the content of the regulated speech," *or* "was adopted by the government because of disagreement with the message the speech conveys." *Schickel v. Dilger*, 925 F.3d 858, 876 & n.2 (6th Cir. 2019) (cleaned up). *First*, the Act's coverage provisions are content-based for all the reasons discussed above and for the reasons this Court

already concluded. *Second*, the Act cannot even be *described* without referencing the content of expression. *Third*, there are good reasons to suspect that the Act reflects the State's "disagreement with the message" that covered websites "convey[]," *id.* at 876 (citation omitted), given that public statements by Defendant say nothing of regulating contracts nor does Defendant attempt to identify the terms of service that purportedly warrant minors' protection. *Finally*, the Act still targets only a "small number," *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994), of websites relative to the vastness of the Internet.

  **C. The Act cannot satisfy First Amendment strict scrutiny or any other form of heightened First Amendment scrutiny .................................................................... 27**

   The Act cannot satisfy strict scrutiny or any form of heightened First Amendment scrutiny. A law survives strict scrutiny only if a State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) ("*AFP*") (citation omitted). The Act does neither. PI Order, ECF No. 33 at PageID 354-57.

   **1. Defendant has failed to identify a sufficient governmental interest in restricting minors' access to protected speech. ................................................. 27**

   Defendant has failed to identify a compelling interest justifying the Act's restriction on minors' "access" to protected speech. § 1349.09(E). In *Brown*, the Supreme Court rejected a governmental interest in "protecting and advancing parents' ability to make decisions about their children's care and upbringing" by restricting minors' access to speech. PI Order, ECF No. 33 at PageID 356. And although the "State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

   **2. The Act is not properly tailored. ....................................................................... 29**

   In all events, the Act fails strict scrutiny because it "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." PI Order, ECF No. 33 at PageID 357. Irrespective of the State's purported interest, the Act is overinclusive—both in the range of websites and the amount of protected speech it regulates. In addition, the Act is "overinclusive" to further parental control under the Supreme Court's decision in *Brown*. *Id.* at PageID 356 (citing *Brown*, 564 U.S. at 803). The Act is also not "not narrowly tailored" to address any concerns about terms of service or data privacy. *Id.* at PageID 355. The Act is plainly

overinclusive to further this interest, as the State could have regulated the contracts or data privacy as compared to access to speech. Conversely, the Act is "underinclusive" because it leaves other websites with similar terms of service unregulated. *Id.* Finally, the Act is a "breathtakingly blunt instrument for reducing social media's harm to children." *Id.* at PageID 356. The Act is also "seriously underinclusive," *id.*, in that it allows minors access to purportedly "dangerous, mind-altering material . . . so long as one parent . . . says it's OK. . . . That is not how one addresses a serious social problem," *Brown*, 564 U.S. at 802.

Regardless, the Act is not the "least restrictive" way to accomplish whatever interests the State might assert. *AFP*, 141 S. Ct. at 2383; *see* PI Order, ECF No. 33 at PageID 357. Parents have many options to oversee and control their minor children's experiences online.

### III. The Ohio Parental Notification by Social Media Operators Act is unconstitutionally vague................................................................................................................... 34

This Court correctly concluded that the Act is unconstitutionally and "troublingly" vague in multiple ways. The First Amendment and the Due Process Clause demand that in every case, "precision and guidance" are provided such that "those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54.

The Act's central coverage provision applies to websites that "target[] children, or [are] reasonably anticipated to be accessed by children." § 1349.09(B). By itself, "this expansive language would leave many operators unsure as to whether it applies to their website." PI Order, ECF No. 33 at PageID 357. And the Act's recitation of eleven undefined, non-exhaustive factors for determining whether websites meet these standards "is also unilluminating." *Id.* The First Amendment prohibits speech restrictions that require resolution of "the open-ended rough-and-tumble of factors." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010) (cleaned up). Here, the factors are especially inappropriate because they include "malleable and broad-ranging considerations like '[d]esign elements' and '[l]anguage.'" PI Order, ECF No. 33 at PageID 357 (quoting § 1349.09(C)).

Other vague terms—such as what it means for a website to qualify as a "widely recognized media outlet," § 1349.09(O)(2), and what it means for websites to allow their users to "interact socially," § 1349.09(A)(1)(a)—feature prominently in the Act's content- and speaker-based

exceptions. So, while many websites know that they will be covered by the Act, many more are left guessing about whether they must shoulder the Act's burdens.

**IV. NetChoice meets all the requirements for a permanent injunction. ................................ 37**

NetChoice is entitled to a permanent injunction preventing Defendant from enforcing the Act against NetChoice's members. The standard for a permanent injunction is similar to the standard for a preliminary injunction, except that NetChoice must demonstrate actual success on the merits. *Am. Civil Liberties Union of Ky. v. McCreary Cnty.*, 607 F.3d 439, 445 (6th Cir. 2010). For all the reasons explained above, NetChoice succeeds on the merits.

This Court's order granting NetChoice a preliminary injunction already determined that NetChoice satisfies the remaining factors for a permanent injunction. PI Order, ECF No. 33 at PageID 358-59. NetChoice's members will suffer irreparable harm without injunctive relief. *Id.* The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 529 U.S. 14,19 (2020) (internal quotation marks and citation omitted). Moreover, the undisputed evidence demonstrates that NetChoice members face substantial and unrecoverable costs to come into compliance with the law. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758,765 (2021).

The balance of the equities are in NetChoice's favor. PI Order, ECF No. 33 at PageID 359. An injunction preserving First Amendment freedoms is always in the public interest and Defendant has no interest in enforcing an unconstitutional law.

## Introduction

The Parental Notification by Social Media Operators Act violates the First Amendment and Due Process Clause in multiple ways. The Act requires countless Internet websites to obtain parental consent before allowing minors younger than 16 to "access" the websites. Ohio Rev. Code § 1349.09. Alone, this requirement would deprive minors across Ohio of their constitutional rights to access and engage in speech. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 & n.3, 799 (2011). And it would infringe the websites' rights to disseminate speech. The Act compounds these injuries by defining the websites it regulates with a "troubling vague," content-, and speaker-based set of coverage provisions. PI Order, ECF No. 33 at PageID 352-53, 357; *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) ("*NIFLA*"); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *United States v. Williams*, 553 U.S. 285, 304 (2008). As such, the Act is yet another example of an unconstitutional state regulation of minors' access to online speech. *E.g.*, *NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *13 (N.D. Cal. Sept. 18, 2023); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

This Court previously concluded that the Constitution forbids the enforcement of the Act against Plaintiff's members. For that reason, the Court issued a temporary restraining order before the Act took effect in January and subsequently issued an order preliminarily enjoining Defendant from enforcing the Act. No material change in the law (or facts) has occurred since then. The facts that supported this Court's previous injunctive orders in this case, *see* TRO Order, ECF No. 27; PI Order, ECF No. 33, persist and are now undisputed. Covered websites—including NetChoice members' websites—disseminate a broad range of protected speech to minors covered by the Act. The Act imposes an unjustified restriction on minors' access to that speech. At the same time, the Act imposes a large—often crippling—burden on websites' ability to disseminate speech. NetChoice has offered unrebutted testimony that one NetChoice member's covered website does

not "have the capacity to utilize any of the methods of establishing parental consent provided by the law without significant additional burden." Paolucci Decl., ECF No. 2-2 at PageID 82-83 ¶ 13.[2] For these reasons—and many others—the "Act is either underinclusive or overinclusive, or both, for all the purported government interests at stake." PI Order, ECF No. 33 at PageID 357.

Given the lack of any material change in circumstances since the Court preliminarily enjoined Defendant's enforcement of the Act, the only remaining question for the Court is whether to convert that preliminary injunction into a permanent injunction. It should. The standard for a permanent injunction overlaps substantially with the standard for a preliminary injunction, where the Court has already ruled in NetChoice's favor. *Am. Civil Liberties Union of Ky. v. McCreary Cnty.*, 607 F.3d 439, 445 (6th Cir. 2010). For all the reasons this Court has already recognized, and as underscored below, NetChoice is entitled to a permanent injunction preventing Defendant's enforcement of the Act against NetChoice's members.

Accordingly, this Court should grant NetChoice summary judgment; enter a judgment declaring that the Act violates the Speech and Press Clauses of the First Amendment and is unconstitutionally vague in violation of the First and Fourteenth Amendments; and permanently enjoin Defendant from enforcing the Act against NetChoice's members.

## Background

The facts from NetChoice's declarations in this memorandum are undisputed.

### A.     Internet websites disseminate vast amounts of protected speech.

Plaintiff NetChoice, LLC is a leading Internet trade association. Some of its "covered members" operate websites that the Act regulates, including (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram;

---

[2] "Both parties agree and stipulate that the evidence the parties have submitted with their respective briefing thus far is admissible." Prelim. Pretrial Order, ECF No. 37 at PageID 423.

