**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

| | | |
|---|---|---|
| **NETCHOICE, LLC,** | : | |
| | : | |
| *Plaintiff,* | : | **Case No. 2:24-cv-00047** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **DAVE YOST, in his official capacity as** | : | |
| **Ohio Attorney General,** | | |
| | : | |
| *Defendant.* | : | |

---

**DEFENDANT OHIO ATTORNEY GENERAL DAVE YOST'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant Ohio Attorney General Dave Yost opposes Plaintiff NetChoice, LLC's motion

for summary judgment. A memorandum in opposition to NetChoice's motion is attached.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069792)*
    *Lead and Trial counsel*
ELIZABETH HANNING SMITH (0076701)
STEPHEN P. TABATOWSKI (0099175)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH 43215-3428
Tel: (614) 466-2872 | Fax: (614) 728-7592
Julie.Pfeiffer@OhioAGO.gov
Elizabeth.Smith@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov

*Counsel for Defendant Ohio Attorney General*

<u>**MEMORANDUM**</u>

## I.  INTRODUCTION

Ohio's Parental Notification by Social Media Operators Act, Ohio Revised Code Section 1349.09 ("the Act") is an economic regulation that applies to a limited subset of website operators (based on their use of design features and functions that pose unique risks) who wish to contract with minors. Thus, the Act is valid under rational-basis review as an economic regulation of certain contracts—not speech. The First Amendment is not implicated by an economic regulation just because it applies to contracts with entities that host speech.

And even if the Act implicates *some* speech, it remains constitutionally valid because it does so only incidentally and in a content-neutral manner—without regard to or preference for any particular topic. The Act makes constitutionally-permissible distinctions based on the speaker or medium—not their message. As a result, the Act should not be subject to heightened scrutiny under the First Amendment.

No matter the standard, however, the Act survives constitutional scrutiny. Ohio has an important and compelling interest in protecting minors by restricting their ability to contract with covered operators absent parental consent—particularly given the unique health and safety risks adolescents face on covered operators' platforms. Moreover, Ohio has an important and compelling interest in vindicating parents' fundamental right to control their children's care and upbringing. The Act places parents in control of who can collect and use their children's personal information or subject them to onerous contract terms. It is narrowly tailored to accomplish these goals.

Moreover, the Act is not vague. It is sufficiently specific; an ordinary person would understand to whom it applies, what conduct it prohibits, and how penalties are to be assessed and

1

meted out. It provides explicit standards for the Attorney General and the courts to enforce the statute in a non-arbitrary and non-discriminatory manner.

NetChoice utilizes the First Amendment like a cudgel in a manner that threatens to "reawaken[] *Lochner*'s pre-New Deal threat of substituting judicial for democratic decisionmaking where ordinary economic regulation is at issue." *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 603 (2011) (Breyer, J., dissenting) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 589 (1980) (Rehnquist, J., dissenting)). The Court should not permit NetChoice to avoid commercial regulation under the illusion of a First Amendment violation.

Despite NetChoice's assertions otherwise, the Act withstands the First Amendment and vagueness challenges. For the following reasons, NetChoice's motion for summary judgment should be denied.

## II.     LAW AND ARGUMENT

### A.  Trade associations should not have standing to assert the First Amendment rights of minors whom their members intend to exploit.

The policies underpinning the relaxed standing requirements applicable First Amendment overbreadth claims do not support their application here. The fundamental concern of relaxed standing in the overbreadth context is the possibility that a person actually engaging in a protected activity might refrain from that activity "rather than risk punishment for his conduct in challenging the statute." *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Further, the exception is "limited." *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973). *Broadrick* cautions for a case-by-case review of its application because the exception "attenuates" depending on where the regulation in question falls on the spectrum between "pure speech" and conduct unprotected by the First Amendment. *Id*. The Act falls on the latter end of the spectrum—it regulates contracts, not speech—and so the overbreadth exception is attenuated in this context.

