**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

NETCHOICE, LLC,

        *Plaintiff,*

        v.

DAVE YOST, in his official capacity
as Ohio Attorney General,

        *Defendant.*

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:24-cv-00047

Chief Judge Algenon L. Marbley

Magistrate Judge Elizabeth Preston Deavers

**ORAL ARGUMENT REQUESTED**

---

**PLAINTIFF NETCHOICE'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## Table of Authorities

**Page(s)**

**Cases**

*Am. Amusement Mach. Ass'n v. Kendrick,*
244 F.3d 572 (7th Cir. 2001) ..................................................................5

*Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n,*
389 F.3d 536 (6th Cir. 2004) ..................................................................2

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ..............................................................................20

*Barr v. Am. Ass'n of Political Consultants, Inc.,*
140 S. Ct. 2335 (2020) ..........................................................................34

*Bartnicki v. Vopper,*
532 U.S. 514 (2001) .........................................................................29, 37

*Bd. of Tr., State Univ. of N.Y. v. Fox,*
492 U.S. 469 (1989) ..............................................................................12

*Boddie v. Am. Broad. Cos.,*
881 F.2d 267 (6th Cir. 1989) ............................................................36, 38

*Brown v. Entm't Merchs. Ass'n,*
564 U.S. 786 (2011) ...................................................................... *passim*

*Byrd v. Tenn. Wine & Spirits Retailers Ass'n,*
883 F.3d 608 (6th Cir. 2018) ................................................................33

*Charlton-Perkins v. Univ. of Cincinnati,*
35 F.4th 1053 (6th Cir. 2022) .................................................................4

*CHKRS, LLC v. City of Dublin,*
984 F.3d 483 (6th Cir. 2021) ..................................................................4

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
596 U.S. 61 (2022) ................................................................................15

*Columbia Nat. Res. v. Tatum,*
58 F.3d 1101 (6th Cir. 1995) ................................................................37

*Craig v. Boren,*
429 U.S. 190 (1976) ................................................................................3

*Edenfield v. Fane*,
    507 U.S. 761 (1993)...........................................................................................21

*State ex rel. English v. Indus. Comm.*,
    115 N.E.2d 395 (Ohio 1953)...........................................................................33

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)....................................................................................35, 38

*FEC v. Cruz*,
    596 U.S. 289 (2022)...........................................................................................29

*Frazier ex rel. Frazier v. Winn*,
    535 F.3d 1279 (2008)........................................................................................27

*Ginsberg v. New York*,
    390 U.S. 629 (1968)...........................................................................................26

*Green v. U.S. Dep't of Justice*,
    54 F.4th 738 (D.C. Cir. 2022)..........................................................................18

*Hershey v. Jasinski*,
    86 F.4th 1224 (8th Cir. 2023)..........................................................................18

*John Doe, Inc. v. Mukasey*,
    549 F.3d 861 (2d Cir. 2008).............................................................................26

*Johnson v. United States*,
    576 U.S. 591 (2015)...........................................................................................38

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952)...........................................................................................12

*Kenjoh Outdoor, LLC v. Marchbanks*,
    23 F.4th 686 (6th Cir. 2022)............................................................................18

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938).............................................................................................6

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).............................................................................................2

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
    594 U.S. 180 (2021)...........................................................................................27

*Mazo v. New Jersey Secretary of State*,
    54 F.4th 124 (3d Cir. 2022) ......................................................................17, 18

*Mobilize the Message, LLC v. Bonta*,
    50 F.4th 928 (9th Cir. 2022) ...................................................................18

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) ...................................................................18

*NetChoice, LLC v. Att'y Gen., Fla.*,
    34 F.4th 1196 (11th Cir. 2022) ..................................................................6

*NetChoice, LLC v. Bonta*,
    2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) .........................................3

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............................... *passim*

*NetChoice, LLC v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ..............................................................16, 17

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ...............................................................20, 21, 24, 29

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .................................................................13, 15, 19

*Reno v. ACLU*,
    521 U.S. 844 (1997) .........................................................................27, 31

*Roberts v. Wamser*,
    883 F.2d 617 (8th Cir. 1989) ....................................................................3

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ................................................................................37

*Schickel v. Dilger*,
    925 F.3d 858 (6th Cir. 2019) ..................................................................19

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ................................................................................38

*Solantic, LLC v. City of Neptune Beach*,
    410 F.3d 1250 (11th Cir. 2005) ..............................................................34

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ................................................................................23

*Specht v. Netscape Commc'ns Corp.*,
    150 F.Supp.2d 585 (S.D.N.Y. 2001) ......................................................25

*Tipp City v. Dakin*,
   929 N.E.2d 484 (Ohio Ct. App. 2010) .................................................................33

*Trollinger v. Tyson Foods, Inc.*,
   370 F.3d 602 (6th Cir. 2004) ..............................................................................4

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) .............................................................................18, 19, 20, 21

*Van Buren v. United States*,
   593 U.S. 374 (2021) ...........................................................................................25

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ......................................................................................2, 32

*Warth v. Seldin*,
   422 U.S. 490 (1975) .............................................................................................2

## Statutes

15 U.S.C. § 6502 ..........................................................................................................30

18 U.S.C. § 2425 ..........................................................................................................29

Cal. Civ. Code §§ 1798.100-.199 .................................................................................30

Ohio Rev. Code § 1349.09 ............................................................................... *passim*

Ohio Rev. Code § 2907.07 ............................................................................................29

Ohio Rev. Code § 3319.321 ............................................................................................9

Tex. Bus. & Com. Code § 120.001 ..........................................................................16, 17

## Other Authorities

Defending Corp. & Indiv. in Gov. Invest. § 21:14 .....................................................25

NetChoice, About Us, https://perma.cc/2VV8-K5EL .................................................11

Pet. Br., *NetChoice, LLC v. Paxton*, U.S. No. 22-555 (Nov. 30, 2023) ........................17

## Table of Contents

Summary of Arguments ......................................................................................................... vii

Introduction ............................................................................................................................ 1

Argument ................................................................................................................................ 2

I.   NetChoice has standing to assert the interests of Internet users in challenging the Ohio Parental Notification by Social Media Operators Act. .................................................. 2

II.  The Ohio Parental Notification by Social Media Operators Act violates the First Amendment because it restricts covered websites' ability to disseminate protected speech and minors' ability to access and engage in protected speech. ................................................. 4

   A.   The Act triggers heightened First Amendment scrutiny by imposing parental consent for minors to "access" protected speech and to "use" websites that disseminate a vast amount of protected speech. ........................................................... 5

      1.   Minors and websites have First Amendment rights, and Defendant's attempt to distinguish precedent invalidating parental-consent requirements is unavailing. ......................................................................................................... 5

      2.   The Act does not regulate just "contracts"; it regulates "access to" and "use" of websites full of protected speech. ...................................................... 10

   B.   The Act is content and speaker based, independently triggering strict scrutiny. ........ 13

      1.   The Act's coverage provisions restrict access to speech based on the topic and subject matter of speech, and thus based on content. ................................... 13

      2.   The Act's coverage provisions restrict access to speech based on speaker. .......... 18

   C.   The Act cannot satisfy First Amendment strict scrutiny or any other form of heightened First Amendment scrutiny. ........................................................................ 20

      1.   Defendant has failed to identify a sufficient governmental interest in restricting minors' access to protected speech. .................................................... 21

      2.   The Act is not properly tailored. .......................................................................... 24

      3.   The Act's coverage exceptions are not severable, and severability does not allow the Court to avoid the strict-scrutiny analysis. ............................................ 33

III. The Ohio Parental Notification by Social Media Operators Act is unconstitutionally vague... ........................................................................................................................... 35

Conclusion ............................................................................................................................. 38

## Summary of Arguments

Pursuant to Local Rule 7.2(a)(3), NetChoice provides the following summary of arguments for this memorandum.

**I. NetChoice has standing to assert the interests of Internet users in challenging the Ohio Parental Notification by Social Media Operators Act. ............................................. 2**

For all the reasons in this Court's previous orders and in NetChoice's Motion for Summary Judgment, binding precedent allows NetChoice to raise the First Amendmdent rights and interests of Internet users affected by the Act. *See, e.g.*, PI Order, ECF No. 33 at PageID 337-42 (discussing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988)); NetChoice MSJ, ECF No. 43 at PageID 639-41.[1] This Court has already properly rejected Defendant's argument that there is a conflict between NetChoice members' interests and their current and prospective minor users' interests, because they share a common interest in free expression. In any event, Defendant's argument is an improper attempt to conflate the merits of the case with standing. *See Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1058-59 (6th Cir. 2022).

**II. The Ohio Parental Notification by Social Media Operators Act violates the First Amendment because it restricts covered websites' ability to disseminate protected speech and minors' ability to access and engage in protected speech................................. 4**

    **A. The Act triggers heightened First Amendment scrutiny by imposing parental consent for minors to "access" protected speech and to "use" websites that disseminate a vast amount of protected speech................................. 5**

        **1. Minors and websites have First Amendment rights, and Defendant's attempt to distinguish precedent invalidating parental-consent requirements is unavailing. ................................. 5**

Minors and covered websites each have their own First Amendment rights, and the Act impedes those rights in distinct ways. PI Order, ECF No. 33 at PageID 343, 353-54; NetChoice MSJ, ECF No. 43 at PageID 642-45. Governments lack "the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Yet the Act does precisely that, impeding minors' access to a broad range of protected speech. Websites have the right to publish and disseminate protected speech. *See Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938). But the Act limits covered websites' ability

---

[1] Because NetChoice responded to many of Defendant's arguments in NetChoice's own Motion for Summary Judgment, ECF No. 43, and in an effort to reduce duplication of arguments, NetChoice incorporates all the arguments from that Motion (and has cited it where appropriate).

to disseminate speech to minors absent parental consent, and it imposes further burdens by requiring covered websites to develop and adopt costly systems to process parental consent. Defendant's attempts to distinguish and limit *Brown* are all contrary to *Brown* itself, and the ways that the lower courts have interpreted and applied *Brown*. *See NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *17 (W.D. Ark. Aug. 31, 2023) (applying *Brown* to similar parental-consent requirement to access online speech).

2.   **The Act does not just regulate "contracts"; it regulates "access to" and "use of" websites full of protected speech. ........................................................ 10**

Defendant's central argument that the Act just regulates "contracts" and not speech is erroneous for all the reasons this Court and NetChoice's Motion for Summary Judgment have already identified. PI Order, ECF No. 33 at PageID 344; *see* NetChoice MSJ, ECF No. 43 at PageID 645-47. By its plain terms, the Act requires covered websites to "*deny* [minors] *access to* or *use of* the online web site, service, or product" unless they have parental consent. § 1349.09(B), (E) (emphasis added).[2] Accepting Defendant's argument would grant the government untold power to regulate access to speech, as "some of our most valued forms of fully protected speech are uttered for a profit." *Board of Trustees, State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989).

