**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| NETCHOICE, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 2:24-cv-00047 |
| | ) | |
| v. | ) | Chief Judge Algenon L. Marbley |
| | ) | |
| DAVE YOST, in his official capacity | ) | Magistrate Judge Elizabeth Preston Deavers |
| as Ohio Attorney General, | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| *Defendant*. | ) | |

---

**PLAINTIFF NETCHOICE'S REPLY IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

---

**Table of Authorities**

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)........................................................................................................................3

*Barr v. Am. Ass'n of Political Consultants*,
    591 U.S. 610 (2020).......................................................................................................................9

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)............................................................................................... *passim*

*Mazo v. N.J. Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022) .........................................................................................................9

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)................................................................ *passim*

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) .....................................................................................................4

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015).................................................................................................................9, 10

*Reno v. Am. Civil Liberties Union*,
    521 U.S. 844 (1997)....................................................................................................................12

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011).....................................................................................................................5

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994)...............................................................................................................11, 12

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)....................................................................................................................13

*Vidal v. Elster*,
    2024 WL 2964139 (U.S. June 13, 2024) ....................................................................................9

**Statutes**

Ohio Rev. Code § 1349.09.................................................................................................... *passim*

ii

**Other Authorities**

Nickelodeon, Terms of Use (May 9, 2023), https://perma.cc/NN65-XL7A ...............................15

Yelp, Terms of Service (Feb. 22, 2024), https://perma.cc/KWQ7-KWKX ..................................15

**Table of Contents**

Introduction...................................................................................................................... 1

Argument ........................................................................................................................... 2

I.   NetChoice has standing to assert the interests of Internet users in challenging the Ohio
     Parental Notification by Social Media Operators Act. ............................................... 2

II.  The Ohio Parental Notification by Social Media Operators Act violates the First
     Amendment because it restricts covered websites' ability to disseminate protected speech
     and restricts minors' ability to access and engage in protected speech. .................... 2

     A.  The Act triggers First Amendment strict scrutiny by requiring minors to secure
         parental consent before accessing protected speech. ..................................... 2

     B.  The Act violates the First Amendment by restricting access to protected speech
         on the basis of content and speaker............................................................... 7

         1.  The Act restricts access to speech based on content............................... 7

         2.  The Act restricts access to speech based on speaker. ......................... 11

     C.  The Act cannot satisfy First Amendment strict scrutiny or any other form of
         heightened First Amendment scrutiny. ........................................................ 12

III. The Ohio Parental Notification by Social Media Operators Act is unconstitutionally
     vague... .................................................................................................................... 18

Conclusion ...................................................................................................................... 19

**Introduction**

After over one hundred pages of briefing, Defendant presented no argument, evidence, or authority that justifies departing from what this Court already concluded: Ohio's Parental Notification by Social Media Operators Act ("Act"), Ohio Rev. Code § 1349.09, is unconstitutional. *See* PI Order, ECF No. 33.[1] The few new arguments raised by Defendant in his Opposition should similarly be rejected. ECF No. 44.[2]

*First*, NetChoice has standing to assert the interests of Internet users, including minors, in challenging the Act. *Second*, the Act's requirement for minors to secure parental consent before accessing protected speech violates the First Amendment under binding precedent. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 & n.3, 799 (2011); *see, e.g.*, *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *17 (W.D. Ark. Aug. 31, 2023). The Act triggers strict scrutiny for the additional reason that it is content- and speaker-based. Whatever the reason for triggering strict scrutiny, Defendant has failed to carry the State's burden to demonstrate the Act satisfies heightened First Amendment scrutiny. *Third*, the Act's central, coverage-defining provisions are unconstitutionally vague. *See* § 1349.09(A)-(C), (O).

Accordingly, NetChoice respectfully requests the Court grant NetChoice's Motion for Summary Judgment and award NetChoice all the relief requested therein. ECF No. 43.

---

[1] Unless otherwise noted, further statutory citations in this Motion refer to the Ohio Revised Code. This Reply refers to websites, applications, and other digital services covered by the Act as "covered websites." When discussing the Act's requirements, this Reply uses "minor," "adult," and "user" to refer only to Ohio minors younger than 16, adults, and users covered by the Act.

[2] NetChoice incorporates by reference the arguments made in its previous filings. *See* NetChoice Mot. for TRO, ECF No. 2; NetChoice Reply in Support of Mot. for TRO, ECF No. 29; NetChoice MSJ, ECF No. 43; NetChoice Opp. to MSJ, ECF No. 45.

**Argument**

I.     **NetChoice has standing to assert the interests of Internet users in challenging the Ohio Parental Notification by Social Media Operators Act.**

Defendant does not dispute that NetChoice has standing based upon its members' injuries. And NetChoice may also raise the First Amendment interests of its members' minor users for multiple reasons. *See* PI Order, ECF No. 33 at PageID 340-42; NetChoice MSJ, ECF No. 43 at PageID 639-41; NetChoice Opp. to MSJ, ECF No. 45 at PageID 1000-02.

