# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| **NETCHOICE, LLC,** | : | |
| | : | |
| *Plaintiff,* | : | **Case No. 2:24-cv-00047** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **DAVE YOST, in his official capacity as** | : | |
| **Ohio Attorney General,** | : | |
| | : | |
| *Defendant.* | : | |

---

## DEFENDANT OHIO ATTORNEY GENERAL DAVE YOST'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069792)*
   *Lead and Trial counsel*
STEPHEN P. TABATOWSKI (0099175)
JAMES P. REISING (0102996)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH 43215-3428
Tel: (614) 466-2872 | Fax: (614) 728-7592
Julie.Pfeiffer@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
James.Reising@OhioAGO.gov

*Counsel for Defendant Ohio Attorney General*

## MEMORANDUM

### I.     INTRODUCTION

NetChoice's opposition to Attorney General Yost's motion for summary judgment is based upon sweeping misapplications of First Amendment case law and mischaracterizations of the state interests at play. NetChoice continues to deny the operative, commercial aspects of the Act to continue its misguided argument that the Act impermissibly regulates speech based on content. NetChoice makes this argument to avoid any attempt at regulation that, despite mitigating the documented problems its members pose as covered operators, might affect its members' bottom lines. But the Act is not a speech regulation and is not content-based. At most, it is a permissible regulation on the basis of speaker or medium which survives any level of constitutional scrutiny. The Court should reject NetChoice's arguments and grant summary judgment in favor of the Attorney General.

### II.    LAW AND ARGUMENT

#### A. The Act regulates contracts.

In opposing summary judgment, NetChoice primarily argues that the Act is not a contract regulation because of its "requirement that covered websites deny 'access' and 'use' to minor users who lack parental consent." NetChoice Resp., ECF No. 45 at PageID 1002. This argument again ignores the operative obligation imposed by the Act. It requires verifiable parental consent "for *any contract* with a child . . . to register, sign up, or otherwise create a unique username *to access or utilize*" the platform. O.R.C. § 1349.09(B)(1) (emphasis added). The consent requirement is thus triggered only where a platform (1) requires a minor to register or sign up before accessing or using the platform, and (2) conditions registration or sign-up (and, necessarily, access and use) on the minor's agreement to the platform's terms. Accordingly, NetChoice is wrong to suggest that the Act's denial-of-use requirement is a speech regulation untethered to contract. *See* NetChoice

Resp., ECF No. 45 at PageID 1003-04. A covered operator must deny "access to or use" of a platform by a minor only where access or use is *necessarily conditioned* on the minor's agreement to the platform's terms. The Act's requirements, at bottom, always depend on a contract.

Thus, the "dichotomy" NetChoice claims the Act creates, NetChoice Resp., ECF No. 45 at PageID 1009-10, is a false one because the Act's plain terms make a third option immediately apparent: covered operators could allow minors to "access or utilize" their platforms without requiring them to agree to a "contract . . . to register, sign up, or otherwise create a unique username." O.R.C. § 1349.09(B)(1). That the Act applies to some websites and not others in no way suggests the State disagrees "with the covered websites themselves—and the speech on them." NetChoice Resp., ECF No. 45 at PageID 1009. Rather, its application illustrates the coherent, content-neutral reasoning behind the Act, which Ohio has consistently explained as two-fold. First, covered operators' platforms pose unique risks to minors based on shared features and functions unrelated to speech. Second, minors are often exposed to those risks after agreeing to contracts with inconspicuous and one-sided terms. The latter exacerbates the former, and it is the combined effect of both that explains why the Act "leaves many other terms of service on the Internet unregulated . . . ." *See* NetChoice Resp., ECF No. 40 at 1009. While news websites may require users to agree to similarly problematic terms of service, *see id.*, they are not built with similarly problematic features and functions. North Aff., ECF No. 28-4 at PageID 277, ¶ 8-11.  The Act seeks only to address those platforms that implicate both concerns.

Ohio has never argued that all regulations of "commercial or for-profit speech" are permissible so long as they have "some connection to a contract." NetChoice Resp. ECF No. 45 at PageID 1010. Instead, Ohio maintains that (1) content-neutral regulations of commercial transactions like the Act are valid if they are rationally related to a legitimate government interest,

Yost MSJ, ECF No. 42 at PageID 448-50, and that (2) even if such regulations implicate the First Amendment because of an incidental effect on speech, strict scrutiny is not required. *Id.* at PageID 454-56. Whether they apply to minors or adults, NetChoice Resp., ECF No. 45 at PageID 1010-11, this is consistent with the First Amendment framework to which all laws are subject. NetChoice's strawman is unpersuasive—as is the parade of horribles NetChoice invents to knock it down.

