**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| NETCHOICE, LLC, | : |
| | : |
| **Plaintiff,** | : **Case No. 2:24-cv-00047** |
| | : |
| **v.** | : **Judge Algenon L. Marbley** |
| | : |
| DAVE YOST, in his official capacity as | : **Magistrate Judge Elizabeth Preston Deavers** |
| Ohio Attorney General, | : |
| | : |
| | : |
| **Defendant.** | : |

## OPINION AND ORDER

This matter comes before this Court on Defendant Ohio Attorney General David Yost's Motion for Summary Judgment (ECF No. 42) and Plaintiff NetChoice, LLC's ("NetChoice") Motion for Summary Judgment (ECF No. 43). For the reasons set forth below, this Court **DENIES** Defendant's Motion (ECF No. 42) and **GRANTS** Plaintiff's Motion (ECF No. 43).

## INTRODUCTION

This action raises a constitutional challenge to Ohio's Parental Notification by Social Media Operators Act (the "Act"), a state law that requires certain online platforms to obtain verifiable parental consent before any unemancipated minor below the age of sixteen agrees to the platform's terms of service to access or utilize the service. Ohio Rev. Code § 1349.09(B)(1). The Act was signed into law in July 2023 and slated to take effect on January 15, 2024, before it was restrained and enjoined by this Court. (*See* ECF No. 33).

This Court lauds the State's effort through the Act to protect the children of this state. This Court finds, however, that the Act as drafted fails to pass constitutional muster and is constitutionally infirm. And in this constitutional democracy, it cannot be gainsaid that even the government's most noble entreaties to protect its citizenry must abide in the contours of the U.S.

1

Constitution, in this case the First Amendment. As Justice Scalia profoundly reasoned in *Brown v. Entertainment Merchants Association,* (*see* in-depth analysis *infra* Section III.B.1), which found unconstitutional under the First Amendment a California statute imposing restrictions on the sale or rental to minors of "violent video games":

> [M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them . . . . No doubt a State possesses legitimate power to protect children from harm . . . but that does not include a free-floating power to restrict the ideas to which children may be exposed. Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them . . . .

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786*,* 794–95 (2011) (internal quotation marks and citations omitted).

This case resides at the intersection of two unquestionable rights: the rights of children to "a significant measure of" freedom of speech and expression under the First Amendment, *see id.*, and the rights of parents to direct the upbringing of their children free from unnecessary governmental intrusion, *see Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) (finding that the "primary role of parents in the upbringing of their children is now established beyond debate"); *Farrington v. Tokushige*, 273 U.S. 284, 298 (1927) (noting that the parental "right to direct the education of his own child without unreasonable restrictions"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) (emphasizing parents' right "to direct the upbringing and education of children under their control"); *Jenkins v. Rock Hill Loc. Sch. Dist.*, 513 F.3d 580, 590 (6th Cir. 2008) (noting that "parents have a liberty interest in the care, custody, and control of their children") (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

Much like the law at issue in *Brown*, the Act here "straddles the fence between (1) addressing a serious social problem and (2) helping concerned parents control their children." 564 U.S. at 805. And while "[b]oth ends are legitimate," when these goals affect First Amendment rights, the state must pursue them "by means that are neither seriously underinclusive nor seriously overinclusive." *Id.* As Justice Scalia's majority opinion in *Brown* makes clear, even if "the state has the power to enforce parental prohibitions"—for example, enforcing a parent's decision to forbid their child to attend an event—"it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3. "Such laws," Justice Scalia emphasized, "do not enforce *parental* authority over children's speech . . . they impose *governmental* authority, subject only to a parental veto." *Id.*[1]

Minors' access to information is essential to their growth into productive members of our democratic public sphere. As Judge Posner observed when he cautioned of "the danger of allowing government to control the access of children to information and opinion":

> Now that eighteen-year-olds have the right to vote, it is obvious that they must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise.

*Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J.)

---

[1] Indeed, other courts have enjoined state statutes similar to the one at issue here. *See e.g., NetChoice, LLC v. Griffin*, No. 5:23-CV-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) (permanently enjoining age-verification and parental-consent law); *NetChoice, LLC v. Bonta*, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025) (preliminarily enjoining regulation with age-estimation requirements); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) (preliminarily enjoining law requiring platforms to identify minors and monitor and filter out certain content from minor users' accounts); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024) (preliminarily enjoining age-assurance and parental-consent law); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753 (S.D. Miss. 2024) (preliminarily enjoining age-verification and parental-consent law).

# I.    BACKGROUND

## A.  NetChoice and the Internet Landscape

NetChoice is a trade association of Internet companies.  Its members include: Google, which owns and operates YouTube; Meta, which owns and operates Facebook and Instagram; X (formerly Twitter); Nextdoor; Pinterest; and Dreamwidth.  (ECF No. 2-2 ¶¶ 2, 7).  These members' websites and platforms both "publish," "disseminate," "create," and "distribute" speech.  (ECF No. 1 ¶ 18; ECF No. 2-1 ¶ 6).  Adults and teens alike flock to NetChoice members' websites and generate billions of "posts" every day.  (ECF No. 2-1 ¶ 6).

There are a number of good things to be said about social media platforms.  Dreamwidth, for example, allows users to share their writing, artwork, and innermost thoughts.  (ECF No. 1 ¶ 19).  Facebook gives users a space to debate religion and politics or share vacation photos.  Instagram lets people post and view friends' photos, showcase art, follow political commentary, and discover or start small businesses.  (*Id.*).  YouTube endeavors to show people the world in all its facets, from travel documentaries to step-by-step cooking instructions.  (*Id.*).  On Nextdoor, users can connect with neighbors, share local news, and borrow tools.  (*Id.*).  Pinterest houses recipes, style ideas, home designs for users to collect, explore, and compare.  (*Id.*).  And, on X, users can petition their elected representatives and directly engage with them.  (*Id.*).  The ability to form and to maintain social connections on these online platforms can have positive effects on children and adolescents, especially those who routinely feel marginalized or excluded.  (*See* ECF No. 42-2, U.S. Dep't of Health and Human Serv., Office of the Surgeon General, *Social Media and Youth Mental Health* (2023) [hereinafter Surgeon General Advisory]).  In addition to enabling peer connection and social support, social media can also promote positive and identity-affirming content and encourage behaviors that proactively address mental health care.  (*Id.*).

But as the Ohio Attorney General correctly illustrates, these benefits come with a cost. (*See* ECF Nos. 42-1–6). Extensive social media use also has been linked to higher rates of depression, anxiety, and loneliness among young people. Research from the University of Oxford identifies adolescents as particularly vulnerable, with social media use linked to decreased life satisfaction. (ECF No. 42-3, Amy Orben et al., *Windows of developmental sensitivity to social media*, 13 Nature Communications 1649 (2022), https://ora.ox.ac.uk/objects/uuid:d4ce6392-53ef-41d1-a970-67f64b4e1c78). As the evidence in the record suggests, these platforms do not appear to be incorporating user-agnostic judgments when promoting content. "Push notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations are some examples of these features that maximize engagement." (*Id.*). One study led by the Harvard T.H. Chan School of Public Health confirms that "[s]ocial media platforms are highly incentivized to keep youth online"; and that children's and adolescents' online experiences are "heavily monetized through advertising revenue on platforms' websites and mobile applications," which draw upon "highly personalized computational advertising to match users' specific demographics and usage patterns with advertisers' financial interests." (ECF No. 42-1, Amanda Raffoul *et al.*, *Social media platforms generate billions of dollars in revenue from U.S. youth: Findings from a simulated revenue model*, 18 J. Pub. Lib. Sci. 1 (2023), https://doi.org/10.1371/journal.pone.0295337). In 2022, six platforms including Facebook, Instagram, X, and YouTube collectively derived nearly $11 billion in advertising revenue from U.S.-based users younger than 18 years old. (*Id.*).

## B. Ohio's Parental Notification Act

Against this backdrop, lawmakers across the nation have sought to regulate online entities and cabin their deleterious effects, particularly on the youth. The task is an admittedly daunting

one: Legislatures must craft laws broad enough to accommodate the pace with which digital platforms evolve, but not so broad that they cripple innovation or trample free speech. The resulting legislation can therefore be imperfect, but that does not prevent legislatures from trying.

Enter "Ohio's Parental Notification by Social Media Operators Act," Ohio Rev. Code § 1349.09 [hereinafter "the Act"]. Slated to take effect on January 15, 2024, the Act requires unemancipated children under the age of sixteen to obtain "verifiable" parental consent before agreeing to terms and conditions on social media platforms that fit certain criteria.

*1. Covered Operators*

Specifically, the Act regulates "operator[s]" of "online web site[s], service[s], or product[s]" that: (1) have users in Ohio; (2) "target[] children," or are "reasonably anticipated to be accessed by children"; and that (3) allow users to do all of the following:

> (a)   Interact socially with other users within the confines of the online web site, service, or product;
>
> (b)   Construct a public or semipublic profile for the purpose of signing into and using the online web site, service, or product;
>
> (c)   Populate a list of other users with whom an individual shares or has the ability to share a social connection within the online web site, service, or product;
>
> (d)   Create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users.

Ohio Rev. Code § 1349.09(A)(1).

In order to determine whether a platform "targets children, or is reasonably anticipated to be accessed by children," the Attorney General or a court "may" consider eleven factors: (1) subject matter; (2) language; (3) design elements; (4) visual content; (5) use of animated characters or child-oriented activities and incentives; (6) music or other audio content; (7) age of models; (8)

presence of child celebrities or celebrities who appeal to children; (9) advertisements; (10) empirical evidence regarding audience composition; and (11) evidence regarding the intended audience. Ohio Rev. Code § 1349.09(C).

