```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION

NETCHOICE, LLC,                    )
                                   )
   PLAINTIFF,                      )   CASE NO. 2:24-cv-47
                                   )
        vs.                        )
                                   )
DAVE YOST, in his official         )
capacity as Ohio Attorney General,)
                                   )
   DEFENDANT.                      )
_____   )


          TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
          BEFORE THE HONORABLE ALGENON L. MARBLEY
               UNITED STATES DISTRICT JUDGE
                 MARCH 12, 2025; 4:00 P.M.
                      COLUMBUS, OHIO


   APPEARANCES:

   FOR THE PLAINTIFF:
        Lehotsky Keller Cohn, LLP
        By:  Jeremy E. Maltz, Esq.
        200 Massachusetts Avenue, NW, Suite 700
        Washington, DC  20001

        Sperling Kenny Nachwalter, LLC
        By:  Matthew H. Rice, Esq.
        325 North Clark Street, 25th Floor
        Chicago, Illinois  60654

   FOR THE DEFENDANT:
        Ohio Attorney General
        Constitutional Offices Section
        By:  Stephen P. Tabatowski, Esq.
             James P. Reising, Esq.
        30 East Broad Street, 16th Floor
        Columbus, Ohio  43215


                         - - -


        Proceedings recorded by mechanical stenography,
 transcript produced by computer.
```

WEDNESDAY AFTERNOON SESSION

MARCH 12, 2025

- - -

THE COURT:  Ms. Stash, would you please call the case.

THE DEPUTY CLERK:  Case No. 2:24-cv-47, NetChoice, LLC, versus Dave Yost.

THE COURT:  Would Counsel introduce themselves for the record beginning with Counsel for the plaintiff.

MR. MALTZ:  My name is Jeremy Maltz, and I represent Plaintiff NetChoice.

MR. RICE:  Good afternoon.  Matthew Rice also for Plaintiff NetChoice.

THE COURT:  And Counsel for the defense.

MR. TABATOWSKI:  Steve Tabatowski for the defendant, Yost.

MR. REISING:  James Reising for the defendant.

THE COURT:  Good afternoon, Mr. Tabatowski and Mr. Reising.

It is the Court's understanding that there are a number of persons in the virtual gallery.  So I'm going to ask all of those persons participating by phone if they would be so kind as to go on mute so that we won't be getting any feedback.

Give me one second before we begin.

We're here on cross motions for summary judgment, I believe, if I'm reading the docket correctly.  Though you filed

on the same days -- on the same date, Mr. Tabatowski, for the defense, filed first.

So, Mr. Tabatowski, you're going to go first. You'll have 30 minutes. You may reserve some time for rebuttal since there were cross motions filed. How much time do you wish to reserve?

MR. TABATOWSKI: Five minutes for rebuttal, Your Honor.

THE COURT: All right.

Ms. Stash, my courtroom deputy, will be the timekeeper.

So please approach the podium. I want to put on the record what Counsel and I discussed in my conference room before the beginning of this argument, and, that is, the Court's belief -- and I believe it's uncontested -- that *Moody v. NetChoice* is controlling, at least to the extent that it frames the issues. And the Court, through Justice Kagan in remanding the case back to the Eleventh Circuit and to the Fifth Circuit, said that the Court must decide which of the laws' applications are constitutionally permissible and which are not and, finally, weigh the one against the other.

So that sort of frames the argument in this case.

With that being said, Mr. Tabatowski, you may proceed.

MR. TABATOWSKI: Thank you, Chief Judge Marbley, and may it please the Court. As the Court noted, we're here on cross motions for summary judgment, and the Court should grant

summary judgment in favor of the attorney general.

Before I begin, I'll note I'm focusing my presentation today on the merits arguments and will rest on the briefs in term of standing.

THE COURT:  Thank you.

MR. TABATOWSKI:  I'd like to begin with where the parties agree that no one -- excuse me.  Everyone agrees that the Internet is home to vast amounts of speech, both protected and unprotected, and that the operators of online platforms covered by the Act, for their part, both host other speech and engage in speech of their own.

THE COURT:  I take it, based on that representation, that the attorney general, unlike was the case in Texas, does not contest that this statute is designed to regulate speech. Am I right?

MR. TABATOWSKI:  You are incorrect on that point.  The attorney general does argue that the Act regulates the conduct of contracting and not -- is not a direct regulation of speech.

THE COURT:  Doesn't it regulate a person's ability to participate in speech?

MR. TABATOWSKI:  It does incidentally, if it does at all.  If the First Amendment is implicated --

THE COURT:  So it's just an incidental burden.  You're still trying to get away from strict scrutiny.  Would that be a fair statement to make?

MR. TABATOWSKI:  That would be a fair statement to make, Your Honor.  If the Act affects speech at all, it does so incidentally and in a content-neutral manner, and so it's subject to intermediate scrutiny under *Turner Broadcasting*.

THE COURT:  Let me go back for a moment to the original statement that I made with respect to the issues that frame this case.

Do you believe, Mr. Tabatowski, that this -- the record is adequately developed to answer the questions that Justice Kagan posed for the parties in *Moody*?