(4) Nextdoor; (5) Pinterest; and (6) X. Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 11; Paolucci Decl., ECF No. 2-2 at PageID 75-76, 78 ¶¶ 2, 7.

Each covered member operates a website that "publish[es]," *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 853 (1997), "disseminate[s]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023), "creat[es]," and "distribut[es]," *Brown*, 564 U.S. at 792 n.1, protected speech. Szabo Decl., ECF No. 2-1 at PageID 65-66 ¶ 6. They do so by displaying text, audio, images, or video. *Id.* Covered websites are akin to "publishers of opinion work—a newspaper limited to 'Letters to the Editor,' or a publisher of a series of essays by different authors." PI Order, ECF No. 33 at PageID 343. Just like "protected books, plays, . . . movies, . . . [and] video games," covered websites "communicate ideas." *Brown*, 564 U.S. at 790. "That suffices to confer First Amendment protection." *Id.*

On these websites, users can "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017)). Together, these websites disseminate billions of user-generated "posts" per day, all protected by the First Amendment. *See* Szabo Decl., ECF No. 2-1 at PageID 65-66 ¶ 6; PI Order, ECF No. 33 at PageID 333. In fact, many covered members' websites are among the Internet's most popular destinations *because of* the First Amendment expression they publish and facilitate. Szabo Decl., ECF No. 2-1 at PageID 64 ¶ 4.

Teens are among those who use social media websites for expression, education, and civic engagement. *Id.* at PageID 65-66 ¶ 6. They read local news, track world events, follow sports teams, research universities, and explore careers. *See id.* They also pursue academic and extracurricular activities, publish artistic works, shine a light on meaningful causes, find communities, share advice, and support their peers. *See id.* These websites are an indispensable bridge for

3

keeping teens connected with friends and family across any distance. *See id.* Often, Internet web-sites require users to create accounts or a username, either to access any of the speech on the website or to access the full range of speech available on the website. Paolucci Decl., ECF No. 2-2 at PageID 75 ¶ 2; Roin Decl., ECF No. 2-3 at PageID 89 ¶ 4.

**B.    Parents have many tools to oversee how their children use the Internet.**

In part because of the tools that the industry has developed, parents have many choices for shaping and controlling their children's online experiences. Szabo Decl., ECF No. 2-1 at PageID 67-70 ¶ 8.

Foremost, parents control what *devices* minors can access. That includes denying physical access to Internet-connected devices, whether at certain times of the day or altogether. *Id.* Further-more, Internet-connected devices are equipped with a suite of parental-control options. *Id.* at PageID 68-69 ¶ 8.b. For example, Apple allows parents to lock or limit specific apps and features, restrict the device settings to limit content and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* Google offers similar parental controls. *Id.*

Parents also control many of the *networks* that minors can use to connect to the Internet. The wireless routers that provide home Internet access have controls allowing parents to manage which Internet websites minors can use (and at what times). *Id.* at PageID 67-68 ¶ 8.a. Cellular and broadband Internet providers offer a similar set of parental controls. *Id.*

Control via *software* is another avenue of parental authority. *Id.* at PageID 68-69 ¶ 8.b.-c. The leading web browsers offer tools that allow parents to monitor and limit their children's online activity. *Id.* at PageID 69 ¶ 8.c. Third party parental-control software is also available for many devices, including smartphones and computers. *Id.* at PageID 68-69 ¶ 8.b. Many NetChoice mem-ber websites have also developed their own parental controls. *Id.* at PageID 69-70 ¶ 8.d. These controls supplement the substantial resources that members spend crafting and enforcing "content

moderation" policies that aim to prevent harmful or objectionable speech from reaching minors (and other users). *Id.* at PageID 67 ¶ 7.b-c; Paolucci Decl., ECF No. 2-2 at PageID 78-79 ¶¶ 8-9. Finally, covered websites require account holders to be at least 13 years old. Szabo Decl., ECF No. 2-1 at PageID 66-67 ¶ 7.a.

### C. Ohio's Parental Notification by Social Media Operators Act

Ohio has set out to restrict minors' access to online speech. As described by Defendant, the Act requires covered websites to "obtain parental consent" before allowing minors to "use" or "access" covered websites. Dave Yost, FAQ: What is the Parental Notification by Social Media Operators Act?, https://perma.cc/NE24-T3L9 ("Yost, FAQ"), attached to the Decl. of Jeremy Maltz as Ex. 25.[3] Though the Act's coverage provisions are vague, all parties agree that the Act applies "much more broadly than traditional social media companies." *Id.*

#### 1. The Act's vague and broad coverage provisions discriminate based on content and speaker.

The Act has an uncertain but broad scope. It uses a set of content- and speaker-based coverage provisions. But those provisions contain numerous vague terms and exceptions. Consequently, the Act has the potential to regulate many websites where minors can access and engage in protected speech.

Specifically, the Act regulates "operator[s]" that "target" or are "reasonably anticipated to be accessed by children [minors younger than 16]." § 1349.09(B).[4] The Act defines "operator" as

---

[3] All exhibits are attached to the same declaration.
[4] § 1349.09(A)(2) ("'Child' means any consumer of an online web site, service, or product who is under the age of sixteen and who is not emancipated.").

a "business, entity, or person that operates" any "online web site, service, or product" that has

"users in this state [Ohio]"[5] and that "allows those users to do all of the following":

> (a) Interact socially with other users within the confines of the [website];
>
> (b) Construct a public or semipublic profile for the purpose of signing into and using the [website];
>
> (c) Populate a list of other users with whom an individual shares or has the ability to share a social connection within the [website];
>
> (d) Create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users.

§ 1349.09(A)(1). Together, these requirements target websites that disseminate user-generated content and that facilitate their users' "social[]" "interact[ion]"—which the Act leaves undefined.

The Act creates an open-ended, non-exhaustive, eleven-factor analysis for determining whether a website "targets children" or is "reasonably anticipated to be accessed by children":

> [T]he attorney general or a court *may* consider . . . : (1) Subject matter; (2) Language; (3) Design elements; (4) Visual content; (5) Use of animated characters or child-oriented activities and incentives; (6) Music or other audio content; (7) Age of models; (8) Presence of child celebrities or celebrities who appeal to children; (9) Advertisements; (10) Empirical evidence regarding audience composition; and (11) Evidence regarding the intended audience.

§ 1349.09(C) (emphasis added). Almost all of these factors are vague, subjective, or so broad as to be meaningless. For example, "Subject matter," "Language," "Design elements," "Visual content," and "Music or other audio content" simply say that the content of the websites may give rise to coverage under the Act. Nothing in the Act explains how to distinguish among websites that "target[]" or can "reasonably anticipate[]," *id.*, being accessed by 15-year-olds versus 16-year-olds. And because these are factors that "the attorney general or a court *may* consider," they are not even an exhaustive list. Thus websites lack even the certainty that these broad and vague factors

---

[5] This Motion uses "minor," "adult," and "user" to refer only to Ohio minors younger than 16, adults, and users covered by the Act.

are the exclusive factors that will be considered. In all events, given the deliberately free and open nature of the Internet in America, all sorts of websites—even those directed primarily at adults—can "reasonably anticipate[]," *id.*, being accessed by users younger than 16.

Just as the Act's scope is bounded by indeterminate content- and speaker-based criteria, the Act spares from regulation certain websites falling within similar content- and speaker-based categories—favoring the speech available on those websites. The Act "does not apply" to any website "respecting which interaction between users is limited to the following" content- and speaker-based categories:

> (1) Reviewing products offered for sale by electronic commerce or commenting on reviews posted by other users; [or]
>
> (2) Comments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events.

§ 1349.09(O). The Act also "does not apply" to any website "where the predominant or exclusive function is: (a) Cloud storage or cloud computing services; (b) Broadband internet access services; [or] (c) Search engine services." § 1349.09(N).

The Act's definitions and coverage provisions work together to regulate many websites across the Internet. Along with many NetChoice members, the Act reaches art (Behance); service and business review (Yelp); general interest (Gettr, Substack, Cameo); local interest (Citizen); gaming (Origin); messaging (Discord) and perhaps even professional websites (LinkedIn, Fishbowl), among others. Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 11. Defendant's own public statements recognize the Act applies to websites like "gaming platforms, shared message boards, etc." Yost, FAQ. Message boards in particular cover all manner of topics, including religion, politics, backpacking, homeschooling, board games, gardening, among hundreds (if not thousands) of others. Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 12.

### 2.    The Act requires covered websites to deny "access" to minors younger than 16 unless the minors secure parental consent.