Moreover, third-party standing exceptions in other contexts generally scrutinize the relationship between the litigant and third party and whether their interests align. *See, e.g.*, *J.H. Munson Co.*, 467 U.S. at 956 (third-party standing proper where the litigant is an effective advocate for an interest that a third-party is impeded from asserting); *Craig v. Boren*, 429 U.S. 190, 194-95 (1976) (third-party standing proper due to the "close relationship" between the litigant and the third party); *see also Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (rejecting candidate standing under Section 2 of the VRA due to "potential divergence between the interests of a candidate seeking office and citizens attempting to enforce their right to vote") (cited by *McGee v. City of Warrensville Heights*, 16 F. Supp. 2d 837, 846, n.8 (N.D. Ohio 1998)). The alignment of interests between a third party and a litigant asserting a right on its behalf should not be disregarded when considering the overbreadth exception. "[G]enuine conflicts strongly counsel against third party standing." *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991).

The same is true with respect to a First Amendment overbreadth claim—particularly where, as here, there is evidence of a significant and pervasive conflict. *See* Yost MSJ, Ex. A, ECF No. 42-1. Covered operators—many of them NetChoice members—burden children and parents with one-sided contractual terms of questionable enforceability, and do so to generate billions of dollars collecting and selling the userdata of American kids, and kids around the globe. Minors simply do not have the capacity to understand the magnitude of these provisions before engaging with these operators. To that end, they employ user interfaces that are specifically designed to maximize user engagement (and profits) while exacerbating the risks of mental health illnesses and sexual abuse. *See* Yost MSJ, Ex. A, ECF No 42-1; Ex. B ECF No. 42-2; Ex. C., ECF No. 42-3. To permit NetChoice to allegedly vindicate the rights of its child users would turn the concepts of associational and prudential standing on their heads.

Accordingly, the Court should not grant a litigant like NetChoice standing to facially invalidate a statute, in a pre-enforcement posture, based on the purported First Amendment rights of minors whom its members eagerly exploit.

**B. The Act is constitutional.**

**1. The Act satisfies the First Amendment.**

**a. The First Amendment does not guarantee the right to contract with minors.**

The Act only applies to platforms who require children to enter a contract in order "to register, sign up, or otherwise create a unique username to access or utilize" the platform. O.R.C. § 1349.09(B)(1). This puts the lie to NetChoice's claim that the Act restricts "to whom covered websites can disseminate speech . . . ." NetChoice MSJ, ECF No. 43 at PageID 644. In fact, the Act does not prevent NetChoice's members from disseminating speech to anyone, including children. It merely provides that, should an operator wish to contract with a child before she can register with their platform, it must obtain verifiable parental consent. NetChoice's right to contract with children does not implicate the First Amendment.

On this point, *303 Creative LLC v. Elenis* does not stand for NetChoice's right to "disseminate" speech to their preferred audience of minors. 600 U.S. 570, 143 S. Ct. 2298, 2315. That compelled-speech case held that Colorado's anti-discrimination law could not be used by the state to "coopt an individual's voice for its own purposes[]" and force a business to "disseminate the government's preferred messages." *Id.* NetChoice does not allege that the Act compels it to speak, nor does the Act do so.

NetChoice's attempt to shoehorn the Act into the framework of the First Amendment reveals its unwavering insistence on First Amendment *Lochner*ism. The Act regulates commercial transactions between children and some of the largest, most sophisticated corporations in America. It is a regulation of economic activity and is subject to rational basis review. *United States v.*

4

*Carolene Prods. Co.*, 304 U.S. 144, 152 (1938); *see also Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 689 (6th Cir. 2011). However, NetChoice attempts to cloak its members in First Amendment protection by arguing that the Act regulates "far more than 'contracts,' and instead restrict minors' ability to engage in and consume speech." NetChoice MSJ, ECF No. 43, PageID 19. As evidence of this, Netchoice points to the Act's text, claiming that it "requires covered websites to 'deny the child *access to* or *use of* the online web site, service, or product' without parental consent." *Id.* at PageID 18. But this position conveniently ignores the condition precedent to the Act's application: that the minor engage in a contractual arrangement with the covered operator. § 1349.09(B)(1). Simply put, if a covered operator dispenses with the contract, the Act does not apply. If there is no contract, the Act does not deny access to an operator's platform nor its content. The Act is entirely disinterested in speech.