B.  **The Act is content and speaker based, independently triggering strict scrutiny. ................................................................................................................... 13**

1.   **The Act's coverage provisions restrict access to speech based on the topic and subject matter of speech, and thus based on content. ..................... 13**

As this Court has already concluded, the Act is content based—and that is plain on the face of the Act. *See* PI Order, ECF No. 33 at PageID 344-53; NetChoice MSJ, ECF No. 43 at PageID 651-53. Defendant's arguments do not fully address this Court's previous conclusions. Instead, Defendant first asserts that the Act's parental-consent provision is not itself content based, offering only a conclusory citation to the Act's content-based definition of "operator." § 1349.09(A)(1). Then, Defendant contends that the Act's content-based exceptions for (1) "[c]omments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events"; and (2) "[r]eviewing

---

[2] Unless otherwise noted, statutory citations in this Motion refer to the Ohio Revised Code. This Motion refers to websites, applications, and other digital services covered by the Act as "covered websites." When discussing the Act's requirements, this Motion uses "minor," "adult," and "user" to refer only to Ohio minors younger than 16, adults, and users covered by the Act.

products offered for sale by electronic commerce or commenting on reviews posted by other users," § 1349.09(O)(1)-(2), are not content based. But these exceptions demonstrate the Act "singles out specific subject matter for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015). Defendant's rejoinder that the Act only regulates where interactions take place are belied by the text of the Act itself. And Defendant's attempts to analogize the Act to other laws deemed content neutral by other courts are all unavailing.

**2. The Act's coverage provisions restrict access to speech based on speaker.** ............................................................................................................ 18

The Act is also speaker based, and because those speaker-based distinctions evince "facially content based" preferences, the law triggers strict scrutiny. *Schickel v. Dilger*, 925 F.3d 858, 876 & n.2 (6th Cir. 2019) (cleaned up; quoting *Reed*, 576 U.S. at 164); *see* PI Order, ECF No. 33 at PageID 348-53. Although Defendant offers purported content-neutral justifications of the Act, those justifications are irrelevant in light of the Act's facially content-based distinctions.

**C. The Act cannot satisfy First Amendment strict scrutiny or any other form of heightened First Amendment scrutiny** ..................................................................... 20

The Act's parental-consent requirement cannot satisfy any form of heightened First Amendment scrutiny. The State has not "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Nor is the Act "narrowly tailored to serve a significant governmental interest" under intermediate scrutiny. *Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017) (citation omitted).

**1. Defendant has failed to identify a sufficient governmental interest in restricting minors' access to protected speech.** .................................................. 21

Defendant's asserted governmental interests are not sufficient to restrict minors' access to protected speech. First, Defendant has failed to show "a direct causal link between" covered websites "and harm to minors." *Brown*, 564 U.S. at 799. The Act contains no legislative findings. *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). And the authorities Defendant cites in litigation are either conclusory or disclaim any conclusions about causation. In fact, some of them even cite the fact that "social media" has benefits for minors. Second, the Supreme Court has rejected a governmental interest "in aid of parental authority" as sufficient to justify restrictions on minors' First Amendment rights. *Brown*, 564 U.S. at 802.

**2. The Act is not properly tailored.** ........................................................................ 24

The Act is not properly tailored under any form of heightened First Amendment scrutiny. As this Court has concluded, the Act is both over- and underinclusive for every interest that Defendant has asserted. PI Order, ECF No. 33 at PageID 356-57. Furthermore, there are cross-cutting tailoring flaws that would doom the Act regardless of the interests Defendant asserted.

**3. The Act's coverage exceptions are not severable, and severability does not allow the Court to avoid the strict-scrutiny analysis.** ................................ 33

Defendant argues that strict scrutiny can be avoided if this Court severs the Act's exceptions. This argument fails for several reasons. From the outset, severability is a matter of state law, and Ohio law says that courts generally "cannot sever an unconstitutional exemption when doing so would extend [a law's] reach." *Tipp City v. Dakin*, 929 N.E.2d 484, 503 (Ohio Ct. App. 2010). Because that is exactly what Defendant asks this Court to do—extend the Act to certain "news" outlets and other websites—severance is not proper. Further, Defendant's invitation to sever the Act's exceptions for websites dedicated to news and product reviews, § 1349.09(O), would neither render the Act content neutral nor remedy the Act's constitutional flaws. Severing exceptions to the Act's scope would essentially extend the Act's parental-consent requirement to *more* websites. Broadening the Act in this way would only make the Act's constitutional flaws worse. Regardless, the Supreme Court's recent decision in *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (controlling plurality op.), illustrates that severing content-based exceptions to a law is a last remedial step, *not* a way to for the government to avoid strict scrutiny.

**III. The Ohio Parental Notification by Social Media Operators Act is unconstitutionally vague.** ........................................................................................................................ 35

The Act's key coverage provisions in § 1349.09(A), (B), and (O) are unconstitutionally vague. *See* PI Order, ECF No. 33 at PageID 357-58; NetChoice MSJ, ECF No. 43 at PageID 661-64. Defendant's responses to this Court's previous order are wholly conclusory—stating without explaining that provisions this Court has already held unconstitutionally vague actually provide regulated parties and governmental enforcers with sufficient guidance. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Those assertions do nothing to quell the concerns that NetChoice has raised.

## Introduction

Ohio's Parental Notification by Social Media Operators Act ("Act") unconstitutionally restricts minors' "access to" and "use of" websites that undisputedly disseminate vast amounts of protected speech. § 1349.09(E). The Act's parental-consent requirement for minors to access a content- and speaker-based collection of covered websites violates the First Amendment under binding Supreme Court precedent. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 795 & n.3 (2011); *see NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *17 (W.D. Ark. Aug. 31, 2023) (applying *Brown* to similar parental-consent requirement to access online speech). What is more, the Act's central coverage provisions are unconstitutionally vague, leaving many websites across the Internet uncertain about whether they must shoulder the Act's unconstitutional burdens. This Court has already determined as much, based on a materially identical record. *See generally* PI Order, ECF No. 33.

Nothing in Defendant's Motion for Summary Judgment, ECF No. 42, provides this Court reason to reconsider its conclusions. Defendant's arguments do not address this Court's analysis, nor do they grapple with the profound and disruptive effects the Act will have on online speech. Instead, Defendant largely just repeats the same arguments (relying on the same authorities) that this Court has already rejected and that NetChoice has addressed in its Motion for Summary Judgment. *See generally* ECF No. 43. And Defendant's handful of new authorities and glosses on prior arguments fail to carry Defendant's heavy burden to justify the Act's onerous restrictions on covered websites' "ability to publish and distribute speech *to minors* and speech *by minors*." PI Order, ECF No. 33 at PageID 343. Nor do these superficial additions come anywhere near justifying the Act's intrusion on "minors' ability to both *produce speech* and *receive speech*." *Id.*

Accordingly, this Court should deny Defendant's Motion for Summary Judgment and should instead grant NetChoice's Motion for Summary Judgment, ECF No. 43, and award NetChoice all the relief requested therein.

Argument

**I.    NetChoice has standing to assert the interests of Internet users in challenging the Ohio Parental Notification by Social Media Operators Act.**

As explained in NetChoice's Motion for Summary Judgment, NetChoice can raise the interests of Internet users—including minor users—under binding Supreme Court precedent. *See* NetChoice MSJ, ECF No. 43 at PageID 639-41. Defendant no longer disputes that NetChoice has organizational or associational standing to challenge the Act. Def. MSJ, ECF No. 42 at PageID 445-47; Rule 26(f) Report, ECF No. 36 at PageID 417. That is unsurprising: NetChoice members, as some of the "object[s]" of the Act's regulation, have standing to challenge the Act's restrictions on their ability to disseminate speech. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). And NetChoice, therefore, has associational standing. *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004).[3] The only issue Defendant contests is whether NetChoice can raise the First Amendment interests of its members' minor users.

As the Court has already concluded, the law is clear that NetChoice can. PI Order, ECF No. 33 at PageID 337-42. In short, the "Supreme Court has . . . held that a litigant may assert the rights of a third party 'when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights.'" *Griffin*, 2023 WL 5660155, at *10 (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975)). In *Virginia v. American Booksellers Association*, the Supreme Court held that "in the First Amendment context, litigants are permitted to challenge

---

[3] Defendant makes one reference to "associational" standing and states that "[o]verbreadth . . . is not an exception to Article III standing requirements." Def. MSJ, ECF No. 42 at PageID 445, 447. But Defendant does not argue that NetChoice lacks Article III standing.

2

a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." 484 U.S. 383, 392-93 (1988) (cleaned up); *see also NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *4 (N.D. Cal. Sept. 18, 2023); *Griffin*, 2023 WL 5660155, at *11-12. Here, permitting NetChoice to challenge the Act's parental-consent requirements (which the Act requires NetChoice members to impose) will vindicate the rights of minor users to access speech free from unconstitutional restrictions. It will also vindicate NetChoice members' right to disseminate speech. NetChoice MSJ, ECF No. 43 at PageID 641.

Defendant's only response is to claim that NetChoice members have conflicts of interest with their users. *See* Def. MSJ, ECF No. 42 at PageID 446-47. The Court has rightfully rejected that argument. There is no "tension between the interests of minor use[rs] and NetChoice's members [that] overwhelms the shared interest that the two groups have in free expression." PI Order, ECF No. 33 at PageID 342; *Griffin*, 2023 WL 5660155, at *12 ("NetChoice members are well positioned to raise [the] concerns [of minors].")." Indeed, if purveyors of alcohol can raise the rights of 18-21-year-olds to purchase alcohol, surely NetChoice members can raise the rights of users to receive and express protected speech. *See* Def. MSJ, ECF No. 42 at PageID 446 (citing *Craig v. Boren*, 429 U.S. 190, 194-95 (1976), as an example of proper application of third-party standing).[4]

Furthermore, Defendant's argument improperly conflates standing with the merits of the case. It is a "basic principle" that these two inquiries are "distinct analyses [that] must be conducted

---

[4] Defendant's example of a case where a court concluded that a party lacked standing has no bearing here. *Roberts v. Wamser* is a Voting Rights Act case, not a First Amendment case, where the court concluded that a political candidate is not an "aggrieved person" for purposes of the Voting Rights Act's statutory, private right of action. 883 F.2d 617, 621 (8th Cir. 1989).

separately." *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1058-59 (6th Cir. 2022);

*CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021) (reversing district court's judg-

ment because its "holding conflated the merits . . . with [] standing to bring [the claim]"). And that

is true of Article III as well as prudential standing. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d

602, 612 (6th Cir. 2004) ("Standing poses a threshold question involving constitutional, prudential

and . . . statutory limitations on who may sue, regardless of the merits of that person's claim.").