In response, Defendant advances arguments virtually identical to those made during pre-liminary injunction briefing, including that NetChoice members have a "conflict" with minor us-ers. *Compare* Def. Opp. to PI Mot., ECF No. 28 at PageID 207-09, *with* Def. Opp. to MSJ, ECF No. 44 at PageID 971-73. There, the Court was not "persuaded that any tension between the inter-ests of minor [users] and NetChoice's members overwhelms the shared interest that the two groups have in free expression." PI Order, ECF No. 33 at PageID 342; *see id.* at PageID 340-42. Other courts have been similarly unpersuaded. *Griffin*, 2023 WL 5660155, at *10, *12. Nothing in De-fendant's Opposition warrants reconsideration of NetChoice's standing.

II.    **The Ohio Parental Notification by Social Media Operators Act violates the First Amendment because it restricts covered websites' ability to disseminate protected speech and restricts minors' ability to access and engage in protected speech.**

     A.     **The Act triggers First Amendment strict scrutiny by requiring minors to secure parental consent before accessing protected speech.**

The Act's mandate that minors obtain parental consent before accessing protected speech on covered websites violates the First Amendment. § 1349.09(B). This Court has concluded that the Act "regulates" (1) covered websites' "ability to publish and distribute speech *to minors* and speech by *minors*"; and (2) "minors' ability to both *produce speech* and *receive speech*." PI Order, ECF No. 33 at PageID 343. Because the Act restricts protected speech, it is subject to strict scru-tiny. *See id.* at PageID 354; NetChoice MSJ, ECF No. 43 at PageID 641-47.

The Act inescapably requires covered websites to "deny" minors "*access to or use of*" the websites unless those minors secure parental consent to engage in protected First Amendment activity. § 1349.09(B), (E) (emphasis added). The Act applies to "thousands" of websites where minors may engage in protected speech on all manner of topics. Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 12; NetChoice MSJ, ECF No. 43 at PageID 642-43.[3] But governments lack "the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown,* 564 U.S. at 795 n.3. That protection applies equally to content-based and content-neutral parental-consent requirements. *Cf.* Def. Opp. to MSJ, ECF No. 44 at PageID 975-76.[4] Otherwise, it would "vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to'" minors. *Brown*, 564 U.S. at 802 (citation omitted).

Defendant, however, continues to assert that the Act "does not implicate the First Amendment" at all. Def. Opp. to MSJ, ECF No. 44 at PageID 973. Yet, Defendant does not deny that his theory would grant the State broad authority to regulate all manner of protected speech and even adults' access to such speech. *See* NetChoice MSJ, ECF No. 43 at PageID 646. Many of Defendant's specific arguments have already been rejected by this Court and addressed at length in NetChoice's previous briefing. Defendant's new arguments do not fare any better.

**1.** For the first time in this litigation, Defendant addresses the Act's command to "deny . . access" and "use" of covered websites to minors without parental consent. § 1349.09(E).

---

[3] Defendant misunderstands NetChoice's reliance upon *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). *See* Def. Opp. to MSJ, ECF No. 44 at PageID 973. *303 Creative* demonstrates that websites have the right to publish and disseminate speech—a general conclusion Defendant does not otherwise dispute. NetChoice MSJ, ECF No. 43 at PageID 630, 644.

[4] For the reasons discussed in this Court's Order, NetChoice's previous briefs, and below at pp.7-11, the Act is not content-neutral. PI Order, ECF No. 33 at PageID 344-53; NetChoice MSJ, ECF No. 43 at PageID 648-53.

3

Defendant asks the Court to disregard this language, contending that NetChoice's argument "ignores the condition precedent to the Act's application: that the minor engage in a contractual arrangement with the covered operator." Def. Opp. to MSJ, ECF No. 44 at PageID 974 (citing § 1349.09(B)(1)). This argument does not make the Act "entirely disinterested in speech." *Id.* Rather, this "new" argument is simply Defendant's attempt to make the same erroneous argument that the Act regulates only contracts, which this Court has rejected. PI Order, ECF No. 33 at PageID 344. Moreover, the Act's remedy for lack of parental consent demonstrates why the Act is not "entirely disinterested in speech": it denies access to *protected speech* rather than providing any sort of contract-based remedy. That is why this Court concluded the "Act is an access law masquerading as a contract law." *Id.* (cleaned up).

Nor does Defendant's suggestion that covered websites "dispense[] with [their] contract[s]" absolve the Act of constitutional flaws. Def. Opp. to MSJ, ECF No. 44 at PageID 974; *see id.* at PageID 977. As NetChoice has explained, nearly every website on the Internet requires users to agree to some kind of terms of service "to register, sign up, or otherwise create a unique username to access or utilize" the website. § 1349.09(B)(1); *see* NetChoice MSJ, ECF No. 43 at PageID 631. More generally, terms of service are unavoidable online. *See* NetChoice Opp. to MSJ, ECF No. 45 at PageID 1023-24.[5] Yet the Act singles out only those terms of service that help facilitate access to undisputably protected First Amendment activity. That is a First Amendment problem. And, as discussed more below at pp.7-12, asking only a content- and speaker-based collection of speech-disseminators to abandon such terms of service is not a permissible exercise of

---

[5] In fact, some websites purport to have "browsewrap" contracts: where a user agrees by just using the website. *See, e.g., Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014).

state power. "[C]ontent-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (citation omitted).