### B. The Act is not content-based nor impermissibly speaker- or medium-based.

As this Court correctly determined, the Act is *not* content-based merely because it applies to websites that "target[] children" or are "reasonably anticipated to be accessed by children" based on its eleven-factor list. PI Order, ECF No. 33 at PageID 350-51 ("NetChoice has not shown that this language—'targets children' and 'reasonably anticipated to be accessed by children'—are examples of content-based regulation."). While NetChoice oddly claims otherwise, NetChoice Resp., ECF No. 45 at PageID 1010-11, the Court correctly held that this does not make the Act content-based because there is "no indication" that Ohio disfavors content designed to appeal to children—and that "[w]ebsites that children might access" is "not a topic or subject matter[]" in the first place. PI Order, ECF No. 33 at PageID 350 (quotation marks omitted).

The Court's logic also applies to the Act's exceptions. They apply based on how or where "interaction between users" occurs on a website—not because Ohio disfavors or favors the content of that interaction. See O.R.C. § 1349.09(O). "Websites that limit user interaction to public comment on product reviews and news articles" is no more a topic or subject matter than "websites that children might access." While the Act does not expressly draw a public/private-interaction distinction, that distinction is inherent in the types of websites excluded by the Act. The exclusions apply based on how those websites limit "user interaction," O.R.C. § 1349.09(O), and apply to the types of websites where that interaction consists of publicly-viewable comments on reviews and

3

news articles. NetChoice ignores this obvious difference between covered and excluded platforms. While it argues that the exceptions must be content based because "[o]n many (if not most) covered websites *and* excluded websites, users will be able to interact in similar manners and in similar places[,]" NetChoice Resp., ECF No. 45 at PageID 1014, NetChoice tellingly fails to offer a single example. That is because the content-neutral differences between how covered platforms and excluded platforms limit user interaction are patent and commonplace. The Act excepts the latter not because of content, but because by their nature they do not pose the same risks as the unfettered and unmonitored user interaction on covered operators' platforms. *See, e.g.,* North Aff., ECF No. 28-4 at PageID 277, ¶ 8-12; Online Grooming Detection, ECF No. 42-8. The Act is concerned with websites that pose those risks while also conditioning access on onerous contracts, and the exceptions tailor the Act to those ends.

NetChoice is therefore incorrect that *Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994) does not apply. The Act's distinctions are not facially content-based because they are drawn on how or where interaction occurs on a particular medium of website, not on "substantive message." *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 142 S. Ct. 1464, 1472 (2022). NetChoice's contentions regarding the Act's incidental impact on speech is a misplaced tailoring argument for the same reason. *See* NetChoice Resp., ECF No. 45 at PageID 1018. In the context of a content-neutral/content-based inquiry, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism* 491 U.S. 781, 791 (1989). The key question is whether the law "serves purposes unrelated to the content of expression" and, as noted, the Act does so.

4

Thus, the Act's distinctions do not invite strict scrutiny because the "overriding [legislative] purpose" behind them is "unrelated to the content disseminated. . . ." *Turner Broad. Sys.*, 512 U.S. at 647.[1] This analysis would not require a different outcome in *Brown v. Entertainment Merchants Association*, as NetChoice claims, because the law there expressly applied based on a substantive message: violence in a video game. 564 U.S. 786, 789 (2011). In contrast, the Act is not triggered based on "violence," "ideology," "religion," "politics," or any other substantive message. It applies based on the way in which users typically interact on certain platforms. It is content-neutral as a result.