Two types of operators are exempted from the reach of the statute. The Act's requirements do not apply to platforms that "limit[]" "interaction between users" to:

> (1)  Reviewing products offered for sale by electronic commerce or commenting on reviews posted by other users;
>
> (2)  Comments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events.

*Id.* § 1349.09(O). The Act likewise exempts websites "where the predominant or exclusive function is": (1) "[c]loud storage or cloud computing services"; and (2) "[b]roadband internet access services." *Id*. § 1349.09(N)(1)(a)-(b).

### *2. Requirements*

All non-exempt operators that meet the specifications of Ohio Rev. Code § 1349.09(A)(1) must adhere to three requirements. ***First,*** the operator must "[o]btain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product, from the child's parent or legal guardian." Ohio Rev. Code § 1349.09(B)(1). An operator can obtain this "verifiable consent" through "any of the following methods":

> (a)  Requiring a parent or legal guardian to sign and return to the operator a form consenting to the contract by postal mail, facsimile, or electronic mail;
>
> (b)  Requiring a parent or legal guardian, in connection with a monetary transaction, to use a credit card, debit card, or other online payment system that provides notification of each discrete transaction to the primary account holder;

(c) Requiring a parent or legal guardian to call a toll-free telephone number implemented by the operator and staffed by trained personnel;

(d) Requiring a parent or legal guardian to connect to trained personnel by videoconference;

(e) Verifying a parent's or legal guardian's identity by checking a form of government-issued identification against databases of such information, and promptly deleting the parent's or legal guardian's identification from the operator's records after such verification is complete.

*Id.* Unless parental consent is obtained, children under the age of sixteen "shall" be denied access to the "use of the online web site, service, or product." *Id.* § 1349.09(E).

***Second***, the Covered Operator must "[p]resent to the child's parent or legal guardian a list of the features offered by an operator's online web site, service, or product related to censoring or moderating content, including any features that can be disabled for a particular profile." *Id.* § 1349.09(B)(2). ***Third***, the Covered Operator must "[p]rovide to the child's parent or guardian a web site link at which the parent or legal guardian may access and review the list of features [related to censoring or moderating content, including any features that can be disabled for a particular profile] at another time." *Id.* § 1349.09(B)(3).

### 3. Enforcement and Penalties

The Act authorizes the Ohio Attorney General to investigate any noncompliance and "to bring a civil action . . . for appropriate relief including a temporary restraining order, preliminary or permanent injunction, and civil penalties." *Id.* §§ 1349.09(G), (H). A court that finds that an operator has violated the terms of the Act "shall impose a civil penalty" under the following scheme: (1) up to $1000 per day for the first 60 days of noncompliance; (2) up to an additional $5000 per day for days 61-90; and (3) up to an additional $10,000 per day for days 91 and beyond. *See id*. § 1349.09(I). Where an operator is "in substantial compliance," the attorney general must

provide the operator with written notice of the suspected violations, and a 90-day opportunity to cure, in which the operator must provide the attorney general with "written documentation that the violation has been cured and that the operator has taken measures sufficient to prevent future violations." *Id.* § 1349.09(M).

### C.   Procedural History

On January 5, 2024, NetChoice sued the State of Ohio (the "State"), through Ohio Attorney General Dave Yost in his official capacity, for declaratory and injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, challenging the Act as unconstitutional under the First and Fourteenth Amendments. After a January 8, 2024 hearing on Plaintiff's motion for a temporary restraining order ("TRO"), this Court granted the TRO and enjoined Defendant "from enforcing the Act against Plaintiff or its member organizations." (ECF No. 27). On February 12, 2024, this Court granted a preliminary injunction on the same grounds. (ECF No. 33 ("PI Order")).

A month later, the parties agreed that "this case is ready to proceed to a final merits determination"; that "[t]here is not a jury demand;" that they "do not believe that settlement is likely"; and that they will not rely on expert testimony. (ECF No. 37 at 2–3). The parties also "agreed to forego discovery in this case," explaining that "the parties will rely primarily on the record established through the preliminary injunction briefing," and "stipulate that the evidence the parties have submitted with their respective briefing thus far is admissible." (*Id.*).

On May 3, 2025, the parties filed cross-motions for summary judgment (ECF Nos. 42, 43); opposed one another's motions (ECF Nos. 44, 45); and filed their respective replies (ECF Nos. 47, 48). This Court held oral argument on the parties' motions on March 13, 2025.

### D.  Effect of Intervening *Moody* Decision

As set forth in its Complaint, NetChoice alleges that Ohio's Parental Notification by Social Media Operators Act violates the First Amendment rights of its covered members as well as those members' current and prospective users, including Ohio minors.  NetChoice raises both: (1) a traditional facial challenge under the First Amendment; and (2) alternatively, a First Amendment overbreadth facial challenge.  Under a traditional facial challenge, "*no* set of circumstances exists under which [the Act] would be valid." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Under a First Amendment overbreadth facial challenge, "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*. (cleaned up).  NetChoice also alleges that the Act's central coverage provision is unconstitutionally vague in violation of the First Amendment and Due Process Clause of the Fourteenth Amendment.

One week after the parties' summary judgment briefing concluded, the Supreme Court decided *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), a case that considered whether Florida's and Texas's content-moderation laws are facially unconstitutional.  There, the Supreme Court emphasized that although First Amendment facial challenges are subject to "a less demanding though still rigorous standard," they remain difficult to mount successfully. *Id*. at 723.[2]  A proper

---

[2] There are a "host of good reasons" for the Court's judicial skepticism. *Id*.  For example, facial challenges "rest on speculation," *id*. (quotation omitted), "short circuit the democratic process," *id*. (quotation omitted), and is "at odds with Article III," *see id*. at 752 (Thomas, J., concurring). Because of the significant risks associated with facial challenges, the Supreme Court reiterated that challengers bear a heavy burden. *See id*. at 723 (majority opinion); *id*. at 745 (Barrett, J., concurring) ("[T]hese cases illustrate the dangers of bringing a facial challenge . . . . In fact, dealing with a broad swath of varied platforms and functions in a facial challenge strikes me as a daunting, if not impossible, task."); *id*. at 748 (Jackson, J., concurring in part and concurring in the judgment) ("[A]s all Members of the Court acknowledge, plaintiffs bringing a facial challenge must clear a high bar."); *id*. at 750 (Alito, J., concurring in the judgment) ("Facial challenges also strain the limits of the federal courts' constitutional authority to decide only actual 'Cases' and 'Controversies,'" so "parties mounting facial attacks [must] satisfy demanding requirements.").

First Amendment facial challenge, the Court reiterated, proceeds in two steps. The "first step" is to determine every hypothetical application of the challenged law. *Id*. at 724. The second step is "to decide which of the law['s] applications violate the First Amendment, and to measure them against the rest." *Id*. at 725. Plaintiffs can satisfy their burden of showing the law is facially unconstitutional "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. Given this fact-intensive inquiry, the Court remanded the cases because "the record is underdeveloped." *Id*. at 726.[3] On remand, the Fifth Circuit tossed the suit back to the district court, explaining that "these are fact-intensive questions that must be answered by the district court in the first instance after thorough discovery." *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 499 (5th Cir. 2024). The Eleventh Circuit likewise remanded the case "in full to the district court for further proceedings consistent with the Supreme Court's opinion." *See* Order, ECF No. 178-2, *NetChoice, LLC, v. Attorney General,* No. 21-12355 (11th Cir. Aug. 16, 2024).

In light of *Moody*, this Court asked the parties at oral argument whether discovery should be re-opened or summary judgment briefing should be supplemented. The State opined that the record is insufficient but that the burden of proof rests with NetChoice. NetChoice, on the other hand, maintained that the record is sufficient under *Moody*.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict

---

[3] *See also id*. at 747 (Barrett, J., concurring) (noting the record failed to "thoroughly expose[ ] the relevant facts about particular social-media platforms and functions"); *id*. at 749 (Jackson, J., concurring in part and concurring in the judgment) (noting plaintiffs failed to show "how the regulated activities actually function"); *id*. at 750 (Thomas, J., concurring in the judgment) (noting plaintiffs "failed to provide many of the basic facts necessary to evaluate their challenges to H.B. 20"); *id*. at 766 (Alito, J., concurring in the judgment) (noting the "incompleteness of this record").

for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, a court reviews the evidence in the light most favorable to the non-moving party, mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255. A court, however, is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 805 F. Supp. 2d 396, 402–03 (S.D. Ohio 2011) (quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091 (1990)). Rather, it need only consider "those portions of the record specifically called to its attention by the parties." *Id.* at 403. The standards for summary judgment "do not change when, as here, 'both parties seek to resolve [the] case through the vehicle of cross-motions for summary judgment.'" *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

When a motion for summary judgment also seeks a permanent injunction, the party seeking a permanent injunction must satisfy a four-factor test. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Id.* The decision to grant or to deny permanent injunctive relief is "an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.* In a case arising under the First Amendment, "a party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury'

for which there is no adequate remedy at law." *Am. C.L. Union of Kentucky v. McCreary Cnty., Ky.*, 607 F.3d 439, 445 (6th Cir. 2010) (internal quotation marks and citation omitted).