MR. TABATOWSKI:  It may not be, Your Honor.  And, ultimately, that's a NetChoice -- that's a burden problem in terms of showing -- what *Moody* tells us, in part, is that to succeed on a facial challenge, NetChoice has to show that a substantial number of the Act's applications are unconstitutional when compared with its legitimate --

THE COURT:  Before she got there, though, she kind of posed the rhetorical question, which was:  How many of the applications would get into constitutional crosshairs?  So we first have to determine whether, you know, it's maybe a handful or maybe it's multitudes, but we need to find out how many instances we may be contemplating here.

MR. TABATOWSKI:  I would agree with that, Your Honor. And I think *Moody* goes even one step further than maybe Your Honor is suggesting, one step more granular in that the Court

6

noted that, below, the parties had focused on what it called the heartland applications.

THE COURT:  If focused just on facial challenges.

MR. TABATOWSKI:  Or just on the laws applied to the landing page for Facebook, for instance.  But the Court noted that to perform this analysis you have to look at not just the landing page of Facebook but also the direct messaging services that it offers and whether -- so it's not just even whether the Act is constitutional in terms of one website, but even as to disparate functions in that website.

THE COURT:  In your view, then, what activities and by what actors, Mr. Tabatowski, do the laws prohibit or otherwise regulate?

MR. TABATOWSKI:  The Act regulates contracting with minors by covered operators.

THE COURT:  Okay.  Does the Act define -- the Act defines who the covered operators are, does it?

MR. TABATOWSKI:  It does, in Division --

THE COURT:  Who are the covered operators?

MR. TABATOWSKI:  -- (A)(1) of the section.

Covered operators are those -- Any business, entity, or person that operates an online website, service, or product that has users in Ohio and allows them to do all of the following:  Interact socially with other users within the confines of the online website, service, or product; B,

construct a public or semipublic profile for the purpose of signing into and using the online website, service, or product; C, populate a list of other users with whom an individual shares or has the ability to share a social connection within the online website, service, or product; and, D, create or post content viewable by others, including on message boards, chat rooms, video channels, direct or private messages or chats, and a landing page or main feed that presents the user with content generated by other users.

THE COURT:  And it has some exceptions, right?

MR. TABATOWSKI:  That's correct.

THE COURT:  And tell me about the exceptions, Mr. Tabatowski.

MR. TABATOWSKI:  The exceptions to -- in the Act take otherwise covered operators who would meet those criteria and exclude website, service, or products respecting which the interaction between the users is limited to the following: Reviewing products offered for sale by electronic commerce or commenting on reviews posted by other users; and, two, comments incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events.

THE COURT:  And it says something about traditional news sites, right?

MR. TABATOWSKI:  It says established and widely

recognized media outlets.

THE COURT:  Where does the statute define established and otherwise -- not traditional.  I keep wanting to say traditional.

MR. TABATOWSKI:  Widely recognized.

THE COURT:  Where does it define those terms?

MR. TABATOWSKI:  It does not.

THE COURT:  How do we know to whom that section of the statute applies?

MR. TABATOWSKI:  I think in the normal ways that we determine the meaning of undefined terms and statutes.

THE COURT:  Is PBS one of those news sites?

MR. TABATOWSKI:  In my experience, I would believe that PBS would be a widely recognized media outlet.

THE COURT:  How about Fox News?

MR. TABATOWSKI:  In my experience, I believe Fox News to be a widely recognized media outlet.

THE COURT:  Why don't you tell me what the widely recognized sites are.

MR. TABATOWSKI:  All of them?

THE COURT:  Just give me a representative sample.  Assume for the moment that I'm a platform person and I want to see whether my site qualifies for the exemption.  How would I go about -- assume I'm a GC at a -- at Breitbart.  In our present climate, would I, as the general counsel at Breitbart,

enjoy the privilege of being a well-recognized and -- it's not traditional, but you know what I'm saying.  Well-recognized --

MR. TABATOWSKI:  Established.

THE COURT:  Established organization.  I'm going to write that down.  Established organization.

Is Breitbart an established organization?

MR. TABATOWSKI:  I hesitate to speculate on how a court would turn out on that or how the attorney general's interpretation of the statute may turn out on that.

THE COURT:  Well, if the attorney general can't tell me, Mr. Tabatowski, how are you going to tell the plaintiff whether they're excepted or not?  How do you tell the members that?  How will we know?

MR. TABATOWSKI:  I think it's the same kind of reasonable person analysis that courts apply.

THE COURT:  Tell me where in the statute it says that to determine whether I am -- fall within the exception I should deploy the old reasonable person analysis.

MR. TABATOWSKI:  It doesn't say that in the statute. You're correct, Your Honor.

THE COURT:  Would I do what is kind of fashionable now in Supreme Court jurisprudence?  Hewing closely to Justice Scalia's vision of the Constitution, would I look to history to determine what an established one is, look to the history of broadcast journalism?  Would I do that?

10

MR. TABATOWSKI: You might, Your Honor. I think that courts often take undefined terms in a statute and create multifactor analyses to determine whether --

THE COURT: Yeah, but it's usually in the context of the statute and it would look to other terms, purposes of the statute, of the language in the statute so that it would make the statute workable, and it would make the statute sustaining because the courts -- this Court included -- all want to find statutes constitutional, if they are.

What I'm trying to find out, as a threshold matter, is how any member of the plaintiff could look at the statute and determine whether it came within an exception.