The Act "seeks to require certain website operators to obtain parental consent before allowing any unemancipated child under the age of sixteen to register or create an account on their platform." PI Order, No. ECF No. 33 at PageID 333. And "[i]n the absence of parental consent, children under the age of sixteen 'shall' be denied access to the 'use of the online web site, service, or product.'" *Id.* at PageID 334-35 (quoting § 1349.09(E)).

Specifically, covered websites must "[o]btain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the [website]." § 1349.09(B)(1). The Act designates a broad range of actions as "contract[s]"—"including" things like "register[ing]," "sign[ing] up" and "creat[ing] a unique username." § 1349.09(B)(1). When securing consent, covered websites also must "[p]resent to the child's parent or legal guardian a list of the features offered by [the website] related to censoring or moderating content, including any features that can be disabled for a particular profile," and "[p]rovide to the child's parent or guardian a web site link at which the parent or legal guardian may access and review th[is] list of features . . . at another time." § 1349.09(B)(2)-(3).

To provide consent that complies with the Act, parents can: (1) "sign and return . . . a form"; (2) "use a credit card, debit card, or other online payment system"; (3) "call a toll-free telephone number"; (4) "connect to trained personnel by videoconference"; or (5) provide a "government-issued identification" that the operator must check "against databases of such information." § 1349.09(B). After obtaining parental consent, the operator must send the parent written confirmation of the consent. § 1349.09(D)(1).

The Act does not address or even acknowledge the practical problems that covered websites will face in securing parental consent. When enjoining Arkansas's similar parental-consent

8

requirement, the Western District of Arkansas credited that State's own expert testimony that "the biggest challenge . . . with parental consent is actually establishing the relationship, the parental relationship." *Griffin*, 2023 WL 5660155, at *15. The undisputed record evidence here underscores that concern: "Disputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common." Paolucci Decl., ECF No. 2-2 at PageID 84-85 ¶ 16; *see id.* at PageID 83-85 ¶¶ 14-15, 17 (discussing the resources necessary to assure covered websites of parental relationship). The Arkansas court concluded that even parents who might otherwise "freely" provide consent "will be dissuaded by the red tape" of establishing the relationship "and refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *15. And not all websites will have the resources to establish the relationship. Paolucci Decl., ECF No. 2-2 at PageID 84-85 ¶ 16. That is not the only difficulty with parental consent the Act fails to address. For example, the Act does not address how websites should proceed if one parent provides consent but the other does not, or if a parent without custody over a child provides (or withdraws) consent. *Id.* at PageID 83-84 ¶ 15.

If "a child's parent or legal guardian does not affirmatively consent to the terms of service or other contract, the operator *shall* deny the child access to or use of the [website]." § 1349.09(E) (emphasis added). Similarly, the Act requires websites to "terminate" the account of a minor for whom "consent was given in error" or for whom a "parent or legal guardian chooses to withdraw consent." § 1349.09(F).

As a result of these provisions, minors must obtain parental consent to "access," § 1349.09(E), many of NetChoice's members' websites, as well as countless other forums,

message boards, and other Internet websites. *See, e.g.*, Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 12; Paolucci Decl., ECF No. 2-2 at PageID 82-83, 86 ¶¶ 13, 20.

### 3. The Act imposes large penalties for non-compliance.

The Act imposes large penalties for covered websites that "enter[] into a contract with a child without consent of the child's parent or guardian." § 1349.09(I). Specifically, the Act requires courts to impose penalties for *each day* a minor accesses a covered website without parental consent. The "court *shall* impose a civil penalty on the operator as follows": (1) "Up to one thousand dollars for each of the first sixty days the operator failed to comply with this section"; (2) "up to five thousand dollars for each subsequent day the operator failed to comply with this section . . . [through] the ninetieth day"; and (3) "up to ten thousand dollars for each subsequent day the operator failed to comply with this section, commencing with the ninety-first day." *Id.* (emphasis added). As a result, a covered website "faces liability of almost $3 million for every misidentified 15-year-old who accesses an account during the year before turning 16." Szabo Decl., ECF No. 2-1 at PageID 73 ¶ 16.

The statute's supposed "safe harbor" provides neither comfort nor protection. For one, it comes only at the expense of accepting the Act's unconstitutional restraint. It is also potentially illusory. If a covered website is in "substantial compliance," then Defendant "shall not commence a civil action" and "a court shall not impose a civil penalty" if the website "[c]ures the violation" and "[p]rovides the attorney general with written documentation that . . . the operator has taken measures sufficient to prevent future violations." § 1349.09(M). But the Act neither defines "substantial compliance," nor explains what measures would suffice "to prevent" a determined minor from evading a website's parental-consent protocols, instead leaving these determinations to the whims of individuals officials. *See, e.g.*, Paolucci Decl., ECF No. 2-2 at PageID 83-85 ¶¶ 14-17.

### D.     Procedural History

NetChoice sued Defendant for declaratory and injunctive relief on January 5, 2024. Compl., ECF No. 1. NetChoice alleged violations of the First and Fourteenth Amendments of the U.S. Constitution. *See id.* The same day, NetChoice moved for a temporary restraining order and preliminary injunction preventing Defendant's enforcement of the Act against NetChoice's members. Pl.'s Mot. for TRO, ECF No. 2.

After a January 8, 2024, conference, the Court granted a temporary restraining order. TRO Order, ECF No. 27. Following full briefing and a hearing, on February 12, 2024, this Court granted NetChoice a preliminary injunction. PI Order, ECF No. 33. The parties agreed to forgo discovery, and the case is ripe for a final merits determination based on the record that was developed in connection with the motion for preliminary injunction. Rule 26(f) Report, ECF No. 36.

### Argument

*Summary Judgment and Injunctive Relief Standard.* NetChoice is entitled to summary judgment because "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

NetChoice is entitled to a permanent injunction because: (1) it, its members, and members' users would suffer "irreparable injury" otherwise; (2) "remedies available at law . . . are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). These

11

are similar to the factors this Court considered and determined in NetChoice's favor when entering a preliminary injunction. *See* PI Order, ECF No. 33 at PageID 336, 358-59.

*First Amendment Principles.* NetChoice asserts both a traditional and a First Amendment overbreadth facial challenge against the Act. There is "no set of circumstances" under which the Act "would be valid" (a traditional facial challenge). *United States v. Stevens*, 559 U.S. 460, 472 (2010) (citation omitted). In any event, "a substantial number of [the Act's] applications are unconstitutional" (a First Amendment overbreadth facial challenge). *Id.* at 473 (citation omitted). In challenging the Act, NetChoice asserts First Amendment harms to both NetChoice members' and those members' users' rights. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).

**I.**     **NetChoice has standing to assert its own interests, the interests of its members, and the interests of Internet users in challenging the Ohio Parental Notification by Social Media Operators Act.**

NetChoice has standing to challenge the Act and to raise all the arguments it has asserted. PI Order, ECF No. 33 at PageID 336-42. Defendant no longer challenges NetChoice's organizational or associational standing. *See* Rule 26(f) Report, ECF No. 36 at PageID 417. For good reason: NetChoice has standing for all the reasons this Court discussed in its order on NetChoice's motion for preliminary injunction. PI Order, ECF No. 33 at PageID 337-40. Now, Defendant disputes only NetChoice's prudential standing to assert the interests of the minor users of NetChoice member websites. Rule 26(f) Report, ECF No. 36 at PageID 417 ("Defendant contests subject-matter jurisdiction insofar as Plaintiff lacks standing to bring its claims on behalf of minors.").

"NetChoice has standing to bring both its claims on behalf of its member organizations and Ohioan minors." PI Order, ECF No. 33 at PageID 342. Under binding Supreme Court precedent, covered websites (and thus NetChoice) can assert the First Amendment rights and interests of their users—minors included. The court's "robust" and "persuasive" analysis in *NetChoice v. Griffin* is instructive. *Id.* at PageID 340. There, the court explained that "[t]he Supreme Court has . . . held

that a litigant may assert the rights of a third party 'when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights.'" *Griffin*, 2023 WL 5660155, at *10 (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975)). Most "compelling," the court cited *American Booksellers*, which holds that "in the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at *11-12 (quoting 484 U.S. at 392-93 (cleaned up)); *see also Bonta*, 2023 WL 6135551, at *4 (similar).[6] The reason is that "would-be speakers, like the Ohioan minors here, may choose to refrain from engaging in protected activity instead of running the risk of challenging the law." PI Order, ECF No. 33 at PageID 341 (citing *Sec'y of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 956-57 (1984)). And if that occurs, such that would-be speakers "succumb to" the Act's "chilling effect," "[s]ociety as a whole then would be the loser." *Id.* (quoting *J.H. Munson*, 467 U.S. at 956). Accordingly, NetChoice has standing to assert the rights of both its members' current users and also its prospective *future* users. *See Griffin*, 2023 WL 5660155, at *10-11 (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682-84 (1977); *Craig v. Boren*, 429 U.S. 190, 193 (1976)).