Moreover, the Act does not regulate all online contracts by design. The terms minors must agree to before they can access covered operators' platforms, including granting royalty-free licenses on content that these minors produce, permission to harvest minors' personal data, permission to use their names and likenesses in advertising, and enforceable forum selection clauses, pose significant financial and personal risks to not only minors (who may not understand the enormity of their bargain with the operator) but also their guardians, who will be the ones responsible for the fallout of their children's choices. *See* Yost MSJ, ECF No. 43 at PageID 449-452. Moreover, the social nature of the websites targeted by the Act pose physical risks to minors, including predation, sexual harassment, and the risk of addiction. *See* North Aff., ECF No. 28-4 at PageID 277, ¶ 8. Some of these risks are unique to the platforms covered by the Act. If a minor is harmed, the at-issue contracts prohibit them from seeking relief in an appropriate forum. Seeking to obfuscate this simple fact, NetChoice points to popular news websites that "also require minors

to agree to terms of services to create accounts," including the New York Times, CNN, and The Washington Post. NetChoice MSJ, ECF No. 43, PageID 647. But popular news websites are not covered by the Act precisely because they do not pose the unique risks associated with covered operators. It is unlikely that a minor is publishing licensable content in the New York Times, and even less likely that they will encounter predators while perusing the news.

NetChoice's appeal to *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) in support of its position is also inapposite. NetChoice claims that *Brown* would not have "come out differently had California called or treated video game sales or rentals as 'contracts' in the statute. The same is true of the 'contracts' necessary to subscribe to a newspaper, buy a book, rent a movie, or purchase movie tickets." NetChoice MSJ, ECF No. 43 at PageID 647. But this argument entirely elides the Act's function. The Act is not designed to regulate a minor's simple, unadorned purchase of concert tickets or books. The Act regulates a minor's ability to enter into a complex, ongoing, contractual relationship with potential consequences that are far afield from those associated with the simple transactions that NetChoice identifies. It is well within Ohio's authority to regulate these commercial transactions and oversee the well-being of minors entering contracts within its borders. The First Amendment should not prevent a state from regulating commercial entities who condition minors' use of their potentially dangerous products on extensive, one-sided contracts.

### b. The First Amendment does not forbid all laws affecting where, how, or with whom a child can speak.

NetChoice asks this Court to apply a sweeping interpretation of *Brown,* 564 U.S. at 795 & n.3, 799, and hold that any law preventing a child from hearing or saying something without their parents' consent violates the First Amendment. *See* NetChoice MSJ, ECF No. 43 at PageID 643. This interpretation of *Brown* misses the mark. The case did not go nearly so far. *See* Yost MSJ,

ECF No. 42 at PageID 463-65. *Brown* tells us that legislatures cannot create new categories of unprotected speech directed to children. *Brown*, 564 U.S. at 794. It does not tell us that content-neutral laws requiring parental consent always violate the First Amendment.

The Act is content-neutral. Nothing suggests that the Act is based on Ohio's agreement or disagreement with any "substantive message." *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994); *City of Austin*, 596 U.S. 61, 142 S. Ct. 1464, 1472 (2022). The Act does not draw distinctions based on substantive message at all—whether "political" or "ideological" messages, or messages "concerning specific events, including those sponsored by religious and nonprofit organizations." *City of Austin*, 142 S. Ct. at 1473-74. It is "agnostic to content." *Id.* at 1472.