The standing question here is whether, assuming NetChoice is right about the merits, its

members can raise properly raise the rights of their minor users. Longstanding precedent described

above and cited in this Court's previous order holds that NetChoice can raise those rights. Defend-

ant's assertion of a "significant and pervasive conflict" goes to the merits because it assumes—

wrongly—that the Act does not regulate minors' access to protected speech. Def. MSJ, ECF No. 42

at PageID 446. Instead, Defendant's argument relies both on his (1) *characterization* of the Act as

a regulation of contracts; and (2) *justification* of the Act as necessary to prevent certain harms to

minors. Those are merits arguments, asking the Court to make a conclusion about minors' rights

and the character of the Act. They are also *incorrect* merits arguments, which makes them an

especially bad reason to assert that NetChoice lacks standing. *See* NetChoice MSJ, ECF No. 43 at

PageID 642-53; *infra* at Part II.

## II.    The Ohio Parental Notification by Social Media Operators Act violates the First Amendment because it restricts covered websites' ability to disseminate protected speech and minors' ability to access and engage in protected speech.

The Act unconstitutionally requires minors to secure parental consent to "access" and "use"

a broad range of content- and speaker-based websites. § 1349.09(B), (E). In so doing, it would

restrict minors' access to a broad range of protected and valuable speech. Defendant's Motion

attempts to sidestep the Act's grave First Amendment implications. But even when Defendant tries

to engage this issue, the purported justifications for the Act are untethered from the Act's require-

ments and insufficient to satisfy any form of heightened First Amendment scrutiny.

    **A.**    **The Act triggers heightened First Amendment scrutiny by imposing parental consent for minors to "access" protected speech and to "use" websites that disseminate a vast amount of protected speech.**

        **1.**    **Minors and websites have First Amendment rights, and Defendant's attempt to distinguish precedent invalidating parental-consent requirements is unavailing.**

Defendant does not dispute that minors and websites have First Amendment rights. Nor

could he, as this Court and NetChoice have detailed the extensive body of precedent supporting

those rights—and how that precedent applies in this case to invalidate the Act.

In general, minors have broad First Amendment rights, including the right to speak and

listen absent governmental mandates for prior parental consent. *See, e.g.*, PI Order, ECF No. 33 at

PageID 353-54; NetChoice MSJ, ECF No. 43 at PageID 642-44. Supreme Court precedent holds

that minors "are entitled to a significant measure of First Amendment protection." *Brown*, 564

U.S. at 794 (citation omitted). And governments lack "the power to prevent children from hearing

or saying anything *without their parents' prior consent*." *Id.* at 795 n.3. "No doubt" Defendant

"would concede this point if the question were whether to forbid children to read without the pres-

ence of an adult the *Odyssey* . . . ; or *The Divine Comedy* . . . ; or *War and Peace*." *Am. Amusement

Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001).

Those principles control here. The Act impedes minors' ability to engage in and access

speech by requiring covered websites to "obtain parental consent before allowing any unemanci-

pated child under the age of sixteen to register or create an account on their" website. PI Order,

ECF No. 33 at PageID 333. That means minors' access to a broad range of protected speech on

countless websites will be contingent on securing parental consent. NetChoice MSJ, ECF No. 43

at PageID 643. Consequently, this Court correctly concluded that the Act and other "laws that

require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny." PI Order, ECF No. 33 at PageID 354.

Likewise, websites have broad First Amendment rights to publish and disseminate speech to their users. *See, e.g.*, PI Order, ECF No. 33 at PageID 343; NetChoice MSJ, ECF No. 43 at 644-45; *see Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938). But the Act restricts covered websites' ability to publish speech by (1) limiting their ability to publish speech to minors who do not secure parental consent; and (2) requiring websites to develop and adopt the expensive systems necessary to process and validate parental consent. *See, e.g.*, Paolucci Decl., ECF No. 2-2 at PageID 82-83 ¶ 13. Although Defendant attempts to minimize covered websites' First Amendment rights by saying they merely "host speech,"[5] this Court correctly concluded that covered websites are akin to "publishers of opinion work—a newspaper limited to 'Letters to the Editor,' or a publisher of a series of essays by different authors." PI Order, ECF No. 33 at PageID 343; *see NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022) ("Social-media platforms . . . are private companies with First Amendment rights, and when they (like other entities) disclose, publish, or disseminate information, they engage in speech within the meaning of the First Amendment." (cleaned up; citation omitted)), *cert. granted in part sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 478 (2023). Some of the best evidence of websites' editorial discretion is the editorial policies that many covered websites publish. *See* Ex. 19 to NetChoice MSJ, ECF No. 43-3 at PageID 853-55 (Dreamwidth Diversity Statement).

Defendant largely ignores both this precedent and the Act's inevitable curtailment of minors' access to speech and websites' ability to publish speech. Instead, Defendant attempts to limit and distinguish the Supreme Court's rejection of parental-consent requirements in *Brown v.*

---

[5] Def. MSJ, ECF No. 42 at PageID 443.

*Entertainment Merchants Association.* Those arguments are unconvincing and out of step with the way that other lower courts have applied *Brown*—including how *Griffin* applied *Brown* to a similar parental-consent requirement. 2023 WL 5660155, at *17.

*First*, Defendant argues that *Brown* applies only to content-based regulations of speech. *See, e.g.*, Def. MSJ, ECF No. 42 at PageID 463-65, 468. Sometimes the argument is narrow: not all parental-consent requirements require strict scrutiny. *See id.* at PageID 465 ("The types of parental-consent requirements discussed in *Brown* were content-based, and require strict scrutiny. The Act is not, and doesn't."). But Defendant also suggests a broader and much more radical argument: Although the First Amendment protects minors from *content-based* parental-consent requirements, it is silent as to all other kinds of parental-consent requirements. *See id.* at PageID 463-65; *id.* at PageID 465 ("*Brown* did not vitiate a state's ability to require parental consent before a minor can access certain places, speakers, or mediums—so long as that consent requirement is not based on content."). Both arguments fail for all the reasons discussed below at pp.13-18, as the Act is content-based in multiple ways.

But these arguments have a more fundamental flaw, as they give short shrift to minors' rights to "speak or be spoken to without their parents' consent"—which *Brown* went to great pains to vindicate. *Brown*, 564 U.S. at 795 n.3. In *Brown*, California attempted to prohibit the "sale or rental of 'violent video games' to minors," though minors were allowed to have and play such games with parental consent. *Id.* at 789. The Supreme Court held this requirement violated the First Amendment. To begin, the Court recounted what it had recognized for decades: Minors have First Amendment rights to speak and to listen. *Id.* at 794. The law at issue in *Brown* offended those principles because it did not regulate the "relatively narrow and well-defined circumstances" where "government [may] bar public dissemination of protected materials to" minors. *Id.* (citation

omitted). And thus the law was subject to heightened First Amendment scrutiny, which it failed. *Id.* at 795-96. True, as Defendant points out, the Court was addressing a case with a content-based regulation, and the Court used content-based examples to illustrate other places where governments cannot require parental consent. *Id.* at 795 n.3 ("political" and "religious" speech); *id.* at 798 ("violent video games"). But nothing in the Court's analysis suggests that its core holding about minors' rights was only limited to content-based regulations. If it were, that would "vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors." *Id.* at 802 (cleaned up; citation omitted). Under Defendant's proffered test, government would be able to restrict minors' access to bookstores, lecture series, telephones, and almost anything else as long as it targeted those "places, speakers, and mediums" in a content-neutral manner. Def. MSJ, ECF No. 42 at PageID 465.

*Second*, Defendant appears to argue that *Brown* was either limited to its facts (violent video games) or that the Act's parental-consent requirement is not the kind of proscription that requires a "longstanding tradition . . . of specially restricting children's access." Def. MSJ, ECF No. 42 at PageID 468 ("The *Brown* Court rejected the idea of any longstanding tradition in the Country to restrict children from access to depictions of violence."). This argument defies *Brown*. *Brown* held that California's parental-consent requirement was unconstitutional because violent video games are *protected speech* for minors, as evidenced by the lack of history of restricting minors' access to violent speech. *Brown*, 564 U.S. at 793, 795. Here, the same is true: The Act regulates minors' access to protected speech and Defendant makes no attempt to demonstrate a "longstanding tradition" regulating a similarly broad range of protected speech. *Id.* at 795.

Defendant's attempts to analogize the Act to other forms of state regulation are therefore beside the point. For example, the Act is unlike "tattoo or body piercing procedure[s]," "using a

tanning facility," and "the release of personally identifying information of students" Def. MSJ, ECF No. 42 at PageID 468 (citations omitted). As NetChoice has explained, the government's interests in regulating tattooing, piercing, and tanning are fundamentally different from its (illegitimate) interest in regulating access to "vast quantities of constitutionally protected speech" online. *Griffin*, 2023 WL 5660155, at *17; *see* NetChoice MSJ, ECF No. 43 at PageID 655-56. Tattooing, piercing, and tanning involve conduct that the State can regulate to the extent that it imposes health risk or harms. In other words, the State can regulate the use of needles in tattooing and piercing for the same reason it can regulate needles in medical contexts. Thus, there is a reason that Defendant equated tattooing, piercing, and tanning with third parties' disclosure of personal information, Def. MSJ, ECF No. 42 at PageID468—the State's *common, legitimate* interest in regulating those three things is in regulating *conduct*.

What the State cannot do is regulate the expressive qualities of tattooing, piercing, and (to the extent it exists) tanning. In other words, the State's interest in regulating tattoos is in regulating the needles placing permanent ink under the skin of its citizens—not the speech that may result. If the State tried to limit this conduct *based on* its expressive content, as it has done for covered websites here, any such law would be unconstitutional. For instance, governments could not ban or give special protections to tattoos or piercings that reflect "news and current events" or that "review[] products." § 1349.09(O). Nor would the State have much of an interest in regulating temporary tattoos, minors doodling on their arms, books about tattoos, or the protected artwork on the walls of tattoo parlors. Similarly, it is entirely unclear how the Act's restrictions on minors' access to online speech is similar to a law preventing third parties from "releas[ing] . . . personally identifiable information . . . concerning any student attending a public school[.]" § 3319.321(B).

### 2.   The Act does not regulate just "contracts"; it regulates "access to" and "use" of websites full of protected speech.