Given the ubiquity of website terms of service, it would be impracticable and counterproductive to the Act's goals for covered websites to simply dispense with their terms of service—just as it would be for other Internet websites. The reason these contracts are ubiquitous is because they are important for websites to function. For example, to publish user-generated speech (which is the intellectual property of the users), websites must secure a license to disseminate that user-generated speech. *See, e.g.*, Ex. 28 – CNN Terms of Use, ECF No. 43-3 at PageID 926.[6] Moreover, if covered websites abandon their terms of service as Defendant suggests, it may make websites less secure for minors (and other users). For example, terms of service require users to agree to "content-moderation" policies that provide a contractual right for websites to remove inappropriate and harmful content. *See, e.g.*, Szabo Decl., ECF No. 2-1 at PageID 67 ¶ 7.c. Defendant's suggestion would leave everyone worse off.

Furthermore, if websites eliminated their terms of service, minors could freely access websites that Defendant contends are harmful. If the Ohio "Legislature is perfectly willing to" allow minors to access covered websites "so long as" they dispense with their terms of service, it is hard to see how such a scenario supports any legitimate state interest. *Brown*, 564 U.S. at 802.

Thus, Defendant's suggestion does nothing to alleviate the Act's constitutional infirmity. The Act already puts covered websites to an unconstitutional choice—adopt expensive verification systems or stop publishing speech to minors. NetChoice MSJ, ECF No. 43 at PageID 644-45.

---

[6] Defendant misunderstands the purpose of the licenses for user-generated content on websites like the *New York Times*. *See* Def. Opp. to MSJ, ECF No. 44 at PageID 975 ("It is unlikely that a minor is publishing licensable content in the New York Times."). The licenses are not to publish speech in the newspaper itself; the *New York Times* is securing a license to its users' content that allows it to publish user-generated content like user *comments* on its website.

Defendant's new suggestion does the same thing—eliminate terms of service (and all of their benefits for websites and users) or stop publishing speech to minors.

**2.** Defendant also erroneously dismisses the Supreme Court's decision in *Brown* as "inapposite." Def. Opp. to MSJ, ECF No. 44 at PageID 975-76. But *Brown* is "[p]articularly relevant" because the Act's parental-consent requirement is "exactly [the] sort of law" *Brown* declared to unconstitutionally restrict minors' First Amendment rights. PI Order, ECF No. 33 at PageID 353-54; *see* NetChoice MSJ, ECF No. 43 at PageID 642-47.

Defendant's attempt to avoid *Brown* fails. Defendant asserts that the Act's "function" here is not designed to regulate contracts for "simple transactions" like video game purchases or rentals as in *Brown*, but rather, "complex, *ongoing*, contractual relationship[s]" with covered websites. Def. Opp. to MSJ, ECF No. 44 at PageID 975 (emphasis added). But *Brown*'s vindication of minors' right to access protected speech had nothing to do with the precise nature of the "transaction" at issue in that case, so this purported distinction is irrelevant. *Brown* holds that requiring parental consent before minors engage in speech activities violates the First Amendment and must withstand First Amendment scrutiny. PI Order, ECF No. 33 at PageID 353-54 (citing *Brown*, 564 U.S. at 795 n.3). Furthermore, Defendant's distinction fails on its own terms because the Act does *not* regulate any "ongoing contractual relationship." Instead, the Act simply requires *one-time* consent: "parents must only give one-time approval for the creation of an account," subject to the websites' terms and conditions. *Id.* at PageID 356 (citing *Brown*, 564 U.S. at 802); *see also Griffin*, 2023 WL 5660155, at *18.[7] If anything, Defendant (unpersuasively) disclaims the State's authority

---

[7] This is yet another reason the Act is not narrowly tailored, and it is another argument Defendant does not address. *See* NetChoice MSJ, ECF No. 43 at PageID 660.

to impose "ongoing" regulation of these contractual relationships, as discussed below at p.13. *See* Def. Opp. to MSJ, ECF No. 44 at PageID 982.

Likewise, Defendant incorrectly attempts to limit *Brown*'s holding to the proposition that "legislatures cannot create new categories of unprotected speech directed to children." *Id.* at PageID 976 (citation omitted). It is true that legislatures cannot create new forms of unprotected speech. But legislatures can also violate the First Amendment in other ways. For example, laws requiring minors to obtain parental consent before accessing protected speech are unconstitutional, because minors have the underlying "right to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 795 n.3. Defendant's arguments in defense of the Act are akin to "creat[ing] new categories of unprotected speech": speech that take place on covered websites. *Id.* at 792.