### C. The Act survives any level of constitutional scrutiny.

Contrary to NetChoice's assertions, the Act passes muster under any level of constitutional scrutiny. NetChoice argues that the Act is not properly tailored under *Brown* because Ohio has not shown "'a direct causal link between' covered websites 'and harm to minors.'" NetChoice Resp., ECF No. 40 at PageID 1019. Again, *Brown* involved a patently content-based regulation of violent video games, and thus triggered scrutiny—hence the Court's requirement that California demonstrate a "direct causal link." *Brown*, 564 U.S. at 799. Here, the Act is not content-based and, like in *Turner Broadcasting*, Ohio's General Assembly can permissibly make "make a predictive judgment that such a link exists. . . ." *See id., citing Turner Broad. Sys.*, 512 U.S. 622. Moreover, unlike in *Brown*, the harmful combined effects of covered operators' oppressive contracts and features and functions are unique and in no way "indistinguishable from effects produced by other"

---

[1] Relatedly, NetChoice claims that the exceptions cannot be severed because doing so would expand the scope of the law beyond what the General Assembly intended. NetChoice Resp., ECF No. 1031-32. Not so. If the exceptions are to apply, it is because a platform first met the definition of "operator" and required agreement to its terms of service in order to register. O.R.C. § 1349.09(A)(1), (B)(1). Given the infinitesimal subset of websites that could potentially meet both these criteria as well as an exclusion (NetChoice identifies none), severing the exclusions would not expand the scope of the Act beyond what the General Assembly intended.

platforms left unregulated by the Act. *Brown*, 564 U.S. at 800-01. NetChoice would ignore these distinct harmful effects—a child suffering from addiction to social media is the same as a child with a "catchy jingle" stuck in her head, NetChoice argues. NetChoice Resp., ECF No. 45 at PageID 1021. In reality, and unlike the law in *Brown*, the Act is narrowly tailored to address distinct harms posed by covered operators. NetChoice again misses the mark of Ohio's two-fold interest: it is not merely covered operators' oppressive contracts, nor is it merely their features and functions, that form the Act's impetus. NetChoice Resp., ECF No. 45 at PageID 1024. It is the combined effect of both.

NetChoice next retreats to, again, First Amendment *Lochner*ism—states have no interest in vindicating the rights of parents concerned about social media use, because its members can create internal solutions to assist parents. NetChoice Resp., ECF No. 45 at PageID 1022. And, NetChoice argues, many of its members already engage in content moderation to address the risk of child predators. *Id.* at PageID 1027. The problem is that NetChoice's internal solutions are not working. Nearly 70% of parents say parenting is harder now than it was 20 years ago with technology and social media as the top two cited reasons. Surgeon General's 2023 Advisory, Social Media and Youth Mental Health, ECF No. 42-2 at PageID 502. While NetChoice is correct that adults, too, would benefit from more awareness about the contracts they enter into online, NetChoice Resp., ECF No. 45 at PageID 1023, the idea that this means that the Act's consent requirement will not help to drive that awareness is a non sequitur and illogical.

So, too, is NetChoice's claim that the Act is insufficiently tailored because it only requires one-time parental consent. *Id.* at PageID 1025. Even if consent is only required once, this helps draw parental attention to onerous terms of service. The Act's additional requirement that covered operators present parents with "a list of the features offered by an operator's online web site,

6

service, or product related to censoring or moderating content, including any features that can be disabled for a particular profile" further helps to encourage parental awareness of the potentially harmful features and functions of covered operators' platforms. Even under strict scrutiny, a law must "narrowly tailored"—not "perfectly tailored." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (quoting *Burson v. Freeman*, 504 U. S. 191, 209 (1992)). Regardless of the standard applied here, the Act is narrowly tailored. It survives First Amendment scrutiny.

### III.    CONCLUSION

For the foregoing reasons, as well as those contained in the Attorney General's motion for summary judgment and opposition to NetChoice's motion for summary judgment, *see, generally,* ECF No. 42 and ECF No. 44, the Court should grant summary judgment in favor of Attorney General Yost.

<div style="margin-left: 40%;">

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Julie M. Pfeiffer*
JULIE M. PFEIFFER (0069792)*
    *Lead and Trial counsel*
STEPHEN P. TABATOWSKI (0099175)
JAMES P. REISING (0102996)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH 43215-3428
Tel: (614) 466-2872 | Fax: (614) 728-7592
Julie.Pfeiffer@OhioAGO.gov
Stephen.Tabatowski@OhioAGO.gov
James.Reising@OhioAGO.gov

*Counsel for Defendant Ohio Attorney General*

</div>

7

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the U.S. District Court for the and copies were served upon all counsel of record by means of the Court's electronic filing system.

/s/ *Julie M. Pfeiffer*

JULIE M. PFEIFFER
Assistant Attorney General