## III.    LAW & ANALYSIS

NetChoice argues that it is entitled to a permanent injunction and summary judgment on its First Amendment facial challenges on behalf of both NetChoice's covered members and those members' current and prospective users. NetChoice also invokes the void-for-vagueness doctrine under the First and Fourteenth Amendments, arguing that the central coverage provision, the Act's exceptions, and other key terms are unconstitutionally vague.

The State, on the other hand, seeks summary judgment that NetChoice lacks standing to assert the free-speech rights of Ohio children, and that the Act is constitutional. Specifically, the State maintains that: (1) that the Act regulates contracts, not speech and, thus, rational basis review is appropriate; (2) that the Act, "at worst," only "incidentally" implicates speech and is therefore subject to intermediate scrutiny; (3) that the Act, in any event, satisfies any level of scrutiny given Ohio's important and compelling interest in protecting minors and parental decision-making rights. The State also argues that the Act is not unconstitutionally vague.

### A.  Plaintiff's Standing to Challenge the Act

Because Article III limits federal judicial jurisdiction to cases and controversies, *see* U.S. Const. art. III, § 2, federal courts are without authority "to render advisory opinions [or] 'to decide questions that cannot affect the rights of litigants in the case before them,'" *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (citation omitted). Standing is one doctrine that reflects and enforces those limitations. *See Davis v. FEC*, 554 U.S. 724, 732–33 (2008); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). As the Supreme Court explained: "In essence, the question of standing is whether the litigant is entitled to have court decide the

merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490 (1975). This inquiry involves "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Id.* at 498.

The "constitutional minimum of standing" flows from Article III's case-or-controversy requirement and has three elements. *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). First, a plaintiff must show that he or she has suffered or imminently will suffer a concrete injury. *Memphis A. Philip Randolph Inst. v. Hargett,* 2 F.4th 548, 555 (6th Cir. 2021). Second, a plaintiff must show that the injury is fairly traceable to the challenged conduct of the defendant. *Id.* Third, a plaintiff must show that a favorable federal court decision is likely to redress that injury. *Id.*

The federal judiciary also adheres to a set of "prudential" principles that bear on the question of standing and generally prohibit third parties from asserting the rights of others or from asserting generalized grievances. *See Warth*, 422 U.S. 490; *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979); *Valley Forge College v. Americans United*, 454 U.S. 464 (1982). So, even when a case falls within the constitutional boundaries of the "case or controversy" requirement, a plaintiff may still lack standing under these prudential principles "by which the judiciary seeks to limit access to the federal courts to those litigants best suited to assert a particular claim." *Gladstone*, 441 U.S. at 99–100. As this Court recognized in its PI Order, there are exceptions to this general prohibition against third-party standing. *See Powers v. Ohio*, 499 U.S. 400, 410–411 (1991). An organization, for example, has "associational standing" to sue on behalf of its members when its members would otherwise have standing to sue in their own right; the interests at stake are germane to the organization's purpose; and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hargett*, 2

F.4th at 555 (quoting *Friends of the Earth*, 528 U.S. at 181). Additionally, "[w]here plaintiffs challenge a statute or ordinance for vagueness or overbreadth, the Supreme Court has concluded that they have standing to assert the rights of third parties whose protected speech may have been impermissibly curtailed by the challenged prohibition, even though as applied to the plaintiffs themselves, the ordinances only curtailed unprotected expression." *Brandywine, Inc. v. City of Richmond, Kentucky*, 359 F.3d 830, 835 (6th Cir. 2004) (citing *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 59 n.17 (1976)); *see Ison v. Madison Loc. Sch. Bd.*, 395 F. Supp. 3d 923, 931–32 (S.D. Ohio 2019).

The State challenges NetChoice's standing to assert the free-speech rights of Ohio children. (*See* ECF No. 42 at 14–15; ECF No. 44 at 4). It suggests that NetChoice fails to satisfy Article III requirements, i.e., the constitutional requirements. Thus, the State argues, prudential principles—like the overbreadth exception to the general prohibition against third-party standing—are inapplicable here. (*See* ECF No. 42 at 14). NetChoice takes the position that the State "no longer disputes that NetChoice has organizational or associational standing to challenge the Act." (ECF No. 45 at 12 & n.3 ("Defendant makes one reference to 'associational' standing and states that '[o]verbreadth . . . is not an exception to Article III standing requirements,' . . . . [b]ut Defendant does not argue that NetChoice lacks Article III standing.")).

Unlike the preliminary injunction stage, when standing is challenged at summary judgment, "mere allegations of injury are insufficient." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999). Rather, NetChoice "must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Id.* (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 884 (1990)). Plaintiff bears the burden of establishing standing, *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (citing *Lujan,* 504 U.S. at 561), and "must

'show that [it] has standing for each type of relief sought,'" *id.* (cleaned up) (quoting *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009)). Because this burden progresses "with the manner and degree of evidence required at the successive stages of the litigation," a plaintiff "'in response to a summary judgment motion,' . . . cannot rely on 'mere allegations' with respect to each standing element, 'but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.'" *Id.* (quoting *Lujan,* 504 U.S. at 561).

Although the State focuses on NetChoice's standing to bring claims on behalf of Ohio minors, NetChoice itself must still meet the "constitutional minimum" requirements regardless of any third-party rights it seeks to assert. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988) ("To bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact."); *Birmingham v. Nessel*, No. 21-1297, 2021 WL 5712150, at *2–3 (6th Cir. Dec. 2, 2021) (prudential standing doctrines, such as the prohibition on third-party standing "do[] not affect constitutional standing"); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) ("Even where a litigant challenges a law or regulation as overbroad, that litigant must still 'show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.'" (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972))); *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 340, 350 (6th Cir. 2007) ("Even though Prime Media advances an overbreadth challenge, it is thus still required to show an injury in fact . . . ."). Because Defendant challenges NetChoice's standing, this Court begins its analysis there.

*1.     Constitutional Standing*

Under Article III, a plaintiff must establish that it has suffered an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and is capable of being "redressed" by the court. *Lujan,* 504 U.S. at 560–61; *see also Morrison v. Bd. of Educ. of Boyd Cty.,* 521 F.3d

602, 608 (6th Cir. 2008). While these requirements generally prevent a litigant from bringing a claim based on injuries experienced by others, associational standing permits an association or organization to sue based on injuries to its members. *See United Food and Commercial Workers v. Brown Group,* 517 U.S. 544, 557 (1996). To establish associational standing, NetChoice must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hargett*, 2 F.4th at 555 (quoting *Friends of the Earth*, 528 U.S. at 181).

NetChoice satisfies these requirements. First, it has shown that its members have individual standing to sue because they are subject to the Act and will face injury in the form of compliance costs and civil liability if they violate its operative provisions. *See* Ohio Rev. Code § 1349.09(B) (outlining parental consent methods); ECF Nos. 2-1 ¶ 14; 2-2 ¶ 13 (discussing compliance costs); Ohio Rev. Code § 1349.09(I) (imposing civil penalties); *see also Kentucky v. Yellen*, 54 F.4th 325, 342–43 (6th Cir. 2022) ("[C]ompliance costs are a recognized harm for purposes of Article III."); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Am. Booksellers*, 484 U.S. at 392 (plaintiffs suffered an injury in fact that satisfied constitutional standing requirements where the challenged law was "aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution"). In *Lujan,* the Supreme Court explained:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably ***upon whether the plaintiff is himself an object of the action*** (or forgone action) at issue. ***If he is, there is ordinarily little question that the action or***

> ***inaction has caused him injury***, and that a judgment preventing or
> requiring the action will redress it.  When, however, as in this case,
> a plaintiff's asserted injury arises from the government's allegedly
> unlawful regulation (or lack of regulation) of *someone else,* much
> more is needed.  In that circumstance, causation and redressability
> ordinarily hinge on the response of the regulated (or regulable) third
> party to the government action or inaction—and perhaps on the
> response of others as well.

504 U.S. at 561–562 (emphasis in original).  Because several of NetChoice's members are the

direct "object" of the Act, "there is little question" that they satisfy the injury requirement.  *Id.*

Second, the injury is directly traceable to Defendant, whom the Act vests with enforcement

authority.  *See* Ohio Rev. Code § 1349.09(H) ("If it appears that an operator of an online web site,

service, or product failed to comply with this section, the attorney general has the exclusive

authority to bring a civil action in a court of common pleas, or other appropriate court, for

appropriate relief including a temporary restraining order, preliminary or permanent injunction,

and civil penalties.").  And third, the injury would be redressed by an injunction blocking that

authority.  *See Mikel v. Quin*, 58 F.4th 252, 258 (6th Cir. 2023) ("Injunctions redress . . . 'imminent

future' injuries . . . . Injuries are . . . 'imminent' when they are certain or perhaps substantially

likely to occur in the future."  (internal quotation marks and citations omitted)), *cert. denied sub*

*nom. Mikel v. Nichols*, 143 S. Ct. 2660 (2023).

NetChoice has also shown that this lawsuit is germane to its purpose "to make the Internet

safe for free enterprise and free expression," and the nature of the lawsuit is "unlikely to require

fact-intensive inquiry of each member."  (*See* ECF No. 33 at 8–9 (citing ECF No. 2-1 ¶ 3)).  In its

PI Order, this Court concluded, based on the affidavits and evidence presented, that NetChoice has

constitutional associational standing to bring claims on behalf of its members.  (PI Order, ECF No.

33 at 6–8).  Defendant offers no reason for this Court to depart from that ruling.