MR. TABATOWSKI: I think Your Honor could look at the -- you know, *in pari materia*, and look at the statute as a whole to discern what kind of factors would suggest a news outlet is well established, and history may be one of them.

THE COURT: Any other tools -- what other tools are there that I could deploy to find out whether I'm an established news outlet?

MR. TABATOWSKI: I think courts could turn to the traditional canons of construction and interpretation to --

THE COURT: Which ones?

MR. TABATOWSKI: *In pari materia*, we mentioned. I think it's -- the Latin is escaping me.

THE COURT: I understand what *in pari materia* means.

MR. TABATOWSKI: The next one, I think it's -- I can't think of the Latin phrase, but when you have -- you look at other items in the statute, and those undefined terms should be construed in light of the other listed items.

THE COURT: That's kind of like an *ejusdem generis* statute where it might articulate certain features and then you would abide by those features, or those features would help with the definition. But that's not in the statute either, Mr. Tabatowski.

But let's move on. I think that you've answered the questions that I have.

I want to go for a moment, Mr. Tabatowski, to your comment earlier about this case being subject to the intermediate scrutiny under *Turner* as opposed to strict scrutiny under *Flores*. Tell me why intermediate scrutiny would be the proper measure. Let's assume just for the purpose of my question that we're past the standing issue and we're now actually looking at, as you referenced, a merit-based analysis of whether this statute is facially constitutionally infirm.

MR. TABATOWSKI: If we assume that First Amendment scrutiny applies, then the Act gets intermediate scrutiny because the Act is content neutral. And it's content neutral because that inquiry, at its core, is about whether the government is regulating or drawing distinctions in a statute because of disagreement with some message that's being

12

conveyed.

THE COURT: Would you agree that the statute targets some websites and exempts others as a threshold matter? Right?

MR. TABATOWSKI: I would agree.

THE COURT: The Act only purports to govern websites that are targeted at children or reasonably anticipated to be accessed by children; is that right?

MR. TABATOWSKI: That is correct, Your Honor.

THE COURT: And it excludes from coverage websites where interaction between users is, quote, "Incidental to content posted by an established and widely recognized media outlet, the primary purpose of which is to report news and current events."

That's true, too, isn't it?

MR. TABATOWSKI: I believe that, yes, that's an accurate description of Division O, the exceptions.

THE COURT: And it has an exemption for websites where the interaction is limited to review of products for sale, right?

MR. TABATOWSKI: That's correct.

THE COURT: But it doesn't exempt reviews of, for example, services or art? That's true too, isn't it?

MR. TABATOWSKI: If the art is a product, then it would exempt that website.

THE COURT: Okay. Now, the Act would -- could

arguably permit a minor to create an account subject to a contract, of course, with, let's say, *The New York Times* -- I think that's an example I've used before -- raising similar concerns to the ones involved in product formation with Facebook.  So a kid could enter into a contract -- or he could contract with *The New York Times* without parental consent but not with Facebook, right?

MR. TABATOWSKI:  That's correct.

THE COURT:  Explain to me on the surface why that is valid and why that is not content-based.

MR. TABATOWSKI:  The reason, Your Honor, is because *The New York Times* wouldn't meet the definition of an operator in the first instance.

THE COURT:  Can a business be an operator, though?  Is Meta an operator?

MR. TABATOWSKI:  Is Meta an operator?

THE COURT:  Or is Facebook the operator?

MR. TABATOWSKI:  Facebook would be a covered operator.

THE COURT:  So take *The New York Times* corporation, which may be the holding company, if it has *The New York Times* online as a separate entity, is that the same as Meta and Facebook?

MR. TABATOWSKI:  Without having their organizational chart in front of me, Your Honor, I really can't -- I can't answer it.

THE COURT: That's fair enough.

MR. TABATOWSKI: Back to what -- Your Honor's question, the distinction there, while those contracts may pose similar harms or impose similar onerous terms on the minor, *The New York Times* is not going to meet that definition of operator. And it's those two compounding things, those are the state's interest that it's trying to get at with the Act. It's a compounding problem between you begin with this contract that imposes these terms, and then you have this particular medium or functions or features of a covered operator that pose significant, unique risks that are unique to those websites. And now the minor is on the website and, because of those unique risks, they suffer harm.

THE COURT: Isn't a content -- doesn't the statute, which focuses on websites that target children -- is it inextricably linked to the content of those websites? Because the only reason that you believe that they target children, or children would find it compelling to access the website, is because of its content. Isn't that right?

MR. TABATOWSKI: Not in the First Amendment sense. In the Court's preliminary injunction holding, the Court correctly held that since the ultimate inquiry is whether or not the government is regulating because it agrees or disagrees with that content, those criteria and that requirement is really just a way to target the effect of the Act on those that it's

15

seeking to protect. It's not agreeing or disagreeing with cartoons or what have you, whatever may be content that's targeting towards children. It's just -- it's a tailoring effort to tailor the Act's applicability to those types of websites.

THE COURT: But, at the end of the day, aren't the websites either likely or unlikely to be accessed by children because of their content and, as a result, the language actually distinguishes between speakers on the basis of that content? I mean, you, yourself, said it. If it's cartoons, the likelihood is that you and Mr. Maltz are not going to be watching it unless you watch it with your kids.

MR. TABATOWSKI: Yes, Your Honor. But I would again return to content-based, in terms of the First Amendment, ultimately depends on whether the government is drawing those distinctions because it has some bone to pick with that -- that message, that type of content.