In addition, the Supreme Court's leading case on parental-consent laws was brought by trade associations much like NetChoice. Specifically, the case that became *Brown v. Entertainment Merchants Association* was a case brought by the "Video Software Dealers Association [] and the Entertainment Software Association []," which are "associations of companies in the video game industry." *Video Software Dealers Ass'n v. Schwarzenegger*, 2007 WL 2261546, at *1 (N.D. Cal.

---

[6] The *Griffin* court also cited multiple examples of cases where the Supreme Court and lower courts applied a similar principle to permit vendors to raise claims on behalf of their customers. 2023 WL 5660155, at *10-11 (collecting cases).

Aug. 6, 2007). There was no question in that case that trade associations could challenge a law regulating the industry they represent and raising the rights of affected minors.

Consequently, binding precedent allows NetChoice to challenge the Act's parental-consent requirement. Covered websites' rights and minors' rights are two sides of the same coin: The websites seek to vindicate their right to disseminate speech, and minors have a right to access that same speech. *See, e.g.*, *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) ("The right of freedom of speech and press . . . embraces the right to distribute literature, and necessarily protects the right to receive it."); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both."). In other words, NetChoice can challenge the Act's parental-consent requirement to vindicate both its members' dissemination of speech *and* users' ability to receive that same speech.

Because minors' speech rights are so closely tied to covered websites' rights to disseminate speech, NetChoice's members are particularly "well positioned to raise" users' First Amendment "concerns." *Griffin*, 2023 WL 5660155, at *12. Members understand "the ways in which their customers exercise their First Amendment rights on" the covered websites. *Id.* Thus, as this Court has recognized, NetChoice's members and their users have a "shared interest . . . in free expression." PI Order, ECF No. 33 at PageID 342.

## II. The Ohio Parental Notification by Social Media Operators Act violates the First Amendment because it restricts covered websites' ability to disseminate speech and minors' ability to access and engage in speech.

### A. The Act triggers First Amendment strict scrutiny by requiring minors to secure parental consent before accessing protected speech.

The Act violates the First Amendment by requiring minors to secure parental consent before accessing covered websites and the protected speech on those websites. § 1349.09(B). In so

doing, the Act imposes two interrelated First Amendment injuries: "(1) it regulates operators' ability to publish and distribute speech *to minors* and speech *by minors*; and (2) it regulates minors' ability to both *produce speech* and *receive speech*." PI Order, ECF No. 33 at PageID 343. Such regulations are squarely prohibited. *Brown*, 564 U.S. at 795 n.3. "[L]aws" that—like the Act here—"require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny." PI Order, ECF No. 33 at PageID 354. As this Court has already concluded, Defendant's arguments that the Act regulates mere conduct are belied by the Act's plain text and the undisputed record facts. *Id.* at PageID 343-44.

**1.** The Supreme Court has held that States lack "the power to prevent children from hearing or saying anything *without their parents' prior consent*," because "[s]uch laws do not enforce *parental* authority over children's speech . . . ; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3; *see Interactive Digital Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 956 (8th Cir. 2003) (rejecting parental-consent law for violent video games); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 578 (7th Cir. 2001) (similar); *Griffin*, 2023 WL 5660155, at *21 (rejecting parental-consent law for "social media" websites).

Yet that is precisely what this Act does. To access the vast amount of protected speech that covered websites offer, minors must "[o]btain verifiable consent." § 1349.09(B)(1).[7] And if minors cannot secure such consent, covered websites must "deny the child access to or use of the [website]" altogether. § 1349.09(E); *see* Yost, FAQ ("If [a parent] do[es] not give . . . consent, the operator must deny the child use or access of the website[.]"). For minors without parental consent,

---

[7] As this Court previously acknowledged, Defendant conceded that the Act does not require covered websites to implement age verification. PI Order, ECF No. at PageID 353 n.9. The undisputed facts in the record demonstrate that age-verification would be an onerous burden on covered websites and their users. *See, e.g.*, Paolucci Decl., ECF No. 2-2 at PageID 79-82 ¶¶ 10-12.

therefore, the Act is an outright ban on accessing all covered websites. § 1349.09(B). Denying *all* "access to or use of" a website could even require covered websites to block those minors who fail to obtain parental consent from accessing publicly available portions of a website. § 1349.09(E).[8]

The Act would therefore trample minors' First Amendment rights. The Internet is full of websites where minors' ability to engage in speech would be contingent on securing parental consent. Plus, they (and their parents) will face the massive paperwork headache of providing verifiable consent for the huge number of educational, informational, professional, and entertainment websites that the Act covers. *See* Szabo Decl., ECF No. 2-1 at PageID 65-66 ¶ 6 (discussing range of covered websites). The Act applies to myriad websites across the Internet, including "thousands," *id.* at PageID 71 ¶ 12, of "message boards, chat rooms, video channels, direct or private messages or chats," § 1349.09(A)(1)(d). These websites are places where minors engage in all manner of protected speech on all manner of topics. *E.g.*, Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 12. The State could not impose parental-consent requirements for "political rall[ies]" or "religious" services. *Brown*, 564 U.S. at 795 n.3. Yet, under the Act, minors would be unable to use covered websites for those purposes—and many more—unless they successfully secure parental consent *and* successfully convince websites that the consent is sufficient under the Act's terms.

The "values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975); *see* PI Order, ECF No. 33 at PageID 353. Minors have "robust First Amendment protections," *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 194 (2021), and "may not be

---

[8] Such a blanket denial is not technologically feasible for all companies. *See* Mansick Decl., ECF No. 2-4 at PageID 102-03 ¶ 19.

regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Instead, "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Brown*, 564 U.S. at 794 (quoting *Erznoznik*, 422 U.S. at 212-13). The Act here does not even attempt to limit itself to those "narrow" circumstances.

In addition, the Act will restrict to whom covered websites can disseminate speech, in violation of the Speech and Press Clauses of the First Amendment. *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) ("The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."). The "'basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).[9] Thus, the First Amendment's Free Speech and Free Press Clauses protect covered websites, which "publish," *Reno*, 521 U.S. at 853, and "disseminate" protected speech, *303 Creative*, 600 U.S. at 594.

The Act will put covered websites to an unconstitutional choice. They can adopt expensive systems that attempt to obtain "verifiable consent" for covered minors to continue publishing speech to minors. § 1349.09(B)(1). The undisputed record evidence reflects that some websites lack the resources to do so. *See* Paolucci Decl., ECF No. 2-2 at PageID 82-83, 86 ¶¶ 13, 19. Or

---

[9] *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) ("An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." (citation omitted)); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) ("The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication."); *Smith v. California*, 361 U.S. 147, 150 (1959) (recognizing that "publication and dissemination of books and other forms of the printed word" is protected by freedoms of speech and press in case of bookseller challenging state law under First Amendment).

they can stop publishing speech to minors. In either case, websites that misstep face steep penalties if it turns out that a covered minor accessed the websites without parental consent. Szabo Decl., ECF No. 2-1 at PageID 73 ¶ 16. In fact, the threat of liability may be so great that websites will stop providing their services to—or alter their services for—adults. Paolucci Decl., ECF No. 2-2 at PageID 86 ¶ 20 ("[The Act] will force us to err on the side of caution, require our users to provide us significantly more personal data than we wish to collect, force us to restrict access to the site beyond the restrictions we wish to place, and require us to place significant burdens on the speech and anonymity of adults in order to avoid the possibility of fines that will jeopardize our ability to offer the service at all."). Thus, the Act will "effectively suppress[] a large amount of speech that *adults* have a constitutional right to receive." *Reno*, 521 U.S. at 874 (emphasis added).

In sum, the Act violates both minors' rights to access and engage in speech and covered websites' right to disseminate speech. § 1349.09(B)(1).

**2.** Contrary to Defendant's central argument, therefore, the Act does not regulate mere contracts or conduct. Def. PI Opp. Br., ECF No. 28 at PageID 210-13. Rather, the "Act is an access law masquerading as a contract law." PI Order, ECF No. 33 at PageID 344 (cleaned up). A "law prohibiting minors from contracting to access to a plethora of protected speech can[not] be reduced to a regulation of commercial conduct." *Id.* There is no "'contract exception' to the First Amendment," regardless. *Id.* at PageID 343.

Defendant maintains that the "Act regulates contracts, not speech" and "limits covered operators' ability to *contract* with minors absent parental consent." Def. PI Opp. Br., ECF No. 28 at PageID 209-10. Specifically, Defendant argues that, because websites "require users to agree to terms of service," regulations involving those terms of service need only "pass[] muster under the rational basis test as a regulation of commercial activity." *Id.* at PageID 213. In effect, Defendant

18

asserts that the government has authority to regulate "access to or use of" Internet websites, § 1349.09(E), so long as the government includes the word "contract" in the statute.