Although NetChoice makes hay with the Act's exceptions, NetChoice MSJ, ECF No. 43 at PageID 648-49, they are not "content-based" as that phrase is defined by First Amendment jurisprudence. First, the exceptions are concerned with how or where "interaction between users" occurs on a website—not their content. *See* O.R.C. § 1349.09(O). The exceptions are tailored to capture websites where interaction between users occurs publicly, as it does on "reviews posted by other users" and "comments incidental to content posted by" news outlets. O.R.C. § 1349.09(O)(1)-(2). Just as a classification based on a person's employment as a "newspaper distributor" does not depend on the communicative content of the employee or the newspaper, *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 938 (9th Cir. 2022), the Act's exceptions do not depend on the communicative content of excepted websites. Instead, the exceptions depend on where user interaction occurs on websites.

And even NetChoice can't help but acknowledge that its members' websites "are places" where minors can engage in speech. NetChoice MSJ, ECF No. 43 at PageID 29. NetChoice is incorrect that the First Amendment bars any law restricting minors' access to places where they

can engage in speech. The First Amendment does not invalidate a law prohibiting a minor from entering an establishment that primarily serves alcohol, for instance. *Gary v. City of Warner Robins*, 311 F.3d 1334, 1338-40 (11th Cir. 2002). That law undeniably reduces the quantum of speech a minor can engage in, including—depending on the bar—speech on topics like "art," "religion," and "politics." *See* NetChoice MSJ, ECF No. 43 at PageID 643. Yet that law does not implicate the First Amendment because its application depends on a place's particular features which are unrelated to communicative content. *See Warner Robins*, 311 F.3d at 1340. The minor "remains free to observe and engage in" whatever kind of speech occurs there. *Id.*

Likewise, minors remain free to observe and engage in the speech that occurs on *any* website under the Act, whatever the substantive message might be. But if accessing or engaging in that speech requires contracting with a website to construct public or semipublic profiles, populate friend lists, create or post public content, and interact socially with other users, the website must obtain verifiable parental consent. Therefore, the exceptions are not content-based.[1]

NetChoice also contends the Act's distinctions between the social features and functions of covered operators are content-based. NetChoice MSJ at 22, ECF No. 43 at 649-50. It is true that "subtler forms of content discrimination cannot escape classification as content based simply because they swap an obvious subject-matter distinction for a function or purpose proxy." *City of Austin*, 142 S. Ct. at 1468. But "[t]hat does not mean that any classification that considers function or purpose is *always* content based." *Id.* (emphasis in original). A law is content based where it "swap[s] an *obvious* subject-matter distinction for a function or purpose proxy." *Id.* (emphasis

---

[1] Even if the Court is inclined to find the Act's exceptions content-based, the Court must presume they are severable pursuant to Ohio Rev. Code § 1.50, and conduct a severability analysis. *See* Yost MSJ, fn. 7, ECF No. 42 at PageID 456; *see also Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2355 (2020).

added). But while the Act may be dependent on a website's functions (constructing public profiles, populating friends lists, and interacting with other users both publicly and privately), it is not "entirely dependent" on the website's "communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015). Indeed, the social features and functions of covered operators *on their own* are highly unlikely to be "reasonably [] understood by the viewer to be communicative." *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288, 294, 104 (1984) (citing *Spence v. Washington*, 418 U.S. 405 (1974), and *Tinker v. Des Moines School District*, 393 U.S. 503 (1969)). Thus, the Act's distinctions on this basis are not a function or purpose proxy for an "obvious subject-matter distinction[,]" *Reed*, 576 U.S. at 156, and are not content-based.

Nor is the Act's regulation of websites that target or are reasonably anticipated to be accessed by minors. O.R.C. § 1349.09(B). At the outset, nothing indicates that Ohio "disfavors the sort of content designed to appeal to children—cartoons and the like." Opinion, ECF No. 33 at PageID 350. And this Court was correct that "[w]ebsites that children might access" is not a topic, *id.*, let alone a "substantive message." *City of Austin*, 142 S. Ct. at 1472. The Act's regulation of websites that target or may reasonably anticipated to be accessed by children is unconcerned with the substantive message of cartoons or other communications. Recall that the Act is concerned with websites that require children to agree to onerous terms of service, then expose them to unique physical and mental safety risks. The Act's language "tailors the Act's applicability" to the websites most likely to expose children to these harms. Opinion, ECF No. 33 at PageID 350.