Rather than engage with the First Amendment implications of the Act or attempt to satisfy the heightened scrutiny it requires, Defendant maintains that the "Act regulates contracts, not speech" and thus is subject to lenient rational-basis review. Def. MSJ, ECF No. 42 at PageID 448; *see id.* at PageID 448-54. This argument requires Defendant to steadfastly ignore the Act's text and effects. Moreover, the implications of this argument would give the government untold power over speech. For those reasons and more, Defendant's Motion offers this Court no basis to reconsider its conclusion that "a law prohibiting minors from contracting to access to a plethora of protected speech can[not] be reduced to a regulation of commercial conduct." PI Order, ECF No. 33 at PageID 344; *see also* NetChoice MSJ, ECF No. 43 at PageID 645-47. Although Defendant accuses NetChoice of "First Amendment *Lochner*ism,"[6] it is Defendant who is guilty of an even older constitutional misstep: erroneously characterizing a clear restriction on speech as a restriction on conduct.

Throughout the litigation, Defendant has failed to even quote—let alone explain—the Act's requirement that covered websites deny "access" and "use" to minor users who lack parental consent. § 1349.09(B), (E). Defendant's Motion is not different. Specifically, unless parents provide "verifiable consent," covered websites must "*deny* [minors] *access to* or *use of* the online web site, service, or product." § 1349.09(B), (E) (emphases added). Contrary to Defendant's assertion, therefore, the Act severely "restrict[s] what content businesses may make available to consumers." Def. MSJ, ECF No. 42 at PageID 448. Consequently, "the Act is an access law masquerading as a contract law." PI Order, ECF No. 33 at PageID 344.

---

[6] *See* Def. MSJ, ECF No. 42 at PageID 442, 453.

It is true that many covered websites, like nearly every other website on the Internet (*see infra* at pp..25-26), have terms of service. *See* Def. MSJ, ECF No. 42 at PageID 449-53.[7] But the Act does not regulate those terms of service on covered websites. Nor does it regulate licensing agreements, forum-selection, indemnification, data collection, or any of the other contractual provisions that Defendant identifies. *See id.* Rather, the Act creates a dichotomy: (1) either minors secure parental consent and gain "access to" and "use of" all the speech on covered websites; or (2) minors do not secure parental consent, and are denied "access to" and "use of" the covered websites. § 1349.09(B), (E). Thus the Act does not "strik[e] at the commercial aspect of the relationship between social media platforms and their users"—it aims at "the speech aspect of the relationship." PI Order, ECF No. 33 at PageID 344. And because the Act "only requires parents to give express permission to create an account on a regulated [website] *once*," *Griffin*, 2023 WL 5660155, at *20, it says nothing at all about the commercial terms under which minors use covered websites once they have created an account. This is just further confirmation that the Act regulates access to speech, not aspects of a commercial relationship.

Tellingly, the Act leaves many other terms of service on the Internet unregulated, suggesting that the State's particular problem is with the covered websites themselves—and the speech on them. NetChoice MSJ, ECF No. 43 at PageID 647. In fact, the Attorney General's defense of the Act as a regulation of contract is belied by Defendant's own Motion for Summary Judgment, which states that the Act "was passed in response to growing concern about the well documented physical- and mental-health risks posed to children by certain functions and features common to

---

[7] Defendant cites TikTok's terms of service—as did this Court's order, PI Order, ECF No. 33 at Page ID 355—but TikTok is no longer a NetChoice member and TikTok was never identified as a covered website. *See* Compl., ECF No. 1 at PageID 6 ¶12; NetChoice PI Motion, ECF No. 2 at PageID 44; Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 11; NetChoice, About Us, https://perma.cc/2VV8-K5EL.

many internet media platforms" Def. MSJ, ECF No. 42 at PageID 444-45 (citing declaration). That dissonance pervades Defendant's Motion, which never settles on a coherent theory for what the Act targets or why it was passed—whether terms of service or purported risks on websites.

Defendant's theory appears to be that commercial or for-profit speech can be freely regulated so long as it has some connection to a contract. This would have broad implications for free speech—including adults' access to speech free from governmental restraint. After all, "[s]ome of our most valued forms of fully protected speech are uttered for a profit," and likely to be accompanied by contractual terms. *Bd. of Tr., State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989); *see Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (observing that speech is "published and sold for profit does not prevent [it] from being a form of expression whose liberty is safeguarded by the First Amendment"). For one, there is no reason why the State could not outright *prohibit* covered websites from entering into these same "one-sided contracts" with minors *and adults* to access their services. Def. MSJ, ECF No. 43 at PageID 453-54. More generally, there are countless examples of "commercial-consumer . . . relationships" and "commercial transactions" to access and engage in protected speech in everyday life. *Id.* at PageID 452-53; *see* NetChoice MSJ, ECF No. 43 at PageID 646-47.

Though Defendant attempts to paint covered websites' terms of service in insidious terms, it is possible to do that with anything. Signing up for accounts on news websites requires agreeing to terms of service. *See* Exs. 27-29 to NetChoice MSJ, ECF No. 43-3 at PageID 900-52. In return, those websites (in Defendant's words) "gain[] an opportunity to advertise . . . , collect . . . data, and engage in a wide array of other activities intended to benefit the [website] financially." Def. MSJ, ECF No. 43 at PageID 449. Though the Act leaves those websites unregulated, Defendant's arguments suggest that the State would have been allowed to restrict *adults'* access to such

12

websites under the guise of regulating their terms of service. That cannot be right (although Defendant does not disclaim such a power).

Protected speech in a market economy is often the result of some kind of commercial exchange. The leading case here is styled *Brown v. Entertainment Merchants*, after all (likewise for *Virginia Booksellers*, among other stalwarts). Though the State has many tools to regulate the market, impeding people's access to protected speech is not among them.

**B.     The Act is content and speaker based, independently triggering strict scrutiny.**

The Act triggers strict First Amendment scrutiny in other ways too, as the Court has determined and as NetChoice has explained. Its restrictions on minors and websites' speech rights discriminate based on content and speaker. *See* PI Order, ECF No. 33 at PageID 344-53; NetChoice PI Motion, ECF No. 43 at PageID 648-53. Defendant's arguments to the contrary fail to grapple with this Court's previous order and ignore the Act's plain content-based distinctions.

**1.     The Act's coverage provisions restrict access to speech based on the topic and subject matter of speech, and thus based on content.**

Contrary to Defendant's assertions, the Act contains multiple content-based distinctions triggering strict scrutiny. *See* NetChoice MSJ, ECF No. 43 at PageID 651-53. A law is content based whenever it draws regulatory distinctions based on "message," "ideas," "subject matter," or "content"—*i.e.*, whenever it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted). Some of the Act's "facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.*; *see* NetChoice MSJ, ECF No. 43 at PageID 648-51. But subtle or otherwise, all of these distinctions are content based, and Defendant's contrary arguments go nowhere.

*First*, Defendant has no response to the content-based distinctions that are inherent in the Act's core coverage provisions and its nonexhaustive 11-factor analysis for determining whether websites "target[] children" or are "reasonably anticipated to be accessed by children" § 1349.09(A)(1), (C). Instead, Defendant provides a single conclusory sentence that the Act's "operative prohibition requires covered operators who wish to contract with minors to first obtain parental consent because of extrinsic qualities unrelated to any 'substantive message' they might convey." Def. MSJ, ECF No. 42 at PageID 455 (citing § 1349.09(A)(1), (B)(1)). That is wrong. The Act's "operative" requirement (*i.e.*, the parental-consent requirement in Sections 1349.09(B), (E)), is driven by the Act's *coverage provisions*, which are content based. Defendant does not address this Court's conclusion that these coverage provisions are content based. *See* PI Order, ECF No. 33 at PageID 351-52; *see* NetChoice MSJ, ECF No. 43 at PageID 649-50. Nor does Defendant address the statute's nonexhaustive 11-factor analysis to determine whether websites "target[] children" or are "reasonably anticipated to be accessed by children." § 1349.09(C); *see* NetChoice MSJ, ECF No. 43 at PageID 650-51.

*Second*, Defendant erroneously argues that the "the Act's *exceptions*, are also unconcerned with a website's 'substantive message.'" Def. MSJ, ECF No. 42 at PageID 455-56 (emphasis added; citing § 1349.09(O)). Simply reading the Act's exceptions "for product review websites and 'widely recognized' media outlets" refutes this argument because they are "easy to categorize as content based." PI Order, ECF No. 33 at PageID 352. Importantly, the Act is content based both in the websites it regulates and the precise speech from minors it regulates. This Court already observed that the Act treats websites dedicated to product reviews differently based on content. PI Order, ECF No. 33 at PageID 353; *see* NetChoice MSJ, ECF No. 43 at PageID 649. Similarly, some websites dedicated to news are excepted, but a website dedicated to history or futurism is

14

not. § 1349.09(O)(2). And on websites left unregulated by the Act, minors will be able to engage in certain content-based categories of speech without parental consent: (1) "Reviewing products offered for sale by electronic commerce or commenting on reviews posted by other users; (2) Comment[ing] [on] content posted by an established and widely recognized media outlet." § 1349.09(O).[8] The Act thus "favors engagement with certain topics, to the exclusion of others." PI Order, ECF No. 33 at PageID 352. All of these are distinctions based on "subject matter." *Reed*, 576 U.S. at 163. So the Act is not "agnostic as to content." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). Accordingly, all of these distinctions are "plainly [] content-based exception[s] deserving of strict scrutiny." PI Order, ECF No. 33 at PageID 352.

Defendant's remaining arguments are equally unavailing. Defendant first contends that "websites are exempted where 'user interaction is limited' to *public* interactions." Def. MSJ, ECF No. 42 at PageID 462 (emphasis added; quoting § 1349.09(O)); *see also id.* at PageID 456-57. The Act's text cannot support this argument. On many (if not most) covered websites *and* excluded websites, users will be able to interact in similar manners and in similar places. Both covered websites and excluded websites are defined, in part, by allowing users to interact in public or semi-public manners. Covered websites must "allow[]" users to "[c]reate or post content viewable by others," including (but not limited to) public or semi-public places like "video channels . . . and a landing page or main feed that presents the user with content generated by other users."

---

[8] Defendant misconstrues the importance of NetChoice's observation that the Act "restrict[s] a minor's ability to read or comment on an article on one website but not read or comment on the same article on another website." Def. MSJ, ECF No. 42 at PageID 463. Defendant is correct that this is not necessarily a content-based distinction, *see id.*, except to the extent that a minor's differing ability to comment on the same article is based on the Act's content-based coverage distinctions. But Defendant is wrong to argue that this shows the Act is content neutral. Rather, this demonstrates a *tailoring* problem that arises from the law's other content-based distinctions (in addition to demonstrating a speaker-based distinction).

§ 1349.09(A)(1)(d). Likewise, excluded websites are defined by "interaction between users" that takes place on "reviews" and "comments" on articles. § 1349.09(O).