**B. The Act violates the First Amendment by restricting access to protected speech on the basis of content and speaker.**

The Act is also subject to strict scrutiny because its central, coverage-defining provisions, § 1349.09(A)-(B), (O), are content- and speaker-based. *See* PI Order, ECF No. 33 at PageID 353.

**1. The Act restricts access to speech based on content.**

The Act contains numerous content-based distinctions, and none of Defendant's arguments to the contrary is persuasive.

**a.** As an initial matter, Defendant asserts the State is permitted to "restrict[] minors' access to places where they can engage in speech," much like it can prohibit "a minor from entering an establishment that primarily serves alcohol." Def. Opp. to MSJ, ECF No. 44 at PageID 976-77. Almost needless to say, covered websites are nothing like bars: Minors have the First Amendment right to access and engage in protected speech, but they do not have a constitutional right to consume alcohol. The websites regulated by the Act are defined, in part, by allowing their users to "[i]nteract . . . with other users." § 1349.09(A)(1)(a). Put another way, the Act specifically targets

7

websites that facilitate core First Amendment activity among their users—while engaging in their own First Amendment activity themselves. *See* Def. Opp. to MSJ, ECF No. 44 at PageID 974 (stating the Act "target[s]" websites with a "social nature"); *see id.* at PageID 976.

That is why the court in *Griffin* rejected a similar analogy. There, the government likewise "analogized . . . to a restriction on minors entering a bar," which the court deemed "weak" and "not persuasive." *Griffin*, 2023 WL 5660155, at *16. And for good reason—"minors have no constitutional right to consume alcohol, and the primary purpose of a bar is to serve alcohol." *Id.* "By contrast, the primary purpose of a social media platform is to engage in speech," and it is undisputed that "social media platforms contain vast amounts of constitutionally protected speech." *Id.* Adopting Defendant's argument would allow the State to ban minors from libraries, bookstores, and other places similarly dedicated to disseminating protected speech.

Defendant asserts that the Act's limited application to "social" websites is a *virtue*. Def. Opp. to MSJ, ECF No. 44 at PageID 974. But it is the State's attempt to target interaction (*i.e.*, speech)—while exempting favored speech on other websites—that ultimately dooms the Act. The Supreme Court has held that speech's "interactive" quality is itself protected. *See Brown*, 564 U.S. at 798. So Defendant's weak defense that minors do not need parental consent to engage in speech elsewhere on the Internet rings hollow. *See* Def. Opp. to MSJ, ECF No. 44 at PageID 977.

**b.** The Act's exceptions "for product review websites and 'widely recognized' media outlets . . . are easy to categorize as content based." PI Order, ECF No. 33 at PageID 352; *see* § 1349.09(O) (excepting otherwise-covered websites where "interaction between users is limited to" (1) "[r]eviewing products . . . or commenting on reviews posted by other users" or (2) "[c]omments incidental to content posted by an established and widely recognized media outlet"). Defendant disagrees, claiming the "exceptions are concerned with how or where 'interaction between

8

users' occurs on a website—not their content." Def. Opp. to MSJ, ECF No. 45 at PageID 976. That argument is unsupported by the Act's text. *See* NetChoice Opp. to MSJ, ECF No. 44 at PageID 1013-14. And the Court already rejected this argument: "[T]he exceptions as written still distinguish between the subset of websites without private chat features based on their content." PI Order, ECF No. 33 at PageID 353 (emphasis added). The "interaction between users" on the excluded websites is defined by content—"news and current events" and "[r]eviewing" certain "products." § 1349.09(O).[8]

Furthermore, this Court should not accept Defendant's invitation to sever the Act's facially content- and speaker-based exceptions. Def. Opp. to MSJ, ECF No. 44 at PageID 977 n.1. Severing these exceptions (1) is unsupported by Ohio law; (2) would *extend* the Act's unconstitutional effects, not lessen them as in cases like *Barr v. American Association of Political Consultants*,

---

[8] In his Motion for Summary Judgment, Defendant argued that these exceptions are content-neutral, relying, in part, on the Third Circuit's decision in *Mazo v. New Jersey Secretary of State*, 54 F.4th 124 (3d Cir. 2022). Def. MSJ, ECF No. 42 at PageID 457-58. In *Mazo*, the Third Circuit held that a New Jersey law requiring primary-election candidates to obtain consent before referencing a person's or corporation's name in a ballot slogan was "content neutral." 54 F.4th at 149. That decision is distinguishable for the reasons NetChoice explained. *See* NetChoice Opp. to MSJ, ECF No. 45 at PageID 1015-16. But recent Supreme Court precedent makes clear that *Mazo* was also wrongly decided. In *Vidal v. Elster*, the Supreme Court addressed a similar requirement under the Lanham Act to obtain consent before referencing a living person's name in a trademark. The Court held, however, that such a consent requirement was "content based" because it "turns on the content of the proposed trademark—whether it contains a person's name." 2024 WL 2964139, at *5 (U.S. June 13, 2024). That holding clarifies that *Mazo*'s decision on content-neutrality was wrong and underscores that the Act here is likewise content-based. Although the Court in *Vidal* ultimately held the challenged Lanham Act provision did not violate the First Amendment, that holding was limited to the unique features of trademark law, as the Court was careful to explain. *See id.* at *6-12; *id.* at *6 ("Several features of trademark counsel against a per se rule of applying heightened scrutiny to viewpoint-neutral, but content-based trademark regulations."). What is important about *Vidal*'s holding is that, like the consent provision at issue in that case, the Act here is content-based because websites driven by user-generated content and social interactions "are treated differently from [websites] conveying other types of ideas." *Id.* at *5 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015)).