## 2.    *Prudential Considerations and Third-Party Standing*

The only standing issue Defendant contests at summary judgment is whether NetChoice can raise the First Amendment interests of its members' minor users.  A party generally may assert only his or her own rights and cannot raise the claims of third parties who are not before the court. *See Warth*, 422 U.S. at 499.  This rule serves at least two judicial purposes.  It fosters judicial restraint freeing the court from "unnecessary pronouncement on constitutional issues" that may affect the rights of those not before it, and it "assures the court that the issues before it will be concrete and sharply presented." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).  The underlying assumption is "that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

There are, however, exceptions to this rule. *See Powers*, 499 U.S. at 410–411.  First, the Supreme Court has permitted third-party standing in circumstances where "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Compare Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (plurality opinion) (finding it "generally [] appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision," given the closeness of doctors' relationship to patients and the "decision is one in which the physician is intimately involved"), *with Kowalski*, 543 U.S. at 126 (attorneys "do not have 'close relationship with their alleged [hypothetical] clients" to challenge state law that made appointment of counsel discretionary for defendants who plead guilty or *nolo contendre*).

Second, a litigant may assert the rights of a third party not before the court if there are substantial obstacles to the third party asserting its own rights and the litigant will effectively represent the interests of the party. *See e.g.*, *Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972) (distributor of contraceptives to unmarried persons has standing to assert rights of unmarried persons "because unmarried persons denied access to contraceptives . . . are not themselves subject to prosecution and, to that extent, are denied a forum in which to assert their own rights"); *Barrows v. Jackson*, 346 U.S. 249, 257 (1953) (woman who was sued for selling her real property to an African American, in violation of a restrictive covenant applicable to her property, could defend the action by arguing that the covenant violated the equal protection rights of others where "the action of the state court . . . might result in a denial of constitutional rights and . . . it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court").

Finally, a litigant may challenge a statute on the ground that it is overly broad and thus violates the First Amendment rights of third parties not before the court, even if the law is constitutional as applied to the litigants. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 633–35 (1980) ("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."). The reason for this "special rule in First Amendment cases," the Supreme Court explained, "is apparent": "An overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the in terrorem effect of the statute." *Bates v. State Bar of Arizona*, 433 U.S. 350, 380–81 (1977); *see also Baird*, 405 U.S. at 446 n.5 ("[I]n First Amendment cases we have relaxed our rules of standing without regard to the

relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech.").

NetChoice argues that "[b]ecause minors' speech rights are so closely tied to covered websites' rights to disseminate speech, NetChoice's members are particularly 'well positioned to raise' users' First Amendment 'concerns.'" (*See* ECF No. 43 at 27 (quoting *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *12 (W.D. Ark. Aug. 31, 2023)). In support, NetChoice cites *Brown v. Entertainment Merchants Association,* 564 U.S. 786 (2011), a case that sustained a First Amendment challenge to California's restrictions on minors' access to violent video games. (*See* ECF No. 43 at 26–27). Because *Brown* plaintiffs were the "Video Software Dealers Association [] and the Entertainment Software Association []," which are "associations of companies in the video game industry," *Video Software Dealers Ass'n v. Schwarzenegger*, 2007 WL 2261546, at *1 (N.D. Cal. Aug. 6, 2007), NetChoice contends that there can be "no question" that "trade associations could challenge a law regulating the industry they represent and raising the rights of affected minors." (ECF No. 43 at 27).

Standing, however, was never challenged in *Brown* so that case is not a precedent for standing. *See Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 837 (6th Cir. 2001) ("As the Supreme Court has previously noted, 'when questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.' *Hagans v. Lavine,* 415 U.S. 528, 535 n.5, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). This is especially true as it relates to the issue of standing, 'perhaps the most important of [the jurisdictional] doctrines.' *FW/PBS v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).").

Plaintiff next relies on *Craig v. Boren,* 429 U.S. 190 (1976), to argue that "if purveyors of alcohol can raise the rights of 18-21-year-olds to purchase alcohol, surely NetChoice members can raise the rights of users to receive and express protected speech." (ECF No. 45 at 13 (citing 429 U.S. at 194)). In *Craig v. Boren*, the Supreme Court allowed an alcohol vendor to challenge the constitutionality of gender-based differentials in state liquor laws by asserting the equal-protection rights of her male customers. 429 U.S. 190. The Court's analysis began, however, by noting that "prudential objectives[] thought to be enhanced by restrictions on third-party standing[] cannot be furthered here," because "the lower court already has entertained the relevant constitutional challenge" and a decision "to forgo consideration of the constitutional merits in order to await the initiation of a new challenge to the statute by injured third parties would be impermissibly to foster repetitive and time-consuming litigation under the guise of caution and prudence." *See id.* at 193 (noting that "limitations on a litigant's assertion of *jus tertii* [third party standing] . . . stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative"). In other words, the Court found that efficiency cautioned against sending the case back on standing grounds because the constitutional question had already been teed up and decided by the lower courts. *See id.* (noting that "despite having had the opportunity to do so," the state "never raised before the District Court any objection to [vendor's] reliance upon the claimed unequal treatment of 18-20-year-old males as the premise of her equal protection challenge to Oklahoma's 3.2% beer law" and "at oral argument [] acknowledged that [it] always 'presumed' that the vendor, subject to sanctions and loss of license for violation of the statute, was a proper party in interest to object to the enforcement of the sex-based regulatory provision"). Proceeding to the merits, the Court concluded that "vendors and those in like positions have been uniformly permitted to resist efforts at restricting

their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.* at 195.

*Craig v. Boren* is arguably distinguishable on those procedural grounds, namely that unlike the state in that case, Ohio here has challenged Plaintiff's standing from the outset. But Defendant maintains that the case also stands for the proposition that "third-party standing exceptions . . . generally scrutinize the relationship between the litigant and the third party and whether their interests align." (*See* ECF No. 42 at 15). True, a plaintiff must establish that their relationship with the third party whose rights they wish to assert is sufficiently close such that the plaintiffs are "fully, or very nearly, as effective a proponent of the right" as the third party would be. *Singleton*, 428 U.S. at 115. The close-relationship standard is generally satisfied if the third parties' rights are "inextricably bound up with the activity the litigant[s] wish[ ] to pursue." *Id.* at 114.

Defendant contends that NetChoice members "burden children and parents with one-sided contractual terms of questionable enforceability . . . to generate billions of dollars collecting and selling the userdata of American kids" and "employ user interfaces that are specifically designed to maximize user engagement (and profits) while exacerbating the risks of mental health illnesses and sexual abuse." (ECF No. 42 at 15–16). These findings, according to Defendant, should cut against any conclusion that the "relationship" between NetChoice members' social media platforms and their minor users is sufficiently "close," or that their interests are adequately aligned, to justify third party standing. Stated differently, the Attorney General insists that Plaintiff cannot establish a close relationship with its minor users due to a conflict of interest.

The research Defendant submits is certainly compelling. It "underscore[s] the financial incentive for platforms to oppose government efforts to protect youth," and the strong incentive they have to "keep youth online." (*See* ECF No. 42-1 at 2–3; *see also id.* at 3 ("Social media

platforms are suspected to derive hefty profits from youth users who may be vulnerable to negative mental health outcomes, including depression, anxiety, and eating disorders.  Platforms, however, are not required to make these data publicly available, which may limit the abilities of researchers and policymakers to adequately investigate and regulate platform practices.")).

But the "relationship" prong of the third-party standing inquiry does not ask whether NetChoice members are interested in protecting the general interests of the minors, be they health or privacy interests; the relationship between the third party and Plaintiff "only counts insofar as it is linked to the *right asserted*"—here, the right of minors to access social media platforms without obtaining parental consent.  *See Amato v. Wilentz*, 952 F.2d 742, 752 (3d Cir. 1991) (emphasis added).  It is for this reason that the Supreme Court has generally permitted vendors or sellers "to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market."  *See e.g., Craig v. Boren,* 429 U.S. at 195; *see also U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720–21 (1990) (lawyer has third party standing to challenge a fee restriction by raising client's due process rights); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623–24 (1989) (law firm has third-party standing to challenge a drug forfeiture statute on behalf of Sixth Amendment rights of an existing client where forfeited assets were needed to pay attorney's fees); *Barrows*, 346 U.S. at 254–58 (white sellers of land have standing to assert constitutional rights of potential black purchasers in defending a suit to enforce a racially restrictive land covenant).

Additionally, while a professional or transactional relationship may be sufficient, it is not necessary.  In *Baird*, for example, the Supreme Court held that a man convicted under state law "for exhibiting contraceptive articles in the course of delivering a lecture on contraception to a group of students" and for giving a young woman a contraceptive foam at the close of his address

could "assert the rights of unmarried persons denied access to contraceptives." 405 U.S. at 440-43. The state argued that the claimant and young woman had no professional or doctor-patient relationship to support standing. *Id.* Rejecting that argument, the Court explained that the relationship between the litigant "and those whose rights he seeks to assert is not simply that between a [contraceptive] distributor and potential distributees, but that between an advocate of the rights of persons to obtain contraceptives and those desirous of doing so." *Id*. at 445.[4]

In *Triplett*, 494 U.S. 715, the Court permitted an attorney to challenge a restriction on attorney's fees by asserting the due process rights of the client and, in so doing, clarified the key aspects of the third-party relationship prong:

> When . . . enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third party standing has been held to exist.