THE COURT: Okay. So you exempt, for instance, a product review. But you don't exempt a book or film review website. So, again, it hunts back to it being content-based.

MR. TABATOWSKI: Two points on that. The first is that I think -- and I think it's very important that those exceptions, the prefatory Division O, it talks about accepting websites where user interaction is limited to these. So the focus, again, is on how this interaction is occurring.

16

THE COURT:  Don't most of these websites distinguish themselves based on the content?  I mean Spotify is different from The Little Purple Podcast website.  They both have content, but one is mostly music; the other features podcasts.

And the fact that I can't come up with more tells you what my apps look like.

MR. TABATOWSKI:  Those websites do -- that's a business decision to distinguish themselves based on the types of content they provide.  But the Act doesn't do so.  The Act is unconcerned, ultimately, with what content the minor is accessing.  It's concerned with whether the website requires a contract, in the first instance, and whether the website has these features and functions that make it a covered operator under Division (A)(1).

So, to your point, the fact that a minor could get on *The New York Times* and read an article that they would be unable to read on Facebook, that's evidence of content neutrality because the State doesn't care what that article says.  It cares whether, you know -- the medium in which the minor is accessing that article.

THE COURT:  Okay.  So you make the point that your interest is in -- as you said, not in content.  And you also make the point that this is a statute about contract; right?

MR. TABATOWSKI:  That's correct.

THE COURT:  And there are two points that I want to

17

talk about with you. It seems, in your papers and in your argument, the attorney general toggles between several different interests in opposition to the plaintiff's motion. So the attorney general argues both that it seeks to regulate the ability of operators to contract with minors, not to limit minors' access to expressive content, but, in the same breath, asserts that the state's compelling interest is in protecting minors from harm associated with covered operators' platforms, including mental health issues, data privacy issues and sexual predation. You also argue that the State has a compelling interest in protecting and advancing the parents' ability to make decisions about their children's care and upbringing.

I want you to tell me how that squares with your position that this is just about contract.

MR. TABATOWSKI: Well, in terms of whether First Amendment scrutiny applies at all, the statute really regulates the conduct of contracting. But, if speech is implicated, and we have this heightened scrutiny apply under the First Amendment, the state's interest are twofold -- really maybe two-and-a-half fold, as you mentioned. And they're intertwined. They're compounding upon each other.

Like the *Sarah v. Google* case cited in our brief. It's a young woman, signs up for YouTube. She is subject to sex trafficking and grooming behavior that occurs on that website. She wants a remedy. She's harmed. She sues. Google enforces,

18

and the Court enforces, the forum selection clause.  So she now has to go to California to litigate her case.  She has to hire a California attorney.  That's cost prohibitive for a normal everyday Ohioan.

THE COURT:  Identify for me some other harms that flow from contract terms here in Ohio, other than the instance in which the aggrieved plaintiff might have to go to California.

MR. TABATOWSKI:  Well, there are licensing terms. There are -- give me just one moment, Your Honor.

THE COURT:  I don't want you to misunderstand my question, Mr. Tabatowski.  I don't want you to give me potential harms.  I want you to give me actual harms that have flowed from the contract terms.

MR. TABATOWSKI:  The state's -- in the state's evidence is an affidavit from Amanda North who is an Ohio Bureau of Criminal Identification and Investigation special agent.  She has ten years specializing in child exploitation and abuse on the Internet.  And she gets into that a little bit.  In her experience, the vast majority of online predators use websites with the features that make a covered operator. And she gets into the reason as to why they do that.  Public and semipublic profiles --

THE COURT:  Does she reference the oppressive contracts and why she found them to be oppressive?

MR. TABATOWSKI:  No, she does not.

THE COURT:  Does she reference the harms that she, in her investigation, found as a result of these contracts?

MR. TABATOWSKI:  She does not.  Her experience is child exploitation and abuse on the Internet.  But recognizing that when that occurs, a remedy is often unavailable due to these contracts the general assembly enacted.

THE COURT:  Is it possible for the general assembly to simply tailor a statute that goes only to contract and minors' ability to contract and not, in the least, burden speech?  Again, assuming that I find that speech is contemplated here.

MR. TABATOWSKI:  You know, any regulation could conceivably impact or burden speech.  A curfew regulation --

THE COURT:  You've made clear in your papers, if I read them correctly, that these websites whom plaintiff represents, and these operators whom plaintiff represents, are purveyors of speech, aren't they?

MR. TABATOWSKI:  They do host the speech of others.

THE COURT:  They curate speech, don't they?

MR. TABATOWSKI:  They do.

THE COURT:  So we aren't talking about whether the 16-year-old could go to Ricart and purchase an F-150 and sign some type of contract of adhesion.  That's not what we're talking about; right?

MR. TABATOWSKI:  That would not be the same statute.  But I will say, Your Honor --

20

THE COURT: And that's not what -- we're not talking about contract qua contract. We're talking about contract in the context of these providers of speech or purveyors of speech or curators of speech. Any way you slice it, speech is part of it.

MR. TABATOWSKI: That's true, Your Honor. But I don't think that means that the First Amendment says that purveyors of speech are unregulatable because they host or curate the speech of others.