This expansive assertion of government power cannot justify the Act. And, if accepted, Defendant's theory could not be cabined to this parental-consent context. Unsurprisingly, Defendant's theory finds no support in any precedent. In any event, that argument is directly refuted by the text and structure of the law itself.

The Act regulates far more than "contracts," and instead restricts minors' ability to engage in and consume speech. The Act's plain text requires covered websites to "deny the child *access to* or *use of* the online web site, service, or product" without parental consent. § 1349.09(E) (emphases added). In other words, without parental consent, minors cannot "access" all of the protected information and expression made available by the covered websites. That is not a regulation of "contracts"; it is a regulation of speech. And "the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).

Even without the Act's requirement to "deny access" to minors who lack parental consent, the Act would unconstitutionally regulate access to speech. *See, e.g.*, *J.H. Munson*, 467 U.S. at 967 n.16 (applying the First Amendment to a law regulating contracts for charities, and rejecting argument that law was a mere "economic regulation"). As this Court concluded, this is not "a regulation striking at the commercial aspect of the relationship between social media platforms and their users." PI Order, ECF No. 33 at PageID 344. Instead, it regulates the "speech aspect of the relationship." *Id.* Various kinds of "commercial-consumer" "relationship[s]," Def. PI Opp. Br., ECF No. 28 at PageID 213, are common to access all manner of different speech. For example, the law in *Brown* "restrict[ed]" speech even though it involved the "sale or rental" of video games.

564 U.S. at 789, 799. Nothing in *Brown* turned on whether there was (or was not) a "commercial-consumer" relationship. Nor would that case have come out differently had California called or treated video game sales or rentals as "contracts" in the statute. The same is true of the "contracts" necessary to subscribe to a newspaper, buy a book, rent a movie, or purchase concert tickets. The First Amendment protects them all.

Tellingly, the Act does not regulate all contracts, or even all online contracts, for minors. This shows that State's true interest is in regulating particular speech on particular websites, not minors' contracts. For example, popular news websites also require minors to agree to terms of services to create accounts. *See* New York Times, Checkout, https://perma.cc/TA7Z-5X65, attached as Ex. 27; CNN, Sign Up for Your CNN Account, https://perma.cc/2BFQ-TCEK, attached as Ex. 28; The Washington Post, Sign Up, https://perma.cc/TV7N-C2KH, attached as Ex. 29. Yet the Act leaves all those "contracts" and "terms of service"—and many more—unregulated.

Perhaps that is why Defendant's own public-facing descriptions of the Act do not once mention the word contract, and instead emphasize "use" of and "access" to websites: "[T]he Parental Notification by Social Media Operators Act aims to give parents and legal guardians oversight of their children's online presence on certain websites, services or products by *requiring parental consent for use and access*." *See* Yost, FAQ (emphasis added); *see also* Dave Yost, News Releases: Parental Notification by Social Media Operators Act Takes Effect in January (Dec. 27, 2023), https://perma.cc/WRF3-KH3K, attached as Ex. 26 ("Beginning Jan. 15, operators must obtain parental consent before establishing accounts for children under the age of 16."). That recognizes what is clear from the Act itself: in the guise of a restriction on contract formation, the Act regulates the use of covered websites to engage in core speech—the creation, dissemination, and exchange of information, ideas, and expression.

**B.**     **The Act violates the First Amendment by restricting access to protected speech on the basis of content and speaker.**

The Act triggers strict scrutiny and violates the First Amendment in another way: Its central coverage-defining provisions, § 1349.09(A), (B), and (O), are content- and speaker-based. These content- and speaker-based distinctions for restricting access to protected speech would fail any form of heightened First Amendment scrutiny.

The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). Thus, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they" satisfy "strict scrutiny." *Reed*, 576 U.S. at 163-64. First Amendment precedent is also "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *NIFLA*, 585 U.S. at 777-78 (cleaned up).

**1.**     **The Act's coverage provisions restrict access to speech based on content.**

The Act is content-based in multiple ways. A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). And "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *Id.* at 74 (quoting *Reed*, 576 U.S. at 163). The Act is content-based under both of those tests.

*First*, as this Court correctly concluded, the Act's content-based exclusions demonstrate that the "State is [] favoring engagement with certain topics, to the exclusion of others. That is plainly a content-based exception deserving of strict scrutiny." PI Order, ECF No. 33 at PageID 353; *see Planet Aid v. City of St. Johns*, 782 F.3d 318, 327 (6th Cir. 2015) ("[W]hen a

regulation 'regulates speech on the basis of its subject matter,' it is not content-neutral." (citation omitted)). Specifically, the Act excludes websites where "interaction between users is limited to" (1) "[c]omments incidental to content posted by an established and widely recognized media out-let, the primary purpose of which is to report news and current events"; and (2) "[r]eviewing prod-ucts offered for sale by electronic commerce or commenting on reviews posted by other users." § 1349.09(O)(1)-(2). Both of these exclusions are "based on" the "content" of the "websites": "re-port[ing] news and current events" and "reviewing" certain "products." *Id.* So "a product review website is excepted, but a book or film review website, is presumably not." PI Order, ECF No. 33 at PageID 353. These content-based exclusions alone render the entire Act a content-based regu-lation and thus facially invalid. *Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2347 (2020) (controlling plurality op.) (content-based exceptions render entire statute content-based); *Thomas v. Bright*, 937 F.3d 721, 728 (6th Cir. 2019) ("The fact that this content-based aspect is in the *exception* to the general restriction, rather than the restriction itself, does not save it from this analysis."), *abrogated on other grounds by City of Austin*, 596 U.S. at 68.

*Second*, as this Court also previously concluded, the "Act's distinction on the basis of [websites'] functionalities"—their means of disseminating speech and facilitating users' speech—are "content-based." PI Order, ECF No. 33 at PageID 352. In particular, the Act regulates websites that allow users to:

> (a) Interact socially with other users within the confines of the online web site, service, or product;
> (b) Construct a public or semipublic profile for the purpose of signing into and using the online web site, service, or product;
> (c) Populate a list of other users with whom an individual shares or has the ability to share a social connection within the online web site, service, or product;
> (d) Create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or

main feed that presents the user with content generated by other users.

§ 1349.09(A)(1). Similarly, the Act excludes websites that have any number of other "predominant or exclusive function[s]." § 1349.09(N)(1). Those references to "function" are a proxy for other content-based restrictions. *See City of Austin*, 596 U.S. at 74. That is, what the Act couches as elements or functions defining a covered "operator" are really a proxy for "differential treatment" of specific types of speech. *Id.* at 71 (citation omitted).

As this Court concluded, covered websites' choices about whether and how to disseminate user-generated expression "convey a message about the type of community the platform seeks to foster." PI Order, ECF No. 33 at PageID 352. Among those messages are the ideas that (1) user-generated content is not less valuable than speech authored by the websites themselves; and (2) social interactions and connections (as compared to other types of interactions, such as business interactions) have unique value for online communities. Thus, the "features that the Act singles out are inextricable from the content produced by those features." *Id.* And by disseminating speech these ways (and according to their own editorial policies), many covered websites "develop particular market niches, foster different sorts of online communities, and promote various values and viewpoints." *NetChoice, LLC v. Attorney Gen., Florida*, 34 F.4th 1196, 1205 (11th Cir. 2022), *cert. granted in part sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 478 (2023).

*Third*, the Act "singles out specific subject matter for differential treatment," *Reed*, 576 U.S. at 169, by regulating only websites that "target[]" children or that "reasonably anticipate[]" being accessed by minors. § 1349.09(B). To determine whether websites meet these (vague) standards, the Act imposes a non-exhaustive 11-factor analysis that "make[s] clear that content is the essential consideration with respect to whether an operator is covered." PI Order, ECF No. 33 at PageID 350. For example, the Act covers websites that publish child-related "[s]ubject matter" or

23

"[v]isual content" such as "animated characters" or "celebrities who appeal to children," § 1349.09(B)-(C)—while ignoring other websites. This test means that the Act is necessarily *not* "agnostic as to content," as the Supreme Court's precedent requires for content neutrality. *City of Austin*, 596 U.S. at 69. The Court earlier concluded that the Act's "language" is not evidence of "content-based regulation." PI Order, ECF No. 33 at PageID 351. In part, that conclusion rested on the idea that "[t]here is no indication that the State *disfavors* the sort of content *designed to appeal to children*—cartoons and the like." *Id.* at PageID 350 (emphasis added).