### c.  The First Amendment does not forbid content-neutral regulation of distinct speakers and mediums.

As addressed in Attorney General Yost's motion for summary judgment and Section II.B.1.b above, the Act is not facially content based. At most, the Act differentiates based on features distinct to "fundamentally dissimilar mediums." *Netchoice, L.L.C. v. Paxton*, 49 F.4th

439, 480-81 (5th Cir. 2022); *see also Turner Broad. Sys.* 512 U.S. at 643. Websites that are primarily driven by user-generated content, interactions, and social connections, both public and private, (O.R.C. § 1349.09(A)(1)(a)-(d)), are fundamentally different from websites where user interaction is limited to that which occurs publicly. O.R.C. § 1349.09(O)(1)-(2). Because the former category poses unique risks to minors that the latter category does not, *see* Yost MSJ, ECF No. 42 at PageID 461-63, the Act's distinctions are easily "'justified without reference to the content of the regulated speech,'" and have nothing to do with "disagreement with the message" any of the websites might communicate. *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U. S. 781, 791 (1989)).

NetChoice claims that the Act's distinctions target a "small number" of websites as a proxy for a regulation of their content. NetChoice MSJ at PageID 653. Not so. The Act targets "one medium (*or a subset thereof*) but not others." *See Turner*, 512 U.S. at 660 (emphasis added). Thus (and even assuming that, in 2024, "the internet" can be considered a monolithic "medium"), the First Amendment does not demand strict scrutiny for content-neutral regulations that distinguish between "subsets" of mediums. *Id.* Platforms driven by user-generated content, and public/private social connection and interaction, O.R.C. § 1349.09(A), are one such subset—if not a medium of their own. And they are "fundamentally dissimilar mediums," *Paxton*, 49 F.4th at 480-81, or subsets thereof, *Turner*, 512 U.S. at 660, than websites and platforms which the Act does not cover.

### d. The Act is narrowly tailored to achieve its goals and is not substantially under- or overbroad.

Contrary to NetChoice's assertions, the Act is properly tailored. A facially content-neutral statute subject to intermediate scrutiny must not "burden substantially more speech than necessary to further [the statute's] interests." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010), quoting *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997). Alternatively, a statute subject to

strict scrutiny must be narrowly tailored – but need not to be "perfectly tailored." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (quoting *Burson v. Freeman*, 504 U. S. 191, 209 (1992)). As such, statutes examined through the lens of strict scrutiny analysis must not be seriously overinclusive, nor seriously underinclusive. *Brown*, 564 U.S. at 805. Despite NetChoice's numerous theories attempting to demonstrate otherwise, the Act is sufficiently tailored regardless of the standard of review employed by this Court.

### i. The Act does not regulate speech, nor is it overinclusive in the range of websites it regulates.

NetChoice first argues that the Act is "plainly overinclusive simply in the range of websites it regulates," and takes issue with the statute's application to "mom-and-pop" websites. NetChoice MSJ, ECF No. 43 at PageID 657. But the Act seeks to regulate the unique risks associated with covered operators for all of the reasons discussed in Attorney General Yost's motion for summary judgment, Yost MSJ, ECF No. 42 at PageID 459-62, and in Part II.B.1.a, *supra.* The size of the website is entirely unrelated to risks that covered operators' contractual requirements pose to children. Taking NetChoice's example, even "small" nontraditional social media websites like Dreamwidth—with over 4,000,000 accounts—have terms of service that contain many of the problematic provisions that the Act protects against. *See Dreamwidth Statistics,* DREAMWIDTH.ORG[2]; *Terms of Service,* DREAMWIDTH.ORG, (containing indemnity/hold-harmless provision, liability limitations, warranty disclaimers, choice-of-law/forum-selection provision, license to user-submitted content).[3] The fact that the Act extends to nontraditional social media operators like Dreamwidth who employ problematic contracts is evidence that the Act is appropriately tailored.