Nothing in the Act's text requires the interaction on excluded websites to be "public"; the interactions may be viewable only to members that have agreed to the terms of service, for example. Rather, the only relevant difference is the subject matter of the content on the excluded websites: product reviews and news. § 1349.09(O). To the extent that the State sought to regulate purely "private" interactions, the Act (1) does not do so, as it regulates many websites with public interactions similar to excluded websites; and (2) draws unnecessary and impermissible content-based distinctions in its efforts to do so, thereby requiring strict scrutiny. PI Order, ECF No. 33 at PageID 353 ("[T]he exceptions as written still distinguish between the subset of websites without private chat features based on their content.").

Then, Defendant attempts to analogize the Act's coverage provisions to the law evaluated and held to be content neutral in *NetChoice, LLC v. Paxton*, 49 F.4th 439, 480-81 (5th Cir. 2022), *cert. granted in part* 144 S. Ct. 477 (2023). That decision was wrongly decided (the Supreme Court is currently reviewing it) and in any event is distinguishable. *Paxton* considered a Texas law that regulated websites that are "open to the public, allow[] a user to create an account, and enable[] users to communicate with other users for the primary purpose of posting" content, but it excluded websites:

> (i) that consist[] primarily of news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider; and (ii) for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of the content described by Subparagraph (i).

Tex. Bus. & Com. Code § 120.001(1)(C). A divided Fifth Circuit panel construed that exception to reach only "websites whose primary purpose is not the sharing of user-generated speech but rather the dissemination of information 'preselected by the provider.'" *Paxton*, 49 F.4th at 481.

16

The Act here contains no similar limitation that covered websites "primar[ily]" have content "pre-selected by the" website. *Id.* Any website that provides the interactive functionalities outlined in § 1349.09(A)(1) and meets the vague standards in § 1349.09(B) and (C) is covered *regardless* of whether they "primarily" disseminate user-generated content or content they author themselves.

Even if it were true in *Paxton* that Texas was simply "targeting a particular medium," that is not true here. *Paxton*, 49 F.4th at 481. Within the category of websites that feature reviews, "a product review website is excepted, but a book or film review website, is presumably not." PI Order, ECF No. 33 at PageID 353. Thus, minor users seeking to engage in speech about product reviews on websites that have dedicated their editorial policies to such reviews do not need parental consent. But those same minors would need parental consent to post reviews about movies. That is a content-based distinction on speech based entirely on the "message" that those minors wish to express. *Cf.* Def. MSJ, ECF No. 42 at PageID 457. Furthermore, the Fifth Circuit panel majority was incorrect that Texas's favored treatment for "news, sports, [and] entertainment" is not a set of content-based distinctions giving rise to strict scrutiny. Tex. Bus. & Com. Code § 120.001(1)(C)(i); *see* Pet. Br. at 37, *NetChoice, LLC v. Paxton*, U.S. No. 22-555 (Nov. 30, 2023).

Defendant's citations to other inapposite cases do not alter this analysis. For example, the State choosing which websites minors can access without parental consent is unlike the ballot-slogan consent law from *Mazo v. New Jersey Secretary of State*, 54 F.4th 124, 131 (3d Cir. 2022). In that case, New Jersey required "candidates [to] obtain consent from individuals or New Jersey incorporated associations before naming ['individuals or New Jersey incorporated associations'] in their slogans" on primary ballots. *Id.* at 132. The court applied the *Anderson-Burdick* framework for restrictions on the "mechanics of the electoral process," and concluded this law permissibly "distinguishes between speech based on extrinsic features unrelated to the message conveyed." *Id.*

17

at 140, 149. Crucially, "the consent requirement" in *Mazo* "applie[d] to all slogans, regardless of message." *Id.* at 149. Here, by contrast, the parental-consent requirement only applies to a content-based collection of websites.

None of the other cases Defendant cites concluded that regulatory distinctions based on evaluating the topic and subject matter of speech were content neutral. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 791-92 (5th Cir. 2024) (imposing speaker-based ban on drone photography); *Hershey v. Jasinski*, 86 F.4th 1224, 1233 (8th Cir. 2023) (requiring advance notice of "non-University publications"); *Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 690 (6th Cir. 2022) (requiring billboards to not have outstanding fees, not be modified without prior approval, and not "maintain[] an illegal device"); *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 937 (9th Cir. 2022) (imposing distinction in *labor law* between different kinds of workers, without targeting First Amendment activity); *Green v. U.S. Dep't of Justice*, 54 F.4th 738, 745 (D.C. Cir. 2022) (regulating "the act of circumvention and the provision of circumvention-enabling tools" in computer code).

Finally, because parents' choices about whether to grant their children consent to access websites are bound by the Act's content-based coverage provisions, the Act's parental-consent requirement is not "evidence of content-neutrality." Def. MSJ, ECF No. 42 at PageID 463 (discussing the "the Act's deference to parents' wishes as to what platforms their children access").

### 2. The Act's coverage provisions restrict access to speech based on speaker.

As Defendant concedes, the Act is also speaker based. PI Order, ECF No. 33 at PageID 347. And "laws that single out the press, or certain elements thereof, for special treatment . . . are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (citations omitted). Contrary to

18

Defendant's assertions, however, the Act's speaker-based distinctions give rise to strict scrutiny because they reflect facially content-based preferences and single out a disfavored subset of web-sites from within the larger Internet. *See* PI Order, ECF No. 33 at PageID 347; NetChoice MSJ, ECF No. 43 at PageID 651-53. Defendant's arguments to the contrary seem to be tailoring arguments meant to *justify* content- and speaker-based distinctions. Def. MSJ, ECF No. 42 at PageID 459-66.

As an initial matter, Defendant's recitation of *Turner*'s analysis illustrates why the Act's speaker-based distinctions trigger strict scrutiny: because they rely on facially content-based distinctions. In *Turner*, "Congress . . . required cable operators to provide carriage to broadcast stations, but [did] not impose[] like burdens on analogous video delivery systems." 512 U.S. at 659. The Court asked "whether Congress preferred broadcasters over cable programmers based on the content of programming each group offers" and concluded no. *Id.* at 658-59. Crucially, *Turner* concluded the law contained no content-based distinctions on its face. *Id.* at 643-44. It was for *that* reason that the Court delved into Congress's "manifest purpose." *Id.* at 645. Here, however, there is no reason to delve into the purpose or intent of the Act, as the Legislature codified its content-based preferences into the Act's coverage provisions. *See* NetChoice MSJ, ECF No. 43 at PageID 651-53; *see supra* pp.13-18. Thus, this is a case in which a speaker-based law is "facially content based" and "cannot be 'justified without reference to the content of the regulated speech.'" *Schickel v. Dilger*, 925 F.3d 858, 876 & n.2 (6th Cir. 2019) (cleaned up; quoting *Reed*, 576 U.S. at 164).

Defendant's other attempts to justify the Act's speaker-based distinctions cannot do away with the Act's facially content-based preferences. No matter whether the Act is purportedly intended to regulate "contracts" or "online spaces where certain features and functions exacerbate

19

health and safety risks," the Act triggers strict scrutiny because it uses *content* to draw those distinctions. *Cf.* Def. MSJ, ECF No. 42 at PageID 460. That triggers strict scrutiny regardless of whatever legislative intent may be behind the Act. Otherwise, government could always skirt strict scrutiny by pointing to some purported justification of the law. If it were that easy to avoid strict scrutiny, the California law rejected in *Brown* could have survived as a speaker-based regulation of video-game providers aimed at (1) the commercial contracts of "sale[s]" and "rental[s]" of video games; and (2) the specific harms caused by violent video games in particular. 564 U.S. at 789.

Finally, even assuming that the Act were content neutral, its effect on minors' access to speech is hardly "incidental," *Turner*, 512 U.S. at 662, as Defendant asserts, *see* Def. MSJ, ECF No. 42 at PageID 447, 454. Defendant offers only conclusory half sentences of support for this argument, which would be erroneous no matter what Defendant said. Restricting minors' ability to share creative writing on Dreamwidth, discuss religion on one of many forums, discuss their hobbies on one of many other forums, "petition their elected representatives and otherwise engage with them in a direct manner" on X, "share vacation photos . . . with their friends and neighbors" on Facebook and Instagram, and otherwise engage in and access protected speech on the broad range of websites covered by the Act imposes far more than an "incidental" burden on those minors' speech. *Packingham v. North Carolina*, 582 U.S. 98, 104-05 (2017).

### C. The Act cannot satisfy First Amendment strict scrutiny or any other form of heightened First Amendment scrutiny.

The Act's parental-consent requirement cannot satisfy any form of heightened First Amendment scrutiny. This is not the "rare . . . permissible" regulation restricting speech that survives strict scrutiny. *Brown*, 564 U.S. at 799 (citation omitted). The State has not "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Even under Defendant's erroneous assertion

that the Act deserves (at best) intermediate scrutiny, the Act is not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted).

1. **Defendant has failed to identify a sufficient governmental interest in restricting minors' access to protected speech.**

Defendant has failed to provide a sufficient governmental interest justifying restricting minors' access to protected speech. *See* NetChoice MSJ, ECF No. 43 at PageID 654-56. Though Defendant has identified governmental interests that are legitimate and laudable in the abstract, he has not connected those interests to the Act's text or effects.

**Protecting the health and safety of minors.** Though the State undoubtedly has a compelling interest in "protecting the health and safety of minors," Def. MSJ, ECF No. 42 at PageID 466, *Brown* holds that this interest does not permit restrictions on protected speech in the name of protecting minors. 564 U.S. at 799. Nor has the State advanced a specific governmental interest sufficient to restrict minors' access to protected speech, or "specifically identif[ied] an 'actual problem' in need of solving." *Id.* Rather, the sources that Defendant cites recognize that the link between "social media" use and alleged harms to minors is far from clear.

Defendant's *ipse dixit* is not enough to establish that covered websites are harmful, and Defendant has also failed to show "a direct causal link between" covered websites "and harm to minors." *Id.* The Act contains no legislative findings. *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *see Turner*, 512 U.S. at 646 (relying on "unusually detailed" legislative findings to uphold law under intermediate scrutiny). And the authorities Defendant cites are either conclusory or

21

disclaim any conclusions about causation.[9] In fact, the record evidence demonstrates *positive* effects from social media as well. *See* Ex. B to Def. MSJ, ECF No. 42-2 at PageID 495 (citing multiple studies on the benefits of social media use and identifying that, among other things, "[s]ocial media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests").