*Inc.*, 591 U.S. 610, 633 (2020) (controlling plurality op.); and (3) does not make the Act content-neutral. *See* NetChoice Opp. to MSJ, ECF No. 45 at PageID 1031-33.

**c.** The Act's "distinction on the basis of [websites'] functionalities"—their means of disseminating and facilitating users' speech—is also "content based." PI Order, ECF No. 33 at PageID 352. Defendant responds this distinction is not "entirely dependent on the website's communicative content" and thus not an "obvious subject-matter distinction." Def. Opp. to MSJ, ECF No. 44 at PageID 977 (cleaned up). But Defendant recognizes that the "functions" regulated by the Act are in fact "communicative content." Indeed, Defendant says that one of the "functions" the Act restricts is "interacting with other users." *Id.* This Court held that such interactions allowing users to "connect socially online . . . may very well be conveying a message about 'the type of community the platform seeks to foster.'" PI Order, ECF No. 33 at PageID 352 (citation omitted). Defendant tries to separate the "social features and functions" regulated by the Act to say they are not "communicative" "*on their own*." Def. Opp. to MSJ, ECF No. 44 at PageID 977-78 (citation omitted). Yet functions like interacting socially and user-generated posts cannot be separated because they are "inextricable from the content produced by those features." PI Order, ECF No. 33 at PageID 352.

**d.** The Act is also content-based because it regulates only websites that "target[]" children or that "reasonably anticipate[]" being accessed by minors. § 1349.09(B). That "singles out specific subject matter for differential treatment." *Reed*, 576 U.S. at 169 (2015). Defendant argues that "[t]he Act's regulation of websites that target or may reasonably [be] anticipated to be accessed by children is unconcerned with the substantive message of cartoons or other communications." Def. Opp. to MSJ, ECF No. 44 at PageID 978. But the Act's regulation of only websites that "target[]" children or that "reasonably anticipate[]" being accessed by minors strongly

10

suggests that the State favors expression and websites that do not appeal to minors, such as professional networking websites. NetChoice MSJ, ECF No. 43 at PageID 651. This further confirms that the Act's central coverage provisions are a content-based regulation of speech.

### 2. The Act restricts access to speech based on speaker.

The Act is also speaker-based, as Defendant conceded. PI Order, ECF No. 33 at PageID 347; Def. Opp. to PI Mot., ECF No. 28 at PageID 215 ("The Act is justifiably speaker-based."). Speaker-based laws "present serious First Amendment concerns" when they "discriminate . . . among different speakers within a single medium." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994); *see* PI Order, ECF No. 33 at PageID 345. That is what the Act does here and thus is "subject to at least some degree of heightened First Amendment scrutiny." *Turner*, 512 U.S. at 641.

Defendant attempts to avoid the implications of this conclusion, arguing that the Act does not discriminate within a medium, but rather "[t]he Act targets 'one medium (*or a subset thereof*) but not others.'" Def. Opp. to MSJ, ECF No. 44 at PageID 979 (quoting *Turner*, 512 U.S. at 660); *see id.* at PageID 978. There are at least two problems with this argument. *First*, Defendant continues to ignore the content-based distinctions the Act draws between covered websites and excepted websites. *See supra* pp.7-11; NetChoice MSJ, ECF No. 43 at PageID 652; NetChoice Opp. to MSJ, ECF No. 45 at PageID 1017-18. Whatever authority governments could have to regulate within "subsets" of "mediums," governments cannot draw content-based lines to do so, as even *Turner* held. 512 U.S. at 642-43. *Second*, Defendant misunderstands *Turner*. *Turner* is clear that "medium" refers to entire categories of technological means of communication, such as "broadcast," "cable," "newspapers," and "magazines." *Id.* at 638, 650. The medium here is Internet websites, and Defendant does not get to further divide that category into subtypes of special websites—especially to impose content-based speech restrictions. Moreover, *Turner* went to great pains to

11

explain that a law treating cable operators differently from "multichannel multipoint distribution [] systems and satellite master antenna television [] systems" was speaker-based. *Turner*, 512 U.S. at 559. The Court concluded those speaker-based distinctions were "justified by special characteristics of the cable medium: the ['physical'] bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television." *Id.* at 661. There is nothing close to such "special characteristics" here or on the Internet, as the Supreme Court subsequently clarified. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 868-69 (1997).