494 U.S. at 720. What this line of cases makes clear is that the relevant "relationship" inquiry for purposes of third-party standing is whether the plaintiff and the third party have the sort of relationship "of special consequence" such that the plaintiff will be as vigorous as the third party in asserting the third party's rights. *See Caplin & Drysdale*, 491 U.S. at 623 n.3. Paradoxically, it is precisely NetChoice members' financial incentive to keep minors on their platforms that suggests that they are "fully, or very nearly, as effective a proponent" of the minors' rights to access the platforms. *See Singleton*, 428 U.S. at 115; *see also Amato*, 952 F.2d at 752 (noting that

---

[4] The Supreme Court also noted that its *Baird* ruling was consistent with its earlier ruling in *Barrows*—the case that held that "a seller of land was entitled to defend against an action for damages for breach of a racially restrictive covenant on the ground that enforcement of the covenant violated the equal protection rights of prospective non-Caucasian purchasers"—noting that the relationship there "between the defendant and those whose rights he sought to assert was not simply the fortuitous connection between a vendor and potential vendees, but the relationship between one who acted to protect the rights of a minority and the minority itself." *Baird*, 405 U.S. at 445.

where "the vendor's monetary interests are greater, it has more incentive to sue, and its advocacy will be at least as vigorous as the vendee's").

Aside from the relationship factor, this Court finds that the other two prudential standing factors—the impact of the litigation on minors' interests and the ability of third-party minors to advance their own rights—weigh in favor of conferring third-party standing. *Powers*, 499 U.S. at 413–16. In *Baird,* the Supreme Court observed that "more important than the nature of the relationship between the litigant and those whose rights he seeks to assert is the impact of the litigation on the third-party interests." 405 U.S. at 445. Observing that enforcement of the statute would deny persons who "are not themselves subject to prosecution" access to contraceptives, the Court concluded that, "to that extent," those persons "are denied a forum in which to assert their own rights," making the case for third-party standing even "stronger." *Id.* at 446.

Minors themselves are not the subject of the Act so, like the third party in *Baird,* to the extent their constitutional rights are violated, they are "denied a forum in which to assert their own rights." *See* 405 U.S. at 446; *see also id.* at 446 n.6 (noting that in *Prince v. Massachusetts*, 321 U.S. 158 (1944), "a custodian, in violation of state law, furnished a child with magazines to distribute on the streets," and "[t]he Court there implicitly held that the custodian had standing to assert alleged freedom of religion and equal protection rights of the child that were threatened in the very litigation before the Court and that the child had no effective way of asserting herself").

Second, the statute, if it goes into effect, allegedly impacts Ohio minors' First Amendment right to speech by foreclosing their access to social media platforms absent parental consent. *See Baird*, 405 U.S. at 446 n.5 ("[I]n First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom

of speech."); *Munson,* 467 U.S. at 957 ("Although [failure to show an obstacle] might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech."); *Am. Booksellers,* 484 U.S. at 392–93 (no inquiry into obstacle in summarily upholding booksellers' standing to raise book buyers' First Amendment rights in facial challenge to statute).

Based on the longstanding precedent described above and cited in this Court's PI order, as well as the record evidence, this Court concludes that there is no genuine issue of fact that NetChoice has standing to assert its members' rights and the rights of Ohio minors in this constitutional challenge.

### B. Plaintiff's Constitutional Claims

Turning to the merits, this Court now considers the constitutionality of the Act. "[C]ourts usually handle constitutional claims case by case, not en masse." *Moody*, 603 U.S. at 723. In First Amendment cases, the Supreme Court has "lowered th[e] very high bar" of a "traditional" facial challenge, which would require a showing "that no set of circumstances exists under which the [law] would be valid." *See id.* (internal quotation marks and citation omitted). The question is whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (internal quotation marks and citation omitted). As explained earlier, a First Amendment facial challenge has two parts: first, the courts must "assess the state laws'" scope; and second, the courts must "decide which of the laws'" applications violate the First Amendment, and . . . measure them against the rest." *Id*. at 708. The Supreme Court recently admonished that courts cannot treat facial challenges "more like as-applied claims than like facial ones." *Id.* at 704.

NetChoice mounts a "traditional" First Amendment facial challenge to the Act's constitutionality, or, in the alternative, a First Amendment overbreadth challenge. In other words, NetChoice argues that the Act is unconstitutional under all circumstances, or even if it is constitutional in some circumstances, it is unconstitutional in such a great number of circumstances that it should be struck down. (ECF No. 43 at 24–25). NetChoice makes two central arguments to support its position: (1) the Act triggers strict scrutiny by requiring minors to secure parental consent before accessing protected speech; and (2) the Act triggers strict scrutiny and violates the First Amendment because certain provisions, Ohio Rev. Code §§ 1349.09(A), (B), and (O), are content and speaker based. NetChoice also contends that the Act is unconstitutionally vague under the First and Fourteenth Amendment because NetChoice members do not have fair notice as to whether they must comply with the Act's dictates, and if so, how.

The State, on the other hand, maintains that the Act is constitutional and is not unconstitutionally vague. It argues that the Act regulates ordinary commercial transactions, contracts specifically, and is therefore subject to rational basis review. In the alternative, the State argues that the Act is subject to intermediate scrutiny because it is content-neutral "and, at worst, only incidentally implicates speech." (ECF No. 42 at 23). In any event, the Act, according to the State, passes any level of scrutiny because it "advances Ohio's important and compelling governmental interests in protecting the health and safety of minors by requiring parental consent before a covered operator can contract with them." (*Id.* at 35).

Beginning with the Act's scope, this Court concludes that, in every application to a covered website, the Act raises the same First Amendment issues. Specifically, whether it is a NetChoice member product—YouTube; Facebook and Instagram; X; Nextdoor; Pinterest; or Dreamwidth— or other covered websites that provide the "socially interactive" features outlined in the Act and

considered to be "target[ing]" minors or likely to be accessed by minors—like Goodreads, Soundcloud, Substack, Yelp, or LinkedIn—they are all are under the same statutory obligation to block access to unemancipated Ohio minors absent parental consent. Thus, unlike the provisions at issue in *Moody*, the regulation here "raises the same First Amendment issues" "in every application to a covered business." *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1116 (9th Cir. 2024).

### 1. First Amendment: Restrictions on Protected Speech

#### a. The Act Regulates Protected Speech

The First Amendment, applicable to the States through the Fourteenth, prohibits laws "abridging the freedom of speech." U.S. Const., amend. I; *see also Stromberg v. California*, 283 U.S. 359, 368 (1931). A fundamental principle of the First Amendment is that "all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). While in the past, these places took the form of a street or a park, social media platforms today have become the "essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire." *Id.* Because freedom of speech is "the indispensable condition[ ] of nearly every other form of freedom," *Palko v. Connecticut,* 302 U.S. 319, 327 (1937), the First Amendment "bars the government from dictating what we see or read or speak or hear," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002), and protects "the right to distribute, the right to receive, the right to read and freedom of thought," *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965).

Despite the "challenges of applying the Constitution to ever-advancing technology," *Brown*, 564 U.S. at 790, the Act's First Amendment implications come into focus when social media operators are thought of as publishers of opinion work—a newspaper limited to "Letters to

the Editor," or a publisher of a series of essays by different authors. (PI Order, ECF No. 33 at 12); *see Moody*, 603 U.S. at 716 (likening social media platforms to "[t]raditional publishers and editors"). The analogy is an imperfect one—social media operators are arguably less involved in the curation of their websites' content than these traditional examples. (PI Order, ECF No. 33 at 12). But the comparison helps clarify that the Act regulates speech in two consequential ways: (1) it regulates operators' ability to publish and distribute speech *to minors* and speech *by minors*; and (2) it regulates minors' ability both to *produce speech* and to *receive speech*. (*Id.*). And as this Court noted in its PI Order, this Court is unaware of a "contract exception" to the First Amendment. (*Id.*).

These principles control here. The Act impedes minors' ability to engage in and access speech by requiring covered websites to obtain parental consent before allowing any unemancipated child under the age of sixteen to register or create an account on their website. That means minors' ability to contribute or access "a wide array of protected First Amendment activity on any number of diverse topics," *Packingham*, 582 U.S. at 98, will be contingent on securing parental consent—an impermissible curtailment of their First Amendment rights. *See Am. Amusement Mach. Ass'n*, 244 F.3d at 578 (Posner, J.) (finding parental consent requirements for violent video games unconstitutional, noting that "even parents who think violent video games harmful or even edifying . . . may rather prevent their children from playing these games than incur the time and other costs of [providing parental consent]" and "conditioning a minor's First Amendment rights on parental consent of this nature is a curtailment of those rights").

The State insists that the Act does not regulate speech, but the ability of minors to contract, which the Attorney General argues falls comfortably within the State's authority to regulate non-expressive, economic conduct. (*See* ECF No. 42 at 17). Pointing to *Sorrell v. IMS Health, Inc.*,

564 U.S. 552 (2011), the Attorney General contends that "[r]estrictions on economic activity are distinct from regulations on protected expression," (*id.* at 17), and that the Act governs economic activity because it "explicitly applies only where minors are required to enter into a contract with covered operators," (*id.* at 18). When that contract is created, he continues, "an exchange occurs: a minor is given access to a particular platform, and the operator of that platform often gains an opportunity to advertise to the minor, collect the minor's data, and engage in a wide array of other activities intended to benefit the operator financially." (*Id.* at 18).