I do think, if you compare NetChoice -- or, excuse me, *Moody*, the *Moody* case with the Supreme Court's subsequent decision in *TikTok v. Garland*, that kind of helps you understand what we mean by content neutrality in this context. In *Moody*, the Florida and Texas laws essentially restricted platforms from censoring or disfavoring posts on their face. They would prevent de-prioritizing posts by or about political candidates. They would require content moderation to be done in a consistent manner. Texas would outlaw censoring a user based on viewpoint.

So the core substantive holding of *Moody* is that when a platform is engaged in hosting this type of interactive space, it's engaged in First Amendment protected expression, as Your Honor noted. And I'm quoting from the case here:

"When the government interferes with such editorial choices, say, by ordering the excluded to be included,

21

it alters the content of the compilation."

That's a content-based regulation.

Again, quoting from the decision:

"It's an intrusion on protected editorial discretion."

And it would change the speech that would be displayed. Since those laws would require platforms to host certain speech, they were content-based. This says nothing about content. The distinctions drawn here are, at worst, based on speaker because of content-neutral features and functions that they offer.

THE COURT: Would you -- you're over your time, but do you have anything you wish to add, if you assume just for the purpose of my question that I deploy a strict scrutiny paradigm in analyzing this? Do you have anything that you want to say about whether this statute could -- as written, could be deemed void for vagueness?

MR. TABATOWSKI: Yes, Your Honor. I can touch on void for vagueness briefly, just that the Constitution doesn't demand mathematical certainty from statutory language, and the inquiry depends on whether the statute gives not actual but fair notice to those to whom it might apply. And the Act does that. It does it through its definition of operator, and it does it through the factors to determine whether it targets or is reasonably anticipated to target children. That's the -- you could look at those factors.

22

And, ultimately, there is a unifying principal there, and that's whether a website targets or is reasonably anticipated to be accessed by children.  Courts or the attorney general, when they're looking at those factors, they're guided by that unifying principal, and it ultimately comes back to that.

THE COURT:  I'm still troubled by the exception for established and widely recognized media outlets.  I don't know that there are within the statute sufficient guardrails or signposts for determining which media outlets are established or widely recognized.

In California, *The Onion* might be widely recognized as an established media outlet.  And, in Georgia, Breitbart might be.  But, in Maine, query whether either of them would be.  I just don't know how the plaintiff would be able to determine, under that somewhat capacious and subjective language, what widely recognized and established means.

But we can leave it at that.  You will have an -- I'm still going to give you five minutes for rebuttal.

MR. TABATOWSKI:  Thank you, Your Honor.

THE COURT:  Mr. Maltz.

MR. MALTZ:  Your Honor, may it please the Court.  My name is Jeremy Maltz, and I represent the plaintiff, NetChoice, in this case.

The Ohio Parental Notification by Social Media Operators

Act imposes an unconstitutional burden on both the receiving and engaging in speech.  What the Supreme Court just held in *Moody* against *NetChoice* is that the nature of the First Amendment inquiry determines the facial challenge analysis which must look at both the actors and activities.

THE COURT:  Let me ask you the same question that I asked Mr. Tabatowski, Mr. Maltz.

Based on Justice Kagan's directive to the parties on remand in *Moody*, do you think that the record here is adequately developed to answer those same questions?

MR. MALTZ:  Yes, Your Honor, I do.

THE COURT:  Please tell me why.

MR. MALTZ:  So I want to start very quickly with the nature of the First Amendment inquiry.  And so what the Supreme Court said in *Brown* against *Entertainment Merchants Association* is that minors have the right to speak or be spoken to without parental consent, and that the State lacks the power to prevent children from hearing or saying without parents' prior consent.

So what the First Amendment says is that restrictions on access to speech and parental consent requirements, in particular, are going to raise heightened First Amendment scrutiny.  So the question is then, who are the actors?

The statute is really pretty clear in this sense, Your Honor -- because we have argued that aspects of that are vague. It is very clear that the Act is targeting online services

24

where people are engaged in interaction in speech.  The whole definition has been read; so I just want to highlight a couple of things.  Subsection (1)(a) is where people interact socially.  That's where people talk.  A public or semipublic profile, that means that people can sort of see who is speaking.  Populate a list of other users.  That's going to help facilitate interaction.  And, finally, create or post content viewable by others, including things like message boards and chat rooms.

Here, unlike in *Moody*, we have a statute that is laser targeted on precisely the sorts of websites where people go to engage in speech and where the website's core function is to disseminate curated collections of speech and to facilitate and enable their users' creation and access to speech.  Those are the actors.

What are the activities regulated by the Act?  Simply put, the activity regulated by the Act is threshold access to these online services because, at the outset, these services covered by the Act must obtain variable parental consent before allowing them to register or sign up.  And these requirements to sign up for the services usually help make the services functional.  If you can't log in, well, you don't have the accounts that you follow, you don't have -- you're not presented with the content that you have told the service you want to see, and you're not presented with your sort of

personalized collection of curated content. And I should add precisely the kinds of curated content that *Moody* against *NetChoice* just helped protect.

THE COURT: Let me ask you, Mr. Maltz. Does the statute prevent a 15-year-old from accessing what he or she might want to access as long as the parents go along? So, if the parents are in simpatico with what the kid wants to see, we don't have a problem; is that right?