But there *is* a strong indication that the State *favors* expression and websites that do *not* appeal to minors; the State has exempted those websites from the Act's onerous requirements. *E.g.*, *Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2346 (controlling plurality op.) ("Because the law favors speech made for collecting government debt over political and other speech, the law is a content-based restriction on speech."); *Thomas*, 937 F.3d at 728 ("In this way, Tennessee favors certain content (i.e., the excepted content) over others, so the Act, 'on its face,' discriminates against that other content."). Whether on its face or by using these requirements as a "proxy," *City of Austin*, 596 U.S. at 74, regulating websites that "target[]" minors or that "reasonably anticipate[]" being accessed by minors renders the Act content-based. For example, many professional networking websites may not "target[]" minors. To the extent that such websites are therefore excluded under the Act, the Act would *favor* the content-based category of professional networking discussions. Thus, by "g[iving] the most favorable treatment" to this kind of content, the Act's requirement that a website "target[] children" is content-based. *Id.* at 70.

### 2. The Act's coverage provisions restrict access to speech based on speaker.

The Act is also speaker-based. Defendant "concedes" as much. PI Order, ECF No. 33 at PageID 347; Def. PI Opp. Br., ECF No. 28 at PageID 215 ("The Act is justifiably speaker-

based."). A speaker-based law triggers strict scrutiny if it is "facially content based," "cannot be 'justified without reference to the content of the regulated speech,'" *or* "was 'adopted by the government because of disagreement with the message the speech conveys.'" *Schickel v. Dilger*, 925 F.3d 858, 876 & n.2 (6th Cir. 2019) (cleaned up) (quoting *Reed*, 576 U.S. at 164). Speaker-based laws "present serious First Amendment concerns" when they "discriminate . . . among different speakers within a single medium" or "f[a]ll upon only a small number" of speakers. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994); *see* PI Order, ECF No. 33 at PageID 345. The Act does all of that.

*First*, the Act's coverage provisions are facially content-based and "cannot be justified without reference to the content of the regulated speech," *Reed*, 576 U.S. at 164 (cleaned up), for all the reasons discussed above in Part II.B.1. For example, the Act exempts websites where "interaction between users is limited to" "[r]eviewing products" and those "established and widely recognized media outlet[s], the primary purpose of which is to report news and current events." § 1349.09(O)(1)-(2).

Thus, a covered minor user does not need consent to "interact" with and comment on an article posted on "established and widely recognized" media outlets like CNN, *The New York Times*, *The Washington Post*, but, absent parental permission, could not comment on that same article reposted on a covered website like Facebook. *See* Exs. 27-29. And some websites that focus on "news and current events" *are* exempt, § 1349.09(O)(2), while otherwise-covered websites that focus on trivia and historical events *are not* exempt. These "restrictions based on the identity of the speaker are," like most speaker-based laws, "simply a means to control the content" of covered websites. *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

Defendant's own characterization of the Act shows that it cannot be justified without

reference to the content of the speech the Act regulates. Defendant says the Act is not content-based, because it is speaker-based. Def. PI Opp. Br., ECF No. 28 at PageID 214-15 ("The Act is justifiably speaker-based."). At the same time, Defendant cites the Act's content-based categories to identify the speakers that the Act covers. *See, e.g.*, *id.* at PageID 214 (citing § 1349.09(O)(2)'s exemption for "widely recognized media outlet[s]," and the operative provision covering websites that "target children, or [are] reasonably anticipated to be accessed by children"). This circular argument is simply a roundabout concession that the speaker-based distinctions turn on the content that exempted websites publish. Therefore, no matter what approach Defendant chooses, the Act "defin[es] regulated speech by particular subject matter" and "singles out [that] specific subject matter for differential treatment." *Reed*, 576 U.S. at 163, 169. That makes the Act an "obvious" candidate for "strict scrutiny." *Id.* at 163-64.

*Second*, there are good reasons to suspect that the Act reflects the State's "disagreement with the message" that covered websites "convey[]." *Schickel*, 925 F.3d at 876 (citation omitted). As explained above at pp.3, 23, websites' choices about how to disseminate speech convey messages about the communities they intend to foster.

*Finally*, though the Act's definition of a social media "operator" encompasses many websites (including many that have not traditionally been considered social media), the Act still targets only a "small number" of websites, *Turner*, 512 U.S. at 659, relative to the vastness of the Internet. It singles out only websites that meet the elements of the definition for an "[o]perator" and further narrows its reach to the websites that *the Attorney General determines* "target[]" or are "reasonably anticipated to be accessed by" minors. § 1349.09(A)(1), (B). When considered relative to the number of websites that have terms of service, this is an artificially narrow and arbitrary range of websites, unless the State's real aim is to regulate content.

26

**C.** **The Act cannot satisfy First Amendment strict scrutiny or any other form of heightened First Amendment scrutiny.**

The Act triggers strict scrutiny by requiring parental consent as a prerequisite to access protected speech—and by doing so in a content- and speaker-based manner. *See Brown*, 564 U.S. at 799. Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). A law survives strict scrutiny only if a State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) ("*AFP*") (citation omitted). The Act fails both prongs. In fact, the Act's defects are so profound that it cannot survive *any* form of heightened First Amendment scrutiny, such as intermediate scrutiny. *See Griffin¸* 2023 WL 5660155, at *16-21 (enjoining similar law as unconstitutional because it failed intermediate scrutiny).

**1.** **Defendant has failed to identify a sufficient governmental interest in restricting minors' access to protected speech.**

Defendant has "toggle[d] between several different interests" in support of the Act. PI Order, ECF No. 33 at PageID 354. None of those interests justify the Act's restriction on minors' *"access" to protected speech*. § 1349.09(E) (emphasis added). In general, the State must "specifically identify an actual problem in need of solving" before restricting speech. *Brown*, 564 U.S. at 799 (cleaned up). "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will a government's mere "predictive judgment[s]" about harm. *Id.* at 799. Especially important here, the State must identify a problem in need of *governmental* solution. There is no such problem here—at minimum because parents already have many tools to control how their children use covered websites and the Internet. *See supra* pp.4-5.

None of Defendant's asserted interests justify the Act's restrictions on minors' access to protected speech. *First*, under binding Supreme Court precedent, the Act is not a legitimate means to "protect[] and advanc[e] parents' ability to make decisions about their children's care and

27

upbringing." PI Order, ECF No. 33 at PageID 354; Def. PI Opp. Br., ECF No. 28 at PageID 220 (invoking the State's power to "vindicat[e] the fundamental rights of parents in making decisions in their children's upbringing").

Defendant "fails to distinguish [this] purported interest from an analogous—and rejected—state interest in *Brown*." PI Order, ECF No. 33 at PageID 356. As the Court observed, *id.*, California made the same argument in *Brown*, asserting that its law prohibiting the sale and rental of violent video games to minors was "justified in aid of parental authority." *Brown*, 564 U.S. at 802. But the Supreme Court rejected that argument. *Id.* Given the "preexisting protections to help parents," PI Order, ECF No. 33 at PageID 356, "[f]illing the remaining modest gap in concerned parents' control can hardly be a compelling state interest," *Brown*, 564 U.S. at 803. The "government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9. Furthermore, the Court "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802. And it remarked that accepting California's argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212-13). Those same principles apply here.

Defendant's attempts to evade *Brown* are unavailing. To the extent that Defendant relies on the argument that the Act regulates "contracts" and not speech, those arguments are incorrect for the reasons discussed at pp.18-20. Defendant's strained analogies to other governmental regulations fare no better. Regulating "access to" a wide range of protected speech, § 1349.09(E), is worlds apart from regulating "tattoo[s]," "body piercing[s]," "tanning," and "the release of" student records. Def. PI Opp. Br., ECF No. 28 at PageID 220. Laws regulating tattoos (injecting

permanent ink into the skin), piercings, and tanning target health consequences of conduct *regardless* of content. The Act here directly, by contrast, regulates broad swaths of speech *because of* its content.

*Second*, whatever interest the State has in addressing the "contracts" that some covered websites enter into with minors, that interest is not a legitimate basis to restrict "access" to protected speech. § 1349.09(E); *see* PI Order, ECF No. 33 at PageID 355 (noting Defendant's attempts to justify the Act based on "involuntary releases of personally identifiable and other personal information and data" and "terms of service"). This Court noted it is not "clear" that there is such a compelling governmental interest, and Defendant has not cited any precedent supporting such an interest. *See id.*

*Third*, as the Supreme Court has held, while the "State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. Although Defendant has undoubtedly identified harms that the State has an interest in addressing through other means, it has not provided support for regulating access to protected speech. *See* Def. PI Opp. Br., ECF No. 28 at PageID 218 (invoking idea that minors are "susceptible to harms including mental health issues, sexual abuse"); PI Order, ECF No. 33 at PageID 355 (invoking Defendant's assertion that "engagement with operators' platforms . . . damag[es] mental health [], and subject[s] minors to sexual predation").