---

[2] https://www.dreamwidth.org/stats (last accessed 05/31/2024).
[3] https://www.dreamwidth.org/legal/tos (last accessed April 30, 2024).

####    ii.    The Act is the least restrictive means to ensure continued protection for Ohio's youth.

NetChoice's argument that the Act is not the "least restrictive" way to accomplish its goals is unrealistic. NetChoice MSJ, ECF No. 43 at PageID 658. While it may be true that parents could utilize parental-control options to exercise oversight over their minor children's use of the internet, these options are simply not enough. Technology is pervasive and ever-evolving. Parents are not always aware of the different types of platforms their children use. Moreover, children often find ways to circumvent parental control in unexpected and novel ways. The Act precisely remedies this dilemma by mandating parental consent *before* a minor may agree to uncertain contractual obligations and access a covered operator's platform. It would not be enough for Ohio to simply educate parents on these blocking and monitoring tools, as NetChoice suggests. Covered operators should not be absolved of regulation simply because parents have access to control tools.

####    iii.    The Act is properly tailored to further Ohio's interests.

NetChoice advances multiple theories of why the Act is not "properly tailored" to further the State's interests. First, that the Act is overinclusive to further parental control. Second, that the State is better served with attempting to "regulate specific contractual *terms* it considers problems." Third, that the Act is not narrowly tailored to address the State's interest in protecting minors from harm. NetChoice MSJ, ECF No. 43 at PageID 658, 659.

The Act is not overinclusive as to parental control. It is certainly true that, as NetChoice suggests, some parents are disinterested in their child's usage of social media. But the negative effect of social media on minor users is widely recognized. *See, e.g.,* Social Media and Youth Mental Health, ECF No. 42-2; Windows of Developmental Sensitivity, ECF No. 42-3; North Aff.,

ECF No. 42-4; Online Grooming Detection, ECF No. 42-8. And parents have taken notice.[4] The Act provides multiple methods for parents to confirm their consent. For example, a parent can consent via an online form or call a toll-free number. *See* O.R.C. § 1349.09(B)(1)(a)-(d)*.* NetChoice argues that parental consent is so burdensome that minor users will be prevented from accessing covered operators' platforms. But that fear is unsubstantiated. Parental consent under the Act is no more burdensome than consenting for any number of school, extracurricular, or other activities a child might participate in.

NetChoice's suggestion that the State should regulate specific contractual provisions, rather than the contractual arrangement generally, ignores a simple reality. As businesses, covered operators are constantly evolving. So too are the contracts that they subject their users to. Changes to an operator's contract can be unilateral and without notice. *See, e.g., In re Facebook, Inc.*, 402 F. Supp. 3d 767, 793 (N.D. Cal. 2019) (discussing Facebook's unilateral decision to give app developers access to certain information even though users who established Facebook accounts before this time did not agree to these terms when they signed up). As such, covered operators have the ability to subject a minor to whatever one-sided provision that they can conjure up without any real notice or oversight. Should the Act attempt to regulate specific at-issue contractual provisions, covered operators will simply change the provision, invent additional means to monetize their userbase, or find alternative avenues to discourage litigation and absolve themselves of liability. The Act's focus on the overarching contract prevents covered operators from unilaterally tailoring their terms to avoid its application.