Accordingly, the record Defendant has assembled here is much like the deficient record in *Brown*, where "nearly all of the research" showing any harmful effects "is based on correlation, not evidence of causation." 564 U.S. at 800 (cleaned up; citation omitted). Here, the sparse record certainly does not show that the full range of "thousands" of websites covered by the Act *cause* harms to minors sufficient to suppress those minors' access to protected speech. And even for the small handful of websites that Defendant's arguments and authorities emphasize, the "evidence is not compelling." *Id.*

Furthermore, the State lacks a legitimate interest in regulating the expressive aspects of the covered websites themselves. The State lacks a legitimate interest in regulating covered websites

---

[9] *See, e.g.*, Ex. B to Def. MSJ, ECF No. 42-2 at PageID 493 ("More research is needed to fully understand the impact of social media[.]"), PageID 499 ("more research is necessary to understand whether one causes the other"), PageID 500 ("Most prior research to date *has been correlational*, focused on young adults or adults, and generated a range of results." (emphasis added)), PageID 500-01 (identifying "Known Evidence Gaps"); Ex. C to Def. MSJ, ECF No. 42-3 at PageID 517 ("Meta-analyses have identified small or negligible negative links between social media use and well-being, while experimental evidence is mixed. Longitudinal observational studies that have investigated the predictive relationships between social media use and well-being have found that they are either reciprocal, only present in a certain direction or sex or not present at all."), PageID 520 ("The study has multiple limitations that need to be considered. First, to interpret the parameters from our analyses as estimates of causal effects one would need to adopt [five] assumptions[.] . . . Only if these assumptions are met can this observational study be said to capture the causal effects between social media and life satisfaction. Second, the data are self-report and therefore only allow inferences about the impact of self-estimated time on social media, rather than objectively measured social media use.").

simply because they are interactive,[10] as "interact[ivity]" is itself a hallmark of protected speech. *Id.* at 798. Likewise, the State lacks a legitimate interest in restricting minors' access to websites because the State deems the speech disseminated by websites "addictive." Def. MSJ, ECF No. 42 at PageID 441-42, 461, 469. "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011); *id.* at 577-78 (the First Amendment protects "catchy jingles"). Once the Court strips away all of the illegitimate interests, what appears to remain is an improper attempt to "restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. And that appearance is only underscored by the Act's content-based exceptions for preferred websites.

**Aiding parental authority.** Defendant again asserts a governmental "interest in protecting the fundamental right of parents to make decisions about their children's care and upbringing." Def. MSJ, ECF No. 42 at PageID 467. But *Brown* rejected a functionally identical interest "in aid of parental authority" as sufficient to justify restrictions on minors' First Amendment rights. *See* PI Order, ECF No. 33 at PageID 356 (quoting *Brown*, 564 U.S. at 802); *see* NetChoice MSJ, ECF No. 43 at PageID 654-55. Defendant largely does not respond to this Court's analysis.

As relevant here, the government lacks a "compelling state interest" in "[f]illing the remaining modest gap in concerned parents' control" left by existing private means of parental oversight. *Brown*, 564 U.S. at 803. In response, Defendant disputes that existing parental controls are "preventative enough" and argues that the Court and NetChoice "ignore the reality of the pervasiveness . . . of technology." Def. MSJ, ECF No. 42 at PageID 470. But it is precisely the widespread availability of technological tools that makes government intervention improper. *See* PI Order, ECF No. 33 at PageID 356; NetChoice MSJ, ECF No. 43 at PageID 631-32, 655.

---

[10] Def. MSJ, ECF No. 42 at PageID 456-457, 460-62.

Defendant's main concern is that "[p]arents are not always aware of the different types of platforms their minor children use." Def. MSJ, ECF No. 42 at PageID 470; *id.* at PageID 471 ("Often parents do not know which platforms their children are using[.]"). But existing and readily available parental tools help with *precisely that*. *See, e.g.*, Szabo Decl., ECF No. 2-1 at PageID 68-70 ¶ 8. For example, wireless routers and browsers allow parents to monitor the websites their minor children visit. *Id.* at PageID 68-69 ¶ 8.a, c. Similarly, devices and browsers allow parents to limit their minor children only to approved websites. *Id.* at PageID 68-69 ¶ 8.b, c.

Defendant's attempts to distinguish *Brown* are unconvincing, for the reasons discussed above at pp.6-9. Particularly relevant here, Defendant asserts (again) that *Brown*'s holding was limited to a content-based regulation of speech. Def. MSJ, ECF No. 42 at PageID 468. As shown above, the Act here is also content-based, but that is a distinct issue from whether a governmental interest is compelling. Just as in *Brown*, Defendant fails to identify such a compelling interest.

### 2. The Act is not properly tailored.

Defendant has failed to carry his burden to demonstrate that the Act is properly tailored under any form of heightened First Amendment scrutiny. *Brown*, 564 U.S. at 799 (government carries the burden to demonstrate law satisfies strict scrutiny); *see Packingham*, 582 U.S. at 108 (same, under intermediate scrutiny).

This Court has already concluded that the Act is either over- or underinclusive—or both— for every governmental interest Defendant has asserted. PI Order, ECF No. 33 at PageID 356-57. The Act both "sweeps too broadly," burdening and "chilling more constitutionally protected speech than is necessary," *and* "leav[e]s out and fail[s] to regulate significant influences bearing on the [State's] interest." *Griffin*, 2023 WL 5660155, at *16 (cleaned up) (concluding that similar parental-consent requirement failed intermediate scrutiny). Those problems are fatal under both strict and intermediate scrutiny. Nothing in Defendant's Motion addresses this Court's previous

24

analysis. And nothing in Defendant's Motion justifies the Act's combination of startling breadth and curious exceptions. Indeed, many of Defendant's arguments contradict each other.

**The Act is not properly tailored to further parental authority.** The Act is not properly tailored to further the State's interest in "protect[ing] parents' fundamental right to control their children's upbringing." Def. MSJ, ECF No. 42 at PageID 469; *see* PI Order, ECF No. 33 at PageID 356; NetChoice MSJ, ECF No. 43 at PageID 658-59.

First, Defendant's assertion of this interest is undermined by other arguments Defendant makes in his Motion. Specifically, Defendant argues the parental-consent requirement will "ensur[e] heightened awareness of the terms (and potential pitfalls) of the contracts their children are agreeing to." Def. MSJ, ECF No. 42 at PageID 471. Yet elsewhere, Defendant asserts that "97% of *adults* aged 18 to 34 reported willingly accepting legal terms and conditions . . . without ever reading them." *Id.* at PageID 460 (citation omitted; emphasis added); *see id.* (citing similar study). If true, Defendant does not explain why adults would read covered websites' contracts more closely when asked to consent to the many covered websites that their minor children will wish to access. *See* NetChoice MSJ, ECF No. 43 at PageID 643.

Second, the Act is "wildly underinclusive when judged against" Defendant's "asserted justification." *Brown*, 564 U.S. at 802. Terms of service to access websites are pervasive on the Internet. *See Van Buren v. United States*, 593 U.S. 374, 394 (2021) ("Many websites, services, and databases . . . authorize a user's access only upon his agreement to follow specified terms of

service.").[11] But the Act only seeks to "ensur[e] heightened [parental] awareness of the terms" of contracts on some of those websites. Def. MSJ, ECF No. 42 at PageID 471. If such "one-sided" contracts necessitate parental consent, *id.* at PageID 442, 446, 453, it makes no sense to regulate these contracts *only when* they provide access to protected speech, and leave them otherwise unregulated. If anything, it should be the other way around. This underinclusiveness fails strict scrutiny. *Brown*, 564 U.S. at 802. Although Defendant cites a declaration stating that only covered websites carry the risks the State is concerned about, those kinds of conclusory assertions are not sufficient to satisfy strict scrutiny. *See* Def. MSJ, ECF No. 42 at PageID 460-61 (citing Ex. D ¶ 11); *see John Doe, Inc. v. Mukasey*, 549 F.3d 861, 881 (2d Cir. 2008) (governments cannot, "consistent with strict scrutiny standards," rely "on a conclusory assurance").

Finally, Defendant suggests that the Act's parental-consent requirement is a tailoring feature and not the Act's main constitutional bug. Def. MSJ, ECF No. 42 at PageID 471 ("The parent, who typically knows their child best, can then decide based on that child's best interests. This further tailors the Act toward the state's interests."). That ignores Supreme Court and lower court precedent—not to mention this Court's previous order. *See, e.g.*, NetChoice MSJ, ECF No. 43 at PageID 642; *see supra* p.5. True, *Ginsberg v. New York* observed that the law at issue in that case did "not bar parents who so desire from purchasing [] magazines" containing *unprotected* speech for minors. 390 U.S. 629, 639 (1968); *see id.* at 635 ("no issue is presented concerning the obscenity of the material involved" (cleaned up)). That observation has no bearing here, where the State

---

[11] Defendant cites a 2001 case about Netscape, which illustrates just how long these terms of service have been prevalent online. Def. MSJ, ECF No. 42 at PageID 449-50 (citing *Specht v. Netscape Commc'ns Corp.*, 150 F.Supp.2d 585, 594 (S.D.N.Y. 2001)); *see also* Defending Corp. & Indiv. in Gov. Invest. § 21:14 ("Terms of Service agreements are ubiquitous in today's society. They place restrictions on our *use* of everything from smartphones and public computers to social media websites and streaming services.").

has regulated minors' access to *protected* speech. Similarly, the statute in *Reno v. ACLU* facially regulated both minors and adults' access to a mix of *clearly unprotected* and protected speech for minors. 521 U.S. 844, 865 (1997). As one part of a much longer analysis of why that law violated the First Amendment, the Court concluded that the lack of parental consent was only one of *four* reasons that the law "in *Ginsberg* was narrower than the" law at issue in *Reno*. *Id.* As *Brown* later confirmed, a parental-consent requirement for minors to access protected speech would not have altered the outcome in *Reno*. And *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1285 (11th Cir. 2008), is a case about *student* speech rights in school decided before *Brown*. *See* Def. MSJ, ECF No. 42 at PageID 467. The imperative to maintain an environment conducive to learning means that government traditionally has greater authority to regulate public-school students' speech, *see Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 187 (2021), and *Frazier*'s holding may well have been abrogated by *Brown*.

 **The Act is not properly tailored to address alleged harms from websites.** The Act is "a breathtakingly blunt instrument" to address the alleged harms of "social media[]"—let alone the broad range of websites the Act regulates. PI Order, ECF No. 33 at PageID 356. Fundamentally, the Act's requirement for one-time parental consent to address these harms just does not make sense on Defendant's own terms: "[P]arents must only give one-time approval for the creation of an account, and parents and platforms are otherwise not required to protect against any of the

27

specific dangers that social media might pose." PI Order, ECF No. 33 at PageID 356; *see Griffin*, 2023 WL 5660155, at *20 (similar).[12]

The Act is also both over- and underinclusive to address the specific harms that Defendant identifies. PI Order, ECF No. 33 at PageID 355-56; *see* NetChoice MSJ, ECF No. 43 at PageID 659-60.