**C.      The Act cannot satisfy First Amendment strict scrutiny or any other form of heightened First Amendment scrutiny.**

NetChoice's Motion for Summary Judgment explained why "[n]one of Defendant's asserted interests justify the Act's restrictions on minors' access to protected speech." NetChoice MSJ, ECF No. 43 at PageID 654; *id.* at PageID 654-60; NetChoice Opp. to MSJ, ECF No. 45 at PageID 1018-31. In addition, "the Act is either underinclusive or overinclusive, or both, for all the purported government interests at stake." PI Order, ECF No. 33 at PageID 357.

In his Opposition, Defendant continues to "toggle[] between several different interests." *Id.* at PageID 354. But Defendant still fails to address or rebut any of NetChoice's arguments about why the State lacks a legitimate governmental interest in regulating minors' access to protected speech. NetChoice MSJ, ECF No. 43 at PageID 654-56. Likewise, Defendant has not addressed all of NetChoice's tailoring arguments. *Id.* at PageID 656-60.

**1.** Defendant still has no persuasive response to the undisputed record evidence about the myriad options parents have to control and supervise their minor children online. *Id.* at PageID 631-32, 658; NetChoice Opp. to MSJ, ECF No. 45 at PageID 1021-22. Defendant acknowledges that "parents could utilize parental-control options to exercise oversight over their minor children's use of the internet" but cites concerns that (1) "[t]echnology is pervasive and

12

ever-evolving"; (2) parents are "not always aware" of what websites their children use; (3) and "children often find ways to circumvent parental control." Def. Opp. to MSJ, ECF No. 44 at PageID 981. However, it is technology's evolution that has provided parents with precisely the tools to be aware of what websites their minor children are using—and many more means to control their online activity. NetChoice Opp. to MSJ, ECF No. 45 at PageID 1022. Defendant provides no evidence that minors can circumvent all the various overlapping and complementary parental tools in ways that render them an ineffective alternative to government regulation. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000). Likewise, Defendant offers no evidence of the relative efficacy of government-imposed parental-consent requirements versus voluntary parental tools. If minors can circumvent parental tools, as Defendant asserts, they may well be able to circumvent parental consent.

**2.** The Act is overinclusive because it does not regulate the contractual provisions that Defendant (sometimes) claims are the object of the State's regulation—instead of barring minors' access to covered websites without parental consent. *See* NetChoice MSJ, ECF No. 43 at PageID 659. Throughout the entire case, Defendant has asserted broad authority to regulate commercial and economic affairs when doing so would impede minors' access to protected speech (*i.e.*, the Act's parental-consent requirement). *See* Def. Opp. to PI Mot., ECF No. 28 at PageID 211-13; Def. MSJ, ECF No. 42 at PageID 448-54; Def. Opp. to MSJ, ECF No. 44 at PageID 973-75. Yet when NetChoice suggests actually regulating pure economic conduct that would have no effect on minors' access to speech (*e.g.*, specific contractual provisions), Defendant claims that the State is powerless. *See* Def. Opp. to MSJ, ECF No. 44 at PageID 982. Defendant's assertions of governmental power have it precisely backwards.

13

Moreover, Defendant's argument here underscores two points in NetChoice's favor. *First*, it is further evidence that the Act targets speech, not contracts. If the goal was problematic contractual terms, the State would target those terms, not restrict minors from accessing protected speech. *Second*, it reveals another reason the Act is underinclusive: even if minor users secure parental consent, nothing in the Act regulates those contractual terms after the one-time parental consent is given. *See* PI Order, ECF No. 33 at PageID 356.

**3.** The Act is also "wildly underinclusive" as a regulation of online contracts containing the specific terms that Defendant claims are harmful. *Brown*, 564 U.S. at 802. Defendant's response to this argument demonstrates a core conflict between Defendant's arguments about the State's governmental interests and the Act's tailoring. When faced with arguments that the Act is underinclusive as a regulation of contracts, Defendant justifies the Act as a regulation of websites' features. But when faced with the argument that the Act is overinclusive as a regulation of websites' features, Defendant justifies the Act as a regulation of contracts. This does not demonstrate proper tailoring: The "overbreadth in achieving one goal is not cured by the underbreadth in achieving the other." *Id.* at 805.