But "the First Amendment right to the 'freedom of speech' protects against not just regulations that directly suppress speech but also those that target activities useful for speaking." *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 882 (6th Cir. 2024). Like many of NetChoice's member organizations, a publisher stands to profit from engagement with consumers. (*See* PI Order, ECF No. 33 at 12). That an entity seeks financial benefit from its speech, however, does not vitiate its First Amendment rights. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964); *see also Bonta*, 113 F.4th at 1120 ("The mere fact that a business may earn revenue from its services is 'insufficient by itself' to render its opinions about those services 'commercial.'" (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983))). While the State is correct that regulations restricting commercial or non-expressive conduct are subject to a different standard of review than regulations restricting protected expression, *Sorrell* is unhelpful because the Court there rejected a similar argument by Vermont "that heightened judicial scrutiny is unwarranted because its law is a mere commercial regulation." *Sorrell*, 564 U.S. at 566.

The Vermont law at issue in *Sorell* restricted the sale, disclosure, and use of pharmacy records that revealed the prescribing practices of individual doctors, with exceptions that allowed entities engaging in "educational communications" to purchase the information, but barred

disclosure when the recipients would use the information for marketing. *Id*. at 557. Additionally, "Vermont could supply academic organizations with prescriber-identifying information to use in countering the messages of brand-name pharmaceutical manufacturers and in promoting the prescription of generic drugs," but the law prevented pharmaceutical manufacturers from using the information for their own marketing purposes. *Id.* at 564. Thus, the statute "disfavor[ed] marketing, i.e., speech with a particular content, as well as particular speakers, i.e., [entities] engaged in marketing on behalf of pharmaceutical manufacturers." *Id.* at 552; *id.* at 664 ("The law on its face burdens disfavored speech by disfavored speakers."). As the Court summarized:

> Vermont argues that its prohibitions safeguard medical privacy and diminish the likelihood that marketing will lead to prescription decisions not in the best interests of patients or the State. It can be assumed that these interests are significant. Speech in aid of pharmaceutical marketing, however, is a form of expression protected by the Free Speech Clause of the First Amendment. As a consequence, Vermont's statute must be subjected to heightened judicial scrutiny. The law cannot satisfy that standard.

*Id.* at 557.

Like the law considered in *Sorrell*, the Act here "does not simply have an effect on speech, but is directed at certain content and is aimed at particular speakers." *Id*. at 567. Particularly, if a website "targets children" or is "reasonably anticipated to target children," and offers socially interactive features—like the ability to interact with other users; construct a public or semipublic profile; populate a list of other users with whom an individual "shares or has the ability to share a social connection"; create or post visible content "including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users," *see* Ohio Rev. Code § 1349.09(A)—then that website faces a dichotomy: (1) either minors secure parental consent and gain "access to" and "use of" all the speech on covered websites; or (2) minors do not secure parental consent and are denied

"access to" and "use of" the covered websites. *Id.* §§ 1349.09(B), (E). These provisions do not strike at the commercial aspect of the relationship between covered websites and their users, they tackle the social speech aspect of it. (PI Order, ECF No. 33). As this Court noted in its PI Order, "a law prohibiting minors from contracting to access to a plethora of protected speech can[not] be reduced to a regulation of commercial conduct." (PI Order, ECF No. 33 at 13). Because the Act implicates protected speech, at least to some degree, it is not subject to the deferential rational basis standard of review. (*Id.*).

b.      *The Law is Content Based*

Having concluded that the Act does indeed implicate the First Amendment, this Court next considers whether it should be subject to strict scrutiny or only to intermediate scrutiny. Courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content," but only "an intermediate level of scrutiny" when "regulations are unrelated to the content of speech." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994).[5] NetChoice argues that several provisions of the law discriminate based on content, whereas Defendant argues that the Act is content-neutral and that any effect it has on speech is incidental.

When considering whether a regulation is content based, the principal inquiry is whether the government has regulated the speech based on its communicative content. *Id.* at 643. When a law "applies to particular speech because of the topic discussed or the idea or message expressed," it is content based on its face. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61,

---

[5] "Strict scrutiny" requires the government to show that the law at issue is "narrowly tailored to serve compelling state interests." *KenAmerican Res., Inc. v. United States Sec'y of Lab.*, 33 F.4th 884, 893 (6th Cir. 2022) (quoting *Reed*, 576 U.S. at 163). On the other hand, "intermediate scrutiny" validates a law "under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id.* (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 26–27 (2010)).

69 (2022) (cleaned up).  And "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result."  *Id.* at 74 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).  Nor can a facially content-based law escape strict scrutiny so long as it has a "benign motive."  *Reed*, 576 U.S. at 165–66.  It is worth noting that "[g]overnment discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'"  *Id*. at 168–69 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  But a law need not discriminate based on viewpoint to be content based.  *See id.* at 169 ("[I]t is well established that 'the First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" (quoting *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980))).

Other regulations are better described as speaker based.  The Supreme Court is "deeply skeptical of laws that distinguish among different speakers, *Nat'l Inst. Of Fam. & Life Advocs. v. Becerra*, 138 S.Ct. 2361, 2378 (2018), but speaker-based restrictions "are not automatically content based or content neutral," *Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019).  Speaker based restrictions are suspect only because they are often a proxy or pretext for regulation of content.  *Id.*  But if they distinguish between speakers "based only on the manner in which speakers transmit their messages to viewers, and not upon the messages that they carry," they are subject only to intermediate scrutiny.  *Turner Broad. Sys.*, 512 U.S. at 645.

NetChoice argues that the Act is facially content based because it targets some websites while exempting others.  Specifically, the Act only purports to govern websites that are targeted

at children, or reasonably anticipated to be accessed by children.  Ohio Rev. Code § 1349.09(B).[6]

The Act also excludes from coverage websites where interaction between users is "incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events."  *Id.* § 1349.09(O).[7]  Similar is an exemption for websites where interaction is limited to reviews for "products for sale," but the Act does not exempt reviews of, for example, services or art.  *Id.*  All of these, NetChoice argues, are content-based restrictions.

---

[6] "(B) The operator of an online web site, service, or product that targets children, or is reasonably anticipated to be accessed by children, shall do all of the following:

(1) Obtain verifiable consent for any contract with a child, including terms of service, to register, sign up, or otherwise create a unique username to access or utilize the online web site, service, or product, from the child's parent or legal guardian using any of the following methods:

(a) Requiring a parent or legal guardian to sign and return to the operator a form consenting to the contract by postal mail, facsimile, or electronic mail;
(b) Requiring a parent or legal guardian, in connection with a monetary transaction, to use a credit card, debit card, or other online payment system that provides notification of each discrete transaction to the primary account holder;
(c) Requiring a parent or legal guardian to call a toll-free telephone number implemented by the operator and staffed by trained personnel;
(d) Requiring a parent or legal guardian to connect to trained personnel by videoconference;
(e) Verifying a parent's or legal guardian's identity by checking a form of government-issued identification against databases of such information, and promptly deleting the parent's or legal guardian's identification from the operator's records after such verification is complete.

(2) Present to the child's parent or legal guardian a list of the features offered by an operator's online web site, service, or product related to censoring or moderating content, including any features that can be disabled for a particular profile.

(2) Provide to the child's parent or guardian a web site link at which the parent or legal guardian may access and review the list of features described in division (B)(2) of this section at another time."

[7] "(O) This section does not apply to an online web site, service, or product respecting which interaction between users is limited to the following:

(1) Reviewing products offered for sale by electronic commerce or commenting on reviews posted by other users;

(2) Comments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events."

NetChoice contends that even if these are just speaker-based restrictions, they cannot be justified without reference to content, and are therefore, content-based distinctions subject to strict scrutiny. *Schickel*, 925 F.3d at 876 & n.2.

The State, on the other hand, maintains that the Act is "agnostic to content." (ECF No. 42 at 24 (quoting *City of Austin*, 596 U.S. at 69)). According to the State, the Act's parental consent requirement is based on "extrinsic qualities unrelated to any 'substantive message'" that the covered websites "might convey." (*Id.*). The State also contends that the Act's exceptions, O.R.C. 1349.09(O)(1)-(2), are not content-based because they apply "based on *how* or *where* user interaction occurs on a website—in public or private—and not on *what* message is being conveyed." (*Id.* at 25).

Turning first to the language that defines the broad category of operators to which the Act applies—websites that "target[] children" or are "reasonably anticipated to be accessed by children"—NetChoice argues that these are transparently content-based restrictions because whether a website "targets children" is inextricably connected to its content. (ECF No. 29 at 12). The State argues, on the other hand, that this language is simply an example of tailoring, designed to prevent overbreadth by exempting websites that are unlikely to be accessed by children. (ECF No. 28 at 27-28).

As this Court noted at the PI juncture, since this language identifies a certain topic, it is tempting to apply strict scrutiny reflexively, particularly given that facially content-based regulations cannot be rehabilitated by an apparent benign purpose. *Reed*, 576 U.S. at 165–66. In *Reed*, the Supreme Court invalidated a regulation that treated, for example, "Temporary Directional Signs" differently from "Ideological Signs." *Id.* at 164. The Supreme Court reasoned that the sign code was facially content based because it discriminated based on communicative

content and was, therefore, subject to strict scrutiny. *Id.* at 159, 164. But relevant here is the Supreme Court's "rejection of the view that *any* examination of speech or expression inherently triggers" strict scrutiny. *City of Austin*, 596 U.S. at 69. That is, a law may still be content neutral, even if it requires reading the speech at issue to determine if the speech or speaker is covered. *Id.* In *City of Austin*, a sign was treated differently under the code based solely on whether it was located on the same premises as the topic being discussed, and the sign message mattered "only to the extent that it inform[ed] the sign's relative location." *Id.* at 71. Evaluation of speech was necessary there only to determine whether the sign was an on-premises sign or an off-premises sign. *Id.* The sign's location relative to its content determined the regulation to which it was subject, but the topic was otherwise not considered. *Id.* The majority concluded that Austin's sign regulation was content-neutral because it did not "single out any topic or subject matter for differential treatment." *See id.*; *see also NetChoice, LLC v. Bonta*, ___ F.Supp.3d ___, 2025 WL 807961, at *9 (N.D. Cal. Mar. 13, 2025) (distinguishing regulation at issue in *City of Austin* from state law regulating social media platforms that "single[s] out particular subject matter, specifically, online content that is likely to be accessed by children").