MR. MALTZ: Correct. Under the statute, much like the statute in *Brown* against *Entertainment Merchants Association*, if parents agree, then minors can access the speech. And I should add here -- this is maybe a bit of a tangent -- but can access the entire service and can access the parts of the service that Defendant argues are so tremendously harmful to minors. And, quite frankly, Your Honor, that doesn't make sense. This sort of one-time --

THE COURT: Under the statute, could one indulge the presumption that the parents are aware of that fact? The parents are aware that if we sign this contract for them to go onto TikTok, they understand that they might see some ballet dancing, but they also might see some dirty dancing. Isn't that true?

MR. MALTZ: I don't know that we can generalize across all parents, Your Honor.

THE COURT: But the fact remains that you can -- that

26

the law recognizes certain parental rights and prerogatives. Isn't that true? You have a fundamental right to raise your minor child; right?

MR. MALTZ: Yes, Your Honor.

THE COURT: So, if a parent has entered into a contract -- has signed the contract under the statute with TikTok, then how does that burden TikTok and TikTok's speech as a curator?

MR. MALTZ: Well, Your Honor -- I'm sorry. If the parent denies consent?

THE COURT: No, the parents grant consent.

MR. MALTZ: If the parents grant consent, then both the minor and the service will be allowed to engage in protected speech activities.

THE COURT: Right. I ask that in response to your question -- or your statement that once they get on the website, once the parents sign the contract and get on the website, the kid can just go and explore, as kids are wont to do, and they might explore things that are, again, ballet dancing, and they might explore things that are dirty dancing. But the parent understands that. In signing that contract, this gives the kid the right to do -- to get into TikTok and take advantage of all of its offerings.

MR. MALTZ: And parents have the ability to determine what online services their minor children use. They have a

27

wealth of opportunities to do so. This Act doesn't seek to educate parents about those tools. It doesn't seek to make those tools more effective. What it says is every time a minor -- and in this case a minor under 16 -- wants to use an online service, he or she must secure parental consent. That's flatly unconstitutional under binding precedent, Your Honor.

So NetChoice members -- as we have said in the record, NetChoice members provide tools to parents. Third parties provide tools to parents. Device manufacturers provide them. Software, you know -- browsers, you name it. So we do not.

THE COURT: But NetChoice members don't purport to provide parents with all of the tools available, just the tools that NetChoice members have determined are best.

MR. MALTZ: It is true that NetChoice members have their own sort of bespoke set of parental tools, and those vary. This might not be in the record, but there's more and more every day. But parents can supplement.

What the courts have said is, it is not always on the disseminator of speech to self-regulate especially when there are third parties and widely available software, widely available tools available to parents. Those are less restrictive alternatives, and they must be used.

THE COURT: It's also true that the government is not prohibited from providing protections that redound to the benefit of children and parents. That's true too, isn't it?

MR. MALTZ:  Yes.

THE COURT:  Your complaint here is that it burdens speech, not that it's illegal, per se, for them to legislate in this area.

MR. MALTZ:  Of course not.  The problem here is that the government has put its thumb against minors accessing the places where there is a tremendous amount of protected speech.

THE COURT:  A tremendous amount of what?

MR. MALTZ:  Of protected speech.

THE COURT:  Let me ask you this, Mr. Maltz.  How can this statute be saved?

MR. MALTZ:  I'm not sure that this statute could be saved, Your Honor.  I'll just say I start from the proposition that any time you're imposing a threshold restriction on access to protected speech, you must satisfy some form of heightened scrutiny.

THE COURT:  The reason I ask that is that you will recall -- at least as I read it -- Justice Kagan implied in *Moody* that it may be that there are some applications that -- under the two statutes under consideration, that are valid, and then there will be some applications that are unconstitutional.

So, if we were to excise out, redact those unconstitutional provisions, then the statute could still stand; is that right?

MR. MALTZ:  If we remove all possible unconstitutional

29

provisions of -- or applications of the law, yes, Your Honor.

THE COURT: And that's why Justice Kagan wanted the case to go back for a more fully developed record so they could kind of parse out what the Court believed was constitutional applications vis-à-vis unconstitutional applications; right?

MR. MALTZ: Yes, Your Honor. That's correct.

THE COURT: That's why I asked the question at the outset, whether the record was adequately developed to make for these disparate -- sometimes disparate applications.

Can you tell me any applications of the statute that, in your view -- or I should say in the plaintiff's view -- is constitutional?

MR. MALTZ: If the law --

THE COURT: Other than like the preamble or something like that. The substantive portions of the statute.

MR. MALTZ: Yes, Your Honor. So, if there are statutes on the -- excuse me, websites on the Internet that contain purely unprotected speech, for example, then probably the government can do whatever it wants there. I would have questions about parental consent for purely unconstitutional speech. But I think it's maybe a constitutional application. A second potential unconstitutional application is content that is unprotected from minors; so pornography.

Here, however, the sort of -- the vast amount of services covered by this law aren't going to be those websites.

30

It's clearly not a target of the Ohio legislature. And I should also say, to the extent that such websites get swept into this pretty broad coverage definition, there's an obvious less restrictive alternative, and it is to do what other states have done, which is pass their own sorts of laws regulating only those online services, or apply the laws that exist in Ohio about distributing to minors.