### 2. The Act is not properly tailored.

In any event, the Act is not properly tailored. The Act fails strict scrutiny because it "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." PI Order, ECF No. 33 at PageID 357; *see Brown*, 564 U.S. at 805 (government must pursue its interests "by means that are neither seriously underinclusive nor seriously overinclusive").

Moreover, the Act is not the "least restrictive means" to satisfy any possible governmental interest. *AFP*, 141 S. Ct. at 2383 (citation omitted).

There are some flaws that doom the Act *regardless* of the State's asserted interest. The Act is plainly overinclusive simply in the range of websites it regulates. As Defendant has put it, this law will affect everything from some of the Internet's largest websites down to "*mom-and-pop*" websites. Def. PI Opp. Br., ECF No. 28 at PageID 198 (emphasis added). Indeed, the undisputed record evidence demonstrates that the Act jeopardizes some "mom-and-pop" websites' ability to continue offering their services. Paolucci Decl., ECF No. 2-2 at PageID 86 ¶ 20.

In response, Defendant has pointed to the alleged problems with "social media." *E.g.*, Def. PI Opp. Br., ECF No. 28 at PageID 197-99, 217-18. But the Act applies to "much more . . . than traditional social media companies." Yost, FAQ. There are important differences among covered websites. Indeed, there are important differences among *NetChoice members*. Yet the Act imposes a blanket restriction on access to all those websites, irrespective of these differences. Dreamwidth, for instance, "does not accept any form of advertising" and collects only "the minimum amount of personally-identifying data about [users] that is necessary in order to operate the service." Paolucci Decl., ECF No. 2-2 at PageID 76 ¶ 3. But the Act regulates Dreamwidth all the same. Such an omnibus approach is the very opposite of narrow tailoring.

Relatedly, the Act is overinclusive in the range of protected speech it regulates. The Act prohibits minors from accessing *any* speech on covered websites absent parental consent. It did not matter to the State that the speech may be educational, religious, political, or otherwise protected and valuable (or even innocuous). Yet minors use covered websites for all those purposes. Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 12.

Similarly, the Act is not the "least restrictive" way to accomplish whatever interests the State might assert. *AFP*, 141 S. Ct. at 2383 (citation omitted); *see* PI Order, ECF No. 33 at PageID 357. For instance, Ohio could give "parents the information needed to engage in active supervision" over their children's access to the Internet. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000). That would require little more than the State itself publicizing the diverse array of blocking and monitoring tools that are already widely available. *See supra* pp.4-5. "Similarly, the State could always act to encourage the use of filters . . . by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up). "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824. Rather, "if a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 815.

In addition to these flaws, the Act is not properly tailored to further the specific interests the State has asserted thus far—as this Court concluded. *First*, the Act is "overinclusive" to further parental control. PI Order, ECF No. 33 at PageID 356. The Act "enforce[s] a governmental speech restriction, subject to parental veto, as opposed to protecting only the interests of genuinely concerned parents." *Id.* (citing *Brown*, 564 U.S. at 804). Put another way, "some parents simply may not care" about their minor children's access to speech online, yet the Act requires those parents to consent as well. *Id.* Defendant cannot "show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to [covered websites] but cannot do so." *Brown*, 564 U.S. at 803. Furthermore, as the *Griffin* court found, a lack of parental *consent* will not always reflect a lack of parental *approval*: "[P]arents and guardians who otherwise would have freely given consent to open an account will be dissuaded by the red tape [of the parental-consent process] and refuse consent—which will unnecessarily burden minors' access to constitutionally

protected speech." 2023 WL 5660155, at *15. Parents may simply grow weary of the constant paperwork barrage that the Act imposes—a new form for each new website that each child wishes to access.

*Second*, the Act is "not narrowly tailored" to address any concerns about a handful of "social media" websites' terms of service or hypothetical concerns about data-privacy breaches. PI Order, ECF No. 33 at PageID 355. The Act is plainly more restrictive than necessary to further this interest. For instance, the Act is not limited to such "social media" websites (nor would be it constitutional if it were). And the State did not even attempt to regulate specific contractual *terms* it considers problems, rather than (1) entire contracts themselves; and (2) "access to and dissemination of speech." *Id.* Similarly, if the State were truly concerned about data privacy, it could have enacted comprehensive data privacy laws that do not deny minors access to protected speech.

The Act is also "underinclusive" because it leaves *other* websites with similar terms of service unregulated. *Id.* It makes no sense to exempt otherwise-covered websites that allow minors to post comments incidental to "news" or "products," § 1349.09(O), when those websites have terms of service too. Nor does it make sense to leave the rest of the Internet unregulated. Indeed, that the Act leaves other websites with similar terms of service unregulated further belies the idea that the State was concerned with regulating contracts under the Act.

*Third*, the Act is "not narrowly tailored" to address any interest in preventing harms to minors. PI Order, ECF No. 33 at PageID 355-57. To the contrary, the Act is a "breathtakingly blunt instrument for reducing social media's harm to children." *Id.* at PageID 356. As an initial matter, the sources on which Defendant relies focus on only a small handful of websites. Ex. A to Def. PI Opp. Br., ECF No. 28-1 at PageID 233 ("six major social media platforms"); Ex. B to Def.

PI Opp. Br., ECF No. 28-2 at PageID 244 (similar). Those sources plainly cannot justify the Act's expansive coverage provisions and range of all covered websites.

Indeed, even focusing on those handful of websites, the sources could not support the Act's restriction on "access to," § 1349.09(E), the wide range of protected speech covered by the Act. Defendant relies heavily on the Surgeon General's Advisory. Def. PI Opp. Br., ECF No. 28 at PageID 208-09. But that same report highlights that "[s]ocial media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests." Ex. B to Def. PI Opp. Br., ECF No. 28-2 at PageID 246. Thus the Act's restrictions on access would "discard these beneficial aspects" of access to covered websites, *Bonta*, 2023 WL 6135551, at *16, by "[f]oreclosing minors under sixteen from accessing all content on websites that the Act purports to cover" if they cannot secure parental consent, PI Order, ECF No. 33 at PageID 356.

The Act is also "seriously underinclusive" in important respects. *Id.* (citing *Brown*, 564 U.S. at 802). Assuming for the sake of argument that Defendant's cited sources somehow established that covered websites were harmful to minors, the Ohio "Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent . . . says it's OK. . . . That is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802; *see* PI Order, ECF No. 33 at PageID 356 (similar); *Griffin*, 2023 WL 5660155, at *18 (similar).

Such poor tailoring "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 585 U.S. at 774 (quoting *Brown*, 564 U.S. at 802). In sum, the Act "is only in support of what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804. "This is not . . . narrow tailoring." *Id.* The Act therefore cannot survive strict scrutiny and is unconstitutional.

### III.  The Ohio Parental Notification by Social Media Operators Act is unconstitutionally vague.

The Act also violates the First Amendment and the Due Process Clause because its coverage and obligation-defining provisions, including § 1349.09(A), (B), (C), and (O), are "troublingly," PI Order, ECF No. 33 at PageID 357—and unconstitutionally—vague.

A "fundamental principle in our legal system is that laws . . . must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). In every case, this "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* "When speech is involved," however, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54; *Boddie v. Am. Broad. Cos.*, 881 F.2d 267, 270 (6th Cir. 1989) ("Stricter standards are required where a statute has a potentially inhibiting effect on speech, because the free dissemination of ideas may be the loser." (cleaned up)). The Act is subject to this heightened standard because it determines which websites must "deny" "access to" and "use" of websites full of protected speech. § 1349.09(E); *see* PI Order, ECF No. 33 at PageID 357.

The Act's central coverage provisions violate this standard in several ways:

*First*, the Act's threshold coverage requirement provides websites with no guidance about whether they are covered and grants Defendant far too much discretion. Specifically, the Act regulates a website that, among other things, "targets children, or is reasonably anticipated to be accessed by children." § 1349.09(B). In the context of the Act, that requires websites to determine whether they are "target[ed]" to, or "reasonably anticipated to be access by," a 15-year-old versus a 16-year-old. Alone, "this expansive language would leave many operators unsure as to whether it applies to their website." PI Order, ECF No. 33 at PageID 357.