---

[4] Nicole Russell, *Parents Need Help Regulating Their Children's Social Media. A Government Ban Would Help*, USA TODAY, May 7, 2024. Available at: https://perma.cc/8D9B-J6MM

Finally, the Act is adequately tailored to address the harms posed by the contracts that their minor users are subjected to. As discussed in Attorney General Yost's motion for summary judgment, Yost MSJ, ECF No. 42 at PageID 449-452, and in Part II.B.1.a, *supra*, the terms minors must agree to before they can access covered operators' platforms pose significant financial and personal risks to minors who may not understand the enormity of their bargain with the operator. *See, e.g., Terms of Service,* FACEBOOK.COM; *Terms of Service, Terms of Service,* TIKTOK.COM. Moreover, the social nature of these operators' platforms pose physical risks to minors. *See* North Aff., ECF No. 28-4 at PageID 277, ¶ 8. NetChoice has been unable to identify a website or subset of operator whose terms of use do not manifest these risks. This alone is fatal to NetChoice's tailoring argument.

On the other hand, the Act's parental consent requirement might at least mitigate or entirely prevent the wide-ranging, ever-evolving harms associated with covered operators and the contracts that they demand from their minor users. To characterize such minimally invasive, family-oriented legislation as an overexpansive violation of minors' free speech rights again showcases NetChoice's retreat to First Amendment *Lochner*ism. The State should not be prevented from protecting its youth from one-sided, potentially dangerous commercial relationships.

### 2. The Act is not unconstitutionally vague.

The State maintains that the Act is a commercial regulation and denies that it even implicates the First Amendment. *See* Yost MSJ ECF No. 42 at PageID 472-74. However, even if this Court assumes it does, the Act sufficiently defines prohibited conduct and provides clear parameters for enforcement. Thus, it satisfies constitutional requirements and withstands NetChoice's void for vagueness challenge under even the strictest standard of review.

### a. The Act uses common terms and a person of ordinary intelligence can reasonably determine what it prohibits.

The law does not expect the drafters of statutes to write with crystal clear perfection. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Laws must simply "'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.'" *Miller v. Wilkinson,* No. 2:98-cv-275, 2010 U.S. Dist. LEXIS 103364, *13 (S.D. Ohio Sept. 30, 2010).

Terms do not necessarily need to be defined so long as a person of ordinary intelligence would know what conduct is prohibited. While NetChoice's motion for summary judgment complains that the Act employs undefined words, this is simply an effort to create vagueness where none exists. The Sixth Circuit has rejected similar attempts to undermine the commonly-understood meaning of simple terms. *See Chambers v. Stengel,* 256 F.3d 397, 401 (2001) (holding that the terms "solicit," "victim," "accident or disaster," and "general public" are common terms, and individuals of common intelligence do not have to guess at their meaning.). NetChoice attempts to complicate the Act by decrying the lack of definition for simple terms. But the Act is sufficiently specific as to whom it applies—social media operators "who target[] children or are reasonably anticipated to be accessed by children." O.R.C. § 1349.09(B). "Operator" is expressly defined as "any business, entity, or person that operates an online web site, service, or product that has users in this state" and allows its users to engage in certain specific conduct set forth in O.R.C. § 1349.09(A)(1)(a)-(d). And the Act also clearly delineates to whom it *does not* apply. The Act's carve-outs again employ common terms which are easily understood in context.

A law can have "flexibility and reasonable breadth, rather than meticulous specificity" and still pass the vagueness test. *Grayned*, 408 U.S. at 110 (quoting *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1088 (8th Cir. 1969)). Indeed, this Court has held that "[t]he failure to define a term in a statute or an ordinance does not automatically 'render the statute unconstitutionally vague' where the common meaning of the word provides both adequate notice of the conduct prohibited and of the standards for enforcement." *Stevens v. City of Columbus*, S.D.Ohio No. 2:20-CV-1230, 2020 U.S. Dist. LEXIS 118743, at \*13 (July 7, 2020) (quoting *Belle Maer Harbor v. Charter Twp. Of Harrison*, 170 F.3d 554, 558 (6th Cir. 1999)).