*Alleged mental health concerns.* The Act is not properly tailored to address the alleged mental health concerns posed by "social media." Def. MSJ, ECF No. 42 at PageID 441-42, 446, 460-61, 466, 469. For example, Defendant contends that *some* websites "utilize user interfaces which can be addictive to minors" because they use "design features" like: "push notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'like'), and algorithms." *Id.* at 461 (cleaned up). Even if those features were "addictive," the Act is not limited to regulating websites with those features. None of those features is included in the Act's central coverage requirements. *Cf.* § 1349.09(A)(1); *see* PI Order, ECF No. 33 at Page 352 ("Features like 'infinite scroll,' . . . are not the features that the Act identifies as hallmarks of the websites it regulates."). That is why websites like Dreamwidth—which lacks such features—must shoulder the Act's burdens. *See* Paolucci Decl., ECF No. 2-2 at PageID 76 ¶ 3. In fact, the Act will likely regulate far more websites *without* these features than *with* these features. *See* Szabo Decl., ECF No. 2-1 at PageID 71 ¶¶ 11-12.

---

[12] Similarly, Defendant contends that the "Act provides parents the opportunity to vet certain platforms before their children's engagement, to see if they [have] addictive user-engagement features and are likely to contain features that attract sexual predators." Def. MSJ, ECF No. 42 at PageID 469. Yet throughout the rest of his Motion, Defendant argues that covered websites are *necessarily* defined by "features that attract sexual predators" and pose other risks. *Id.*; *see id.* at PageID 460-62. In other words, the only websites that parents can provide consent for are websites Defendant argues are inherently dangerous.

As addressed above at pp.21-22, nor does Defendant prove that any covered websites "cause" addiction, *Brown*, 564 U.S. at 799, or cause any of the other mental health problems Defendant attributes to the thousands of websites that the Act regulates. *See, e.g.*, Def. MSJ, ECF No. 42 at PageID 461. For addiction, Defendant attempts to argue that it is "next to impossible for children to get off the[] platforms" because one study states "nearly half of adolescents report being online 'almost constantly.'" Ex. A to Def. MSJ, ECF No. 42-1 at Page 482; *see also* Def. MSJ, ECF No. 42 at PageID 441 (similar). "Online" does not mean "on covered websites"—or even "on social media." Instead, time spent "online" includes time spent on streaming services, news and product review websites, educational platforms, email, and all of the other Internet locations that the Act leaves unregulated.

*Alleged Risk of Predators.* Similarly, the Act is also not properly tailored to address the risk of third-party predators. Def. MSJ, ECF No. 42 at PageID 442, 447, 460-63, 466, 469. The government cannot "suppress[]" the speech of a "law-abiding" minor or website "to deter conduct by a non-law-abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001). By regulating minors' access to protected speech to reduce the risks posed by criminal third parties, the Act imposes the kind of "prophylaxis-upon-prophylaxis approach" that the Supreme Court's First Amendment precedents reject. *FEC v. Cruz*, 596 U.S. 289, 307 (2022). Instead, the State can penalize the criminal conduct itself, as federal and state law already do. *See* 18 U.S.C. § 2425; Ohio Rev. Code § 2907.07(B)(1), (E)(1). As the Supreme Court has squarely held, these kinds of "[s]pecific laws . . . must be the State's first resort to ward off the serious harm that sexual crimes inflict." *Packingham*, 582 U.S. at 107. Plus, many websites themselves engage in content moderation to address the risk of malicious actors. *See, e.g.*, Szabo Decl., ECF No. 2-1 at PageID 67 ¶ 7.c. These are clear less-restrictive alternatives to the Act's restrictions on access to protected speech.

Defendant's references to specific "features that create a hub for sexual predators" show just how poor a fit the Act is to address the acts of criminal third parties. Def. MSJ, ECF No. 42 at PageID 461-63. For instance, Defendant references "encrypted . . . chat functions" as such a dangerous feature. *See, e.g.*, *id.* at PageID 461-63; Ex. D to Def. MSJ, ECF No. 42-4 at PageID 529 ¶ 9. Assuming for the sake of argument that encrypted chats are dangerous, the Act's text does not even mention this function, and the Act's applicability does not turn on whether a given website offers such a function. *Cf.* § 1349.09(A)(1)(d) (listing basic "direct or private messages or chats" as one of five non-exhaustive ways to "[c]reate or post content viewable by others"). Defendant identified only *two* covered websites with such functions. Ex. D to Def. MSJ, ECF No. 42-4 at PageID 529 ¶ 10. But many covered websites do not have "encrypted" chats *or any chat functions at all*. The Act regulates all of those websites without such chats all the same.

*Alleged involuntary release of personal information.* The Act is not properly tailored to address "involuntary releases of personally identifiable and other personal information and data." *See, e.g.*, Def. MSJ, ECF No. 42 at PageID 447, 460, 466. The Act does not regulate data-privacy at all and thus cannot be properly tailored to that interest. Assuming for the sake of argument that the Act had some tangential effect on minors' data privacy, the Act's restrictions on minors' access to speech are far overbroad for addressing data privacy. The State could, like other States, enact data-privacy regulations that do not restrict or burden access to speech. *See, e.g.*, Cal. Civ. Code §§ 1798.100-.199. Defendant's comparison to the federal Children's Online Privacy Protection Act ("COPPA") only underscores how improperly tailored the Act is. Def. MSJ, ECF No. 42 at PageID 477-78. COPPA requires parental consent before certain websites "collect[], use, or disclos[e]" "personal information" from known minors *younger than 13*. 15 U.S.C. § 6502(b)(1)(A)(ii); *see id.* § 6502(a) (regulating websites that are "directed to" or that have

"actual knowledge that [they are] collecting personal information from" such minors); Compl., ECF No. 1 at PageID 10 ¶ 29 (referencing this requirement). COPPA directly addresses minors' data privacy, whereas the Act is a blunderbuss regulation of minors' access to covered websites.

**The Act is overbroad in the range of websites and protected speech it regulates.** Cross-cutting all of Defendant's asserted governmental interests, the Act is overbroad simply in the range of websites—and protected speech on those websites—it regulates. Running throughout Defendant's Motion are arguments and sources about a handful of traditional "social media" websites.[13] Though Defendant attempts to embrace the Act's breadth as a virtue, his only defense of that breadth is conclusory arguments that common interactive functionalities are necessarily harmful. Def. MSJ, ECF No. 42 at PageID 469-70.

**The Act is overinclusive because it will affect adults' (and minors aged 16-17) access to protected speech.** The Act is overinclusive because it will have an effect on adults' (and users aged 16-17) access to speech, *Reno*, 521 U.S. at 874, contrary to Defendant's assertion, Def. MSJ, ECF No. 42 at PageID 469. Although the Act regulates some minors' access to speech, the Act's onerous compliance obligations will necessarily affect websites' ability to disseminate speech to all users. *See* NetChoice MSJ, ECF No. 43 at PageID 645, 665. The costs of processing parental consent for Ohio minors—and risks of doing do incorrectly—will require some websites to alter their operations for *all* users. *Id.*; Paolucci Decl., ECF No. 2-2 at PageID 86 ¶ 20.

---

[13] *See, e.g.*, Def. MSJ, ECF No. 42 at PageID 441 ("social-media megacorporation"); *id.* at PageID 461 ("[S]ome *social-media companies* to whom the Act applies profit heavily from minors' personal information by collecting and selling behavioral data. Additionally, it is well-established that *these companies* utilize user interfaces which can be addictive to minors, given their interactive medium and features that maximize user engagement." (emphases added; internal citation omitted)); Ex. A. to Def. MSJ, ECF No. 42-1 at PageID 482 ("six major platforms"), *cited at* Def. MSJ, ECF No. 42 at PageID 441, 446, 461 & n.8; Ex. C to Def. MSJ, ECF No. 42-2 at PageID 522-23 ("Bebo," "Facebook," "MySpace," "Twitter," and "Whatsapp").

**The Act limiting its definition of minors to those younger than 16 is arbitrary based on Defendant's other arguments.** Defendant asserts that "the Act narrowly targets an age [range] of particular susceptibility," a "window[] [that] occur[s] between the ages of eleven and fifteen." Def. MSJ, ECF No. 42 at PageID 471-72. In support of this argument, Defendant cites one study from the UK that seemingly focused on large "social media" websites. Ex. C to Def. MSJ, ECF No. 42-3 at PageID 522-23. Even if a single study about minors from another country were enough to support legislation that applies to Ohio minors, Defendant still must reconcile the Act's reach with the other arguments he makes in defense of the Act.

Throughout his Motion, Defendant makes sweeping statements about all minors, relying on authorities that seemingly apply to all minors. For instance, Defendant asserts that "[o]nline-contract literacy is a problem for adults—let alone children." Def. MSJ, ECF No. 42 at PageID 460. Defendant similarly asserts that some covered websites "collect[] and sell[] behavioral data," not distinguishing among minors. *Id.* at PageID 461. The sources that Defendant cites for the allegedly addictive qualities of "social media" address studies about teenagers all the way up to age 17. *See, e.g.*, Ex. B to Def. MSJ, ECF No. 42-2; Ex. C to Def. MSJ, ECF No. 42-3. In short, Defendant argues that the Act is necessary to address purported ills that Defendant contends affect *all* minors—yet the Act only requires parental consent for those younger than 16 to access covered websites. According to Defendant's own arguments, that renders the Act underinclusive.

To be sure, the Act would not be any more constitutional if it regulated all minors' access to speech. The Supreme Court has recognized that laws attempting to regulate minors' access to speech must account for "different ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 390. Requiring parental consent for only certain minors to access protected speech is not such a means.

**The Act's purported safe-harbor provision does not make the Act properly tailored.** Defendant asserts that "the enforcement provisions in the statute narrowly tailor the Act in service of its goals." Def. MSJ, ECF No. 42 at PageID 471. Defendant argues, in essence, that the Act is narrowly tailored under the First Amendment because—if websites attempt to comply with the Act's unconstitutional requirements—they may be eligible for the Act's safe-harbor provision. *Id.* ("[O]perators can easily avoid all civil enforcement proceedings and penalties simply by curing the violations that the Ohio Attorney General passes along to them."). That would be akin to arguing a prohibition on political speech is properly tailored so long as the State offers violators the ability to "cure" violations. No principle of constitutional law supports this argument and Defendant cites no caselaw in support of his assertion that that a law's "enforcement provisions" can make a law narrowly tailored. Rather, the Act's staggering penalties for non-compliance certainly make its constitutional flaws worse. *See, e.g.*, NetChoice MSJ, ECF No. 43 at PageID 665.

> **3.** **The Act's coverage exceptions are not severable, and severability does not allow the Court to avoid the strict-scrutiny analysis.**

Perhaps recognizing that the Act's content- and speaker-based restrictions make the Act an especially grave First Amendment violation, Defendant invites this Court to sever the Act's "exceptions." Def. MSJ, ECF No. 42 at PageID 456 n.7. Severability does not solve the problem. Defendant's argument is incorrect as a matter of state law and constitutional law—and fundamentally misconstrues the doctrine of severability.