Defendant claims that the Act is not underinclusive because it "does not regulate all online contracts by design." Def. Opp. to MSJ, ECF No. 44 at PageID 974. According to Defendant, certain contractual terms are particularly worthy of regulation—though only via parental-consent, instead of outright bans or other direct regulation. These terms include "royalty-free licenses on content that [] minors produce, permission to harvest minors' personal data, permission to use their names and likenesses in advertising, and enforceable forum selection clauses." *Id.* Yet these terms are ubiquitous on the Internet because terms of service to access and engage in protected speech on websites are ubiquitous. *See* NetChoice Opp. to MSJ, ECF No. 45 at PageID 1023-24;

14

*see supra* p.4. That is true for both websites designed for minors that do not meet the Act's coverage requirements,[9] and websites explicitly exempted from the Act.[10] Because it leaves these other websites with similar or even broader contract terms unregulated, the Act is underinclusive.[11]

To justify this underinclusiveness, Defendant argues that the Act targets the *combination* of contracts and the "unique risks" Defendant contends covered websites pose to minors. Def. Opp. to MSJ, ECF No. 44 at PageID 980. But when faced with the reality that many covered websites like Dreamwidth lack the *features and risks* that Defendant contends are harmful, *see, e.g.*, NetChoice MSJ, ECF No. 43 at PageID 657, Defendant retreats to arguing that websites like Dreamwidth have the kind of *terms of service* that the State deems harmful, *see* Def. Opp. to MSJ, ECF No. 44 at PageID 980. Yet that leads right back to the Act's underinclusiveness as a regulation of contracts.

If the State's interest is in regulating specific contractual terms, it must directly regulate *all* websites requiring agreement to such terms. If the State's interest is in regulating purportedly harmful features, it must target only those websites with such unique features. And if the State has a combined interest in both contracts and purportedly harmful features, it needs an even more nuanced regulatory approach. But the Act does none of this, so it is not properly tailored.

**4.** The Act is overinclusive in the range of websites it regulates. *See* NetChoice MSJ, ECF No. 43 at PageID 657; NetChoice Opp. to MSJ, ECF No. 45 PageID 1029. Defendant does not attempt to justify the full breadth of the Act, but claims "[t]he size of the website" the Act regulates

---

[9] *See, e.g.*, Nickelodeon, Terms of Use (May 9, 2023), https://perma.cc/NN65-XL7A (by using website, user agrees to arbitration agreement and royalty-free licenses).

[10] *See, e.g.*, Yelp, Terms of Service (Feb. 22, 2024), https://perma.cc/KWQ7-KWKX ("[Y]ou hereby irrevocably grant us world-wide, perpetual, non-exclusive, royalty-free, assignable, sublicensable, transferable rights to use Your Content for any purpose.").

[11] This is also another reason why the Act is clearly designed to target websites based on their speech, not to regulate contracts. *See supra* a pp.3-7.

"is entirely unrelated to the risks that covered operators' contractual requirements pose to children." Def. Opp. to MSJ, ECF No. 44 at PageID 980. Defendant's contention that the Act can be justified as a regulation of contract alone is incorrect for the reasons discussed above at pp.3-7. Furthermore, the Act also applies to a host of small websites that cannot afford to implement the Act's parental-consent requirements. For example, NetChoice has presented undisputed record evidence that Dreamwidth cannot afford to comply with the Act, which may affect *adults'* access to protected speech. Paolucci Decl., ECF No. 2-2 at PageID 85-86 ¶¶ 17-19. And Dreamwidth's experience is representative of the "thousands" of smaller websites subject to the Act's sweeping scope. *See* Szabo Decl., ECF No. 2-1 at PageID 71 ¶ 12. The Act's burden on these smaller websites demonstrates that it is both overinclusive and not the least restrictive means to further the State's purported interests.

**5.** The Act is overinclusive to furthering any interest in parental control. *See* NetChoice MSJ, ECF No. 43 at PageID 658. Defendant acknowledges as much: "some parents are disinterested in their child's use of social media." Def. Opp. to MSJ, ECF No. 44 at PageID 981. Yet Defendant claims (1) "the negative effect of social media on minor users is widely recognized"; and (2) "[t]he Act provides multiple methods for parents to confirm their consent." *Id.* at PageID 981-82. These responses miss the point.

Defendant's first response runs right into *Brown*, where the Supreme Court "doubt[ed] that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." 564 U.S. at 802. *Brown* therefore held that law was overinclusive because "[n]ot all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they

16

purchase violent video games." *Id.* at 804. Thus, like the law in *Brown*, the "entire effect [of the Act] is only in support of what the State thinks parents *ought* to want." *Id.*

Nor does it matter how many methods of consent parents have under the Act. The Act imposes a hoop that parents must jump through for minors to access speech. This will inevitably lead to some parents being "dissuaded by the red tape" and "refus[ing] to consent," "unnecessarily burden[ing] minors' access to constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *15. Moreover, Defendant does not address the difficulty for websites to verify a parent-child relationship. *Id.* at *4; Paolucci Decl., ECF No. 2-2 at PageID 83-85 ¶¶ 14-17. Defendant also does not address the undisputed record evidence that not all covered websites will be able to comply with all of the Act's methods of parental consent. *See* Paolucci Decl., ECF No. 2-2 at PageID 82-83 ¶ 13. In these ways, covered websites are in a fundamentally dissimilar position from "school[s]" and other entities that may process parental consent in minor children's day-to-day lives. *Cf.* Def. Opp. to MSJ, ECF No. 44 at PageID 982.