It is challenging to reconcile *City of Austin* with *Reed.* Indeed, Justice Thomas, who wrote *Reed*, dissented in *City of Austin*, saying the majority's attempt to distinguish Austin's sign code from the one in *Reed* was unworkable. *Id.* at 91. (Thomas, J., dissenting). In Justice Thomas's view, if the message matters at all when applying a regulation, the law is content based. *Id.* at 92.

The Act here certainly requires consideration of the content on an operator's platform to determine if it "targets children" or is "reasonably anticipated to be accessed by children." The Act's eleven-factor list attempts to make clear that content is the essential consideration with

respect to whether an operator is covered.[8] Ohio Rev. Code § 1349.09(C)(1)-(11).[9] But Justice Thomas's more rigid approach only garnered three votes in *City of Austin*. The majority's opinion instead requires this Court to inquire whether the Act "single[s] out any topic or subject matter for differential treatment." *City of Austin*, 596 U.S. at 71. The "targets children" or "reasonably anticipated to be accessed by children" language tailors the Act's applicability to only the platforms that have a chance of attracting the children the Act seeks to protect. Sites that are not reasonably likely to be accessed by children need not conform with the Act's dictates.

In any event, as this Court has concluded, the coverage provision's distinction on the basis of [websites'] functionalities"—i.e., their means of disseminating speech and facilitating users' speech— are "content-based." (PI Order, ECF No. 33 at 21). In particular, the Act regulates websites that allow users to: (a) interact socially with other users; (b) construct a public or semipublic profile; (c) populate a list of other users with whom an individual "shares or has the ability to share a social connection"; (d) create or post visible content "including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users." Ohio Rev. Code §

---

[8] "Attempts to" because the Act remains vague with respect to which operators it regulates, as discussed further below.

[9] "In determining whether an operator's online web site, service, or product targets children, or is reasonably anticipated to be accessed by children, the attorney general or a court may consider the following factors:
    (1) Subject matter;
    (2) Language;
    (3) Design elements;
    (4) Visual content;
    (5) Use of animated characters or child-oriented activities and incentives;
    (6) Music or other audio content;
    (7) Age of models;
    (8) Presence of child celebrities or celebrities who appeal to children;
    (9) Advertisements;
    (10) Empirical evidence regarding audience composition; and
    (11) Evidence regarding the intended audience."

1349.09(A)(1). Similarly, the Act excludes websites that have any number of other "predominant or exclusive function[s]." *Id.* § 1349.09(N)(1).

As this Court has concluded, covered websites' choices about whether and how to disseminate user-generated expression "convey a message about the type of community the platform seeks to foster." (PI Order, ECF No. 33 at 21). In other words, the Act's references to "function" are a proxy for "differential treatment" of specific types of speech. *See City of Austin*, 596 U.S. at 71–74. Among the messages the Act regulates are the ideas that: (1) user-generated content is not less valuable than speech authored by the websites themselves; and (2) social interactions and connections (as compared to other types of interactions, such as business interactions) have unique value for online communities. Thus, the "features that the Act singles out are inextricable from the content produced by those features." (PI Order, ECF No. 33 at 21). And by disseminating speech these ways (and according to their own editorial policies), many covered websites "engage[] in compiling and curating others' speech into an expressive product of [their] own." *Moody*, 603 U.S. at 709–10; *see also id.* at 729–30 ("A private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment.").

The exceptions to the Act for product review websites and "widely recognized" media outlets are also content based. Specifically, the Act excludes websites where "interaction between users is limited to": (1) "[c]omments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events"; and (2) "[r]eviewing products offered for sale by electronic commerce or commenting on reviews posted by other users." Ohio Rev. Code § 1349.09(O)(1)-(2). Both of these exclusions are "based

on" the "content" of the "websites": "report[ing] news and current events" and "reviewing" certain "products." *Id.* Presumably, the public nature of comments—as opposed to private chats—reduces the predation risk to minors that Defendant argues covered operators pose. Even assuming, however, that requiring parental approval before a minor can engage in private user interaction is one of the Act's goals—and a constitutionally sound one—the exceptions as written still distinguish between the subset of websites without private chat features based on their content. For example, a product review website is excepted, but a book or film review website is presumably not. The State is therefore favoring engagement with certain topics, to the exclusion of others. That is plainly a content-based exception deserving of strict scrutiny. (PI Order, ECF No. 33 at 22); *see Planet Aid v. City of St. Johns*, 782 F.3d 318, 327 (6th Cir. 2015) ("[W]hen a regulation 'regulates speech on the basis of its subject matter,' it is not content-neutral." (citation omitted)).

The State nonetheless argues that the Act is aimed at the "unique risks" that covered operators' platforms pose to minors "based on shared features and functions unrelated to speech." (ECF No. 48 at 3). But "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165.

        *c.*      *The Act Violates Ohioan Minors' Rights*

NetChoice also argues that the Act merits strict scrutiny because it infringes on minors' rights both to access and to produce First Amendment protected speech. Generally, First Amendment protections "are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975); *Tinker v. Des Moines Independent School District,* 393 U.S. 503, 511–14 (1969); *Brown*, 564 U.S. at 794.

For that reason, "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik,* 422 U.S. at 212–213 (citation omitted). While the State "possesses legitimate power to protect children from harm," that "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citations omitted). Indeed, governments lack "the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3. "No doubt" Defendant "would concede this point if the question were whether to forbid children to read without the presence of an adult the *Odyssey . . .* ; or *The Divine Comedy . . .* ; or *War and Peace*." *Am. Amusement Mach. Ass'n,* 244 F.3d at 577.

Particularly relevant here is the Supreme Court's analysis in *Brown*, which invalidated a California regulation prohibiting the sale of violent video games to minors. 564 U.S. 786. The Act *sub judice* mirrors the requirements considered in *Brown.* And like content-based regulations, laws that require parental consent for children to access constitutionally protected, non-obscene content are subject to strict scrutiny.

### d.    The Act fails Strict Scrutiny

Having concluded that the Act is a content-based regulation, this Court considers whether the Act fails strict scrutiny. Strict scrutiny is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). It requires the government to show that the law "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed*, 576 U.S. at 171. In other words, to survive strict scrutiny, the State must "specifically identify an actual problem in need of solving" and show that "the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799.

Attorney General Yost toggles between several different interests in his motion and opposition to NetChoice's motion. Defendant argues both that it seeks to regulate the ability of operators to contract with minors, not to limit minors' access to expressive content, but in the same breath asserts that the State's compelling interest is in protecting minors from harms associated with covered operators' platforms, including mental health issues, data privacy issues, and sexual predation. (ECF No. 42 at 35–37). Defendant also argues that the State has a compelling interest in protecting and advancing parents' ability to make decisions about their children's care and upbringing. (*Id.* at 36). This Court will address each of these purported interests in turn.

With respect to minors' ability to contract with operators, Defendant cites the risk to minors of "involuntary releases of personally identifiable and other personal information and data." (ECF No. 42 at 16–17). Attorney General Yost also points out that courts have enforced these extensive "click-wrap" terms against minors. (*Id.*) As this Court previously held, however, the Act is not narrowly tailored to protect minors against oppressive contracts. The Act regulates access to and dissemination of speech when it could instead seek to regulate the—arguably unconscionable— terms of service that these platforms require. The Act is also underinclusive with respect to this interest. For example, as NetChoice explains, a child can still agree to a contract with the *New York Times* without their parent's consent, but not with Facebook.

Next, Defendant argues that scientific research supports the notion that engagement with operators' platforms can have damaging mental health effects, and subject minors to sexual predation. (ECF No. 42 at 35–36). The research reports submitted by the State outline the potential risk of harm to children and teens from both: (1) exposure to harmful content; and (2) excessive use perpetuated by the features discussed above like "infinite scrolling." (*Id.* at 29–31). To satisfy its burden, the State must come forward with "a compelling basis for believing" that these harms

are "actually caused by" the socially interactive nature of these websites, "and not pretexts for regulation on grounds not authorized by the First Amendment." *Am. Amusement Mach. Ass'n*, 244 F.3d at 576. The record Defendant has assembled here, however, is much like the deficient record in *Brown*, where "nearly all of the research" showing any harmful effects "is based on correlation, not evidence of causation." 564 U.S. at 800 (cleaned up; citation omitted).[10] The record also does not show that the full range of "thousands" of websites covered by the Act *cause* harms to minors sufficient to suppress those minors' access to protected speech.