In general, the reason the facial First Amendment analysis allows for some amount of unconstitutional applications is because we're concerned about the government broadly prohibiting a large range of speech and, then, when you get hailed into court saying, Well, there is this application over here that looks kind of constitutional; so we have to look at the broad sweep. And the broad sweep is social media services; broadly defined, to be sure, but services where people go to engage in protected speech. That's why this case is so different from *Moody*. That's why I began with the idea that we need to look at the nature of the First Amendment right at issue and then look at the statutes themselves.

So, in *Moody*, that was a case about editorial discretion. That's presented to the Court. It was largely an issue about, can certain services remove certain speech or treat certain speech differently?

What the Supreme Court said was often, yes, and especially on social media websites like those covered by the

31

law here.  Yes, they have an editorial discretion right to engage in content moderation.

But we're really not so sure about Uber.  I don't know that Uber is engaging in expressive activity.  Would it -- I don't know -- kick somebody off their service or just -- in providing ride sharing services?  Then they looked at the laws.  The justices looked at the laws.  And the Florida law, in particular, was defined in such an incredibly broad way that Uber could have been a social media company under that statute.

So what the majority said was, We've told you what this right is.  The right is compiling and curating collections of third-party speech.  What we need you to do, lower courts, is figure out what websites are actually covered by the law, and are they doing the thing that we just said was protected?

Here, we don't have what I'm going to call "the Uber problem."  The Court also talked about things like email and direct messaging services.  I don't think that email and direct messaging services are covered by this law.  But, if they were, that would also be unconstitutional, telling a minor they cannot access email without parental consent.  Email is one of the most important ways that people communicate today.  That would be a tremendous First Amendment burden.  The same thing with things like direct messaging.

So, when compared to *Moody*, this case is relatively straightforward.  This is the case of the government broadly

prohibiting a whole bunch of protected speech, and then maybe relying on a couple of plausibly constitutional applications. The fact is the unconstitutional applications do substantially outweigh any potential constitutional applications of the law.

And I do want to say one thing about *Moody*, is the Court did not determine that the laws in *Moody* were content-based. It said, Well, this law is so unconstitutional, at least the social websites --

THE COURT:  You're talking about the Texas law now, because there was a Florida law and Texas law under consideration.

MR. MALTZ:  Thank you for the clarification.  It was just about the Texas law.  Of course, we maintain that that law is both content-based and viewpoint based.

THE COURT:  The Texas law was much easier to identify as content-based because, basically, what the Texas legislature said was that these services skew to the left, and we think that we need to have more conservative viewpoints included so that it would bring it into balance.  And Justice Kagan and the Supreme Court jurisprudence, at least up to this point, is clear that that's not what our jurisprudence says.  The government is not in the business of making sure that the marketplace of ideas is balanced.  The marketplace of ideas is based on the ideas that are put out there.  At some point, they may tilt to the left, and, at some point, they may tilt to the

right.  But the government's -- the government, at least to this point, has not been part of the thought police.

MR. MALTZ:  Yes, Your Honor.

And so I do want to say one thing about how this law is, in fact, content-based and does, in fact, trigger strict scrutiny.  Throughout the briefing, Defendant has said that content-based provisions are defined by expressing a disagreement with particular viewpoints or statements.  I don't think he said viewpoints or statements.  That's my brackets.

But a content-based regulation of speech is any speech that singles out particular subject matter and regulates it differently.  And here what's regulated differently, the easiest cases are product reviews and news.  It does not need to be the case that the government disagrees with things that are not news.  It matters that news is treated differently from sports.  It's treated about the same as art and all of the rest of the things that didn't get their own expressed inclusions.

The law is content-based also in its targeting of social media websites which get singled out for their facilitation of protected speech.  We do think, in many applications -- not many applications, but many portions of the definition of what qualifies as a service likely to be accessed by children is going to require looking at content.  So, again, it might not be that the State is trying to disfavor content that is appealing to minors, but it is conferring a benefit on those

websites that don't have such content.  So those are all content-based distinctions.  They all trigger strict scrutiny.

And going back to your question about whether the record is sufficiently developed, once we're in the world of heightened First Amendment scrutiny, it's enormously difficult for Defendant to carry that burden.  And the facts here just don't do so.  At the outset, we need a compelling governmental interest for strict scrutiny.  And the State -- excuse me, Defendant has advanced a number of such interests, some of which might be compelling outside of the realm of speech.

Regardless of the nature of the governmental interest, we need to ask whether this is the least restrictive alternative.  It's not.  There are many private alternatives to this government regulation of speech.  And this is what the Supreme Court said in *Brown*, was the industry is self-regulating.  The video game stores are self-regulating. Parents have abilities to make sure their minor children don't buy these video games, video games that, candidly, have much worse content than you're going to find on a website like Dreamwidth which is regulated by this law.  So those least restrictive alternatives show this law fails strict scrutiny.

Then the law is tremendously both over and underinclusive where its overinclusivity on one hand doesn't solve the underinclusivity on the other, and vice versa.  At various points, the defendant says, Well, this is a regulation

35

of contract. Well, it's woefully inadequate as a regulation of online contract because these contracts are everywhere. They're everwhere, in part, because they need to be because of privacy regulations. Every time that banner pops up on the bottom of a webpage that says, Do you agree to our cookie policy or our privacy policy, that website is probably going to try to enforce that against you at some point, again, because they have to under many data privacy laws.