The Act's "attempt at clarity"—a non-exhaustive, undefined, eleven-factor test—is

34

"unilluminating," *id.*, and invites arbitrary and subjective enforcement. The First Amendment pro-hibits speech restrictions that depend on an "open-ended rough-and-tumble of factors." *Citizens United*, 558 U.S. at 336 (cleaned up). With good reason. The factors here include "malleable and broad-ranging considerations like '[d]esign elements' and '[l]anguage.'" PI Order, ECF No. 33 at PageID 357 (quoting § 1349.09(C)). Those kinds of factors simply say that a website's content will be relevant, not what types of content will subject the website to regulation. And none of the 11 factors are defined. *Id.*

By premising the Act's onerous compliance burdens (and its restrictions on speech) on the interaction among a *minimum* of 11 subjective factors, the Act fails to "give fair notice of conduct that is forbidden or required." *FCC v. Fox*, 567 U.S. at 253. Websites have no notice about what parts of their services or what factors (including unenumerated factors) the Attorney General or courts will rely on to determine whether the website is covered. The "standardless" individual factors and the government's ability to choose which factors to apply in an individual case "au-thorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. This "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements." *Griffin*, 2023 WL 5660155, at *13. "Such ambiguity renders a law unconstitutional." *Id.*

This Court correctly rejected Defendant's comparison of the Act's multi-factor test to "the Children Online Privacy Protection Act of 1998 ('COPPA')." PI Order, ECF No. 33 at PageID 358. Though that "federal regulation [] uses some of the same factors to explain which websites or online services are 'directed to children,'" COPPA's "more specific factors and the existence of the COPPA scheme do not cure vagueness in the eleven-factor list." *Id.* The COPPA factors inform whether a website "target[s]" or is "directed to" children under 13. 16 C.F.R.

§ 312.2. By contrast, the Act covers websites that might be "accessed" by any minor under age 16. § 1349.09(B). "Content" and "subject matter" that *might* be "accessed" by minors is a far broader and more amorphous universe than "content" and "subject matter" "directed to" children under 13. Even if adopting another law's vague test could satisfy due process concerns, there is at least one more problem. COPPA says that its factors "will" be considered. 16 C.F.R. § 312.2. But the Act here says only that the factors "may" be considered. § 1349.09(C). COPPA's exhaustive list of factors offers far more certainty than the Act's non-exhaustive list.

Regardless, even if this multi-factor test were not vague, the Act's other coverage provisions are. *See* PI Order, ECF No. 33 at PageID 358 ("None of these phrases or the definitions in COPPA rehabilitates, for example, amorphous descriptors like 'established' or 'widely recognized.'").

*Second*, the Act's "eyebrow-raising" exception for "established" and "widely recognized" media outlets whose "primary purpose" is to "report news and current events" is likewise unconstitutionally vague. *Id.* at PageID 357-58 (citing § 1349.09(O)(2)). The Act does not define "established," "widely recognized," or even "media outlet"—and thus "provides no guardrails or signposts" for websites or regulators. *Id.* (discussing "established" and "widely recognized"). Many people get their news through websites like Facebook or X. *See* Feb. 7 2024 Hearing Tr., ECF No. 35 at PageID 390:7-11; Szabo Decl., ECF No. 2-1 at PageID 65-66 ¶ 6. But the Act leaves it ambiguous whether these websites, or aspects of these websites, would be exempted. The Act is also unclear whether this exemption encompasses local news outlets that are not "widely recognized." PI Order, ECF No. 33 at PageID 357-58. Consequently, this "capacious and subjective language practically invites arbitrary application of the law." *Id.* at PageID 358.

*Third*, the Act's requirement that covered websites must allow users to "[i]nteract socially"

with other users is undefined and unexplained. § 1349.09(A)(1)(a). Most interaction could be deemed "social," but it is not clear that the Act captures all websites where users can "interact." For instance, it is unclear whether the mere *ability* to comment on another user's post is a social interaction that could subject a website offering that functionality to the Act's requirements. If the Act does not regulate websites by their functionality, however, that raises even more questions. For example if the Act distinguishes between "social" interaction and other forms of interaction like "professional" interaction, then websites across the Internet will be left guessing about whether they "allow" user interactions that are sufficiently "social[]" to trigger the Act's requirements. *Id.*

When the government sets out to regulate speech, it must do so clearly—leaving no questions about who is covered. Clarity would not have saved the Act's unconstitutional parental-consent requirement. But the vagueness infecting the Act's coverage provisions certainly exacerbate those constitutional flaws and provide an individual reason to hold the Act unconstitutional. *See Reno*, 521 U.S. at 871-72 (noting the "special First Amendment concerns" that are raised by "vagueness" in a "content-based regulation of speech").

## IV. NetChoice meets all the requirements for a permanent injunction.

The standard for a permanent injunction "is essentially the same as" the standard for a preliminary injunction, except NetChoice must demonstrate "actual success" "on the merits." *Am. Civil Liberties Union*, 607 F.3d at 445 (cleaned up). NetChoice has amply demonstrated why it prevails on the merits. *See supra* Parts I-III. And this Court has already correctly determined that NetChoice satisfies the remaining permanent-injunction factors as well. *See* PI Order, ECF No. 33 at PageID 358-59.

NetChoice, its members, and their users will undoubtedly suffer multiple forms of irreparable harm, as this Court concluded. As a matter of law, "[w]hen constitutional rights are

37

threatened or impaired, irreparable injury is presumed." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (cleaned up). Most pertinent here, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (internal quotation marks and citation omitted); *see* PI Order, ECF No. 33 at PageID 359. The Act violates covered members' and their users' First Amendment rights for all the reasons discussed in Part II.

What is more, websites risk enormous liability by publishing speech to minors which heightens the First Amendment problems. In part because of that risk of liability, some covered websites will "err on the side of caution" and "restrict access to the site beyond the restrictions we wish to place" and "place significant burdens on the speech and anonymity of adults in order to avoid the possibility of fines that will jeopardize our ability to offer the service at all." Paolucci Decl., ECF No. 2-2 at PageID 86 ¶ 20. Specifically, the Act imposes a $1,000 per day penalty for the first 60 days an operator fails to secure parental consent from a minor, $5,000 per day after 60 days, and then $10,000 per day after 90 days. § 1349.09(I). If a website misidentifies even a single 15-year-old, the Act would impose almost $3 million in penalties—just for the year before the 15-year-old turns 16. Szabo Decl., ECF No. 2-1 at PageID 73 ¶ 16. As Dreamwidth's declarant testified, "even a single day's fine of $1000 would represent a significant increase in our average monthly expenses" and "the fines for a single mistake would exceed our net profit for 2022 by day 19 and exceed our total gross income for the entirety of 2022 by day 95." Paolucci Decl., ECF No. 2-2 at PageID 85-86 ¶ 18. Given that perfect compliance is not likely to be possible, covered websites risk liability simply by operating. Szabo Decl., ECF No. 2-1 at PageID 72-73 ¶ 14.

Setting those injuries aside, covered members' unrecoverable compliance costs are sufficient irreparable injury. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (citing

compliance costs "with no guarantee of eventual recovery"). For example, Dreamwidth's declarant testified "the cost of the engineering and support time necessary to implement the requirements of the law will be substantially prohibitive." Paolucci Decl., ECF No. 2-2 at PageID 86 ¶ 19. This Court credited that testimony and observed that the "engineering and compliance procedures" for some covered members are "extremely burdensome." PI Order, ECF No. 33 at PageID 359. "[T]here is no cause of action through which [NetChoice members] could seek to recover those compliance costs." *Id.*

This Court also correctly concluded in granting a preliminary injunction that enjoining Defendant's enforcement of the Act is in the public interest. *See id.*; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) ("harm to the opposing party" and "the public interest" "merge when the Government is the opposing party"). It "is always in the public interest to prevent the violation of a party's constitutional rights." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (internal quotation marks and citation omitted). Here, a permanent injunction would ensure that minors could continue to access and engage in protected speech on the vast array of websites regulated by the Act. And those websites would be able to continue disseminating speech to the public without the Act's onerous burdens. On the other side of the ledger, "the State has no interest in enforcing laws that are unconstitutional." PI Order, ECF No. 33 at PageID 359 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 591 F. Supp. 3d 205, 215 (W.D. Ky. 2022)); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982) (similar).

Accordingly, this Court should enter a permanent injunction that prohibits Defendant from enforcing the Act against NetChoice's members.

## Conclusion

Plaintiff respectfully requests that this Court grant NetChoice's motion for summary judgment, enter a judgment declaring that the Act violates the Speech and Press Clauses of the First

Amendment and is unconstitutionally vague in violation of the First and Fourteenth Amendments of the U.S. Constitution, and permanently enjoin Defendant from enforcing the Act against NetChoice's members.

Dated: May 3, 2024

Respectfully submitted,

*s/Matthew H. Rice*
Matthew H. Rice (97290)
  *Trial Attorney*
SPERLING & SLATER, LLC
55 W. Monroe Street, 32nd Floor
Chicago, Il 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
mrice@sperling-law.com

Joshua P. Morrow*
Alexis Swartz*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
alexis@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

*(admitted pro hac vice)*

*Attorneys for Plaintiff NetChoice, LLC*