Moreover, the Act explicitly sets forth the requirements for compliance. It demands that "operators" obtain verifiable parental consent before entering into a contract "with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product." *See* O.R.C. § 1349.09(B)(1). If a violation is found, the Act further outlines the civil penalty imposed, with a chance for the operator to remedy any violation within 90 days of notice. *See* O.R.C. § 1349.09(I)(1)-(3), (M)(2)(a)-(b). NetChoice's attempt to parse the language of the Act to obfuscate ordinary meanings is unpersuasive and has no merit. The Act uses ordinary language which a person of ordinary intelligence can understand and clearly delineates prohibited conduct. Thus, it passes constitutional scrutiny.

### b. The Act contains objective, non-discriminatory enforcement standards.

O.R.C. § 1349.09 provides explicit standards for the Attorney General and the Courts to enforce the statute. The Act specifically lays out eleven factors for the Attorney General to consider in making its determination as to whether an operator's product targets children. *See* O.R.C. § 1349.09 (C)(1)-(11). They include "[e]mpirical evidence regarding audience composition" and the "[p]resence of child celebrities or celebrities who appeal to children." *Id.* NetChoice claims that these eleven factors are "subjective" and "fail to 'give fair notice of conduct that is forbidden or

16

required'" Netchoice MSJ, ECF No. 43 at PageID 662. But nearly identical factors are incorporated in the Federal Trade Commission's regulations which govern similar operators and online activity. *See* Children Online Privacy Protection Act of 1998 ("COPPA"), 16 C.F.R. § 312. Indeed, many of NetChoice's members are already subject to the same framework under federal law. *See* Yost MSJ, ECF No. 42 at PageID 477-478). These factors provide concrete, identifiable metrics that put operators on fair notice of what will be considered in the Attorney General's review and what platforms will be subject to enforcement. *See United States v. Marmolejo*, No. 3:04-cr-132, 2007 U.S. Dist. LEXIS 26524, *6 (S.D. Ohio Apr. 10, 2007). Further, the Act outlines the civil penalty imposed for violations, and provides a chance for the operator to remedy their violation within 90 days of notice. O.R.C. § 1349.09(I)(1)-(3), (M)(2)(a)-(b). This safe harbor provision is again similar to that provided under COPPA. 16 CFR § 312.9 & 312.11.

NetChoice's assertion that "websites have no notice about what parts of their services or what factors (including unenumerated factors) the Attorney General or courts will rely on to determine whether the website is covered," Netchoice's MSJ, ECF No. 43 at PageID 662, is false. The Act clearly sets forth specific factors in § 1349.09(C)(1)-(11), which track many of those set forth in COPPA. The Act is not "standardless" as NetChoice suggests – and Courts have long held that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward*, 491 U.S. at 794, 109). While NetChoice further complains of the Act's grant of discretion, the existence of discretion is not evidence of vagueness. *Ward*, 491 U.S. at 794 (holding standards may permissibly retain flexibility and officials exercising considerable discretion in implementing them does not render a law vague).

The Act does more than just establish minimal guidelines. It outlines, in ordinary terms and with sufficient specificity, to whom the statute applies to, the conduct that is prohibited, and what factors will be considered in enforcement. Thus, it passes even strict scrutiny and is constitutional.

## III.    CONCLUSION

For the foregoing reasons, the Court should deny NetChoice's motion for summary judgment.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ Julie M. Pfeiffer
JULIE M. PFEIFFER (0069792)*
    *Lead and Trial counsel
ELIZABETH HANNING SMITH (0076701)
STEPHEN P. TABATOWSKI (0099175)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH 43215-3428
Tel: (614) 466-2872 | Fax: (614) 728-7592
Julie.Pfeiffer@OhioAGO.gov
Elizabeth.Smith@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov

Counsel for Defendant Ohio Attorney General

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing was electronically filed with the U.S. District Court for the and copies were served upon all counsel of record by means of the Court's electronic filing system.

/s/ Julie M. Pfeiffer
JULIE M. PFEIFFER
Assistant Attorney General

19