First, "[w]hether a portion of a state's statute is severable is determined by the law of that state." *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018). Under Ohio law, courts "cannot sever an unconstitutional exemption when doing so would extend [a law's] reach beyond what a legislative body intended." *Tipp City v. Dakin*, 929 N.E.2d 484, 503 (Ohio Ct. App. 2010) (citing *State ex rel. English v. Indus. Comm.*, 115 N.E.2d 395 (Ohio 1953)

(Taft, J., concurring)). Here, this Court should not sever the Act's content-based exceptions, because severing those exemptions would extend the Act to "news" outlets and other websites that the Legislature expressly (and therefore intentionally) excluded from the Act's scope. This "inability to sever the content-based exemptions," *id.*, totally dissolves Defendant's severability arguments. *See id.* (collecting cases under Ohio law); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1269 n.16 (11th Cir. 2005) (under similar Florida law of severability, "invalidating the scheme of exemptions requires us to invalidate the sign code in its entirety").

Second, even if severability were an option under state law, severing the Act's exceptions and requiring parental consent for minors to engage in and access speech on *more* websites would make the law even more overbroad. Requiring minors to secure parental consent to post comments on news sites or to post product reviews, § 1349.09(O), would place yet more protected speech behind state-imposed hurdles. And for websites that require an account just to read this content, the hurdles would place even more protected speech behind the Act's restrictions. In fact, two declarants in this case (Goodreads and Techdirt) both cited the Act's content-based exceptions as reasons their websites may not fall under the Act's scope. *See* Roin Decl., ECF No. 2-3 at PageID 91-92 ¶ 14; Masnick Decl., ECF No. 2-4 at PageID 101-02 ¶ 16. Thus, Defendant invites this Court to "remedy" the Act's unconstitutionality under the First Amendment by requiring minors to secure parental consent before discussing books on Goodreads, for instance.

Finally, Defendant cites no support for the proposition that severability is a means to avoid determining whether a law satisfies strict scrutiny. That is not how severability or heightened First Amendment scrutiny works. Recently, in *Barr v. American Association of Political Consultants, Inc.*, a controlling plurality of the Supreme Court analyzed severability as a *remedy* for a content-based law that *it already concluded* failed strict scrutiny. 140 S. Ct. 2335 (2020) (plurality op.).

Specifically, the Court considered a law generally prohibiting robocalls made to cell phones, but making content-based exceptions for, among other things, collecting debts owed to the federal government. *Id.* at 2346. The Court first concluded that the exception was content-based. *Id.* at 2346-47. Then, it concluded that the exception was unconstitutional under the First Amendment because it could not satisfy strict scrutiny. *Id.* at 2347. Only after (1) determining the law was content based; and (2) concluding the law failed strict scrutiny did the plurality decide to either "invalidate the entire 1991 robocall restriction, or instead to invalidate and sever the 2015 government-debt exception." *Id.* at 2348. In other words, severability was a last remedial step, not a way to avoid the strict-scrutiny analysis. None of the concurrences or dissents in the case suggested that the Court should have used severability to make the law content neutral. In any event, there is nothing that this Court could sever here that would make the Act's parental-consent requirement constitutional.

## III.    The Ohio Parental Notification by Social Media Operators Act is unconstitutionally vague.

The Act's coverage provisions are unconstitutionally vague. *See* PI Order, ECF No. 33 at PageID 357-58; NetChoice MSJ, ECF No. 43 at PageID 661-64. Though Defendant recounts the various standards for unconstitutional vagueness at great length, he offers only conclusory arguments that Sections 1349.09(A), (B), (C), and (O) "give fair notice of conduct that is forbidden or required" and will not give rise to "arbitrary or discriminatory" enforcement. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

As an initial matter, Defendant incorrectly asserts that the Act must be evaluated under "relaxed" vagueness standards. Def. MSJ, ECF No. 42 at PageID 472-74. As explained above in Part II, in this Court's order, and in NetChoice's Motion for Summary Judgment, the Act is subject to the heightened vagueness standards applicable to regulations of speech. PI Order, ECF No. 33

at PageID 357; NetChoice MSJ, ECF No. 43 at PageID 661. "Stricter standards are required where a statute has a potentially inhibiting effect on speech, because the free dissemination of ideas may be the loser." *Boddie v. Am. Broad. Cos.*, 881 F.2d 267, 270 (6th Cir. 1989) (cleaned up).

Most of Defendant's arguments are conclusory, offering just a single sentence asserting that a provision is not vague. For example, Defendant contends (in a single sentence) that the Act's application to websites "who target[] children or are reasonably anticipated to be accessed by children" is not vague. Def. MSJ, ECF No. 42 at PageID 475 (quoting § 1349.09(B)); *see id.* ("[T]he Act is sufficiently specific as to whom it applies—social media operators 'who target[] children or are reasonably anticipated to be accessed by children.'" (quoting § 1349.09(B)). Yet that single sentence does not explain how websites are supposed to determine whether they "are reasonably anticipated to be accessed by" a 15-year-old (and thus subject to the Act) or just 16-year-olds (and thus free of regulation). NetChoice MSJ, ECF No. 43 at PageID 661. Defendant's arguments about the Act's open-ended, and undefined 11-factor analysis to determine whether websites meet this standard is similarly deficient. Although Defendant focuses on *two* of those factors, he leaves the rest of the factors largely unaddressed. Def. MSJ, ECF No. 42 at PageID 477. And whatever superficial similarities exist between this 11-factor analysis and COPPA, *id.* at PageID 477-78, this Court and NetChoice have explained why that comparison is faulty, *see* PI Order, ECF No. 33 at PageID 357; NetChoice MSJ, ECF No. 43 at PageID 661-63.

Similarly, Defendant offers a single sentence asserting that § 1349.09(A)(1)'s "operator" definition is not vague. Def. MSJ, ECF No. 42 at PageID 475 ("'Operator' is expressly defined as 'any business, entity, or person that operates an online web site, service, or product that has users in this state' and allows its users to engage in certain specific conduct set forth in [] § 1349.09(A)(1)(a)-(d)."). Yet it is precisely the "specific conduct," *id.*, that Defendant mentions

only in passing that makes the definition vague. As explained in NetChoice's Motion for Summary Judgment, it is not clear what it means for websites to "allow[]" users to "[i]nteract socially" as compared to any other form of interpersonal interaction. *See* NetChoice MSJ, ECF No. 43 at PageID 663-64. Even if such a line could be drawn, the Act does not explain how a website could prohibit social interaction while allowing other kinds of interaction. *Id.*

Defendant employs the same conclusory approach to the Act's content-based coverage exceptions. § 1349.09(O). Addressing only the Act's exception for "established and widely recognized media outlet[s]," Defendant simply asserts that "the terms 'established', 'widely recognized' and 'primary purpose,' when viewed in context . . . are easy to decipher." Def. MSJ, ECF No. 42 at PageID 475. Perhaps Defendant does not want to explain what he believes "established" and "widely recognized" to mean because that would illustrate that the Act grants the Attorney General the authority to confer benefits on certain favored speakers. Yet the First Amendment demands that government should draw "no distinction" between individuals and the institutional media. *Bartnicki*, 532 U.S. at 525 n.8. Or perhaps he does not want to explain because any proffered elaboration is likely to discriminate based on the viewpoint of the media outlet. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). Or perhaps he cannot distill these vague standards for this Court because he does not yet know. Each of these explanations would be a constitutional problem for the Act.

Notably, Defendant contends that the most important factor in the vagueness analysis is "'the requirement that a legislature establish minimal guidelines to govern law enforcement.'" Def. MSJ, ECF No. 42 at PageID 477 (quoting *Columbia Nat. Res. v. Tatum*, 58 F.3d 1101, 1105

(6th Cir. 1995)). More recent Supreme Court caselaw has discarded any hierarchy between the vagueness doctrine's twin concerns about (1) notice to (potentially) regulated parties; and (2) cabining governmental officials' enforcement discretion. *Fox*, 567 U.S. at 253; *see id.* at 254 ("[T]he broadcasters claim they did not have, and do not have, sufficient notice of what is proscribed.").[14] Notice to (potentially) regulated parties is especially important when governments regulate speech, as this uncertainty alone will chill people from exercising their speech rights. *Fox*, 567 U.S. at 253-54 ("rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech"); *Boddie*, 881 F.2d at 270 (collecting cases).

Defendant's discounting of the importance of notice to regulated parties—in combination with his conclusory contentions that the Act is not vague—are hard to see as anything more than an argument to trust Defendant and his enforcement discretion. Although many regulatory schemes are properly entrusted to Defendant, the speech of Ohio minors and websites across the Internet cannot be.

## Conclusion

Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment, and instead grant NetChoice's Motion for Summary Judgment, ECF No. 43, and award NetChoice all the relief requested therein.

---

[14] *See, e.g.*, *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (treating two considerations as equal); *Johnson v. United States*, 576 U.S. 591, 597 (2015) ("We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges.").

Dated: June 3, 2024                          Respectfully submitted,

                                             s/ Matthew H. Rice
                                             Matthew H. Rice (97290)
                                                 Trial Attorney
                                             SPERLING & SLATER, LLC
                                             55 W. Monroe Street, 32nd Floor
                                             Chicago, Il 60603
                                             Tel: (312) 641-3200
                                             Fax: (312) 641-6492
                                             mrice@sperling-law.com

Joshua P. Morrow*                            Steven P. Lehotsky*
Alexis Swartz*                               Scott A. Keller*
LEHOTSKY KELLER COHN LLP                      Jeremy Evan Maltz*
408 W. 11th Street, 5th Floor                LEHOTSKY KELLER COHN LLP
Austin, TX 78701                             200 Massachusetts Avenue, NW, Suite 700
(512) 693-8350                               Washington, DC 20001
josh@lkcfirm.com                             (512) 693-8350
alexis@lkcfirm.com                           steve@lkcfirm.com
                                             scott@lkcfirm.com
Jared B. Magnuson*                           jeremy@lkcfirm.com
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE                       *(admitted pro hac vice)
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com


                    Attorneys for Plaintiff NetChoice, LLC




                                    39

## CERTIFICATE OF SERVICE

I, Matthew H. Rice, an attorney, certify that on June 3, 2024, I caused Plaintiff NetChoice's Response in Opposition to Defendant's Motion for Summary Judgment to be filed with the Court's CM/ECF system and thereby served upon the following registered users of that system:

Julie M. Pfeiffer
Elizabeth Hanning Smith
Stephen P. Tabatowski
Ohio Attorney General's Office
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, OH 43215

*s/Matthew H. Rice*