**6.** Defendant concludes that "the Act's parental consent requirement *might at least mitigate* . . . harms associated with covered operators and . . . their minor users." *Id.* at PageID 983 (emphasis added). Where access to protected speech is concerned, the government's assertion that a law "might at least mitigate" some harm is woefully inadequate under any standard of heightened scrutiny. *Id.*; *see Brown*, 564 U.S. at 799. Nor is it NetChoice's burden to *disprove* that "the social nature of these operators' platforms pose physical risks to minors." Def. Opp. to MSJ, ECF No. 44 at PageID 983. If anything, NetChoice has provided ample, undisputed evidence that minors benefit greatly from being able to interact with their peers and the valuable speech available on members' websites. *See, e.g.*, NetChoice MSJ, ECF No. 43 at PageID 630-31. Regardless, it is *Defendant's burden* to prove a causal relationship between all of the websites the Act regulates and the

17

harms that Defendant identifies. *See* NetChoice Opp. to MSJ, ECF No. 45 at PageID 1019-21. Defendant has not.

**III.     The Ohio Parental Notification by Social Media Operators Act is unconstitutionally vague.**

Several of the Act's coverage-defining provisions, including § 1349.09(A)-(C) and (O), are unconstitutionally vague. PI Order, ECF No. 33 at PageID 357; NetChoice MSJ, ECF No. 43 at PageID 661-64. Although clarifying these provisions would not save the Act's unconstitutional parental-consent requirement, their vagueness exacerbates the Act's constitutional flaws. This independently violates the First Amendment and the Due Process Clause.

Defendant reiterates arguments this Court already considered and rejected. *Compare* Def. Opp. to PI Mot., ECF No. 28 at PageID 224-28, *with* Def. Opp. to MSJ, ECF No. 44 at PageID 983-87; *see* PI Order, ECF No. 33 at PageID 357-58. Defendant makes the conclusory assertion that "[t]he Act uses ordinary language which a person of ordinary intelligence can understand," and supports this claim by simply quoting the language of the Act without further explanation. Def. Opp. to MSJ, ECF No. 44 at PageID 985. This fails to meaningfully respond to any of the arguments NetChoice raised in its Motion. For example, NetChoice argued that websites have no way of knowing whether they are "target[ed]" to, or "reasonably anticipated to be accessed by," § 1349.09(B), a 15-year-old versus a 16-year-old under the Act's coverage provision or its set of 11 non-exhaustive factors for making those determinations. NetChoice MSJ, ECF No. 43 at PageID 661-62. Likewise, Defendant fails to address how to understand the Act's "eyebrow-raising" exception for "*established*" and "*widely recognized*" media outlets whose "primary purpose" is to "report news and current events." PI Order, ECF No. 33 at PageID 357-58 (emphasis added) (discussing § 1349.09(O)(2)). Defendant again tries to compare the Act's 11 factors in § 1349.09(B) to federal law. Def. Opp. to MSJ, ECF No. 44 at PageID 986. But this Court and

18

NetChoice already explained why that comparison is faulty. *See* PI Order, ECF No. 33 at PageID 357 (the "more specific factors" in federal law "do not cure the vagueness in the eleven-factor list" and "do not address the broad-ranging language in the exceptions"); NetChoice MSJ, ECF No. 43 at PageID 661-63; NetChoice Opp. to MSJ, ECF No. 45 at PageID 1034.

In sum, this Court was correct that the Act is unconstitutionally vague. Defendant has presented no good grounds for changing that conclusion.

## Conclusion

Plaintiff respectfully requests that this Court grant NetChoice's Motion for Summary Judgment, enter a judgment declaring that the Act violates the Speech and Press Clauses of the First Amendment and is unconstitutionally vague in violation of the First and Fourteenth Amendments of the U.S. Constitution, and permanently enjoin Defendant from enforcing the Act against NetChoice's members.

Dated: June 24, 2024

Respectfully submitted,

*s/Matthew H. Rice*
Matthew H. Rice (97290)
   *Trial Attorney*
SPERLING & SLATER, LLC
55 W. Monroe Street, 32nd Floor
Chicago, Il 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
mrice@sperling-law.com

Joshua P. Morrow*
Alexis Swartz*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
alexis@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

*(admitted pro hac vice)*

*Attorneys for Plaintiff NetChoice, LLC*

20

**CERTIFICATE OF SERVICE**

I, Matthew H. Rice, an attorney, certify that on June 24, 2024, I caused Plaintiff NetChoice's Reply in Support of Its Motion for Summary Judgment to be filed with the Court's CM/ECF system and thereby served upon the following registered users of that system:

Julie M. Pfeiffer
James P. Reising
Stephen P. Tabatowski
Ohio Attorney General's Office
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, OH 43215

*s/Matthew H. Rice*