But even if protecting children against these harms is a compelling interest, which it very well may be, *see Sable Communications of California, Inc. v. F.C.C.*, 429 U.S. 115, 126 (1989) (explaining that "there is a compelling interest in protecting the physical and psychological well-being of minors"), the Act is not narrowly tailored to those ends. As this Court previously concluded, "[f]oreclosing minors under sixteen from accessing all content on websites that the Act purports to cover, absent affirmative parental consent, is a breathtakingly blunt instrument for reducing social media's harm to children." (PI Order, ECF No. 33 at 25). The State's approach is an untargeted one, as parents must only give one-time approval for the creation of an account, and parents and platforms are otherwise not required to protect against any of the specific dangers that social media might pose. As the Supreme Court observed in *Brown*, legislation preventing minors

---

[10] *See e.g.,* ECF No. 42-2 at 5 ("More research is needed to fully understand the impact of social media[.]"), *id.* at 11 ("more research is necessary to understand whether one causes the other"), *id.* at 12 ("Most prior research to date *has been correlational*, focused on young adults or adults, and generated a range of results." (emphasis added)); *id.* (identifying "Known Evidence Gaps"); ECF No. 42-3 at 3 ("Meta-analyses have identified small or negligible negative links between social media use and well-being, while experimental evidence is mixed. Longitudinal observational studies that have investigated the predictive relationships between social media use and well-being have found that they are either reciprocal, only present in a certain direction or sex or not present at all."), *id.* at 6 ("The study has multiple limitations that need to be considered. First, to interpret the parameters from our analyses as estimates of causal effects one would need to adopt [five] assumptions[.] . . . Only if these assumptions are met can this observational study be said to capture the causal effects between social media and life satisfaction. Second, the data are self-report and therefore only allow inferences about the impact of self-estimated time on social media, rather than objectively measured social media use.").

from buying violent video games was "seriously underinclusive" because the "Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent . . . says it's OK. . . . That is not how one addresses a serious social problem." 564 U.S. at 802.

Finally, with respect to the rights of parents, Attorney General Yost fails to distinguish the State's purported interest from an analogous—and rejected—state interest in *Brown*. When the State of California tried a similar argument, that the legislation prohibiting minors from purchasing violent video games was "justified in aid of parental authority," the Supreme Court noted that it doubted "punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802. More conclusively, however, the Court detailed a series of preexisting protections to help parents—just as there are here—such that "filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id.* at 803. And the legislation was also overinclusive, in that it enforced a governmental speech restriction, subject to parental veto, as opposed to protecting only the interests of genuinely concerned parents. *Id.* at 804. That is, some parents simply may not care. *Id.* The same is true here.

Indeed, Defendant concedes that "parents have certain parental-control options for overseeing how their minor children use the internet," but contends that "these options are simply not preventative enough and ignore the reality of the pervasiveness . . . of technology." (ECF No. 42 at 39). The fact that parents may be unaware of these tools, however, is not a proper justification. *See Ginsberg v. New York*, 390 U.S. 629, 639 (1986) ("It is cardinal with us that the custody, case, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." (quoting

*Prince*, 321 U.S. at 166)).  As another district court observed, "parents control whether their minor children have access to Internet-connected devices in the first place, and Defendant[] ha[s] not shown minors are so capable of evading parental controls that they are an insufficient alternative to the State infringing on protected speech." *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1127 (D. Utah 2024) (cleaned up).

This Court, although sympathetic to what the Ohio legislature sought to do, finds that the evidence does not establish the required nexus between the legislative concerns about the well-being of minors and the restrictions on speech.  In other words, the Act is either underinclusive or overinclusive, or both, for all the purported government interests at stake.  Ohio's response to a societal worry that children might be harmed if they are allowed to access adult-only sections cannot be to ban children from the library altogether absent a permission slip.  As Justice Holmes put it, the Constitution "does not enact Mr. Herbert Spencer's Social Statics." *Lochner v. New York*, 198 U.S. 45, 75–76 (1905) (Holmes, J., dissenting).  This is not to suggest that the State is wholly without power to enact legislation that seeks to minimize social media harms.  Protecting children's well-being is a laudable, perhaps even achievable, goal.  But Ohio's imperative is to achieve this goal through legislation that is constitutional.

## 2.  Due Process: Void for Vagueness

Laws run afoul of the Due Process Clause of the Fourteenth Amendment if they fail to "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2009).  In addition to affording regulated parties notice, precision is also essential to ensure that laws cannot be enforced in an arbitrary or discriminatory way.  *Id.*  The need for clarity is particularly acute when laws restrict speech.  *See id*.  Having concluded above

that the Act does in fact regulate speech, this Court rejects Attorney General Yost's invitation to apply a relaxed vagueness standard.

NetChoice identifies several aspects of the Act that this Court finds troublingly vague. Specifically, the Act purports to apply to operators that "target[] children" or are "reasonably anticipated to be accessed by children." Ohio Rev. Code § 1349.09(B). On its face, this expansive language would leave many operators unsure as to whether it applies to their website. The legislature's apparent attempt at clarity is also unilluminating. The Act provides an eleven-factor list that the Attorney General or a court may use to determine if a website is indeed covered, which includes malleable and broad-ranging considerations like "[d]esign elements" and "[l]anguage." Ohio Rev. Code § 1349.09(C). All the listed considerations are undefined.

The Act also contains an eyebrow-raising exception for "established" and "widely recognized" media outlets whose "primary purpose" is to "report news and current events," the speaker and content-based flavor of which are discussed further below. Ohio Rev. Code § 1349.09(O)(2). But the Act also provides no guardrails or signposts for determining which media outlets are "established" and "widely recognized." Such capacious and subjective language practically invites arbitrary application of the law.

Attorney General Yost does not focus his argument on these examples, but instead highlights aspects of the Act that are more precisely defined. For example, he points to the Act's "carve-outs," (ECF No. 42 at 44), and a few of the eleven factors that are less vague: "[e]mpirical evidence regarding audience composition" and "[p]resence of child celebrities or celebrities who appeals to children." (Id. at 46 (quoting § 1349.09(C))). Defendant Yost also points to the Children Online Privacy Protection Act of 1998 ("COPPA"), a federal regulation that uses some of the same factors to explain which websites or online services are "directed to children," and

therefore, covered by COPPA. (*Id.* at 46–47). But he points to no case where a court has concluded that COPPA's language is not vague, nor can this Court find one.

These more specific factors and the existence of the COPPA scheme do not cure vagueness in the eleven-factor list. But even if they did, they do not address the broad-ranging language in the exceptions. None of these phrases or the definitions in COPPA rehabilitates, for example, amorphous descriptors like "established" or "widely recognized."

## C. Permanent Injunction

In determining whether to enter a permanent injunction, this Court considers a modified iteration of the factors it utilizes in assessing preliminary injunctions: (1) success on the merits; (2) whether the plaintiff will suffer irreparable injury absent an injunction; (3) whether, balancing the hardships, there is harm to the defendant; and (4) whether the public interest favors granting the injunction. *See Amoco Prod.*, 480 U.S. at 546 n.12 ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *Am. C.L. Union of Kentucky*, 607 F.3d at 445.

As discussed above, NetChoice prevails on the merits. And this Court has already determined that NetChoice satisfies the remaining factors for injunctive relief. (PI Order, ECF No. 33 at 27–28). Specifically, NetChoice members and their users will suffer multiple forms of irreparable harm. As a matter of law, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (cleaned up). Most pertinent here, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (internal quotation marks and citation

omitted). The Act violates covered members' and their users' First Amendment rights for all the reasons discussed above. Covered members' unrecoverable compliance costs also constitute sufficient irreparable injury. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (citing compliance costs "with no guarantee of eventual recovery"). This Court previously observed that the "engineering and compliance procedures" for some covered members are "extremely burdensome," and "there is no cause of action through which [NetChoice members] could seek to recover those compliance costs." (PI Order, ECF No. 33 at 28).

The last two factors in the balancing test merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). It "is always in the public interest to prevent the violation of a party's constitutional rights." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (internal quotation marks and citation omitted). Here, a permanent injunction would ensure that minors could continue to access and engage in protected speech on the vast array of websites regulated by the Act. And those websites would be able to continue disseminating speech to the public without the Act's burdens. On the other side of the ledger, "the State has no interest in enforcing laws that are unconstitutional." (PI Order, ECF No. 33 at 29) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 591 F. Supp. 3d 205, 215 (W.D. Ky. 2022)); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982) (similar).

In short, where a First Amendment injury is both "threatened" and "occurring" and a plaintiff has prevailed on the merits, permanent injunctive relief is the appropriate remedy. *See Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). Accordingly, this Court grants Plaintiff's motion for a permanent injunction.

## IV.    CONCLUSION

Having considered the parties' cross-motions for summary judgment, the declarations and exhibits in the record, and the arguments of counsel, and for the reasons set forth above, it is hereby **ORDERED** that Defendant's motion for summary judgment (ECF No. 42) is **DENIED**; and Plaintiff's motion for summary judgment and permanent injunction (ECF No. 43) is **GRANTED**. It is **FURTHER ORDERED** that Defendant David Yost, in his official capacity as Attorney General for the State of Ohio, and his respective officers, employees, representatives, and agents are **ENJOINED** from enforcing the Parental Notification by Social Media Operators Act, Ohio Rev. Code § 1349.09, Am. Sub. H.B. No. 33 §§ 803.380, 1349.09, 135th Gen. Assemb., Reg. Sess. (Ohio 2023). It is **FURTHER ORDERED** that this Opinion and Order shall constitute a final judgment in this case, and the Clerk of Court is **DIRECTED** to close the case administratively.

   **IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATE: April 16, 2025**