So every time a minor goes to a website, a minor is going to enter into something that looks like a contract. Whether it's enforceable down the line is another question.

THE COURT: So what if the State were to make this applicable to all platforms, all websites? And, in order for a -- someone under 16 to gain access to them, there had to be parental consent? Would that be a cure?

MR. MALTZ: No, I don't think so. It would depend greatly on how it was written. As I just said, I think that because these contracts are so unavoidable, that kind of law would run the risk of making the Internet --

THE COURT: So, in other words, if I'm a parent -- and because the marshal service advises us not -- as federal judges not to be on Facebook. But let's say I'm a parent and I have to -- I'm assuming you have to sign a contract to be on Facebook; is that right?

MR. MALTZ: You have to agree to the terms of service

upon account creation.

THE COURT:  And what if, as part of state law, the State required all providers that required a contract to include a provision which said that if you have a child 15 or younger, then you also -- in signing this contract, you are agreeing to allow your child access to this website?  Or there could be a box that says your child is prohibited from accessing -- my child is prohibited from accessing this website.  Would that make it constitutional?

MR. MALTZ:  I just want to clarify if I could.  Do you mean sort of, I go to a website and I get a pop-up that has to verify parental consent, or is this upon account creation?  Because those are plausibly different answers.

THE COURT:  Upon account creation.

MR. MALTZ:  Upon account creation, then, this is a harder facial challenge because I -- bestbuy.com, I'm sure you need to create an account.  And I think there are user reviews on Best Buy.  I think Best Buy would have a weaker First Amendment argument.  I think all of the services that are members of NetChoice would have --

THE COURT:  What about Meta?

MR. MALTZ:  Meta --

THE COURT:  What about that same example with Meta?

MR. MALTZ:  Meta has multiple services that I think --

THE COURT:  Facebook?

37

MR. MALTZ: That's unconstitutional, Your Honor, under these theories here.

THE COURT: You said that's unconstitutional?

MR. MALTZ: To require parental consent for account creation on Facebook?

THE COURT: Yes.

MR. MALTZ: Yes, Your Honor.

THE COURT: All right. Thank you, Mr. Maltz. I have no further questions.

MR. MALTZ: With that, I just ask that the Court grant Plaintiff NetChoice summary judgment, declare the Act unconstitutional, permanently enjoin defendants from enforcing the Act against NetChoice's members and grant NetChoice's other requested relief.

THE COURT: Thank you.

Mr. Tabatowski, your rejoinder.

MR. TABATOWSKI: Thank you, Your Honor.

Do you have a copy of the statute in front of you, the Act? I just want to briefly touch on the application of *Brown* that we heard my friend talk about. We heard my friend say that the threshold here in this case is unconstitutional under *Brown* because the threshold here is whether a -- is that parental consent is required to register or sign up to access a website. But the Act requires a contract no matter what. And, by example, there is occasionally content you can access on

38

Twitter, you can access without creating an account, without agreeing to the terms of service that come along with that. You just click on a link; you see the post.

The Act says nothing about that content, and it's because the threshold is not just that you have to register to sign up and access and the Act's unconstitutional under *Brown* because it requires parental consent for that.  The threshold is the contract.  I think that's the attorney general's interpretation of the statute.

The attorney general also interprets the statute to not require affirmative age verification like some of those other statutes.  I believe in the *Griffin* case was one that required affirmative age verification.

This is a self-reporting statute.  So, if the child fibs and says that they're over the age of 16, the Act is not requiring these companies to go through and verify the age of all of its users.

THE COURT:  How does that save the Act?

MR. TABATOWSKI:  I think it's an example of its tailoring -- or the burden -- the burden, whether it's disproportionate to the amount of protected speech that it might incidentally impact.

I'll also point out the comparison to *Brown* and the idea that video game companies and video game sellers can self-regulate.  It's just not an apt comparison to compare

these prolific, ubiquitous platforms with a brick and mortar video game retail establishment.  Quite frankly, NetChoice's members have absolutely no incentive to self-regulate in any manner that affects their bottom line and keeps children, you know, off of their platform.  So there's going to be, and there has been, pushback by NetChoice any time governments try to regulate.  And we haven't seen them work with legislatures to help craft legislation that would address these issues without violating, in NetChoice's eyes, the First Amendment.

So that's all I have for you, Your Honor.  If you have no other questions, we would ask that you grant summary judgment in favor of the defendant.

THE COURT:  Mr. Tabatowski, thank you very much, sir. I have no further questions.

The Court is going to take this under advisement and issue an opinion within the next two weeks.  Further briefing will not be necessary.  As I indicated to both parties, this case has been expertly briefed, and the briefing has been thorough, the arguments cogent.

And I certainly appreciate, Mr. Tabatowski and Mr. Maltz, your answering the questions put by the Court because the purpose of this, of course, is to fill in gaps in the Court's knowledge to enable me to make the most correct decision possible.  I really do appreciate the fact that both of you answered the questions forthrightly.

40

Thank you very much.  Safe travels to everyone who is traveling.

(Proceedings concluded at 5:12 p.m.)

41

C E R T I F I C A T E

I, Shawna J. Evans, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable Algenon L. Marbley, Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


                              s/Shawna J. Evans_____
                              Shawna J. Evans, RMR, CRR
                              Official Federal Court Reporter


                              June 10, 2025